1   JOSEPH H. HUNT
    Assistant Attorney General
2   Civil Division
    C. SALVATORE D'ALESSIO, JR.
3   Acting Director
    MARY HAMPTON MASON
4   (New York Bar No. 2255198)
    Senior Trial Counsel
5   PAUL QUAST
    (Colorado Bar No. 49154)
6   Trial Attorney
    Constitutional & Specialized Tort Litigation
7   Torts Branch, Civil Division
    Department of Justice
8   Box 7146 Washington, DC 20044
    Email: paul.c.quast@usdoj.gov
9   Telephone: (202) 616-4150

10  Attorneys for Defendants

11              IN THE UNITED STATES DISTRICT COURT

12                  FOR THE DISTRICT OF ARIZONA

13                                        No. CV-19-00481-TUC-JAS

14  A.I.I.L., et al.,

15              Plaintiffs,

16  v.                                    **MOTION TO DISMISS FOR LACK
                                          OF PERSONAL JURISDICTION AND
17  Jefferson Beauregard Sessions, III, et al.,   FAILURE TO STATE A CLAIM**

18              Defendants.

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

I.  FACTUAL AND PROCEDURAL BACKGROUND. ......................................... 2

    A.  The Individual Allegations and Claims................................................... 2

    B.  The Alleged Creation of "Family Separation" Policies ......................... 4

    C.  Class Allegations .................................................................................... 8

    D.  Related Litigation .................................................................................... 9

II. STATUTORY AND REGULATORY FRAMEWORK. ...................................... 11

    A.  Expedited Removal, Credible Fear, and Mandatory Detention under the
       Immigration and Nationality Act ("INA") ............................................ 11

    B.  Statutes Governing the Care and Custody of Unaccompanied Alien Children ..... 12

    C.  Criminal Prosecution for Improper Entry ............................................. 14

    D.  The "Zero-Tolerance Policy" ................................................................ 14

III. THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF PERSONAL
     JURISDICTION OVER THE DEFENDANTS ......................................................... 15

    A.  Plaintiffs Must Show That Each Defendant Has Constitutionally Sufficient
       "Contacts" with Arizona. ....................................................................... 16

    B.  Plaintiffs Have Not Established Constitutionally Sufficient Contacts Between Any
       Defendant and Arizona........................................................................... 17

IV. THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO EXTEND
     *BIVENS* TO CHALLENGE THE CONSTITUTIONALITY OF THE
     GOVERNMENT'S FEDERAL PROSECUTION OR IMMIGRATION
     ENFORCEMENT POLICY ..................................................................................... 21

    A.  Plaintiffs' Claims Involve a New Context ............................................ 22

    B.  Multiple Alternative, Existing Processes Preclude the Creation of a *Bivens*
       Remedy................................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.  Other Factors Counsel Strongly Against Implying a *Bivens* Remedy Here .......... 27

V.  DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS ............................. 39

A.  Plaintiffs Fail to Allege the Violation of a Clearly Established Due Process Right ............................................................................................................... 41

B.  Plaintiffs Fail to Allege a Violation of a Clearly Established Equal Protection Right ................................................................................................................ 48

C.  Plaintiffs Fail to Allege the Violation of a Clearly Established Fourth Amendment Right ................................................................................................................ 51

D.  Defendants Did Not Personally Violate Plaintiffs' Constitutional or Federal Statutory Rights .............................................................................................. 54

E.  The Court Should Dismiss Plaintiffs' Federal Statutory Claims For Additional Reasons ........................................................................................................... 56

VI. PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY .................................................... 59

CONCLUSION ............................................................................................................ 60

**INTRODUCTION**

To challenge federal immigration policy, Plaintiffs ask this Court to recognize novel claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against fifteen current and former high-ranking government officials in their personal capacities: former White House Chief of Staff John F. Kelly; Senior Advisor to the President Stephen Miller; former Attorney General ("AG") Jefferson B. Sessions, III; Counselor to the AG Gene Hamilton; former Secretary of Homeland Security Kirstjen Nielsen; former Acting Secretary of Homeland Security and former Commissioner of United States Customs and Border Protection ("CBP") Kevin K. McAleenan; Acting Commissioner of CBP Mark Morgan; former Chief of CBP United States Border Patrol Carla Provost; Acting Director of Immigration and Customs Enforcement ("ICE") Matthew Albence; former Director of ICE Thomas Homan; former Acting Director of ICE Ronald D. Vitiello; former Director of United States Citizenship and Immigration Services ("USCIS") L. Francis Cissna; Secretary of Health and Human Services ("HHS") Alex Azar; former HHS Counselor for Human Services Policy Margaret Wynne; and former Director of the Office of Refugee Resettlement ("ORR") Scott Lloyd ("Defendants"). Plaintiffs purport to bring this individual-capacity suit as a class action, and they seek both money damages and the establishment of a fund for mental health treatment for the alleged constitutional and statutory civil rights violations. Compl. ¶¶ 24, 268–78.

To begin with, Plaintiffs have not alleged facts establishing that this Court has personal jurisdiction over Defendants. Plaintiffs' failure to plead facts establishing any colorable basis for the threshold issue of personal jurisdiction coincides with the Complaint's other substantive deficiencies and requires dismissal.

Among these deficiencies, the Supreme Court has held that core separation-of-powers principles preclude suits for money damages based on the sort of constitutional challenges to high-level U.S. immigration policy that Plaintiffs make here. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (rejecting *Bivens* cause of action); *see also Mejia-Mejia v. U.S. Immigration & Customs Enf't*, No. CV 18-1445 (PLF), 2019 WL 4707150,

at *4 (D.D.C. Sept. 26, 2019) (declining to extend *Bivens* to a family separation challenge and noting that "this action is obviously a collateral challenge to a government-wide policy affecting thousands of individuals"). Congress has never authorized the remedy Plaintiffs demand, and a number of alternative processes exist to more effectively and efficiently address any and all alleged constitutional infirmities in U.S. policy. Moreover, numerous other factors counsel against creating a money damages remedy against individual federal officials in the novel and sensitive context presented here: a challenge to the Executive Branch's enforcement of immigration laws at the border. Immigration is an arena not only heavily regulated by Congress, but one deeply connected to our national security for which primacy rests with the political branches.

Not only does authoritative precedent compel the conclusion that no novel damages cause of action should be created here, all Defendants are entitled to qualified immunity because Plaintiffs have not alleged the violation of any clearly established constitutional or statutory right by any Defendant. Of note, Plaintiffs only allege a "conspiracy" by a single entity, the Executive Branch, which itself warrants a finding of no clearly established law. *See Abbasi*, 137 S. Ct. at 1867 ("When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal."). Finally, absolute immunity bars Plaintiffs' claims against former AG Sessions, and all of the other individuals to whom the challenged policy of zero tolerance for improper entry is attributed, for the government's decision to prosecute all (or any) persons who violate a particular federal law.

Therefore, as explained more fully below, the Complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(2) and (6).

## I.   FACTUAL AND PROCEDURAL BACKGROUND.

### A. The Individual Allegations and Claims

Plaintiffs are five Central American families who allege that the federal government separated them from each other after they came into the United States. Defendants, as they

must, assume the truth of only well-pled factual allegations and only for the limited purpose of this motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ana and her two sons, Jaime and Mateo, crossed into the United States on May 25, 2018. Compl. ¶ 60.[1] After crossing into the United States, CBP officers took them into custody. *Id.* ¶ 61. While in custody, CBP officers/agents separated Ana from Jaime and Mateo. *Id.* ¶ 62. Jamie and Mateo were later transferred to ORR custody. *Id.* ¶ 65. On June 26, 2018, a federal district court granted a preliminary injunction for a class of parents, which included Ana, ordering the United States to reunify all class members with their minor children. *Id.* ¶ 219; *Ms. L. v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019). Ana was released on bond on July 6, 2018. Compl. ¶ 71. Jamie and Mateo were released to Ana's custody on July 13, 2018. *Id.* ¶ 72.

Lorena and her daughter, Karina, presented to CBP officers at the DeConcini Port of Entry on December 22, 2017. *Id.* ¶ 77. They were taken into custody by CBP. *Id.* Over the course of three days, Lorena and Karina were transferred to a number of other facilities in New Mexico and Arizona. *Id.* ¶ 78. On the third day, ICE officers separated them. *Id.* ¶ 80. Lorena remained detained until she signed a form agreeing to her removal from the United States. *Id.* ¶ 86. After allegedly being told by an unidentified individual that the only way to see her daughter again was to consent to removal, Lorena told an immigration judge that she consented to removal. *Id.* Lorena was deported to El Salvador on March 21, 2018. *Id.* Karina remained in the United States. *Id.* ¶¶ 86–87. After sixteen months of separation, Lorena returned to the United States and was reunited with Karina. *Id.* ¶ 89. Lorena and Karina are currently seeking asylum or withholding of removal. *Id.* ¶ 91.

Jorge and his daughter, Diana, crossed into the United States on June 4, 2018. *Id.* ¶ 92. The following day a CBP officer separated them. *Id.* ¶ 94. Jorge was subsequently

---

[1] On December 18, 2019, the Court granted Plaintiffs' motion to proceed under pseudonyms. Dkt. 22.

1  held in a series of detention facilities and Diana was transferred to the care of ORR. *Id.*
2  ¶¶ 94–95. They were reunified after about eight weeks. *Id.* ¶¶ 97–98.

3      Jairo and his daughter, Beatriz, crossed into the United States on December 24,
4  2017. *Id.* ¶ 101. They were separated after being held in government custody for two days.
5  *Id.* ¶¶ 104–05. In mid-January 2018, Jairo was deported to Guatemala. *Id.* ¶ 107. Beatriz
6  was transferred to the custody of ORR. *Id.* ¶ 108. Beatriz returned to Guatemala and
7  reunited with Jairo and her mother in June of 2018. *Id.* ¶ 107.

8      Jacinto and his son, Andres, crossed into the United States on May 16, 2018. *Id.*
9  ¶ 111. They were taken into custody and separated from each other the next day. *Id.* ¶ 112.
10  Andres was transferred to ORR custody. *Id.* ¶ 115. Jacinto signed a document consenting
11  to be removed from the United States after an ICE officer allegedly convinced him that
12  signing it was necessary for his asylum case. *Id.* ¶ 118. Jacinto maintains he could not read
13  or understand the document, which was in English. *Id.* Jacinto was deported in May of
14  2018. *Id.* ¶ 119. Ten months after their initial separation, Jacinto returned to the United
15  States and Jacinto and Andres were reunited. *Id.* ¶¶ 115, 120.

16  **B. The Alleged Creation of "Family Separation" Policies**

17      Plaintiffs allege that Defendants, high-level Executive Branch officials, conspired
18  together to formulate and implement a series of policies to separate Central American
19  families along the southern border. *See id.* ¶¶ 123–256. According to Plaintiffs, certain
20  Defendants began discussing the possibility of separating families as a border enforcement
21  measure in early 2017. *Id.* ¶¶ 123, 125. In July 2017, "a number of Defendants" began
22  implementing the idea of family separations through a "covert 'pilot program'" at certain
23  "CBP facilities along the southern border." *Id.* ¶ 133. Hundreds of children were separated
24  from their parents under the pilot program and transferred from CBP to ORR custody. *Id.*
25  ¶¶ 137–38. The pilot program concluded in October 2017. *Id.* ¶ 141. Around that time,
26  Nielsen (then White House principal deputy Chief of Staff) purportedly discussed the
27  possibility of creating a general policy of family separation on the southern border with
28  Chief of Staff Kelly, AG Sessions, and Senior Advisor Miller. *Id.* In December 2017,

4

certain Defendants drafted or oversaw the drafting of a memorandum which described options for enhancing border security, including the option to separate immigrant families. *Id.* ¶¶ 142–43. Plaintiffs do not allege whether this option, if any, was chosen or acted upon.

According to Plaintiffs' allegations, in April of 2018, Director Homan, Director Cissna, and Commissioner McAleenan (then the heads of ICE, USCIS, and CBP), in consultation with Chief Provost, authored a memorandum to Secretary Nielsen "seeking further approval for expanded family separations along the southern border." *Id.* ¶¶ 149–50. Plaintiffs allege that shortly after receiving the memorandum, Nielsen met with McAleenan, Homan, and Cissna "to discuss expanding family separations." *Id.* ¶ 151. Nielsen agreed to expand the policy of separating families entering the United States to "all points across the southern border." *Id.* "[S]enior officials from the White House, DOJ, DHS, and HHS, including Defendants Sessions, Nielsen, Kelly, Miller, Hamilton, Homan, Vitiello, Cissna, McAleenan, Lloyd, and Provost," and others also discussed family separations in multiple meetings. *Id.* ¶ 152. They purportedly conducted these discussions without consulting with lower-level government employees. *Id.* ¶ 154. "They also drafted, reviewed, and edited memoranda that spelled out how to deter immigrants by separating families at the southern border." *Id.* ¶ 152. Plaintiffs identify this group as the "Conspiracy Defendants." *Id.* AG Sessions, Chief of Staff Kelly, Nielsen, Counselor Hamilton, Senior Advisor Miller, Homan, Cissna, and McAleenan directed CBP and ICE officers "to separate families at the southern border." *Id.* ¶ 153. Those officers followed the policies formulated by Defendants and separated the families. *Id.*

According to Plaintiffs, the government's "family separation" policies took multiple forms. *Id.* ¶¶ 155–59. Some separations, they allege, were performed without stated justification. *Id.* ¶ 156. However, Plaintiffs concede the United States justified other separations on the suspicion that the adult was not the actual parent of the child, and Plaintiffs do not actually dispute that federal officers acted on credible suspicions. *Id.* ¶ 157. Others occurred because the parent was criminally prosecuted for unlawful entry into the United States under 8 U.S.C. § 1325(a). *Id.* ¶ 158. Plaintiffs assert referrals for

prosecutions had increased following AG Sessions' announcement on April 6, 2018, of a "Zero Tolerance" policy of accepting for prosecution all cases DHS referred involving violations of Section 1325(a) along the southern border. *Id.* Plaintiffs allege that AG Sessions, Secretary Nielsen, Senior Advisor Miller, and Counselor Hamilton created the Zero Tolerance policy as a pretext to cause separations. *Id.* ¶ 160. Plaintiffs say that when a parent who had violated Section 1325(a) was referred by DHS to DOJ for criminal prosecution, their child would be "moved to another CBP facility or transferred to ORR custody," as per standard practice while criminal charges are pending. *Id.* ¶ 161. According to a Staff Report by House of Representatives, at least 2,231 children were separated from their parents along the southern border from May 7, 2018, through June 20, 2018. *Id.* ¶ 165.

While in government custody, Plaintiffs contend that parents and children were deprived the opportunity to communicate, subjected to harassment by officers, and forced to travel long distances apart. *Id.* ¶¶ 168–73. Some parents, Plaintiffs maintain, were tricked by unidentified immigration officers into waiving their asylum rights or consenting to their own deportation, and others did not understand the forms that they were signing or only signed in order to be reunited with their children. *Id.* ¶¶ 178–82. These actions sometimes extended the separations, although the court in the *Ms. L* litigation stopped such deportations and ordered that eleven parents deported without their children be returned to the United States. *Id.* ¶¶ 183–84.

As pled, Defendants at DHS and HHS failed to take proper steps to prepare for the influx of children into ORR care or take adequate measures once the children were placed with ORR. *Id.* ¶¶ 185–210. Children separated from their parents were classified as unaccompanied alien children, without processes in place to track family relationships. *Id.* ¶ 227. A staff report by the House of Representatives concluded that the "stripping of data connecting parents to their children" caused delays to reunification. *Id.* ¶ 231.

Plaintiffs allege that the United States continues to separate families up to the present day, despite the *Ms. L* decision limiting the circumstances when separations may occur. *Id.* ¶¶ 225, 234. The ongoing separations are occurring as a result of a parent's

criminal offenses, doubts about familial relationships, and parent's health issues. *Id.* ¶¶ 235–37. Congress is aware that separations are ongoing. *Id.* ¶ 238.

Defendants, who were among "the President's most senior advisors," purportedly implemented these policies in order to further an alleged "animus" on the part of President Trump "toward Central Americans." *Id.* ¶¶ 240–49. Defendants "serve or served at the pleasure of the President, and in their roles, they have implemented the Administration's discriminatory agenda, including through initiatives and/or practices that disfavor non-white, non-European individuals generally and target Central Americans specifically." *Id.* ¶ 248. Plaintiffs allege that they suffered harm to their mental health as a result of the separations. *Id.* ¶¶ 257–67.

Based on these allegations, Plaintiffs assert eight causes of action in this lawsuit: (1) Count I – Substantive Due Process (Forcible Separation of Family Units) against all Defendants, *id.* ¶¶ 280–90; (2) Count II – Substantive Due Process (Failure to Provide Adequate Health Care) against Defendants Nielsen, Kelly, Homan, Vitiello, Albence, Cissna, McAleenan, Morgan, Azar, Lloyd, Provost, John/Jane Doe DHS Defendants, and John/Jane Doe HHS/ORR Defendants, *id.* ¶¶ 291–300; (3) Count III – Substantive Due Process (Punitive Treatment) against all Defendants, *id.* ¶¶ 301–09; (4) Count IV – Procedural Due Process, against Defendants Sessions, Nielsen, Kelly, Homan, Vitiello, Albence, Cissna, McAleenan, Morgan, Hamilton, Provost, and John/Jane Doe DHS Defendants, *id.* ¶¶ 310–17; (5) Count V – Equal Protection against all Defendants, *id.* ¶¶ 318–26; (6) Count VI – Fourth Amendment (Protection from Unlawful and Unreasonable Seizures) against Defendants Sessions, Nielsen, Kelly, Homan, Vitiello, Albence, Cissna, McAleenan, Morgan, Hamilton, Provost, and John/Jane Doe DHS Defendants, *id.* ¶¶ 327–36; (7) Count VII - Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985(3) against the "Conspiracy Defendants,"[2] *id.* ¶¶ 337–42; (8)

---

[2] The Complaint defines the "Conspiracy Defendants" as Defendants Sessions, Nielsen, Kelly, Miller, Hamilton, Homan, Vitiello, Cissna, McAleenan, Lloyd, and Provost, as well

Count VIII - Refusal or Neglect to Prevent or Aid in Preventing Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1986 against all Defendants, *id.* ¶¶ 343–47.

### C. Class Allegations

At the motion to dismiss stage, the Court considers only allegations pertaining to named plaintiffs because a putative class action cannot proceed unless the named plaintiff can state a claim for relief. *See Boyle v. Madigan*, 492 F.2d 1180, 1182 (9th Cir. 1974) ("Until [the named plaintiffs] can show themselves aggrieved in the sense that they are entitled to the relief sought, there is no occasion for the court to wrestle with the problems presented in considering whether the action may be maintained on behalf of the class."); *Kamath v. Robert Bosch LLC*, No. 2:13-CV-08540-CAS, 2014 WL 2916570, at \*5 n.4 (C.D. Cal. June 26, 2014) ("[A]t the motion to dismiss stage, the Court only considers allegations pertaining to the named plaintiff because a putative class action cannot proceed unless the named plaintiff can state a claim for relief as to himself.").

Plaintiffs seek to frame this case as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(3). Compl. ¶ 268. Plaintiffs purport to represent two classes. First, "a nationwide class consisting of all *minor children* who since 2017 have arrived at or between ports of entry along the United States' southern border, and who have been separated from their parents by DHS or its sub-agencies (including CBP, ICE, or USCIS) without a demonstration in a hearing that the parent was unfit or presented a danger to that child" (the "Child Class") (emphasis added). *Id.* ¶ 269. And second, "a nationwide class consisting of all *parents* who since 2017 have arrived at or between ports of entry along the United States' southern border, and who have a minor child who was separated from them by DHS or its sub-agencies (including CBP, ICE, or USCIS) without a

---

as John/Jane Doe DHS Defendants at CBP and ICE and John/Jane Doe HHS/ORR Defendants. Compl. ¶ 152.

demonstration in a hearing that the parent is unfit or presents a danger to the child" (the "Parent Class"). *Id.* (emphasis added).[3]

### D. Related Litigation

The events underlying this case have spawned numerous lawsuits against both the federal government and many of these individual defendants. For example:

Some Plaintiffs and members of the potential Parent Class are class members in the *Ms. L* litigation, discussed above. On June 26, 2018, the *Ms. L.* court certified a nationwide class of parents separated from their children and granted a class-wide preliminary injunction based on the plaintiffs' claim that the federal government's separation of children from their parents violated the Fifth Amendment. *Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83; *see also M.M.M. ex rel. his minor child, J.M.A. v. Barr*, No. 18-cv-1832 (S.D. Cal.). The following claims were brought on behalf of the class in *Ms. L*: (1) separation of the class members from their children violates procedural and substantive due process under the Fifth Amendment; (2) practices regarding separation of class members from their children are arbitrary and capricious, thus violating the Administrative

---

[3] Although class certification is not presently before the Court and would be premature at this time, *see Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) (noting that "in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or motion to dismiss prior to ruling on class certification"), Defendants note that they would have additional defenses than those addressed in this motion against claims brought by certain class members. For example, claims that accrued prior to October 3, 2017, *see, e.g.*, Compl. ¶¶ 133–41 (alleging the existence of a pilot program that ran from July 2017 through October 2017), are barred by the two year statute of limitations applicable to *Bivens* suits in Arizona. *See Rhodes v. Chavez*, 644 F. App'x 714, 715 (9th Cir. 2016). Also, any Class Members who have previously sued Defendants for the alleged creation of family separation policies where that "prior litigation was terminated by a final judgment on the merits" are precluded from pursuing those claims again. *See Cent. Delta Water Agency v. United States*, 306 F.3d 938, 952 (9th Cir. 2002) (discussing the elements of claim preclusion). The plaintiffs in *Mejia-Mejia*, No. 18-1445, (D.D.C.), and *Lopez-Sales v. Sessions*, No. 18-1700 (D.D.C.), for example, are both precluded from pursuing those claims again. Though these defenses do not control the named Plaintiffs' claims, and other defenses may be relevant to purported class members, Defendants specifically preserve the right to assert any such defenses.

Procedure Act ("APA"); and (3) separation of families violates the federal laws that provide for asylum and other protections from removal and class members have a private right of action to challenge violations of their right to apply for asylum under 8 U.S.C. § 1158(a). *See Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 1, 32, 85. The *Ms. L* court recently held that the government's application of the factors identified in the preliminary injunction generally were consistent with the court's orders, including the government's use of criminal history as a justification for separations. *Compare Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 509 at 9–10 (Order on Motion to Enforce Preliminary Injunction) *with* Compl. ¶¶ 234–35 (discussing post-injunction separations and the use of old criminal offenses as a justification for separations).

Members of the potential Parent Class are also class members in *Ms. J.P. v. William P Barr*, No. 18-6081 (C.D. Cal.) ("*Ms. J.P.*"), where a court granted a preliminary injunction requiring the federal government to screen, and, where appropriate, provide mental health treatment to those members of the class in custody, as well as those released from custody. *See Ms. J.P.*, No. 18-6081 (C.D. Cal.), Dkt. 251 at *45–46.

Some Plaintiffs and members of the potential Child Class are members of a putative class action against eleven of these same individual Defendants in the District Court for the District of Columbia. *K.O. v. Sessions*, No. 20-309 (D.D.C.) ("*K.O.*"). Plaintiffs in *K.O.* assert claims for violations of the Fourth Amendment, Fifth Amendment, 42 U.S.C. § 1985(3), and 42 U.S.C. § 1986. *See K.O.*, No. 20-309 (D.D.C.), Dkt. 45 (Amended Complaint). *K.O.* was recently transferred to the District Court for the District of Columbia after a court in Massachusetts granted defendants' motion to dismiss and held that it lacked personal jurisdiction over the defendants and that venue was improper. *K.O. v. Sessions*, No. 18-40149-TSH, 2020 WL 533461, at *7–8 (D. Mass. Feb. 3, 2020).

Some members of the potential classes also brought individual claims against some of these same Defendants, and have already had claims arising from an alleged family separation policy decided on their merits. *See, e.g.*, *Mejia-Mejia*, 2019 WL 4707150, at *6 (dismissing individual-capacity claims against AG Sessions and Director Lloyd with

1  prejudice); *see also Lopez-Sales v. Sessions*, No. 18-1700 (D.D.C.), Dkt. 30 (stipulating to
2  dismissal with prejudice of individual-capacity claims against AG Sessions and Director
3  Lloyd). Another case in Arizona involving the separation of families at the border, *C.M. v.*
4  *United States*, No. 19-05217 (D. Ariz.), seeks damages against the United States under the
5  Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–80.

6  **II.  STATUTORY AND REGULATORY FRAMEWORK.**

7        The following specific statutory and regulatory schemes apply in the immigration
8  context pled in the Complaint and inform the analysis of the instant motion.

9  **A. Expedited Removal, Credible Fear, and Mandatory Detention under the**
10 **Immigration and Nationality Act ("INA")**

11       Any individuals who attempt to enter the United States without inspection and are
12 apprehended within two weeks and one hundred miles of a port of entry, *e.g.*, Compl ¶¶ 60,
13 92, may be subject to a process commonly referred to as "expedited removal," which
14 provides an accelerated removal process for certain aliens. *See* 8 U.S.C. § 1225(b).[4] Under
15 expedited removal processes, aliens are ordered removed from the United States without
16 further hearing or review unless the alien expresses an intention to apply for asylum or a
17 fear of persecution. 8 U.S.C. § 1225(b)(1)(A). Aliens who express an intention to apply for
18 asylum or a fear of persecution are referred for a credible fear interview with an asylum
19 officer. *Id.* Congress has explicitly mandated the detention of individuals who are in the
20 expedited removal process and whose claim of credible fear of persecution is still being

21

22 ─────────────────────

23 [4] Generally, when aliens are apprehended by CBP they may be processed for expedited
24 removal, removal proceedings pursuant to 8 U.S.C. § 1229a, or reinstatement of removal
pursuant to 8 U.S.C. § 1231(a)(5). In Section 1229a removal proceedings, aliens will have
25 an opportunity to contest their removability from the United States and apply for various
forms of relief, including asylum, before an immigration judge. *Id.* These aliens are
26 provided a written notice, known as a notice to appear, specifying among other things the
nature of the proceedings against the alien, the legal authority under which the proceedings
27 are conducted, and the charges against the alien with the statutory provisions alleged to
have been violated. *Id.* § 1229(a). Unaccompanied alien children generally are subject to
28 Section 1229a removal proceedings. *See* 8 U.S.C. § 1232(a)(5)(D)(i).

11

considered or has been rejected. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause *shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.") (emphasis added). Individuals processed for expedited removal and subject to mandatory detention are eligible for release from immigration detention only if they are granted parole in limited circumstances. *See, e.g.*, *id.* § 1182(d)(5)(A); 8 C.F.R. §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii). The INA also requires that any individuals who express an intent to apply for asylum at a port of entry, *e.g.*, Compl. ¶ 77, be detained during their removal proceedings, 8 U.S.C. § 1225(b)(2)(A), unless the Secretary of Homeland Security exercises his discretion to release them on parole, 8 U.S.C. § 1182(d)(5). *See* 8 C.F.R. § 235.3(c).

**B.  Statutes Governing the Care and Custody of Unaccompanied Alien Children**

   *a.  The Homeland Security Act of 2002 ("HSA")*

   The HSA, enacted in 2002, created DHS and transferred most immigration functions formerly performed by the Immigration and Naturalization Service to the newly-formed DHS and its components, including USCIS, CBP, and ICE. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; *see also* DHS Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (also set forth as a note to 6 U.S.C. § 542). Congress separately transferred to ORR the responsibility for caring for unaccompanied alien children ("UAC") "who are in Federal custody by reason of their immigration status." HSA, § 462(a)(b)(1)(A), codified as amended at 6 U.S.C. § 279(b)(1)(A) (2002). That is, Congress transferred to ORR the responsibility of caring for any UAC who ORR receives from DHS.

   The HSA transferred to ORR the responsibility, in consultation with DHS, for making UAC placement decisions. 6 U.S.C. § 279(b)(1)(C), (D). The HSA defines an "unaccompanied alien child" as a child who:
>    (A) has no lawful immigration status in the United States;
>    (B) has not attained 18 years of age; and
>    (C) with respect to whom–

(i) there is no parent or legal guardian in the United States; or
(ii) no parent or legal guardian in the United States is available to provide care and physical custody.

*Id.* § 279(g)(2). Congress prohibited ORR from releasing UACs on their own recognizance. *See id.* § 279(b)(2).

> ### b. Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")

In 2008, the TVPRA codified protections related to the custody of UACs. The TVPRA requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). Congress also required that "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." *Id.* § 1232(b)(3). Thus, the combination of the HSA and the TVPRA requires that all UACs in DHS custody be transferred to HHS, and that HHS provides for UACs in its care.

The TVPRA requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). It delegates to the Secretary of HHS the authority to make such placement decisions, noting that the Secretary "may consider danger to self, danger to the community, and risk of flight." *Id.* Staff from HHS, and particularly ORR, make an initial care provider placement decision for each UAC. *See* ORR Policy Guide: Children Entering the United States Unaccompanied § 1.3.2, http://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied (last visited Feb. 13, 2020).[5]

_____

[5] Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). At several points in this brief, Defendants cite material from government websites, including statistical information, whose accuracy cannot be reasonably questioned, and is

The TVPRA makes clear that HHS is responsible for all placement decisions for UACs in its custody and provides guidelines for their placement with a custodian, including the requirement for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA provides that a child may be placed with a proposed custodian (either a person or an entity) if HHS

> . . . makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

*Id.* § 1232(c)(3)(A). Neither the TVPRA nor the HSA provides HHS with authority to apprehend or detain aliens, or to enforce the INA through prosecutions for improper entry or otherwise. HHS is purely a custodian and provider of social services for UACs.

## C. Criminal Prosecution for Improper Entry

Individuals in DHS custody may be subject to prosecution for criminal violations of immigration or other laws. *See, e.g.*, 8 U.S.C. §§ 1324, 1325, 1326. For example, the United States Code makes it a federal crime for aliens to: (1) enter the United States "at any time or place other than as designated by immigration officers," (2) elude "examination or inspection by immigration officers," or (3) obtain entry to the United States "by a willfully false or misleading representation or the willful concealment of a material fact." 8 U.S.C. § 1325(a). DHS has discretion to refer people to the U.S. Department of Justice ("DOJ") for prosecution based on the particularized facts and circumstances.

## D. The "Zero-Tolerance Policy"

On April 6, 2018, then-AG Sessions issued a "Memorandum for Federal Prosecutors along the Southwest Border" that provided guidance on how to exercise prosecutorial discretion with respect to illegal entry enforcement consistent with DOJ priorities and

proper for judicial notice and consideration on a motion to dismiss. *See, e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (taking judicial notice of relevant facts provided on government website which "neither party disputes").

14

Congress's legislative choices. *See* Apr. 6, 2018, Zero-Tolerance Memorandum, *available at* https://www.justice.gov/opa/press-release/file/1049751/download (last visited Feb. 13, 2020); U.S. DOJ, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), 2018 WL 1666622; Compl. ¶ 158. The memorandum directed southwest border prosecutors immediately to adopt a policy of accepting, to the extent practicable, all offenses referred for prosecution under 8 U.S.C. § 1325(a) by DHS.

On June 20, 2018, the President issued an executive order stating that it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." Executive Order § 1, *available at* https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/ (last visited Feb. 13, 2020); Compl. ¶¶ 217–18.

**III.   THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION OVER THE DEFENDANTS**

Plaintiffs' lawsuit must be dismissed under Federal Rule of Civil Procedure 12(b)(2) because the Court does not have personal jurisdiction over any of the fifteen Defendants. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783 (2017) (pre-requisites for personal jurisdiction "must be met as to each defendant"). As the Supreme Court has explained, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014); *id.* (usual rules apply to establish in personam jurisdiction over federal employees sued individually). "This is because . . . in most cases," a district court may exercise personal jurisdiction upon proper service of a defendant "'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Id.* (quoting Fed. R. Civ. P. 4(k)(1)(A)); *see Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) ("Where . . . there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits.") (citing Fed. R. Civ. P. 4(k)(1)(A)). Here, none of the fifteen Defendants – each sued in a personal, not

15

official capacity – "is subject to the jurisdiction" of courts in Arizona, and Plaintiffs cannot meet their burden of showing otherwise. *See Schwarzenegger*, 374 F.3d at 800 ("Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate."); *id.* (plaintiff's "pleadings and affidavits [must] make a prima facie showing of personal jurisdiction").

### A. Plaintiffs Must Show That Each Defendant Has Constitutionally Sufficient "Contacts" with Arizona.

Arizona authorizes its courts to assert "personal jurisdiction over a person, whether found within or outside Arizona, to the maximum extent permitted by . . . the United States Constitution." Ariz. R. Civ. P. 4.2(a). Arizona's long-arm statute is thus "coextensive with federal due process requirements," and so "the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 800–01. In other words, Arizona courts may exercise personal jurisdiction over a nonresident defendant[6] only if "that defendant ha[s] at least 'minimum contacts' with the . . . forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Depending on the nature of a defendant's forum contacts (if any), personal jurisdiction may take the form of general or specific jurisdiction. *Schwarzenegger*, 374 F.3d at 801–02. "For general jurisdiction to exist over a nonresident defendant . . . , the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Id.* at 801 (internal quotation marks and citation omitted); *see Munns v. Clinton*, 822 F. Supp. 2d 1048, 1077 (E.D. Cal. 2011) (same for individual-capacity *Bivens* defendants). "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger*,

---

[6] Plaintiffs do not allege that any Defendant resides in Arizona. *See generally* Compl. Nor could they, as all of the Defendants presently live elsewhere.

374 F.3d at 801; *see Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 ("[O]nly a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in that State.") (internal quotation marks and citation omitted). For specific jurisdiction, a plaintiff bears the burden of showing first, that "[t]he non-resident defendant . . . purposefully direct[ed] his activities or consummate[d] some transaction with the forum or resident thereof; or perform[ed] some act by which he purposefully avail[ed] himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Schwarzenegger*, 374 F.3d at 802. Second, plaintiff must show that his or her "claim . . . arises out of or relates to the defendant's forum-related activities." *Id*. If – and only if – plaintiff demonstrates both purposeful availment/direction and relatedness, "the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (internal quotation marks and citations omitted).

**B. Plaintiffs Have Not Established Constitutionally Sufficient Contacts Between Any Defendant and Arizona.**

Here, the Complaint includes no references at all to personal jurisdiction. *See generally* Compl. While Plaintiffs do address and purport to establish subject matter jurisdiction and venue, *see id.* ¶¶ 44–50, they make no allegations about the Court's personal jurisdiction over any Defendant. *See generally id*. The Complaint never alleges, in other words, that general jurisdiction applies, or that any Defendant resides in or has substantial "continuous and systematic" contacts with Arizona. *Id.*; *see Schwarzenegger*, 374 F.3d at 801.[7]

Likewise, the Complaint says nothing about specific jurisdiction, or about how any Defendant – let alone each of them – interacted with Arizona such that specific jurisdiction

---

[7] Indeed, while Plaintiffs bear the burden on this issue, defense counsel has conducted diligent research and is aware of no information that any Defendant lives in Arizona; owns property there; or otherwise engages with the state in a manner allowing general jurisdiction.

applies. *See generally* Compl. While the Complaint references Arizona numerous times, *see id.* ¶¶ 1, 8, 19–22, 45–50, 60, 66, 68, 77–78, 82-83, 87, 95, 101, 106, 108, 140, 142, 153, 158, 165, 201, 254, most of these allegations make no mention of any Defendant and instead discuss where the separations allegedly occurred, *see id.* ¶¶ 1, 19–20, 22, 48, 165 (in Arizona and elsewhere); where Plaintiffs and other purported class members allegedly were detained, *see id.* ¶¶ 19–22, 45, 48–50, 61, 66, 68, 77–78, 82–83, 87, 95, 106, 108 (in Arizona and elsewhere); and where Plaintiffs and other purported class members allegedly crossed into the United States, *see id.* ¶¶ 46–47, 60, 101 (in Arizona).[8] But Plaintiffs do not claim that any *Defendant* separated anyone from a family member anywhere; detained anyone anywhere; or had anything to do with Plaintiffs' choice of which State to attempt entry. *See generally id.*[9] These Arizona allegations, in other words, describe *Plaintiffs'* alleged experiences or those of putative class members, not the actions of Defendants. *Id.* ¶¶ 1, 19–22, 45–50, 60, 66, 68, 77–78, 82–83, 87, 95, 101, 106, 108, 140, 165, 254. Plaintiffs' connections to Arizona, however, have no bearing on the jurisdictional analysis. *Walden*, 571 U.S. at 283–91. As the Supreme Court said in *Walden*, "[w]e have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* at 284 (reversing court of appeals and finding no personal jurisdiction over federal defendant in *Bivens* suit). Rather, due process requires that a defendant's "connection with the forum

---

[8] Plaintiffs reference some alleged action by one or more Defendants in paragraphs 8, 142, 153, 158, and 201, but these allegations describe high-level policymaking activity and efforts to implement national policy. *See* Compl. ¶¶ 8, 142, 153, 158, 201. As explained below, such allegations cannot establish specific personal jurisdiction here. The Complaint's remaining two references to Arizona – in paragraphs 140 and 254 – have nothing to do with personal jurisdiction and instead identify a particular organization's headquarters location and an unrelated litigation matter. *Id.* ¶¶ 140, 254.

[9] To the contrary, the Complaint repeatedly states that specific, unnamed "officers" and "guards" separated the plaintiff parents and children and placed them in detention facilities. *See, e.g.*, Compl. ¶¶ 60–63, 66–67, 71, 78, 80–82, 94, 104–05, 112–13.

18

State . . . arise out of contacts that the 'defendant *himself*' creates with [that] State." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis added).

Turning to the Complaint's allegations about the Defendants' alleged activities, Plaintiffs again identify no conduct triggering specific jurisdiction. *See generally* Compl. Plaintiffs' references to the Defendants instead focus on their high-level role in formulating and implementing national immigration policy and practices from other locations, such as Washington, D.C.[10] But courts around the country have long held that "allegations limited to national policy implementation and oversight are insufficient to support a finding of personal jurisdiction" against individual-capacity defendants. *Munns*, 822 F. Supp. 2d at 1078; *see Oksner v. Blakey*, No. C 07-2273 SBA, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007), *aff'd*, 347 Fed. App'x 290 (9th Cir. 2009) ("the mere fact that federal officials enforce federal laws and policies on a nationwide basis is not sufficient in and of itself to confer personal jurisdiction" in a *Bivens* suit against such officials).[11] A contrary result

---

[10] *See* Compl. ¶¶ 8–9, 11–12, 17, 25–37, 39–41, 43, 55, 123, 125–26, 128–30, 132–36, 141–60, 162–65, 167–70, 172–73, 175–77, 185, 187, 192–93, 195–97, 199, 201–02, 204–06, 208, 210–11, 215–17, 225, 227, 231–33, 239–42, 248–52, 254–56, 267, 272–73, 280–347.

[11] *See also Yellowbear v. Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015) ("[N]umerous courts, including our own, have held that broad supervisory authority is insufficient" to establish personal jurisdiction over "a government official . . . in an individual capacity suit."); *Perez v. United States*, No. 13CV1417-WQH-BGS, 2014 WL 4385473, at *7–9 (S.D. Cal. Sept. 3, 2014) (allegation that high-ranking officials supervised/implemented federal border-security policy insufficient to establish personal jurisdiction in *Bivens* suit); *Moss v. U.S. Secret Service*, No. 06-3045, 2007 WL 2915608, at *18–19 (D. Or. Oct. 7, 2007), *rev'd in part, dismissed in part on other grounds*, 572 F.3d 962 (9th Cir. 2009) (no specific jurisdiction over federal official in *Bivens* suit based on adoption/implementation of national policy); *Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1301–02 (N.D. Ga. 2007), *aff'd sub nom. Mahmud v. U.S. Dep't of Homeland Sec.*, 262 F. App'x 935 (11th Cir. 2008) (no specific jurisdiction in *Bivens* suit based on "'mere fact that'" supervisory TSA official "'enforce[s] federal laws and policies . . . on a nationwide basis'") (quoting *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993)); *Rank v. Hamm*, No. 204-0997, 2007 WL 894565, at *11–13 (S.D.W. Va. Mar. 21, 2007) ("[A]doption of a

"would essentially subject the individual Defendants to personal liability in every state in the Union regardless of how tenuous their actual contacts with a particular forum might be." *Munns*, 822 F. Supp. 2d at 1078. Such an approach would ignore the "purposeful availment"/"purposeful direction" requirement noted above and its focus on a defendant's intentionality in interacting with the forum state. *See Perez*, 2014 WL 4385473, at *8 (purposeful direction requires "an intentional act, . . . expressly aimed at the forum state, . . . causing harm that the defendant knows is likely to be suffered in the forum state"). As the *Perez* court put it, "general allegations of the[ ] [defendant] federal officers' supervisory responsibilities and alleged implementation" of border-security policy do not meet "[p]laintiffs' prima facie burden to satisfy the purposeful direction test" and thus cannot establish specific personal jurisdiction. 2014 WL 4385473, at *8.[12] Because the Complaint

---

nationwide policy does not of itself result in [individual-capacity federal official] purposefully directing personal activities toward West Virginia."); *McCabe v. Basham*, 450 F. Supp. 2d 916, 924–27 (N.D. Iowa 2006) (no specific jurisdiction over former Secretary of Homeland Security or Director of Secret Service; "[a]t bottom, Plaintiffs are premising jurisdiction over . . . senior-level federal government officials[ ] upon . . . [their] supervisory status . . . [and] the acts of low-level federal, state and/or local government employees"); *Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000), *aff'd sub nom. Nwanze v. Morris*, 6 F. App'x 98 (2d Cir. 2001) ("[m]ere supervision over the Bureau of Prisons, the reach of which extends into every state," does not support personal jurisdiction over individual-capacity defendant); *Claasen v. Brown*, No. Civ. A. 94-1018-GK, 1996 WL 79490, at *2 (D.D.C. Feb. 16, 1996) ("In order to exercise personal jurisdiction over a federal official in an individual capacity, a court must find minimum contacts other than those arising from federal employment or supervisory roles."); *Wag-Aero, Inc.*, 837 F. Supp. at 1486 (no personal jurisdiction unless "a federal court . . . find[s] that a federal defendant sued in his or her personal capacity has minimum contacts with the forum"; if an agency head "could be sued personally in any district within his or her official authority merely for supervising acts of subordinates . . . the minimum contacts requirement would be rendered meaningless"); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. La. 1991) (no personal jurisdiction over federal officials "who enforce the federal laws and policies on a nationwide basis," including "Zero Tolerance" federal drug enforcement policy, because "governmental officials must have the requisite minimum contacts with the forum state").

[12] *Accord Moss*, 2007 WL 2915608, at *18–19 (no purposeful interaction with Oregon

does not show that any Defendant has constitutionally sufficient "minimum contacts" with Arizona, the Court lacks personal jurisdiction over all of the Defendants.[13] Fed. R. Civ. P. 12(b)(2); *see also K.O.*, 2020 WL 533461, at *3–6 (dismissing for lack of personal jurisdiction and improper venue purported class action on behalf of minor children allegedly separated at the southwestern border, finding "Plaintiffs' showing on the first two prongs [of the specific jurisdiction test] is not merely weak, it is non-existent").

## IV.   THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO EXTEND *BIVENS* TO CHALLENGE THE CONSTITUTIONALITY OF THE GOVERNMENT'S FEDERAL PROSECUTION OR IMMIGRATION ENFORCEMENT POLICY

Plaintiffs attempt to bring a *Bivens* action against Defendants, seeking damages for allegedly unconstitutional policy decisions of the United States in the immigration arena. But Supreme Court precedent squarely establishes that Plaintiffs have no such claim. *Abbasi*, 137 S. Ct. at 1861. Plaintiffs' claims "bear little resemblance to the three *Bivens* claims the [Supreme] Court has approved in the past: a claim against [federal] agents for handcuffing a man in his own home without a warrant [*see Bivens*, 403 U.S. at 388]; a claim against a Congressman for firing his female secretary [*Davis v. Passman*, 442 U.S. 228 (1979)]; and a claim against prison officials for failure to treat an inmate's asthma [*see Carlson v. Green*, 446 U.S. 14 (1980)]." *Abbasi*, 137 S. Ct. at 1860. And the Supreme Court has been exceedingly skeptical of any invitation to invent new *Bivens* claims, as Plaintiffs invite this Court to do. Compl. ¶¶ 25, 44; *Abbasi*, 137 S. Ct. at 1860. Simply put,

---

where plaintiffs allege that agency head had "nation-wide policy of engaging in viewpoint discrimination"); *Rank*, 2007 WL 894565, at *11–13 (no purposeful direction of "personal activities toward West Virginia" based on federal official's adoption of nationwide policy); *McCabe*, 450 F. Supp. 2d at 924 (allegations that high-level federal officials created or followed an allegedly impermissible policy or practice "do[] not indicate any act by which [the officials], in their individual capacities, purposefully availed themselves of the privilege of conducting activities within [the forum state]" or the benefits of its laws).

[13] Because Plaintiffs have not met their burden of satisfying either the purposeful availment/direction or relatedness prongs of specific jurisdiction analysis, the Court need not reach the "reasonableness" inquiry. *Schwarzenegger*, 374 F.3d at 801–02.

21

"a *Bivens* action is not 'a proper vehicle for altering an entity's policy,'" particularly in the immigration context with its clear separation of powers implications, and this Court should leave to Congress the decision whether to authorize a damages action, or some other form of relief, to do just that. *Abbasi*, 137 S. Ct. at 1860 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

### A.  Plaintiffs' Claims Involve a New Context

Under the Supreme Court's analysis for determining whether to recognize a *Bivens* remedy, this Court must first assess whether Plaintiffs' allegations present "a new *Bivens* context." *Id.* at 1859. As the Court made clear in *Ziglar v. Abbasi*: "[i]f the case is different in a meaningful way from previous *Bivens* cases *decided by [the Supreme] Court*, then the context is new" and a special factors analysis must be performed. *Id.* (emphasis added).[14] *Abbasi* listed non-exclusive examples of such differences:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. Such "meaningful" differences may be "small, at least in practical terms." *Id.* at 1865. But "even a modest extension is still an extension." *Id.* at 1864.

Here, the differences are in no way small or modest, and all of the potential factors identified in *Abbasi* materially distinguish this case from *Bivens*, *Davis*, and *Carlson*. The "new-context inquiry is easily satisfied." *Id.* at 1865. First, unlike the "line-level" officers at issue in *Bivens*, Defendants are (or were) some of the nation's highest officials, responsible for enforcing and implementing federal legislation through high-level

---

[14] *Abbasi* strictly limits the "new context" inquiry to a comparison with the three cases in which the Supreme Court itself affirmatively approved of a *Bivens*-type remedy – *Bivens*, *Davis*, and *Carlson*. *Id.* at 1859. The analysis does not consider decisions of courts of appeals or district courts recognizing a *Bivens* remedy.

Executive Branch policy. *See* Compl. ¶¶ 26–37, 39–41. Second, Plaintiffs' constitutional claims arise in the context of immigration and related criminal enforcement activities, areas in which the Supreme Court has never affirmatively recognized an implied remedy and which are fraught with separation of powers concerns. Third, these claims challenge the United States' broad authority to enforce the nation's borders through the implementation of policies that apply to all potential entrants to the United States, not the type of specific officer action at issue in *Bivens*. *See, e.g.*, Compl. ¶¶ 26–37, 39–41, 288, 298, 307, 315, 324, 333. Fourth, the judicial guidance on the constitutional standards governing the high-level official actions at issue here is far less particular than the specific, binding guidance available to the officers involved in *Bivens*, *Davis*, and *Carlson*. *Cf. Abbasi*, 137 S. Ct. at 1864 ("[T]he judicial guidance available to this warden, with respect to his supervisory duties, was less developed."). Fifth, and relatedly, the statutory and legal mandates pursuant to which Defendants – who worked for a variety of agencies within the Executive Branch – acted are meaningfully different from those at issue in *Bivens*, *Davis*, or *Carlson*. *See, e.g.*, *Wilkie v. Robbins*, 551 U.S. 537 (2007) (declining to recognize proposed Fourth and Fifth Amendment claims); *accord De La Paz v. Coy*, 786 F.3d 367, 375 (5th Cir. 2015). Sixth, the recognition of a *Bivens* claim in this context would risk significant and disruptive intrusion by the Judiciary into the functioning of both Congress, which has been active in establishing both statutory mandates regarding UACs and criminal prosecution for unlawful entry, and the Executive Branch. Finally, as discussed below, this case involves multiple "special factors" that the Supreme Court has not previously addressed in *Bivens*, *Davis*, or *Carlson* that alone warrant a finding of new context. *Abbasi*, 137 S. Ct. at 1860.

In short, the contextual attributes of this case are not only significant, they span *all* of the differences described as meaningful in *Abbasi*; certainly they are "meaningful enough" to preclude extension of *Bivens* to this context. *Abbasi*, 137 S. Ct. at 1859. Thus, in considering Plaintiffs' claim, this Court *must* address the "antecedent" issue of whether to imply a remedy at all. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). That, in turn, involves asking: (1) whether "alternative, existing process[es]" protect the right at issue,

and (2) whether any other "special factors counsel[] hesitation" in implying a damages remedy. *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie*, 551 U.S. at 550). As shown below, the answer to both questions is yes – Plaintiffs have alternative avenues to obtain relief *and* there are numerous "special factors" counseling against recognizing the *Bivens* remedy Plaintiffs request.

**B. Multiple Alternative, Existing Processes Preclude the Creation of a *Bivens* Remedy**

Plaintiffs have (or had) "available to them 'other alternative forms of judicial relief,'" and "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi.* 137 S. Ct. at 1863 (quoting *Minneci v. Pollard*, 565 U.S. 118, 124 (2012)). "Under this rationale, the Supreme Court has declined to extend *Bivens* where Congress has provided at least a partial remedy via statute . . . as well as where other causes of action provide redress." *Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018) (internal citations omitted). The fact that existing avenues of redress do not provide for "monetary compensation" does not mean that the Court should create a *Bivens*-type remedy. *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012); *see id.* ("Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the Immigration and Nationality Act, Congress never created such a remedy."). Indeed, where a plaintiff has an alternative process, the Court has "*consistently* rejected invitations to extend *Bivens*." *Malesko,* 534 U.S. at 70 (emphasis added). As the Ninth Circuit has confirmed, "'[a]lternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018).

The availability of an avenue to pursue injunctive relief is "of central importance" to deciding whether to imply a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862. The APA, for example, provides explicit authority to consider constitutional issues in official capacity actions, and is an alternative process counselling against a damages remedy. *See, e.g.*, *W.*

*Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("[T]he APA leaves no room for *Bivens* claims based on agency action or inaction."). The availability of habeas is another potential process that counsels against a *Bivens* remedy, *see Abbasi*, 137 S. Ct. at 1849, and indeed "might" provide a "more direct route to relief than a suit for money damages." *Id.* at 1862–63; *see Mirmehdi*, 689 F.3d at 982 ("The availability of habeas is another remedy."). The Ninth Circuit has also held that the INA provides a "remedial system" to challenge immigration detention. *Id.*

Plaintiffs have alternative avenues of review here, the availability of which (regardless of its outcome) counsel against any implied remedy. Indeed, members of the proposed Parent Class have already sought injunctive and habeas relief, and have filed statutory claims under the APA arising out of the same policies and related actions that Plaintiffs challenge here. *See, e.g.*, *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 505 (D.D.C. 2018) (ordering the government to reunify plaintiff with her sons). Plaintiffs also are (or could have been) members of the class in *Ms. L.*, which pursued APA relief. The court in *Ms. L.* granted a class-wide preliminary injunction to parents based on claimed separations without a determination that the parent was unfit or a danger to their child, holding that such separations likely violated the Fifth Amendment. *Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83; Compl. ¶ 75 (noting that a plaintiff received judicial relief from *Ms. L* court). Plaintiffs also could have sought injunctive relief similar to the class in *Ms. J.P.*, where the district court has already ordered the federal government to provide mental health treatment to a class of separated families. *See Ms. J.P.*, No. 18-6081 (C.D. Cal.), Dkt. 251 at *45–46. But even if plaintiffs in the individual cases or *Ms. L.* or *Ms. J.P.* had not been successful, the actions themselves, and the ability to have their constitutional challenges addressed in federal court, demonstrate that alternative processes exist to address Plaintiffs' concerns. *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability."). The only court yet to address the issue of the inappropriateness of an individual damages

25

remedy in the context of alleged "family separations" confirms this analysis. *See Mejia-Mejia*, 2019 WL 4707150, at *5 ("As the numerous cases before this Court and the two class actions before Judge Sabraw in the Southern District of California demonstrate . . . there are alternative mechanisms available to challenge the constitutionality of the kind of government action at issue here."). In short, there has been no shortage of litigation in this area. Plaintiffs' constitutional challenges thus plainly can be, and have been, pursued through other avenues.

Even without those cases, a new *Bivens* claim should not be recognized because Plaintiffs also have at least a potential avenue for suit in state tort law (for anyone acting outside the scope of federal employment), and/or a suit against the United States under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346(b), 2671–80; *see C.M.*, No. 19-05217 (D. Ariz.) (asserting FTCA claims for damages from family separations). In fact, Plaintiffs state their intention to bring an FTCA claim. Compl. ¶ 17 n.2. While the FTCA standing alone may not constitute a sufficient alternative process in all contexts, *see Carlson*, 446 U.S. at 20–23, the availability of the FTCA (and/or state law remedies) when considered with other factors is probative of whether Congress "might doubt" or a court should hesitate to recognize a *Bivens* remedy.[15] *Abbasi*, 137 S. Ct. at 1861.

It is not even necessary to divine all potential avenues for alternative forms of judicial relief in this context because it is clear that many are available. *See generally Liff*, 881 F.3d at 921 ("We do not parse the specific applicability of this web of" alternatives "but instead note the spectrum of remedies they provide"). This Court should decline to supplement the avenues of review provided by Congress with a non-statutory individual

---

[15] *See, e.g.*, *Malesko*, 534 U.S. at 73–74 (refusing to imply a remedy for plaintiff whose "lack of alternative tort remedies was due solely to [the] strategic choice" not to sue for common-law negligence); *Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134–35 (N.D. Ala. 2017) (acknowledging that, under *Carlson*, "[t]he FTCA remedy is not a substitute for a *Bivens* action," but still considering "an effective and available [FTCA] remedy" – whose "administrative prerequisites" the plaintiff "failed to follow" – in the mix with other "special factors").

capacity claim for damages. Review and the potential for relief through these avenues *alone* is sufficient to preclude creating a new *Bivens* remedy. *Abbasi.* 137 S. Ct. at 1863.

### C.  Other Factors Counsel Strongly Against Implying a *Bivens* Remedy Here

In addition to the processes discussed above, a wide range of "special factors" may or "might" make it inappropriate to create a *Bivens* remedy in a particular context, even where no alternative remedy exists. *Abbasi*, 137 S. Ct. at 1861. Although a single factor can suffice, special factors in the aggregate may also preclude a *Bivens* remedy. *See Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (concluding that factors "[t]aken together" "constitute[d] 'special factors'" and precluded creation of a *Bivens* remedy); *Abbasi*, 137 S. Ct. at 1862–63 (taking into account multiple factors, including congressional silence in a heavily legislated arena, the potential for injunctive relief, and national security considerations). Plaintiffs' claims implicate at least five distinct and additional factors that compel hesitation and warrant not implying a damages remedy in this novel and sensitive context.

> *a.  Congressional Action in the Context of Immigration Has Been "Frequent and Intense" and Implying a Damages Remedy Would Raise Serious Separation-of-Powers Concerns*

In *Abbasi*, the Court recognized that Congress's failure to provide a damages remedy "is relevant . . . and . . . telling" when Congress has otherwise considered and regulated in a given arena. 137 S. Ct. at 1862. This is particularly true where Congress's interest has been "frequent and intense." *Id.* In the exercise of its Constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, Congress has acted repeatedly on the issues of immigration prosecution and the custody of alien children, among them enacting and modifying the Immigration and Nationality Act ("INA"), the HSA, and the TVPRA. And the Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)); *accord E. Bay Sanctuary Covenant v. Trump*,

932 F.3d 742, 755 (9th Cir. 2018) (citing U.S. Const. art. I, § 8, cl. 4, *id.* art. I, § 8, cl. 3; *id.* art. I, § 8, cl. 11) ("Congress is vested with the principal power to control the nation's borders.").

The INA provides for the expedited removal and mandatory detention of certain aliens who enter the United States without documentation allowing for their admission. *See* 8 U.S.C. § 1225(b)(1). Individuals processed for expedited removal who are determined by an asylum officer to have a credible fear of persecution must be detained for further consideration of the application for asylum. 8 U.S.C. § 1225(b)(1)(B)(ii). Individuals who present themselves at a port of entry and are processed for immigration proceedings under Section 1229a are to be detained if the individual is not clearly and beyond a doubt entitled to be admitted. 8 U.S.C. § 1225(b)(2)(A); *see* 8 C.F.R. § 235.3(c). The INA provides the circumstances under which an individual may be paroled, the procedures and requirements for asylum, and the procedures for challenging removal and detention. *See, e.g.*, 8 U.S.C. §§ 1158, 1182, 1225–30; *see also* 8 U.S.C. § 1231(g)(1) (stating the "Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal"); *Comm. Of Cent. Am Refugees v. Immigration & Naturalization Serv.*, 795 F.2d 1434, 1440 (9th Cir. 1986) (stating Attorney General has "broad discretion" in deciding where to house deportable aliens). The HSA created DHS and transferred to HHS the responsibility for the care and custody of UACs. *See* 6 U.S.C. §§ 542, 279(a). The TVPRA further codified HHS's responsibility for all placement decisions for UACs in its custody and provides the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(b)(1), (c)(3).

The passage of these statutes represents just a sampling of Congress's actions in this area. Since enacting the INA in 1952, Congress has amended it wholesale at least six times. *De La Paz*, 786 F.3d at 377 (listing statutes). Likewise, Congress has amended the TVPRA

28

and passed other legislation to care for UACs and combat human trafficking.[16] At no time has Congress provided the sort of damages remedy contemplated here.

Additionally, Congress is plainly aware of the particular issues at the core of this lawsuit – allegations regarding the widespread separation of families, and harms consequent thereto – and has responded with legislation and other oversight. *See, e.g.*, Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Pub. L. No. 116-26, 133 Stat. 1018 (requiring the Executive Branch to submit monthly reports to Congress and the public of the number of any separated children and the cause of those separations); Compl. ¶ 238 (discussing Congressional report on family separations). Indeed, for each of the past two years Congress has appropriated $4 million to HHS's Substance Abuse and Mental Health Services Administration in order to address mental health needs of UACs through the National Child Trauma Stress Initiative, with a special focus in 2018 on children who were separated from their family. *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981; Joint Explanatory Statement of the Committee of Conference, H.R. Rep. No. 115-952, at *533 (2018); *see also* Consolidated Appropriations Act, 2019, H.R. Rep. No. 116-31, § 224 (prohibiting DHS from using

---

[16] *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464; Prosecutorial Remedies and Tools against the Exploitation of Children Today Act of 2003 (Protect Act), Pub. L. No. 108-21, 117 Stat. 650; Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875; Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558 (2006); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044; Violence against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54; National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, 126 Stat. 1632; Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227; National Human Trafficking Hotline, Pub. L. No. 114-271, 130 Stat. 1398 (2016); Combating Human Trafficking in Commercial Vehicles Act, Pub. L. No. 115-99, 131 Stat. 2242 (2018); No Human Trafficking on Our Roads Act, Pub. L. No. 115-106, 131 Stat. 2265 (2018).

appropriation funds to take actions against sponsors and potential sponsors of UACs). Both the House and the Senate have held multiple hearings on family separations. *See, e.g.*, *Oversight of Immigration Enforcement and Family Reunification Efforts Before the S. Comm. on the Judiciary*, 115th Cong. (July 31, 2018). Among those persons subject to Congressional oversight and inquiry who have testified in these hearings are some of the individual Defendants in this case. *See, e.g.*, *Oversight of the Department of Homeland Security Before the H. Comm. on the Judiciary*, 115th Cong. (Dec. 20, 2018) (Nielsen testifying); *Hearing on Prescription Drug Affordability and Innovation Before the S. Comm. on Finance*, 115th Cong. (June 26, 2018) (Azar); *Oversight of the Trump Administration's Family Separation Policy Before the H. Comm. on the Judiciary*, 116th Cong. (Feb. 26, 2019) (Lloyd); Compl. ¶ 227 (McAleenan and Provost). Congress has also considered multiple legislative proposals regarding family separation in the immigration context that have not been passed into law. *See, e.g.*, Keep Families Together Act, S. 3036, 115th Cong. (2018); Protect Kids and Parents Act, S. 3091, 115th Cong. (2018).

Despite statutes, repeated amendments, and recent congressional oversight, Congress has never provided a damages remedy against government officials who create or implement policy to enforce the nation's immigration laws – the damages remedy Plaintiffs seek in this suit.[17] This "institutional silence speaks volumes," and "counsels strongly against judicial usurpation of the legislative function." *De La Paz*, 786 F.3d at 377; *see also Abbasi*, 137 S. Ct. at 1862 (noting that where policies "attract the attention of Congress," yet "Congress fails to provide a damages remedy," then "it is much more difficult to believe that 'congressional inaction' was 'inadvertent'" (citing *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988))). As the Ninth Circuit has stated in the immigration enforcement context, "Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the [INA], Congress never created such a remedy." *Mirmehdi*, 689 F.3d at 982 (citation

---

[17] In contrast, for example, Congress *has* created a private right of action for victims of trafficking to sue their traffickers for damages, 18 U.S.C. § 1595.

omitted). Given Congress's "repeated and careful attention to immigration matters," *De La Paz*, 786 F.3d at 377, this Court should not supplant the legislative function by creating a *Bivens* claim here. *Id.* at 378 ("[T]he comprehensive regulations and remedies provided in civil immigration law and regulations preclude crafting an implied damage remedy here."); *Mirmehdi*, 689 F.3d at 982 (declining to allow *Bivens* action by aliens in part because "[t]he complexity and comprehensiveness of the existing remedial system is another factor among a broad range of concerns counseling hesitation").

> b. *National and Border Security Concerns, which are Constitutionally Committed to the Political Branches, Counsel Against Creation of an Individual Capacity Cause of Action in this Context*

Because Plaintiffs' claims arise out of immigration enforcement activities at an international border, they necessarily implicate national security and foreign affairs. Like immigration, these areas are constitutionally committed to the political branches. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1861; *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016) (recognizing "controlling role of the political branches" in foreign affairs); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power . . . Such matters are so exclusively entrusted to the political branches of government. . . ."). Indeed, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Hernandez v. Mesa*, 885 F.3d 811, 819 (5th Cir. 2018) (en banc) (risk to national security counseled against recognizing *Bivens* claim in border shooting case) (certiorari granted). This most certainly includes judicial interference by extending *Bivens*. *See Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012) ("The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence."); *see also Mejia-Mejia*, 2019 WL 4707150, at *5 n.6 ("These concerns are heightened with respect to immigration matters that also implicate national security.").

The national security and border concerns at issue here counsel against recognizing a new *Bivens* claim. Congress has charged DHS and its components with securing the border, 6 U.S.C. §§ 111, 202, and courts have long recognized that "this country's border-control policies are of crucial importance to the national security and foreign policy of the United States." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004). Related "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,' which further 'counsels hesitation' in extending *Bivens*." *Mirmehdi*, 689 F.3d at 982 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009)). Indeed, the Supreme Court has recognized that concerns about "subjecting the prosecutor's motives and decisionmaking to outside inquiry" are magnified in the immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) (citation and quotation omitted). Thus, any supplemental damages remedy provided here should come from Congress.

### c. Bivens *Actions May Not Be Used to Challenge High-Level Executive Branch Immigration Enforcement Policy on the Border*

Plaintiffs do not challenge the acts of lone, line-level or rogue officers, but instead the decision-making of Congress and alleged policies of the Executive Branch. Although styled as a suit against Defendants, Plaintiffs' real grievance is with national immigration policies of the Executive Branch regarding enforcement of the immigration laws. The Complaint is replete with references to the "Trump Administration," and even specific statements made by the President of the United States. *See, e.g.*, Compl. ¶¶ 215, 217, 239, 242, 244–49. But the Supreme Court has held that special factors preclude damages suits against federal agencies and entities. *F.D.I.C. v. Meyer*, 510 U.S. 471, 485–86 (1994) (declining to imply a damages action directly against a federal agency). As the Court has explained, "injunctive relief [not an individual-capacity damages action] has long been recognized as the proper means for preventing *entities* from acting unconstitutionally." *Malesko*, 534 U.S. at 74 (emphasis added).

32

*Abbasi* confirms that individual-capacity constitutional lawsuits challenging high-level Executive Branch policy raise serious separation-of-powers issues and other practical concerns. *Abbasi*, 137 S. Ct. at 1860. Interfering in government policymaking through the vehicle of an individual-capacity damages action accrues "substantial social costs" far beyond those imposed by a traditional *Bivens* action. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The entire thrust of *Bivens* and its progeny is that it is directed to the actions of lone, typically line-level officers, towards lone plaintiffs, not government-wide decision-making. *Cf. Rodriguez v. Swartz*, 899 F.3d 719, 745, 748 (9th Cir. 2018) (allowing a *Bivens* claim against "a rank-and-file officer, not the head of the Border Patrol or any other policy-making official," where the line-level officer had been prosecuted by the United States for murder). Plaintiffs should not be permitted to evade clear Supreme Court holdings on this point simply by naming individual high-level Executive Branch employees as defendants.

Furthermore, Plaintiffs' proposed *Bivens* claims would implicate the precise separation-of-powers concerns in the policy-making arena that *Abbasi* identified. Far from claiming Defendants were on some personal lark, Plaintiffs maintain that Defendants violated their constitutional rights through implementing and/or condoning policies *of the United States*.[18] And here these policies were informed by Congressional directives. *See,*

---

[18] *See, e.g.*, Compl. ¶ 28 ("[A]s Chief of Staff, Kelly advised President Trump on all aspects of immigration policy and practice, including the detention of asylum seekers and forcible separation of children and parents"); *id.* ¶¶ 133–38 (alleging the creation of a "pilot program" that resulted in the separation of hundreds of children from their parents); *id.* ¶¶ 145–54 (alleging an agreement "to pursue separation of families entering the United States at all points across the southern border"); *id.* ¶¶ 158–60 (alleging that the Zero-Tolerance policy of prosecuting anyone who violated 8 U.S.C. § 1325(a) along the southern border was a pretext for "widespread separations"); *id.* ¶ 165 (alleging that "*the government* began to separate parents and children at substantially increased rates and in substantially increased numbers") (emphasis added); *id.* ¶¶ 166–67 (alleging that the separations were effected by "John/Jane Doe DHS Defendants"); *id.* ¶ 288 ("Defendants have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the clearly established Fifth Amendment due process rights of Plaintiffs and Class Members . . . .").

*e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV), 1325(a). As the only court to squarely address this issue in the context of "family separation" allegations has recognized, a suit against high-level Executive Branch policymakers alleging the creation of such policies "is obviously a collateral challenge to a government-wide policy affecting thousands of individuals." *Mejia-Mejia*, 2019 WL 4707150, at *4, *6.

The creation of an individual capacity damages action in these circumstances would burden Defendants and future officials alike "from devoting the time and effort required for the proper discharge of their duties." *Abbasi*, 137 S. Ct. at 1860. Moreover, "the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formation" of any policy or practice related to the separation of Plaintiffs and their children at the border, requiring "courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.* The Complaint is replete with allegations of such discussions between high-ranking officials of the Executive Branch. *See, e.g.*, Compl. ¶¶ 123, 134–35, 141, 150–52. Even the President himself is alleged to have had some involvement in U.S. policy on this front. *Id.* ¶¶ 242–49. The threat of discovery could inhibit the free flow of advice and fulsome analysis within the Executive Branch, *see Fed. Open Mkt. Comm. Of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979), and reduce the Executive's autonomy and confidentiality, *see Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004); *accord Mejia-Mejia*, 2019 WL 4707150, at *5 (noting that if courts extended *Bivens* to challenges of "Executive Branch policies . . . the discovery required to gain details on individual defendants' motivations could dampen the candor of conversations and advice rendered by officials within the executive branch"); *cf. Lanuza v. Love*, 899 F.3d 1019, 1029 (9th Cir. 2018) (quoting *Abbasi*, 137 S. Ct. at 1849) ("*Bivens* actions against high-ranking executive officers, such as the Director of the Federal Bureau of Investigation and the U.S. Attorney General in *Abbasi*, are disfavored because such suits 'would call into question the formulation and implementation of a high-level executive policy, and the burdens of that litigation could prevent officials from properly

34

discharging their duties.'"). Indeed, Plaintiffs are almost certain to seek such intrusive discovery to prove the details of the alleged "conspiracy".

While a *Bivens* action would not be appropriate to challenge *any* government policy, that concern is particularly heightened, where, as here, the policy was allegedly created at the highest levels of government in an arena with respect to which power has been constitutionally-committed to the Executive Branch. *See Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012) (explaining that "[p]reserving the constitutionally prescribed balance of powers is . . . [a] special factor counseling hesitation" in implying a *Bivens* remedy). Of relevance in this context, the Constitution "vests power in the President to regulate the entry of aliens into the United States." *E. Bay Sanctuary Covenant*, 932 F.3d at 755; *see id.* (citing U.S. Const. art. II, § 2, cl. 1 (President's role as "Commander in Chief"); U.S. Const. art. II, § 3 (President's right to "receive Ambassadors and other public Ministers"); U.S. Const. art. II, § 3 (Take Care Clause)). While Congress, as discussed above, "has the power to regulate naturalization, it shares its related power to admit or exclude aliens with the Executive." *E. Bay Sanctuary Covenant*, 932 F.3d at 756. In contrast, the Judicial Branch's authority in "the area of immigration and naturalization" is relatively circumscribed. *Mathews v. Diaz*, 426 U.S. 67, 81–82 (1976). There is simply no question that the judicial creation of a *Bivens* remedy to challenge Executive Branch immigration policies would disturb the balance of powers delineated in the Constitution.

### d. Additional Separation-of-Powers Principles Would Be Violated by Creating an Individual Capacity Claim for Prosecutorial Policy Decisions

In a similar vein, Plaintiffs' claims raise additional separation-of-powers concerns related to the Executive's enforcement of the laws. "The Supreme Court has long recognized that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'" *In re Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also United States v. Edmonson*, 792 F.2d 1492, 1497 (9th Cir. 1986) ("It cannot be disputed that under our system of separation of powers, the decision whether to prosecute, and the decision as to

the charge to be filed, rests in the discretion of the Attorney General or his delegates, the United States Attorneys."). "The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." *In re Aiken City*, 725 F.3d 255, 262–63 (D.C. Cir. 2013) (citing U.S. Const. art. II, § 1, cl. 1 (Executive Power Clause); U.S. Const. art. II, § 1, cl. 8 (Oath of Office Clause); U.S. Const. art. II, § 2, cl. 1 (Pardon Clause); U.S. Const. art. II, § 3 (Take Care Clause); *see also* U.S. Const. art. I, § 9, cl. 3 (Bill of Attainder Clause)). To aid the President in the task of taking care that the laws are faithfully executed, Congress specifically delegated to the Attorney General and his or her subordinates in the DOJ the power to "conduct any kind of legal proceeding, civil or criminal," 28 U.S.C. § 515(a). To the extent Defendants implemented a policy of criminally prosecuting all DHS referrals of Section 1325(a) violations, Compl. ¶ 158, they did so as contemplated by Congress, 8 U.S.C. § 1325(a), and pursuant to power granted specifically by the Constitution to the Executive. Separation-of-powers concerns counsel squarely against creating a *Bivens* remedy aimed at the exercise of that power. *Abbasi*, 137 S. Ct. at 1857 ("separation-of-powers principles are or should be central to the analysis" of whether to recognize a damages remedy).

> e. *The Scope and Number of Governmental Actions and Actors Plaintiffs Challenge Across Agencies Would Make Devising a Workable Individual-Capacity Cause of Action Impracticable*

The Supreme Court has recognized that a "serious difficulty of devising a workable cause of action" for a particular *Bivens* claim counsels against such a free-standing non-statutory remedy. *See Wilkie*, 551 U.S. at 562. Relatedly, where recognizing a plaintiff's proposed remedy would open the floodgates, the unusual risk of "burden and demand" on federal officials that "might well prevent" them "from devoting the time and effort required for the proper discharge of their duties" (and related "practical concerns") will also counsel hesitation. *Abbasi*, 137 S. Ct. at 1860; *see also id.* at 1858 (discussing the "costs and consequences to the Government itself" of recognizing a new claim). These factors all

inhere in this specific context. *Mejia-Mejia*, 2019 WL 4707150, at \*5 ("[G]iven the thousands of asylum seekers and many others involved in the immigration system, allowing individual capacity damages claims risks a torrent of new litigation that could burden both the Executive Branch and the judiciary . . . .").

Creating the *Bivens* action Plaintiffs seek would also have sweeping implications "on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858. Those system-wide costs include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself . . . ." *Id*. In the context of immigration enforcement operations, claims similar to Plaintiffs' could readily be asserted by numerous other aliens facing criminal prosecution, detention, and removal. Given the fact that every single one of the approximately 61,000 individuals removed from the United States in 2017 were from a foreign country, *see* Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *available at* https://www.ice.gov/removal-statistics/2017 (last visited Feb. 13, 2020), this alone could open the floodgates of litigation over equal protection claims against government officials enforcing immigration laws. And, should the Court allow claims to proceed that are based on allegations about officials' personal motives, such claims may be relatively easy to plead and difficult to disprove. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[C]harges of racial discrimination . . . may be easy to make and difficult to disprove.") (citation omitted); *cf. Crawford-El v. Britton*, 523 U.S. 574, 584–85 (1998) ("Because an official's state of mind is easy to allege and hard to disprove, insubstantial claims that turn on improper intent may be less amenable to summary disposition . . . .") (internal quotations omitted). The Court has consistently resisted efforts to embroil the judiciary in lawsuits over the subjective motive behind facially lawful official conduct. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011); *Wood v. Moss*, 572 U.S. 744, 761–62 (2014).

The potentially tremendous financial impact at issue also weighs heavily against supplanting Congress's role in deciding whether to create a damages remedy, particularly with the sort of class-wide fund Plaintiffs seek here. *See, e.g*., *Meyer*, 510 U.S. at 486

(discussing the "potentially enormous financial burden" of creating a *Bivens* remedy to challenge agency policies); Compl. at 75. In circumstances where Congress has chosen to allow broad-based challenges to policies and practices in the official capacity arena, the number of potential plaintiffs and potential damages can be enormous. *See, e.g.*, *Cobell v. Salazar*, 679 F.3d 909, 912 (D.C. Cir. 2012) (discussing the creation of $3.4 billion settlement fund). Plaintiffs allege here that the universe of "family separation" plaintiffs number in the thousands. Compl. ¶¶ 267, 271. From a practical perspective, even assuming there were viable claims, it is unlikely that any government official would have sufficient assets to pay the potential costs associated with remedying an unconstitutional policy of the United States. *See Carlson*, 446 U.S. at 21 (noting *Bivens* actions subject officials to "personal financial liability"). Ultimately, Congress is best-equipped to decide whether and how to provide a financial remedy for past harms caused by government policies.

Plaintiffs' choices about how to structure their suit underscore the unworkability of implying a *Bivens* remedy here. For example, Plaintiffs bring this suit as a class action, but class actions to challenge general government policies are uniquely ill-suited to litigate constitutional tort claims, which must be brought against federal officials for their "own individual actions." *Iqbal*, 556 U.S. at 676. Plaintiffs also seek injunctive relief against the Defendants requiring "the establishment of a recovery fund to provide for health services to Class Members," Compl. at 75, but *Bivens* suits allow only for money damages. *See, e.g.*, *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) ("The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities."). Individual-capacity suits of this nature against federal employees are simply not conducive to the sort of remedy Plaintiffs seek. *Cf. Meyer*, 510 U.S. at 486 ("We leave it to Congress to weigh the implications of such a significant expansion of Government liability.").

\*\*\*

Plaintiffs' proposed constitutional tort claims implicate a remarkable number and variety of separation-of-powers concerns counseling hesitation. This Court should certainly decline to create the novel *Bivens* cause of action Plaintiffs seek here.

## V.  DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS

Plaintiffs' lawsuit should also be dismissed because all fifteen Defendants are entitled to qualified immunity for all claims raised in the Complaint. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is "an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Accordingly, courts should resolve "immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). To overcome qualified immunity, a plaintiff must "plead[] facts showing" two prongs "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (quoting *Harlow,* 457 U.S. at 818).

For purposes of qualified immunity, a right is clearly established if, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (alterations in original) (quoting *Anderson*, 483 U.S. at 640). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201; *see West v. City of Caldwell,* 931 F.3d 978, 983 (9th Cir. 2019) (Courts may not "define clearly established law at a high level of generality). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Once a government "official pleads qualified immunity, the burden is on the plaintiff to

prove" a particular Defendant engaged in the violation of a clearly established right. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

Courts may "exercise their sound discretion in deciding which of the two prongs of [the qualified immunity] analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Where a case can "be disposed of more readily" at the second step, *id.* at 237 (citation omitted) – because the court can "quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all," *id.* at 239 – the court may find that qualified immunity applies without reaching the initial "constitutional" question. This rationale applies equally to Plaintiffs' federal statutory claims under 42 U.S.C. §§ 1985(3) and 1986, which incorporate constitutional standards by definition. *See, e.g.*, 42 U.S.C. § 1985 ("If two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the *equal protection of the laws* . . . .") (emphasis added); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); *Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994) (explaining why the requirements of qualified immunity apply in § 1985 cases).

Here, Defendants' immunity can easily be resolved at step two – Plaintiffs' failure to identify the violation of a clearly established constitutional or related federal statutory right. Principles of constitutional avoidance favor this approach, particularly where, as here, the answer to the clearly established question is plain. *Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("[O]ur usual adjudicatory rules suggest that a court should forbear resolving [the merits of a constitutional question]."). The absence of case law at the time of Plaintiffs' separation that would have put Defendants on notice of any clearly established right requires dismissing Plaintiffs' claims. *See D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018) ("Tellingly, neither the panel majority nor the partygoers have identified a single precedent

– much less a controlling case or robust consensus of cases – finding a [constitutional] violation 'under similar circumstances.'") (citations omitted).

### A. Plaintiffs Fail to Allege the Violation of a Clearly Established Due Process Right

Plaintiffs ask this Court to recognize an across-the-board clearly established due process right of immigration detainees to be housed with their minor children, but precedent does not clearly support any such right. As an initial matter, the Supreme Court has warned against analyzing claimed substantive due process rights at too general a level. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). It has also "been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). When analyzed appropriately, it is clear that the right Plaintiffs claim is both too context-dependent to qualify as clearly established and is, in any event, not supported by Supreme Court or Ninth Circuit precedent.

Although framed in a variety of different ways, at their core, Plaintiffs' substantive due process claims, Counts I ("Forcible Separation of Family Units"), II ("Failure to Provide Adequate Health Care"), and III ("Punitive Treatment"), are all rooted in the premise that Plaintiffs have a categorical constitutional right to remain "together as a family." Compl. ¶ 283; *see id.* ¶¶ 296, 305. But any right which children may have regarding their relationship with their parents necessarily varies by context. *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that rights of familial association apply differently when an individual is imprisoned); *accord Dunn v. Castro*, 621 F.3d 1196, 1205 (9th Cir. 2010). The fact-specific nature of the inquiry required in this case, the necessity of balancing competing interests, and the complexity of managing adult and family detention at the United States border all compel the conclusion that the law applicable to Plaintiffs' constitutional and related federal statutory claims was not clearly established for qualified immunity purposes. *See Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 509 at 9–10 (Order on Motion to Enforce Preliminary Injunction) (noting that substantive

41

due process is context-dependent and in the context of family separations on the border, "the government interests extend to securing the Nation's borders and enforcing the Nation's criminal and immigration laws, and all that those interests entail, including detention and parole determinations for migrants taken into custody.").

But even setting aside that problem, Plaintiffs' claims cannot be squared with the statutory scheme governing immigration enforcement. It is well established that Congress has broad power to regulate immigration, even when such decisions touch on sensitive familial relationships. *See, e.g.*, *Fiallo*, 430 U.S. at 797–98 (rejecting constitutional challenge to sections of INA which excluded the relationship between an illegitimate child and his natural father from the special preference status otherwise accorded a "child" or "parent" of a United States citizen or lawful permanent resident). Courts have thus repeatedly rejected attempts to establish that aliens have any substantive due process right to family visitation, or to be detained in proximity to – much less to be detained with or released from detention with – family members. *See, e.g.*, *Aguilar v. U.S. Immigration & Customs Enf't.*, 510 F.3d 1, 22 (1st Cir. 2007) (immigration arrest which prevented parent from making arrangements for the care of their children did not violate the right to family integrity); *Gallanosa by Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children.").

Related case law confirms the point. From a legal perspective, courts consider immigration detainees analogous to pretrial detainees under certain circumstances. *See Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person detained for deportation to be the equivalent of a pretrial detainee."). But pretrial detainees, even those who are U.S. citizens, do not have a constitutional right to be housed with or even near family members while in criminal custody. *See Olim v. Wakinekona*, 461 U.S. 238, 247–48 & n.8 (1983) (interstate transfer of criminal detainee does not violate any due process right, even if the transfer leaves detainee separated hundreds of miles from his family) (citing *Montanye v. Haymes*, 427 U.S. 236, 241 n.4 (1976)); *Ms. L.*, 310 F. Supp.

42

3d at 1143 (noting that "parents and children may lawfully be separated when the parent is placed in criminal custody"). Whatever the parameters of their rights, aliens attempting to enter the United States certainly do not have greater constitutional rights than U.S. citizens. *See Mathews*, 426 U.S. at 79–80 ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").

There is also no historical precedent to support the novel substantive right that Plaintiffs claim. *See, e.g.*, *City of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (asserting that the "shock-the-conscience" inquiry "may be informed by a history of liberty protection"); *United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *5–6 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom. United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019) (alien-parent's referral for prosecution under 8 U.S.C. § 1325(a) was not enough to show "outrageous government conduct" for purposes of the Fifth Amendment because "the case law provides little guidance on how . . . parental rights are actually manifested when a parent charged with . . . illegal entry . . . is separated from their child who allegedly accompanied them across the border" and noting "the lack of clearly established parental rights in these circumstances and under case law"). To the contrary, it has always been acknowledged that "the evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process." *Aguilar*, 510 F.3d at 22 (citing *de Robles v. Immigration & Naturalization Serv.*, 485 F.2d 100, 102 (10th Cir. 1973)). Any associated interference with the right to family integrity alleged here was incidental to such enforcement and sprang from the federal government's legitimate interest in prosecuting illegal entrants and/or detaining them during the expedited removal and credible fear screening process. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) ("[D]etention during deportation proceedings [is] a constitutionally valid aspect of the deportation process."); *Payne-Barahona v. Gonzales*, 474 F.3d 1, 3 (1st Cir. 2007) (rejecting the argument that "family separation" based on a valid deportation "shocks-the-conscience"). This is a

43

critically important point because *every* governmental detention of a parent runs the risk of interfering in some way with the parent's ability to care for his or her children. *See id.* at 3 ("If there were such a right [to challenge a parent's valid deportation], it is difficult to see why children would not also have a constitutional right to object to a parent being sent to prison or, during periods when the draft laws are in effect, to the conscription of a parent for prolonged and dangerous military service.").

It is for this reason that the overwhelming majority of cases run contrary to Plaintiffs' theories of substantive due process. "After all, the right to family integrity has been recognized in only a narrow subset of circumstances," *Aguilar*, 510 F.3d at 23, but not in deportations, which "are routine and do not of themselves dictate family separation," *Payne-Barahona*, 474 F.3d at 3. As described by numerous courts of appeals, "[i]f an alien could avoid the consequences of unlawful entry into the United States by having a child, it would create perverse incentives and undermine Congress's authority over immigration matters." *Marin-Garcia v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011).[19]

Defendants are mindful that some district courts have recently held that certain policies allegedly resulting in family separations at the border may be unconstitutional and plaintiffs were *likely* to succeed on "their substantive due process claim that their continued separation, absent a determination that [the parent] is either an unfit parent or presents a danger to her sons, violates their right to family integrity under the Fifth Amendment."

---

[19] *See also Newton v. Immigration & Naturalization Serv.*, 736 F.2d 336, 343 (6th Cir. 1984) (finding "no constitutional rights of citizenship implicated in the decision to deport" parents of citizen children); *Delgado v. Immigration & Naturalization Serv.*, 637 F.2d 762, 764 (10th Cir. 1980) ("This Court has repeatedly held that the incidental impact visited upon the children of deportable, illegal aliens does not raise constitutional problems."); *Cortez–Flores v. Immigration & Naturalization Serv.*, 500 F.2d 178, 180 (5th Cir. 1974) ("[D]eportation of a parent does not deprive the child of any constitutional rights."); *de Robles*, 485 F.2d at 102 (rejecting argument that it is unconstitutional to break up a family and deprive children of "constitutional right to a continuation of the family unit"); *Cervantes v. Immigration & Naturalization Serv.*, 510 F.2d 89, 92 (10th Cir. 1975) ("The incidental impact on aliens' minor children caused by the enforcement of duly-enacted conditions on aliens' entrance and residence does not create constitutional problems.").

44

*Jacinto-Castanon*, 319 F. Supp. 3d at 499; *see also Ms. L.*, 310 F. Supp. 3d at 1145–46 (finding likelihood of success on plaintiffs' due process claim). However, this does not demonstrate that any particular Defendants' alleged action in this case violated clearly established law. Those decisions were not decisions on the merits, but came in a different procedural posture (preliminary injunction), issued against a different defendant (the United States), facing different plaintiffs, seeking different relief (injunctive), in a different factual context (before reunification). More importantly, for qualified immunity purposes, even if there were a decision on the merits, district court decisions cannot clearly establish a legal proposition of the nature raised here. *See Camreta*, 563 U.S. at 709 n.7 (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011)) ("'A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'"). They certainly cannot do so where they, as here, post-date most of the challenged conduct. *Pearson*, 555 U.S. at 232 ("[T]he court must decide whether the right at issue was 'clearly established' *at the time of defendant's alleged misconduct*.") (emphasis added).

Plaintiffs' attempt to particularize their substantive due process claims fares no better. For instance, Count III alleges that Defendants violated Plaintiffs' due process rights by subjecting them to "punitive treatment" by separating their families. Compl. ¶¶ 304–305. But as discussed above, Plaintiffs cannot point to any clearly-established law requiring that they be held together as a family. And any claims regarding the particular conditions of their detention, to the extent they existed, (*see, e.g.*, Compl. ¶ 65 (freezing cold rooms), *id.* ¶¶ 65, 78, 93 (inadequate bedding), *id.* ¶¶ 67, 78, 103 (inadequate food), *id.* ¶ 103 (overcrowding)), or the failure to provide them with adequate health services (Count II) would have to be brought against the line-level officers and/or custodians who allegedly committed the particular infractions. *Iqbal*, 556 U.S. at 676, ("[A] plaintiff must plead that

each Government-official defendant, through the official's own individual actions, has violated the Constitution.").[20] Such claims do not undercut dismissal of Defendants herein.

Similarly, the minor Plaintiffs cannot show that they had some clearly established substantive due process right *not* to be treated as "unaccompanied alien children" even though they entered the United States with their parents. By federal statute (not the Constitution), a UAC is a child under 18 years of age with no lawful immigration status in the United States who either (1) does not have a parent or legal guardian in the United States or (2) does not have a parent or legal guardian in the United States "available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Courts have struggled to apply this definition, with federal judges disagreeing on when the label is appropriate. *Compare D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) ("Consequently, to be 'available to provide care' for a child, a parent must be available to provide what is necessary for the child's health, welfare, maintenance, and protection.") *with id.* at 744 (Floyd, J., dissenting) ("Congress has not empowered the federal Office of Refugee Resettlement to seize children from bad parents. The Office is only authorized to detain alien children whose parents are not available in the United States."). Judges also disagree about precisely when and under what circumstances aliens (whether adults or children) entering the United States gain constitutional protections.[21] When judges disagree on such questions, all of which are

---

[20] Depending on the facts and circumstances, a plaintiff may also be able to seek injunctive relief to remedy ongoing constitutionally deficient conditions of confinement. *See, e.g.*, *Doe v. Kelly*, 878 F.3d 710, 725 (9th Cir. 2017) (affirming grant of preliminary injunction requiring the government to provide detainees with mats and blankets after 12 hours); *Ms. J.P.*, No. 18-6081 (C.D. Cal.), Dkt. 251 (discussed supra at 10).

[21] *Compare Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.") *with United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Garza v. Hargan*, 874 F.3d 735, 747 (D.C. Cir. 2017), *cert. granted, judgment vacated sub nom. Azar v. Garza*, 138 S. Ct. 1790 (2018) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161

implicated by Plaintiffs' claims, it is unfair to subject officials to "money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Given the lack of clarity even on these general principles, Plaintiffs cannot show that clearly established substantive due process law prohibited Defendants' conduct in the "particular circumstances" alleged here. *Wesby*, 138 S. Ct. at 590. Accordingly, Counts I, II, and III should be dismissed.

Plaintiffs also make a procedural due process claim (Count IV, Compl. ¶¶ 310–17), but to the extent any due process claim lies here, it sounds in substantive, not procedural due process. Even if Plaintiffs were to press such a claim, it would fail. As with substantive due process, a procedural due process claim requires courts to "ask whether there exists a liberty or property interest of which a person has been deprived," *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011), and as noted, *supra*, no such interest was clearly established with respect to immigration detainees. But even if such an interest did exist, ORR's care and custody of UACs does not violate any clearly established procedural due process rights because there are sufficient mechanisms to challenge the initial decision to maintain custody of such children, including Plaintiffs here. Due process only requires "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted); *id.* at 333–35 (prescribing a

_____

(1945) (Murphy, J., concurring)) (Henderson, J., dissenting) ("[B]efore developing the 'substantial connections' that constitute 'entry' for an illegally present alien—'[t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.'"); *Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 445 (3d Cir. 2016) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)) (holding that petitioners, aliens who were apprehended after illegally entering the United States, could not state a proper Suspension Clause claim because "the Supreme Court has unequivocally concluded that 'an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) ("[I]llegal aliens are not law-abiding members of the political community and aliens who have entered the United States unlawfully have no more rights under the Second Amendment than do aliens outside of the United States seeking admittance.").

balancing test for procedural due process claims). Agencies are not required to provide trial-like procedures unless mandated to do so by Congress. 5 U.S.C. § 554(a); *see Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990). Children are in ORR care and custody pursuant to the HSA and TVPRA, and there are mechanisms for challenging ORR's determination that their parents or other custodians are unable to provide for each child's care and custody. *See, e.g.*, Children Entering the United States Unaccompanied: Section 2, Safe and Timely Release from ORR, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2. Indeed, all families identified in this Complaint were reunited before it was filed. Compl. ¶¶ 71, 89, 98, 110, 120. Additional procedural safeguards are not required under a *Mathews* balancing test. 424 U.S. at 333–35. Therefore, there was no clearly established procedural due process violation inherent in the government's custody of Plaintiffs, and Count IV should be dismissed.

### B. Plaintiffs Fail to Allege a Violation of a Clearly Established Equal Protection Right

Plaintiffs cannot show that the alleged general polices violated any clearly established equal protection right (Count V). The Supreme Court has long held that a policy that does not identify a suspect classification or fundamental right "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) (internal quotation and citations omitted); *see Aleman v. Glickman*, 217 F.3d 1191, 1200 (9th Cir. 2000) (explaining that rational basis review applies if a classification does not involve a fundamental right or protected class). Even as alleged, the policies described by Plaintiffs targeted all groups entering along the southern border. *See* Compl. ¶¶ 133–38, 145–54, 158–60. This is not a suspect classification. Moreover, the vast majority of illegal entries to the United States occur at its Southern Border,[22] and this,

---

[22] *See* Nationwide Apprehensions by Citizenship and Sector in Fiscal Year 2017, *available*

rather than any "discriminatory animus toward immigrants from Central America," Compl. ¶ 241, is an "obvious alternative explanation" explaining the impetus for those alleged policies. *Iqbal*, 556 U.S. at 682–83 (rejecting animus allegations because "obvious alternative explanation" explained disparate treatment of Arab Muslims).

But even if there were a fundamental right or national origin classification somehow at issue here, it is not clearly established in the immigration and related UAC context that a court must apply a heightened standard of review. Courts have repeatedly affirmed that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979); *accord Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) ("Because decisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive.") (quotations and citation omitted); *see also e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008); *Jean v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984). Where an equal protection challenge to a federal immigration law (as opposed to a state law based on alienage) is brought, only rational basis review applies. *See Mathews*, 426 U.S. at 83. "[I]t is clear that classifications made under the immigration laws need only be supported by some rational basis to fulfill equal protection guarantees." *Alvarez v. Dist. Dir. of U.S. Immigration & Naturalization Serv.*, 539 F.2d 1220, 1224 (9th Cir. 1976) (upholding preferential treatment for commuter aliens from Mexico and Canada against equal protection challenge).

"[I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. Rational basis review is highly deferential, especially because "[a]ny rule of constitutional law that would

---

*at* https://www.cbp.gov/sites/default/files/assets/documents/2018-May/usbp-apprehensions-citizenship-sector-fy2017.pdf (last visited Feb. 13, 2020); CBP Border Security Report for Fiscal Year 2017, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/cbp-border-security-report-fy2017.pdf (last visited Feb. 13, 2020).

inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution." *Id.* at 2419–20 (quotation and citation omitted); *id.* at 2420 ("[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny."). "A law will survive rational basis review 'so long as it bears a rational relation to some legitimate end.'" *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). "[I]t is difficult to show that a law violates the equal protection clause under rational basis review," because such review invalidates only laws "so irrational or absurd on their face [that] it is clear they can be motivated by nothing other than animus or prejudice against a group." *Id.* at 543; *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

Features of geography support a focus of enforcement efforts on the southern border. As a practical matter, it is relatively difficult for non-Canadian asylum seekers to approach the United States from the northern border because they must first travel by air or sea to Canada. *See, e.g.*, *Iqbal*, 556 U.S. at 679–81 (in deciding a motion under 12(b)(6), a court may draw on its judicial experience and common sense). In contrast, the nation of Mexico lies on the southern border of the United States; to the south of Mexico are the countries which make up Central America. Thus, asylum seekers from non-contiguous countries south of the border face fewer logistical barriers to approaching the United States through its southern border. The border between the United States and Canada is also thousands of miles longer than the border with Mexico, making enforcement efforts more diffuse. Plaintiffs ask this Court to ignore these realities and the obvious alternative and common sense explanation for any alleged policies along the southern border, *i.e.*, to the extent limited immigration enforcement resources are going to be committed anywhere, it is reasonable to commit more of those resources to the geographic areas where the violations occur most often. Viewed in this light, the zero-tolerance policy was not a "pretext," Compl. ¶ 160, but a logical attempt to allocate scarce resources to stop illegal entry of aliens along the border. Plaintiffs may dispute the "effectiveness and wisdom" of enforcing this policy through criminal prosecution, with the attendant separation when the

alien charged is a parent who comes to the border with his or her child. *Hawaii*, 138 S. Ct. at 2421. But the Court may not substitute its judgment, or Plaintiffs', for the Executive's judgment with regard to enforcing laws passed by Congress; nor may the Court reject the rational basis underlying the policy. *See id.*

### C. Plaintiffs Fail to Allege the Violation of a Clearly Established Fourth Amendment Right

Plaintiffs also cannot show that the government's separation or continued custody of the Plaintiff children violated Plaintiffs' clearly established Fourth Amendment rights. The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . .

A "seizure" occurs only when a government official, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

Plaintiffs do not complain of any seizure in a constitutionally-recognized sense. The Plaintiffs were apprehended once: at the time they were initially detained after crossing the border. Compl. ¶¶ 60, 77, 93, 102, 112. Nowhere does the Complaint contest the validity of these initial apprehensions. After that initial apprehension and the time Plaintiffs spent in the custody of the immigration officers, *see Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985) (holding that a seizure continues "throughout the time the arrestee is in the custody of the arresting officers"), any constitutional challenge to government custody might arguably implicate the Fifth Amendment (or other constitutional provisions which were not clearly established here), but not the Fourth Amendment. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 144 (1979) (stating that the speedy trial right or Eighth Amendment, and not the Fourth Amendment, provide redress for indefinite detention where probable cause otherwise exists); *Zadvydas*, 533 U.S. at 690 (analyzing allegations of "indefinite civil detention" under the Fifth Amendment). Plaintiffs do not allege the type

of "continuing seizure" that might flow from the use of excessive force by officers after they were taken into CBP custody. *Robins*, 773 F.2d at 1010. To the extent Plaintiffs allege a violation based on separation and the continued detention of the children "without their parents' consent," Compl. ¶ 331, that violation would speak to their family integrity claim (Count I, Compl. ¶¶ 280–90), discussed above, not a stand-alone Fourth Amendment claim. *See supra* at 40–46. Plaintiffs' attempt to shoehorn the Fourth Amendment – which was "tailored explicitly for the criminal justice system" – into the context of government care and custody of alien children, falls far short. *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). At the very least, Plaintiffs have not alleged any challenged actions that would amount to a clearly established "seizure" for the purposes of the Fourth Amendment.[23] *West*, 931 F.3d at 983 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)) ("The Supreme Court has emphasized, especially in the Fourth Amendment context, that [courts] may not 'define clearly established law at a high level of generality.'").

It is also not clearly established that if there were a "seizure" it was unreasonable in these circumstances. *Terry*, 392 U.S. at 9 (noting that the Constitution prohibits "unreasonable" seizures). For those families where the parents were referred for criminal prosecution, Plaintiffs cannot show that it was clearly established that the children were not "unaccompanied alien children" after their parents were transferred into criminal custody. *See supra* at 45–46; *see also* 8 U.S.C. § 1232(b)(3) (requiring that CBP transfer a UAC to HHS custody within 72 hours of determining that the child is a UAC, absent exceptional circumstances). Indeed, there can be no doubt that Plaintiffs would not have been "available to provide care and physical custody" during the time they were referred

---

[23] Nor has it been clearly established that each (or any) Plaintiff had the requisite substantial connections with the United States such that the Fourth Amendment applied to them at all. *See Verdugo-Urquidez*, 494 U.S. at 265 ("'[T]he people' protected by the Fourth Amendment . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.").

for prosecution or in criminal custody. 6 U.S.C. § 279(g)(2)(C)(ii). And once Plaintiffs were determined to be UACs, the terms of their release would be an agency decision governed by the TVPRA – not a decision by any individual defendant herein. 8 U.S.C. § 1232(c)(3)(A). No clearly established law required HHS to bypass TVPRA requirements because Plaintiffs entered the United States with an adult.

The government's ability to hold family units in ICE family residential centers is limited even for those families where the parent is not referred for criminal prosecution. The *Flores* Settlement Agreement, as interpreted in a series of court decisions, places restrictions on DHS's ability to detain children in the family residential centers. *See Flores v. Lynch*, 828 F.3d 898, 905–908 (9th Cir. 2016) (holding that the Settlement Agreement applies to minors accompanied by their parents); *Flores v. Lynch*, 212 F. Supp. 3d 907, 913–14 (C.D. Cal. 2015); *Flores v. Sessions*, No. 2:85-cv-04544, Dkt. 363 at 29–31 (C.D. Cal. June 27, 2017). The *Flores* Settlement Agreement does not require the release of alien parents, *Flores*, 828 F.3d at 909, including those who are subject to continued detention. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.") (emphasis added).[24] This discrepancy – that parents are presumed detained while children must be quickly released – combined with the government's interest in enforcing immigration laws at international borders, *see United States v. Flores-Montano*, 541 U.S. 149, 149 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international

---

[24] Settlement agreements do not establish the baseline for constitutional conduct. *See*, *e.g.*, *Palmer v. Sheahan*, No. 93 C 181, 1994 WL 801474, at *1 n.4 (N.D. Ill. Feb. 15, 1994) ("If the defendants violated the terms of the consent decree, the appropriate remedy is an order . . . from the judge who entered the decree, not damages pursuant to § 1983.") (citing cases); *Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir. 1986) ("[R]emedial court orders per se, apart from independent constitutional grounds affirmed there, cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create 'rights, privileges, or immunities secured by the Constitution and laws.'") (quoting 42 U.S.C. § 1983).

border."), demonstrates that it was not clearly established that any "seizure" here was unreasonable. *See Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam)) ("[L]iability will not attach unless there exists 'a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."). Accordingly, Count VI should be dismissed.

### D. Defendants Did Not Personally Violate Plaintiffs' Constitutional or Federal Statutory Rights

As the Supreme Court has made clear, "[b]ecause vicarious liability is inapplicable to *Bivens* . . . suits," to survive a motion to dismiss "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). In *Iqbal*, for example, the Supreme Court rejected as insufficient allegations that (1) the former Attorney General and former Director of the FBI "knew of, condoned, and willfully and maliciously agreed" to subject plaintiff to constitutional violations because of race, religions or national origin, (2) the AG was the "principal architect" of the policy, and (3) the FBI Director was "instrumental in [its] adoption, promulgation, and implementation" as a conclusory, formulaic recitation of the elements of a claim, and not entitled to an assumption of truth. *Id.* at 669, 680–81. Adequate allegations of fact establishing personal participation are required both in *Bivens* and federal statutory civil rights claims. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Bisbee*, 39 F.3d at 1102 ("The justifications for the doctrine of qualified immunity enunciated in *Harlow* are equally present in section 1985 claims.").

As an initial matter, the Complaint contains allegations of conduct by persons other than Defendants. For example, Plaintiffs allege other, unnamed, government employees performed the actual separations. *See id.* ¶¶ 62, 80, 94, 105, 112–113, 166. Plaintiffs do

not allege that Defendants personally participated in Plaintiffs' separations. Compl. ¶¶ 59–122. John/Jane Doe Defendants are also alleged to have engaged in malfeasance by lying to or coercing asylum seekers, or participating in other misconduct. *Id.* ¶¶ 169, 178–182. Plaintiffs further allege that government employees physically mistreated Plaintiffs or others. *See, e.g.*, *id.* ¶ 82 (driving recklessly while Plaintiff was shackled in back of vehicle); *id.* ¶ 104 (repeatedly striking a mother). But because it is black letter law that there is no "respondeat superior" liability in *Bivens* actions, *Iqbal*, 556 U.S. at 676, the named Defendants cannot be liable for any of those actions.

For that same reason, allegations that Defendants failed to provide Plaintiffs with adequate health care, Compl. ¶¶ 291–300, are insufficient and fail for lack of personal participation. Even presuming constitutionally inadequate care was alleged,[25] Defendants were many steps removed from custodians or medical professionals who might have been personally responsible for Plaintiffs' medical care or aware of their medical conditions. Defendants all are or were in high-level policymaking positions, and were not even direct supervisors of federal employees within DHS or ORR with custodial responsibility for Plaintiffs. Therefore, Count II should be dismissed.

Furthermore, some Defendants are not alleged to have done anything, or could not have participated in the government's alleged unconstitutional conduct because their tenure did not overlap with the timing of the alleged conduct. For example:

- Defendants Morgan and Albence are not alleged to have taken any actions, let alone any unconstitutional actions. Similarly, the Complaint contains only a single conclusory allegation of any conduct by Secretary Azar, and it is without probative value. Compl. ¶ 233.

- Some Defendants have left their positions or government service altogether before portions of the alleged misconduct occurred, *e.g.*, Defendants Kelly (left January 2,

---

[25] *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (explaining the high standard for alleging a deliberate indifference claim).

2019), Homan (June 29, 2018), Vitiello (April 12, 2019), Cissna (June 1, 2019), and Lloyd (November 2018), and cannot be liable for any of the alleged conduct after their departure, *e.g.*, Compl. ¶ 234.

- Some Defendants only entered into government service or assumed their positions after portions of the alleged misconduct occurred, *e.g.* Defendants Azar (began January 29, 2018), Morgan (May 28, 2019), Cissna (October 8, 2017), and cannot be liable for any of the alleged conduct before they started, *e.g.*, Compl. ¶ 125 (discussing alleged February 14, 2017 meeting); *id.* ¶ 142 (discussing alleged "December 2017 Family Separation Memo").

Accordingly, at the very least, the Court should dismiss the second cause of action and all claims against Morgan and Albence and narrow any remaining claims to actions taken while Defendants were in their official positions.

### E. The Court Should Dismiss Plaintiffs' Federal Statutory Claims For Additional Reasons

Defendants are also entitled to qualified immunity with respect to Plaintiffs' claims under Sections 1985 (Count VII) and 1986 (Count VIII). *See Abbasi*, 137 S. Ct. at 1866 (applying qualified immunity to Section 1985 claim). To state a claim under Section 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29 (1983). Section 1985(3), however, "provides no substantive rights itself." *Id.* at 833. Instead, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere." *Id*. Allegations that the "conduct was motivated by a racial or perhaps otherwise class-based, invidiously discriminatory animus . . . constitutes an essential element of a cause of action

1   under section 1985(3)." *Trerice v. Pedersen*, 769 F.2d 1398, 1402 (9th Cir. 1985). Here,
2   Plaintiffs invoke their equal protection rights. Compl. ¶ 339.

3       In addition to the reasons already given by Defendants about why they are entitled
4   to qualified immunity for Plaintiffs' equal protection claim, *supra*, Section V.B,
5   Defendants are also entitled to qualified immunity on Plaintiffs' statutory claims. *See*
6   *Griffin*, 403 U.S. at 102–03 (noting that cause of action under § 1985(3) requires proof of
7   an injury to, or deprivation of, a federally assured right or privilege). Indeed, the extent to
8   which Section 1985(3) even applies to federal actors at all has not been not clearly
9   established, *see DeBolt v. Rose*, No. 4:15-CV-00215, 2017 WL 3701002, at *2 (D. Ariz.
10   Mar. 31, 2017) (Soto, J.) (holding that the court lacked subject matter jurisdiction over
11   Section 1985(3) claim against individual federal defendants), let alone against federal
12   actors who formulate general policy. *Cf. Canlis v. San Joaquin Sheriff's Posse Comitatus*,
13   641 F.2d 711, 719–20 (9th Cir. 1981) ("§ 1985(3) was originally designed to protect
14   oppressed southern blacks from the violence of the vindictive Ku Klux Klan . . . .").

15       Fundamentally, Plaintiffs statutory claims fail because they do not allege any
16   conspiracy between distinct persons or entities. Rather, Plaintiffs allege that Executive
17   Branch officials "consult[ed] among themselves and then adopt[ed] a policy for the entity,"
18   the Executive Branch. *Abbasi*, 137 S. Ct. at 1867. As *Abbasi* explained, "[u]nder this
19   principle—sometimes called the intracorporate-conspiracy doctrine—an agreement
20   between or among agents of the same legal entity, when the agents act in their official
21   capacities, is not an unlawful conspiracy." *Id.* This doctrine is "derived from the nature of
22   the conspiracy prohibition," which requires an agreement between "two or more separate
23   persons." *Id.* But "[w]hen two agents of the same legal entity make an agreement in the
24   course of their official duties . . . as a practical and legal matter their acts are attributed to
25   their principal. And it then follows that there has not been an agreement between two or
26   more separate people." *Id.*; *see Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771
27   (1984) ("They are not unlike a multiple team of horses drawing a vehicle under the control
28   of a single driver.").

57

Drawing on these principles, *Abbasi* discussed the viability of a Section 1985(3) claim against multiple "Executive Branch" officials for discussions that "were the preface to, and the outline of, a general and far-reaching policy." 137 S. Ct. at 1867. Although the Court declined to decide on the applicability of intracorporate-conspiracy doctrine with reference to Section 1985(3) conspiracies, the Court found the law was "sufficiently open" that the government employees were entitled to qualified immunity. *Id.* at 1868–69; *accord Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1245 (9th Cir. 2019) (holding that FBI agents were entitled to qualified immunity against liability against a Section 1985(3) claim); *id.* at 1245–46 (explaining that agents could not "reasonably have known that agreements entered into or agreed-upon policies devised with other employees of the FBI could subject them to conspiracy liability under § 1985(3)"). Just as in *Abbasi*, many of the Defendants here work or worked in the same agencies, and all Defendants worked for the same branch of government, raising similar intracorporate-conspiracy issues. As with the "team of horses" analogy mentioned in *Abbasi*, executive agencies and departments all work together under the leadership of the White House and, ultimately, the President. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 249 (D.C. Cir. 2014) ("[E]xecutive agencies . . . operate under the direction and supervision of the single President."). Because the law is no clearer now than it was at the time *Abbasi* was decided, Defendants are entitled to qualified immunity.

Plaintiffs' claim under 42 U.S.C. § 1986 must derivatively fail because a violation of Section 1986 depends on an underlying violation of Section 1985. Section 1986 provides that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . are about to be committed, and having power to prevent or aid . . . neglects or refuses so to do . . . shall be liable to the party injured . . . ." 42 U.S.C. § 1986. If a plaintiff fails to demonstrate a claim under Section 1985, however, courts consistently conclude that a plaintiff cannot sustain a cause of action under Section 1986. *See, e.g.*, *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) ("A claim can be stated under section 1986 only if the complaint contains a valid claim

under section 1985."). In short, Plaintiffs' Section 1986 claim is doomed by their failure to allege facts sufficient to state a claim under Section 1985, and both claims should be dismissed on the basis of qualified immunity. *See Saucier*, 533 U.S. at 201.

## VI. PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY

In *Imbler v. Pachtman*, the Supreme Court held that "in initiating a prosecution and in presenting the [government's] case, the prosecutor is immune from a civil suit for damages . . . ." 424 U.S. 409, 431 (1976); *see also Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (absolute immunity also protects the decision not to prosecute). This immunity extends to any activities of the prosecutor "intimately associated with the judicial phase of the criminal process . . . ." *Imbler*, 424 U.S. at 430. The Court has continued to employ *Imbler*'s functional approach in determining whether absolute prosecutorial immunity applies in a given case. *See Burns v. Reed*, 500 U.S. 478, 492 (1991) (listing cases). The Supreme Court has confirmed that, like line prosecutors, policymakers are absolutely immune from claims that arise out of the formulation of prosecutorial policies. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 349 (2009) (supervising prosecutors had absolute immunity for general claims that their "supervision, training, or information-system management was constitutionally inadequate"); *accord Dellums v. Powell*, 660 F.2d 802, 803 (D.C. Cir. 1981) (extending *Imbler*'s prosecutorial immunity to the Attorney General for acts of prosecutorial policymaking).

Plaintiffs allege that in April 2018 former AG Sessions announced a "Zero Tolerance" policy to criminally prosecute all DHS referrals of Section 1325(a) violations. Compl. ¶ 158. This decision to initiate prosecutions against a class of offenders (whether, as Plaintiffs claim, it was a "pretext" for discrimination, *id.* ¶ 160, or not) was the kind of core activity protected by *Imbler*. 424 U.S. at 431. To the extent former AG Sessions, or any other Defendant, is alleged to have created or implemented the policy of criminal prosecution at issue, such acts are protected by absolute immunity, and all related claims must be dismissed. *Dellums*, 660 F.2d at 806; *see* Compl. ¶ 160 (suggesting that the

59

government's zero-tolerance policy "was conceived of" by Defendants Sessions, Nielsen, Miller, and Hamilton). As discussed above, the immunity derives from the function of the prosecutorial act, not the particular title of the government official. *See Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)) ("The Supreme Court has adopted a 'functional approach' to determine whether an official is entitled to absolute immunity. This approach looks to the nature of the function performed, not the identity of the actor who performed it.").

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated this 14th day of February, 2020.

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director
Constitutional & Specialized Tort Litigation
Torts Branch, Civil Division

MARY HAMPTON MASON
Senior Trial Counsel
Constitutional & Specialized Tort Litigation
Torts Branch, Civil Division

*/s/ Paul Quast*
PAUL QUAST

*Counsel for Defendants*

60

**LRCiv 12.1 CERTIFICATION**

Pursuant to Local Rule 12.1(c), Defendants' counsel certifies that before filing this motion, I notified Plaintiffs' counsel of the issues to be asserted in this motion and the parties were unable to agree that the pleading was curable in any part by a permissible amendment offered by Plaintiffs.

*/s/ Paul Quast*
Paul Quast


**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by means of the District Clerk's CM/ECF electronic filing system on February 14, 2020.

*/s/ Paul Quast*
Paul Quast