1   Jacqueline P. Rubin (admitted *pro hac vice*)
    PAUL, WEISS, RIFKIND,
2   WHARTON & GARRISON LLP
3   1285 Avenue of the Americas
    New York, NY 10019
4   (212) 373-3000

5
    Lee Gelernt (admitted *pro hac vice*)
6   AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
7   IMMIGRANTS' RIGHTS PROJECT
8   125 Broad Street, 18th Floor
    New York, NY 10004
9   (212) 549-2660

10  Attorneys for Plaintiffs

11  *(Additional Counsel for Plaintiffs Listed on Signature Page)*

12
13  **IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF ARIZONA**

14

15  A.I.I.L., et al.,                              No. 4:19-cv-00481-JAS

16                          Plaintiffs,

17              - v -                              **PLAINTIFFS' OPPOSITION TO
                                                   DEFENDANTS' MOTION TO
18  Jefferson Beauregard Sessions III, et al.,     DISMISS**

19                          Defendants.            **Oral Argument Requested**

20                                                 Assigned to the
21                                                 Hon. James A. Soto

22

23

24

25

26

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 3

III. ARGUMENT ...................................................................................................... 7

    A.   THIS COURT HAS PERSONAL JURISDICTION OVER
         ALL DEFENDANTS ................................................................................... 8

        1.   Plaintiffs Have Made a *Prima Facie* Showing ................................. 8

        2.   This Court Has Conspiracy Jurisdiction Over
            Defendants ......................................................................................... 15

    B.   PLAINTIFFS HAVE ADEQUATELY PLEADED *BIVENS*
         CAUSES OF ACTION FOR VIOLATIONS OF THE
         FOURTH AND FIFTH AMENDMENTS ................................................. 17

        1.   This Action Does Not Arise in a New Context ................................. 17

        2.   Even If the Court Concludes This Case Presents a New
            Context, "Special Factors" Do Not Counsel Against a
            *Bivens* Remedy ................................................................................. 22

    C.   QUALIFIED IMMUNITY DOES NOT SHIELD
         DEFENDANTS ......................................................................................... 33

        1.   Defendants Violated Plaintiffs' Clearly Established
            Fifth Amendment Right to Family Integrity ..................................... 35

        2.   Defendants Violated Plaintiffs' Clearly Established
            Fifth Amendment Substantive Due Process Right to
            Receive Adequate Medical Care While in Custody ........................ 38

        3.   Defendants Violated Plaintiffs' Clearly Established
            Fifth Amendment Right to Be Free From Punitive
            Treatment Without Due Process ....................................................... 39

        4.   Defendants Violated Plaintiffs' Clearly Established
            Fifth Amendment Right to Procedural Due Process ........................ 41

        5.   Defendants Violated Plaintiffs' Clearly Established
            Fifth Amendment Right to Equal Protection Under the
            Law .................................................................................................... 44

6.    Defendants Violated Plaintiffs' Clearly Established
      Fourth Amendment Right Against Unreasonable
      Seizures ............................................................. 47

D.    PLAINTIFFS' SECTION 1985 & 1986 CLAIMS SHOULD
      NOT BE DISMISSED .................................................. 50

      1.    Plaintiffs Have Adequately Pleaded Facts Supporting
            Each Element of Their Statutory Claims ......................... 50

      2.    Defendants Are Not Entitled to Qualified Immunity on
            Plaintiffs' Section 1985(3) and 1986 Claims .................... 55

E.    DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE
      IMMUNITY .............................................................. 58

IV.   CONCLUSION ................................................................. 59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Advanced Bldg. & Fabrication, Inc.* v. *Cal. Highway Patrol*,
  918 F.3d 654 (9th Cir. 2019) ................................................................. 33

*Ali* v. *Raleigh Cty.*,
  No. 5:17-cv-3386, 2018 WL 4101517 (S.D.W. Va. Aug. 28, 2018).......................... 57

*Amini* v. *Pro Custom Solar LLC*,
  No. 8:17-cv-2244, 2018 WL 6133632 (C.D. Cal. Aug. 13, 2018) ............................. 12

*Anderson* v. *Creighton*,
  483 U.S. 635 (1987).................................................................................. 33

*Anderson-Francois* v. *Cty. of Sonoma*,
  415 F. App'x 6 (9th Cir. 2011) ................................................................... 36

*Arce* v. *Douglas*,
  793 F.3d 968 (9th Cir. 2015) ..................................................................... 44

*Ariz. Dream Act Coalition* v. *Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ................................................................... 47

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)......................................................... 27, 33, 40, 45, 51

*Ave. 6E Invs., LLC* v. *City of Yuma, Ariz.*,
  818 F.3d 493 (9th Cir. 2016) ..................................................................... 45

*Bailey* v. *Pataki*,
  No. 1:08-cv-8563, 2010 WL 4237071 (S.D.N.Y. Oct. 26, 2010) ............................. 57

*Bank Markazi* v. *Peterson*,
  136 S. Ct. 1310 (2016).............................................................................. 31

*BBK Tobacco & Foods LLP* v. *Juicy eJuice*,
  No. 2:13-cv-00070, 2014 WL 1686842 (D. Ariz. Apr. 29, 2014)............................. 15

*Bhatti* v. *Cty. of Sacramento*,
  281 F. App'x 764 (9th Cir. 2008) ............................................................... 36

*Biliack* v. *Paul Revere Life Ins. Co.*,
  265 F. Supp. 3d 1003 (D. Ariz. 2017) ........................................................ 14

*Bistrian* v. *Levi*,
  912 F.3d 79 (3d Cir. 2018) .......................................................... 19, 24, 25

*Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971)....................................................................... *passim*

*Bohn* v. *Cty. of Dakota*,
    722 F.2d 1433 (8th Cir. 1985) .................................................................. 36

*Brosseau* v. *Haugen*,
    543 U.S. 194 (2004).................................................................................. 34

*Brunoehler* v. *Tarwater*,
    743 F. App'x 740 (9th Cir. 2018) ................................................. 18, 20, 21

*Buckley* v. *Fitzsimmons*,
    509 U.S. 259 (1993).................................................................................. 59

*Bunyan* v. *Camacho*,
    770 F.2d 773 (9th Cir. 1985) .................................................................... 47

*Burns* v. *Reed*,
    500 U.S. 478 (1991).................................................................................. 58

*Burns* v. *United States*,
    501 U.S. 129 (1991).................................................................................. 30

*C.M.* v. *United States*,
    No. 2:19-cv-5217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ......... 37, 49

*Calder* v. *Jones*,
    465 U.S. 783 (1984).............................................................................. 9, 12

*Canlis* v. *San Joaquin Sheriff's Posse Comitatus*,
    641 F.2d 711 (9th Cir. 1981) .................................................................... 53

*Carlson* v. *Green*,
    446 U.S. 14 (1980)............................................................................ *passim*

*Castellanos* v. *United States*,
    No. 3:18-cv-0428, 2020 WL 619336 (S.D. Cal. Feb. 10, 2020) ............... 18

*Chavez* v. *United States*,
    683 F.3d 1102 (9th Cir. 2012) ....................................................... 18, 19, 21

*Chirila* v. *Conforte*,
    47 F. App'x 838 (9th Cir. 2002) ............................................................... 16

*City of Cleburne, Tex.* v. *Cleburne Living Ctr.*,
    473 U.S. 432 (1985).................................................................................. 44

*City of L.A.* v. *Lyons*,
    461 U.S. 95 (1983).................................................................................... 24

*Claasen* v. *Brown*,
    No. 1:94-cv-1018, 1996 WL 79490 (D.D.C. Feb. 16, 1996)...................... 13

*Cleveland Bd. of Educ.* v. *LaFleur*,
   414 U.S. 632 (1974) ................................................................. 35

*Cooper* v. *Aaron*,
   358 U.S. 1 (1958) ................................................................... 44

*Copperweld Corp.* v. *Indep. Tube Corp.*,
   467 U.S. 752 (1984) ................................................................. 54

*Corr. Servs. Corp.* v. *Malesko*,
   534 U.S. 61 (2001) .................................................................. 23

*Cousins* v. *Lockyer*,
   568 F.3d 1063 (9th Cir. 2009) ..................................................... 7

*Cuevas* v. *United States*,
   No. 16-cv-00299-MSK-KMT, 2018 WL 1399910
   (D. Colo. Mar. 19, 2018) ........................................................... 24

*Daniels-Hall* v. *Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ...................................................... 10

*Data Disc, Inc.* v. *Sys. Tech. Assocs., Inc.*,
   557 F.2d 1280 (9th Cir. 1977) ................................................. 15, 16

*Davis* v. *Passman*,
   442 U.S. 228 (1979) .......................................................... *passim*

*Davison* v. *Carona*,
   No. 8:06-cv-1258, 2010 WL 4345752 (C.D. Cal. Sept. 29, 2010) ............. 40

*DeBolt* v. *Rose*,
   No. 4:15-cv-0215, 2017 WL 3701002 (D. Ariz. Mar. 31, 2017) ............... 53

*Demery* v. *Arpaio*,
   378 F.3d 1020 (9th Cir. 2004) ..................................................... 40

*Dep't of Commerce* v. *New York*,
   139 S. Ct. 2551 (2019) ............................................................. 25

*Doe* v. *Rumsfeld*,
   683 F.3d 390, 392 (D.C. Cir. 2012) ............................................... 31

*Dole Food Co.* v. *Watts*,
   303 F.3d 1104 (9th Cir. 2002) .................................................. 9, 14

*Elliot-Park* v. *Manglona*,
   592 F.3d 1003 (9th Cir. 2010) ................................................ 34, 44

*Fazaga* v. *Fed. Bureau of Investigation*,
   916 F.3d 1202 (9th Cir. 2019) ..................................................... 50

*Flores* v. *Pierce*,
   617 F.2d 1386 (9th Cir. 1980) ............................................................. 34, 44

*Freestream Aircraft (Berm.) Ltd.* v. *Aero Law Grp.*,
   905 F.3d 597 (9th Cir. 2018) ................................................................... 15

*Freytag* v. *C.I.R.*,
   501 U.S. 868 (1991) ................................................................................ 55

*Gonzales* v. *Carhart*,
   550 U.S. 124 (2007) ................................................................................ 35

*Griffin* v. *Breckenridge*,
   403 U.S. 88 (1971) ............................................................................ 52, 53

*Guerra* v. *Sutton*,
   783 F.2d 1371 (9th Cir. 1986) ........................................................... 20, 21

*Hardwick* v. *Cty. of Orange*,
   844 F.3d 1112 (9th Cir. 2017) ........................................................... 35, 59

*Harisiades* v. *Shaughnessy*,
   342 U.S. 580 (1952) ................................................................................ 31

*Hernandez* v. *Cate*,
   918 F. Supp. 2d 987 (C.D. Cal. 2013) ................................................... 44

*Hernandez* v. *Mesa*,
   140 S. Ct. 735 (2020) ................................................................. 17, 18, 31

*Hobson* v. *Wilson*,
   737 F.2d 1 (D.C. Cir. 1984) ............................................... 52, 53, 56, 57

*Hope* v. *Pelzer*,
   536 U.S. 730 (2002) ........................................................................ 34, 55

*Ibrahim* v. *Dep't of Homeland Sec.*,
   538 F.3d 1250 (9th Cir. 2008) ............................................................. 9, 13

*Ignatiev* v. *United States*,
   238 F.3d 464 (D.C. Cir. 2001) ............................................................... 27

*Ill. Dep't of Public Aid* v. *Schweiker*,
   707 F.2d 273 (1983) ............................................................................... 30

*Imbler* v. *Pachtman*,
   424 U.S. 409 (1976) ............................................................................... 58

*Ioane* v. *Hodges*,
   939 F.3d 945 (9th Cir. 2018) ........................................................... 18, 21

*J.S.G. ex rel. J.S.R.* v. *Sessions*,
   330 F. Supp. 3d 731 (D. Conn. 2018) .................................................... 36

*Jacinto-Castanon de Nolasco* v. *U.S. Immigration & Customs Enf't*,
    319 F. Supp. 3d 491 (D.D.C. 2018)........................................................ 24, 36

*Jean* v. *Nelson*,
    727 F.2d 957 (11th Cir. 1984) ................................................................ 46

*Johnson* v. *California*,
    543 U.S. 499 (2005)............................................................................... 44

*Keates* v. *Koile*,
    883 F.3d 1228 (9th Cir. 2018) ........................................................*passim*

*Kirkpatrick* v. *Cty. of Washoe*,
    843 F.3d 784 (9th Cir. 2016) ............................................................ 47, 48

*K.O.* v. *Sessions*,
    No. 4:18-cv-40149, 2020 WL 533461 (D. Mass. Feb. 3, 2020)................... 12

*La Unión del Pueblo Entero* v. *Ross*,
    353 F. Supp. 3d 381 (D. Md. 2018)........................................................ 53

*Lanuza* v. *Love*,
    899 F.3d 1019 (9th Cir. 2018) ........................................................*passim*

*Leafty* v. *Aussie Sonoran Capital LLC*,
    No. 2:15-cv-0655, 2017 WL 588717 (D. Ariz. Feb. 14, 2017) ..................... 9

*Leatherman* v. *Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993)............................................................................... 53

*Lewis* v. *Clarke*,
    137 S. Ct. 1285 (2017)........................................................................... 53

*Lynch* v. *Baxley*,
    744 F.2d 1452 (11th Cir. 1984) .............................................................. 40

*M.G.U.* v. *Nielsen*,
    325 F. Supp. 3d 111 (D.D.C. 2018)................................................... 35, 36

*Mahmud* v. *Oberman*,
    508 F. Supp. 2d 1294 (N.D. Ga. 2007)................................................... 12

*Mahmud* v. *U.S. Dep't of Homeland Sec.*,
    262 F. App'x 935 (11th Cir. 2008) .......................................................... 12

*Mandelkorn* v. *Patrick*,
    359 F. Supp. 692 (D.D.C. 1973)............................................................. 16

*Maney* v. *Ratcliff*,
    399 F. Supp. 760 (E.D. Wis. 1975)......................................................... 13

*Manuel* v. *City of Joliet, Ill.*,
    137 S. Ct. 911 (2017)............................................................................. 49

*Maricopa Cty.* v. *Am. Petrofina, Inc.*,
    322 F. Supp. 467 (N.D. Cal. 1971) ............................................................... 16

*Mathews* v. *Eldridge*,
    424 U.S. 319 (1976) ....................................................................................... 42

*Mavrix Photo, Inc.* v. *Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011) ......................................................................... 8

*Maxwell* v. *Cty. of San Diego*,
    708 F.3d 1075 (9th Cir. 2013) ....................................................................... 34

*Mejia-Mejia* v. *U.S. Immigration & Customs Enf't*,
    No. 1:18-cv-1445, 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ................... 26

*Melea, Ltd.* v. *Jawer SA*,
    511 F.3d 1060 (10th Cir. 2007) ..................................................................... 16

*Melendres* v. *Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ......................................................................... 47

*Minneci* v. *Pollard*,
    565 U.S. 118 (2012) ................................................................................. 22, 24

*Mirmehdi* v. *United States*,
    689 F.3d 975 (2012) ....................................................................................... 31

*Mitan* v. *Feeney*,
    497 F. Supp. 2d 1113 (C.D. Cal. 2007) ......................................................... 17

*Moore* v. *City of E. Cleveland*,
    431 U.S. 494 (1977) ....................................................................................... 35

*Moss* v. *U.S. Secret Serv.*,
    No. 1:06-cv-03045, 2007 WL 2915608 (D. Or. Oct. 7, 2007) ..................... 12

*Ms. J.P.* v. *Barr*,
    No. 2:18-cv-6081, 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019) ................. 24

*Ms. L.* v. *U.S. Immigration & Customs Enf't*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018)................................................. 4, 5, 35

*Ms. L.* v. *U.S. Immigration & Customs Enf't*,
    310 F. Supp. 3d 1133 (S.D. Cal. 2018)................................................. *passim*

*Ms. L.* v. *U.S. Immigration & Customs Enf't*,
    415 F. Supp. 3d 980 (S.D. Cal. 2020)............................................................ 38

*Munns* v. *Clinton*,
    822 F. Supp. 2d 1048 (E.D. Cal. 2011) ......................................................... 12

*Narenji* v. *Civiletti*,
    617 F.2d 745 (D.C. Cir. 1979)........................................................................ 46

*Ochoa* v. *J.B. Martin & Sons Farms, Inc.*,
    287 F.3d 1182 (9th Cir. 2002) ....................................................................... 14

*Oksner* v. *Blakey*,
    No. 4:07-cv-02273, 2007 WL 3238659 (N.D. Cal. Oct. 31, 2007) ........................... 12

*Osborn* v. *Haley*,
    549 U.S. 225 (2007).................................................................................. 24

*Panavision Int'l* v. *Toeppen*,
    141 F.3d 1316 (9th Cir. 1998) ....................................................................... 9

*Papa* v. *United States*,
    281 F.3d 1004 (9th Cir. 2002) ...................................................................... 19

*Perez* v. *United States*,
    No. 3:13-cv-1417, 2014 WL 4385473 (S.D. Cal. Sept. 3, 2014) ............................ 13

*Picot* v. *Weston*,
    780 F.3d 1206 (9th Cir. 2015) ...................................................................... 15

*Prado* v. *Perez*,
    No. 1:18-cv-9806, 2020 WL 1659848 (S.D.N.Y. Apr. 3, 2020) ......................... *passim*

*Rajah* v. *Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ........................................................................ 46

*Ram* v. *Rubin*,
    118 F.3d 1306 (9th Cir. 1997) ................................................................. 41, 42

*Rehberg* v. *Paulk*,
    566 U.S. 356 (2012).................................................................................. 33

*Reno* v. *Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999).................................................................................. 31

*Robins* v. *Harum*,
    773 F.2d 1004 (9th Cir. 1985) ...................................................................... 49

*Robinson* v. *Tripler Army Med. Ctr.*,
    No. 05-17011, 2009 WL 688922 (9th Cir. Mar. 17, 2009) .................................. 43

*Rodriguez* v. *Swartz*,
    899 F.3d 719 (9th Cir. 2018) .................................................................. 23, 24

*Romano* v. *Bible*,
    169 F.3d 1182 (9th Cir. 1999) ...................................................................... 58

*Ross* v. *Krueger*,
    No. 2:13-cv-0355, 2015 WL 1470534 (D. Nev. Mar. 31, 2015)............................ 38

*Santosky* v. *Kramer*,
    455 U.S. 745 (1982).............................................................................. 35, 41

*Scheuer* v. *Rhodes*,
  416 U.S. 232 (1974)..................................................................... 33

*Silvas* v. *E\*Trade Mortg. Corp.*,
  514 F.3d 1001 (9th Cir. 2008) ...................................................... 7

*Sky Billiards, Inc.* v. *Loong Star Inc.*,
  No. 5:14-cv-0921, 2014 WL 12601022 (C.D. Cal. Sept. 4, 2014)............... 9

*Soler* v. *Cty. of San Diego*,
  762 F. App'x 383 (9th Cir. 2019) ................................................... 13

*Spagnola* v. *Mathis*,
  809 F.2d 16 (D.C. Cir. 1986) ......................................................... 53

*Stadt* v. *Univ. of Rochester*,
  921 F. Supp. 1023 (W.D.N.Y. 1996) .............................................. 14

*Starr* v. *Baca*,
  652 F.3d 1202 (9th Cir. 2011) ....................................................... 45

*Tatum* v. *Winslow*,
  122 F. App'x 309 (9th Cir. 2005) .................................................. 38

*Terry* v. *Ohio*,
  392 U.S. 1 (1968).......................................................................... 47

*Textor* v. *Bd. of Regents of N. Ill. Univ.*,
  711 F.2d 1387 (7th Cir. 1983) ...................................................... 16

*Tolan* v. *Cotton*,
  572 U.S. 650 (2014)...................................................................... 55

*Trerice* v. *Pederson*,
  769 F.2d 1398 (9th Cir. 1985) ...................................................... 51

*Troxel* v. *Granville*,
  530 U.S. 57 (2000)........................................................................ 36

*Trump* v. *Hawaii*,
  138 S. Ct. 2392 (2018).................................................................. 46

*Turkmen* v. *Hasty*,
  789 F.3d 218 (2d Cir. 2015) ................................................... 52, 54

*U.S. Dep't of Agric.* v. *Moreno*,
  413 U.S. 528 (1973)...................................................................... 47

*Underwager* v. *Channel 9 Austl.*,
  69 F.3d 361 (9th Cir. 1995) .......................................................... 16

*United Bhd. of Carpenters & Joiners of Am. Local 610* v. *Scott*,
  463 U.S. 825 (1983)...................................................................... 50

*United States* v. *Germaine*,
  99 U.S. 508 (1878) ..................................................................................... 55

*Unknown Parties* v. *Nielsen*,
  No. 4:17-cv-00250, 2020 WL 813774 (D. Ariz. Feb. 19, 2020) ............................... 40

*Unspam Techs., Inc.* v. *Chernuk*,
  716 F.3d 322 (4th Cir. 2013) ..................................................................... 15

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .......................................................................... 44, 45

*W. Radio Servs. Co.* v. *U.S. Forest Servs.*,
  578 F.3d 1116 (9th Cir. 2009) .......................................................... 25

*W.S.R.* v. *Sessions*,
  318 F. Supp. 3d 1116 (N.D. Ill. 2018) ........................................... 36

*Wag-Aero, Inc.*, v. *United States*,
  837 F. Supp. 1479 (E.D. Wis. 1993) .............................................. 13

*Wake Up & Ball LLC* v. *Sony Music Entm't Inc.*,
  119 F. Supp. 3d 944 (D. Ariz. 2015) ............................................... 8

*Walden* v. *Fiore*,
  571 U.S. 277 (2014) .......................................................... 10, 12

*Wallis* v. *Spencer*,
  202 F.3d 1126 (9th Cir. 2000) .................................................. 35, 43

*Warfield* v. *Gardner*,
  346 F. Supp. 2d 1033 (D. Ariz. 2004) .............................................. 8

*Wilkie* v. *Robbins*,
  551 U.S. 537 (2007) ........................................................... 22

*Wilson* v. *Layne*,
  526 U.S. 603 (1999) ........................................................... 33

*Wong Wing* v. *United States*,
  163 U.S. 228 (1896) ........................................................ 40, 46

*Yahoo! Inc.* v. *La Ligue Contre Le Racisme Et L'Antisemitisme*,
  433 F.3d 1199 (9th Cir. 2006) ................................................. 8, 9

*Yellowbear* v. *Ashe*,
  612 F. App'x 918 (10th Cir. 2015) ........................................... 13

*Ziegler* v. *Indian River Cty.*,
  64 F.3d 470 (9th Cir. 1995) ............................................... 13, 15

*Ziglar* v. *Abbasi*,
  137 S. Ct. 1843 (2017) ................................................... *passim*

**STATUTES**

8 U.S.C. § 1158(a)(1) ......................................................................... 3

8 U.S.C. § 1225(b) ............................................................................. 3

8 U.S.C. §§ 1232(c)(2)–(c)(3) ........................................................... 4

42 U.S.C. § 1983 ......................................................................... 33, 52

42 U.S.C. § 1985(3) ................................................................... *passim*

42 U.S.C. § 1986 ........................................................................ *passim*

Pub. L. No. 110-457, 122 Stat. 5044 (2008) ...................................... 4

Pub. L. No. 115-99, 131 Stat. 2242 (2018) ...................................... 29

Pub. L. No. 115-106, 131 Stat. 2265 (2018) .................................... 29

**OTHER AUTHORITIES**

28 C.F.R. § 50.15(a) ........................................................................ 24

## I.    INTRODUCTION

Plaintiffs in this action are some of the thousands of children and parents cruelly separated in Arizona and other southern border states by Defendants.  Plaintiffs now bring this lawsuit on behalf of themselves and similarly situated persons to hold Defendants accountable for this inhumane and unlawful conduct, which has caused severe physical, emotional, and psychological harms.  Defendants move for dismissal, arguing that Plaintiffs have no remedy because this is a case challenging federal immigration policy. Their argument rests on a mischaracterization of the law and the facts.  Defendants acted pursuant to a pathological and unconstitutional scheme to cause pain to Plaintiffs and other Central Americans seeking asylum and other relief in the United States.  And Plaintiffs' claims are grounded in well-established constitutional and statutory rights.

Beginning in 2017, Defendants conspired to cruelly and deliberately separate thousands of immigrant parents and their children.  Defendants separated families without warning or explanation, without affording Plaintiffs any chance to say goodbye or know when they would ever see each other again, and without regard for Plaintiffs' rights or dignity.  Children like Andrés, then six years old, were torn kicking and screaming from their parents' arms.  Defendants provided families with little-to-no information about each other's whereabouts, and parents and children went weeks or months without *any* communication.  Karina, then 13 years old, was traumatized by 16 months of separation from her mother, without any regard for her preexisting mental health issues.  Defendants perpetrated these nightmares without any plan to reunify the families they had torn apart.  Parents and children began to be reunified only after a federal district court judge granted a preliminary injunction halting these cruel, abusive, and unlawful practices.  *Ms. L.* v. *U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018) ("*Ms. L. Order Granting Prelim. Inj.*").

Defendants caused wounds that will never heal.  Their motion to dismiss is an attempt to avoid having to account for their conduct. Each of Defendants' arguments should be rejected.

*First*, this Court has personal jurisdiction over all Defendants because Plaintiffs have adequately alleged that Defendants' and their agents' conduct was directed at Plaintiffs in Arizona, and Plaintiffs' claims arise out of such conduct.

*Second*, Plaintiffs have alleged *Bivens* claims under the Fourth and Fifth Amendments of the United States Constitution resulting from Defendants' violations of Plaintiffs' constitutional rights.  *See generally Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiffs' claims do not arise in a "new context," because actions related to physical seizure and punitive treatment fall within the core of *Bivens* and have been endorsed many times in connection with immigration enforcement.  And even if Plaintiffs' claims involved a new *Bivens* context, no "special factors" counsel against a damages remedy in this case.

*Third*, Defendants cannot establish the affirmative defense of qualified immunity. Clearly established law provides a basis for Plaintiffs' claims to family integrity, to adequate health care while in custody, to be free from punitive treatment, to procedural due process, to equal protection, and to be free of unreasonable searches and seizures.  Any reasonable official would understand that Defendants' cruel treatment violated these rights.

*Fourth*, Plaintiffs' claims are plainly cognizable under 42 U.S.C. §§ 1985(3) and 1986, and Defendants do not cite a single case—much less binding authority—that says otherwise.  Nor can Defendants establish qualified immunity on these claims because their arguments rely on the untenable assertion that the law permits government officials to conspire to violate individuals' constitutional rights, even where they would be subject to damages liability were they to do so independently.  That argument is squarely foreclosed

by decades of well-settled qualified immunity doctrine.

*Finally*, this is not a case where Defendants are entitled to absolute immunity, as the treatment of parents and children at issue here was separate from and occurred independent of any prosecutorial decisions.  Moreover, in some cases there was not even a prosecution.

## II.    BACKGROUND

Beginning in 2017, Defendants forcibly separated thousands of immigrant parents and children who sought refuge in this country.  (Compl. ¶¶ 2, 8, 133–67, 234.)[1]  As of the filing of this case, the United States had admitted to separating approximately 4,000 children from their parents or guardians, and the numbers continue to grow.  (*Id.* ¶¶ 225, 234, 271.)  Many of these children were of so-called "tender age," meaning that they were under 12 years old; some were mere babies who could not yet speak.  (*Id.* ¶¶ 139, 185, 191, 201.)[2]  The resulting "separation crisis" was one of the worst human rights abuses in modern American history.  Even to this day, certain families remain separated.  (*Id.* ¶ 225.)

Defendants—including current and former officials in the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), the Department of Health and Human Services ("HHS"), the Office of Refugee Resettlement ("ORR"), and the White House—ordered and participated in the planning of family separations, oversaw and created the punitive conditions of their confinement, and failed in fulfilling their reunification responsibilities.  (*Id.* ¶¶ 26–43, 123, 128–29, 133–35, 141–64, 167–211, 225–

---

[1]    Noncitizens who arrive in the United States may apply for asylum, withholding of removal, or other immigration relief.  *See* 8 U.S.C. § 1158(a)(1); *see also* 8 U.S.C. § 1225(b).

[2]    "Unaccompanied alien children" or "UACs"—children under 18 years old without immigration status who enter the United States, and have neither a parent nor a legal guardian in the country, or who are taken away from their parents or guardians—move into the custody of ORR, where certain protections apply (Compl. ¶¶ 56–57), including that facilities holding UACs must be "safe and sanitary" and consistent with the "concern for the particular vulnerability of minors."  *Flores* v. *Reno*, No. 2:85-cv-4544, Stipulated Settlement Agreement (C.D. Cal. Jan. 17, 1997).

33.)[3]  Defendants also include as-yet-unidentified line officers in Arizona and elsewhere at the border who effected the separations.  (*Id.* ¶¶ 38, 42, 62–63, 66–67, 77, 80–87, 93–94, 96, 102, 104–05, 107–08, 112–14, 118–19, 125, 141, 152–53, 166, 169, 178–79, 182.)[4]

All Defendants inflicted this inhumane trauma on these parents and children deliberately, and with shocking cruelty:  separating families without warning or explanation and without opportunities to say goodbye; and often carrying out the separations through dishonest explanations as to where the children were going.  (*Id.* ¶¶ 2, 80, 94, 228.)  Neither parents nor children were told when—or even whether—they would ever see each other again.  (*Id.* ¶¶ 2, 63, 112.)  Defendants then sent parents and children to different detention facilities, shelters, and foster homes, often thousands of miles apart.  (*Id.* ¶¶ 2, 10, 70, 87, 95, 108, 115, 170.)  Once the parents and children were separated, Defendants failed to give parents information about their children's whereabouts or well-being, and continued to deny them information as to whether or when they would ever see their children again.  (*Id.* ¶¶ 2, 63, 66, 81, 84, 96, 114, 230.)  Likewise, children were not

---

[3]  The William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (2008), permits United States Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP"), absent exceptional circumstances, to detain unaccompanied children for only up to 72 hours to allow ORR to locate an appropriate facility or attempt to place the child with available parents or legal guardians.  *See generally* 8 U.S.C. §§ 1232(c)(2)–(c)(3).  Otherwise, ORR must locate relatives, friends, or caretakers in the United States to serve as sponsors and care for the children during the pendency of their immigration proceedings.  *Id.*

[4]  Various federal agencies are involved when a noncitizen is detained.  Noncitizens are typically first taken to CBP facilities, which are intended for short-term stays.  (Compl. ¶ 54.)  Then, adults are typically transferred to ICE custody.  (*Id.* ¶ 55.)  Prior to Defendants' use of forced family separations in 2017, a child was typically separated from a parent or legal guardian only where there were specific concerns that the parent represented a danger to the child or was otherwise unfit.  *See generally Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018) ("*Ms. L.* Order Den. Mot. to Dismiss").

told why they were separated or if they would ever be reunited with their parents.  (*Id.* ¶¶ 2, 10, 65, 95, 230.)  Many of the separated families were unable to speak with each other for weeks or months at a time, and some children were not yet old enough to talk.  (*Id.* ¶¶ 163, 173, 183, 210, 228, 230.)

Many of the separated parents were never prosecuted with a crime.  (*Id.* ¶¶ 71, 82, 117, 167, 220.)  Those who were prosecuted for the misdemeanor of illegal entry usually received a sentence of time served, yet Defendants used the opportunity of their brief incarceration (approximately 48 hours or less) to take their children away indefinitely and keep them separated for months after the parents had been released.  (*Id.* ¶ 161.)  Accordingly, the *Ms. L.* Court found that, even if the initial separation of a parent and child were lawful so that parents could be prosecuted, "separating [parents] from their minor children, and failing to reunify [parents] with those children, without any showing the parent is unfit or presents a danger to the child," combined with "the lack of any effective procedures or protocols for notifying the parents about their children['s] whereabouts or ensuring communication between the parents and children, and the use of the children as tools in the parents' criminal and immigration proceedings" warranted an immediate preliminary injunction, noting that the practice "shocked the conscience."  310 F. Supp. 3d at 1145; *see also Ms. L. Order Den. Mot. to Dismiss*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018) (explaining alleged conduct "is brutal, offensive, and fails to comport with traditional notions of fair play and decency").

As is now well known, Defendants perpetrated these nightmares on families knowing full well that, once separated, the information about parents and their children would no longer be linked in the government's databases.  (Compl. ¶¶ 11, 38, 227–33.)  As the *Ms. L.* Court concluded, Defendants kept better track of property than they did of separated children.  (*Id.* ¶¶ 12, 223, 229.)

Defendants knew that their conduct was cruel, inhumane, and unconstitutional, and

that ripping families apart—without warning, without regard for their rights and dignity, and without a plan as to how to track and to reunify them—would cause lasting damage to the affected parents and children.  They took their actions because of their animus toward Central American immigrants, openly seeking to punish Central American immigrants by separating families only in Arizona and other states along the southern border, where Central Americans enter the United States and would be disproportionately affected.  (*Id.* ¶¶ 123, 128, 140–43, 146, 152, 240.)  Defendants have expressed unbridled hostility to this group and stated their intent to prevent future immigration from Central America.  (*Id.* ¶¶ 128, 144, 169, 215, 239–56.)  Indeed, Defendants ignored expert warnings as to how dangerous and harmful separations would be (*id.* ¶¶ 126, 130–31, 136, 140, 147, 152, 154, 177, 212–14), and departed from standard decision-making processes in planning and executing family separations (*id.* ¶¶ 128, 132–36, 141, 152–54, 201, 206, 216–17, 231–33).  As intended, Defendants' actions overwhelmingly and disproportionately harmed Central Americans.  (*Id.* ¶¶ 164, 240.)  Defendants have offered no other plausible, legitimate governmental purpose motivating their actions.

Words cannot convey the suffering Defendants inflicted on each individual Plaintiff.  Ana, Mateo, and Jaime fled Guatemala to seek asylum in the United States.  (*Id.* ¶ 59.)  They were forcibly separated by CBP officers soon after crossing the border, with then seven-year-old Mateo in tears as he was torn from Ana's arms.  (*Id.* ¶¶ 59–62.)  Ana was never criminally charged in connection with her entry and ultimately reunited with her sons only after they were separated for almost two months.  (*Id.* ¶¶ 71, 74.)

Lorena and her daughter Karina fled El Salvador to escape violence and threatened kidnapping.  (*Id.* ¶¶ 76, 77.)  They were separated after three days in custody and only reunited 16 months later; in the interim, Lorena was denied every request to speak with her daughter or learn her whereabouts, while Karina's depression and anxiety went untreated, leading her to contemplate suicide.  (*Id.* ¶¶ 83–84, 87–89.)  Like Ana, Lorena was never charged in connection with her entry.  (*Id.* ¶ 82.)

Jorge and his then seven-year-old daughter Diana fled Honduras to escape death threats, intimidation, and violence. (*Id.* ¶ 92.) After one day in custody, while Diana was sleeping, a CBP officer removed Jorge from their cell, and they did not see each other again for two months. (*Id.* ¶¶ 94–95, 98.) During their separation, Jorge suffered from debilitating headaches, dizzy spells, nausea, vomiting, loss of appetite, and insomnia, yet he received no medical care despite his repeated requests. (*Id.* ¶ 96.) Even after reuniting with her father, Diana continues to experience separation anxiety and remains deeply suspicious of strangers. (*Id.* ¶ 99.)

Jairo and his then three-year-old daughter Beatriz fled Guatemala and arrived in the United States in December 2017. (*Id.* ¶ 101.) After two days in detention, CBP officers forced Jairo to give them Beatriz, who was crying and clung to her father. (*Id.* ¶¶ 103–05.) After five months, Jairo and Beatriz were finally reunited in Guatemala. (*Id.* ¶ 107.) Upon her return, Jairo noticed that Beatriz had a scar on her back and bruises on her legs, and Beatriz told her dad that, while she was in ORR custody, a woman had hit her with a belt. (*Id.* ¶ 108.)

Jacinto and his then six-year-old son Andrés fled Honduras when Jacinto's life was threatened and sought asylum from border agents on May 16, 2018. (*Id.* ¶ 111.) After Jacinto and Andrés were detained for two days, CBP officers forcibly took Andrés, kicking and screaming, from his father, ignoring Jacinto's cries that his son had a heart murmur. (*Id.* ¶ 113.) They were reunited nearly one year later. (*Id.* ¶ 120.) Jacinto was never charged in connection with his entry. (*Id.* ¶ 117.)

## III.   ARGUMENT

On a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cousins* v. *Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (quoting *Silvas* v. *E\*Trade Mortg. Corp.*, 514 F.3d 1001,

1002 (9th Cir. 2008)); *see also Wake Up & Ball LLC* v. *Sony Music Entm't Inc.*, 119 F.
Supp. 3d 944, 954 (D. Ariz. 2015).

## A. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS

Defendants purposefully directed their activities toward Arizona, which is all that is required to establish specific personal jurisdiction in this Court. At the motion-to-dismiss stage, and as Defendants concede (Mot. at 16), Plaintiffs need only make a *prima facie* showing of personal jurisdiction, and all allegations of fact must be accepted as true and read in the light most favorable to Plaintiffs. *Mavrix Photo, Inc.* v. *Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). Here, the allegations make a *prima facie* showing that each Defendant intended to produce, and produced, effects in Arizona. Moreover, Defendants conspired together with in-state actors in Arizona, and thus jurisdiction is appropriate as to all conspirators on that independent basis as well. *Id.*

### 1. Plaintiffs Have Made a *Prima Facie* Showing

As Defendants concede, this Court follows Arizona state law on personal jurisdiction, and "Arizona's long-arm statute provides for personal jurisdiction coextensive with the limits of federal due process." *See Warfield* v. *Gardner*, 346 F. Supp. 2d 1033, 1038 (D. Ariz. 2004) (citing Ariz. R. Civ. P. 4.2(a)). Accordingly, Plaintiffs must show only that Defendants had "minimum contacts" with Arizona to establish specific personal jurisdiction.

Minimum contacts is based on three considerations: whether (1) the defendant purposefully directed activities toward or purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or relates to those forum-related activities, and (3) the exercise of jurisdiction is reasonable. *Yahoo! Inc.* v. *La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006) (en banc). Plaintiffs have the burden of establishing the first two prongs; defendants must then present

1  a "compelling case" that the exercise of jurisdiction would be unreasonable.  *Dole Food*

2  *Co.* v. *Watts*, 303 F.3d 1104, 1108, 1114 (9th Cir. 2002).

3       Here, Plaintiffs satisfy all three prongs.  Defendants directed their conduct toward

4  Arizona and intended to cause effects here, which is sufficient to satisfy the first prong of

5  the "minimum contacts" test.  Defendants do not contest the second prong—that Plaintiffs'

6  claims arise from Defendants' activities in the forum—nor could they.  *See Panavision*

7  *Int'l* v. *Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).  Nor do Defendants analyze the

8  factors on the third "reasonableness" prong, which weigh in Plaintiffs' favor.

9       **(a)**    **Defendants Purposefully Directed Activities at Arizona**

10       Specific jurisdiction, unlike general jurisdiction, can be satisfied by a single tortious

11  action that is purposefully directed at the forum.[5]  *Yahoo! Inc.*, 433 F.3d at 1210.

12  Importantly, the Supreme Court has held that "purposeful direction" is satisfied when a

13  defendant intended to produce and produced effects in the forum.  *See Calder* v. *Jones*, 465

14  U.S. 783, 787 & n.6 (1984) (jurisdiction proper where defendant "intended to, and did,

15  cause tortious injury to [a plaintiff] in [the forum state]").  Where this standard is met,

16  jurisdiction is proper even if defendants' actions were performed from outside of the forum.

17  *Id.* at 787, 789; *see also Ibrahim* v. *Dep't of Homeland Sec.*, 538 F.3d 1250, 1258–59 (9th

18  Cir. 2008) (jurisdiction proper where out-of-state TSA official issued orders intended to

19  affect plaintiffs' detention in forum).

20

21      [5]  This Court need not address general jurisdiction if it finds Plaintiffs have made a *prima*

22  *facie* showing of specific jurisdiction.  Plaintiffs do not waive any argument regarding
    general jurisdiction, however, should discovery later show that any Defendant resides

23  in Arizona.  Defense counsel's unsworn assertions that they have conducted "research"
    and are not aware that any Defendant resides in Arizona (Mot. at 17 n.7) cannot be

24  considered.  *See, e.g.*, *Sky Billiards, Inc.* v. *Loong Star Inc.*, No. 5:14-cv-0921, 2014

25  WL 12601022, at *4 (C.D. Cal. Sept. 4, 2014) (explaining that motion briefing cannot
    supply facts pertaining to jurisdiction); *see also Leafty* v. *Aussie Sonoran Capital LLC*,

26  No. 2:15-cv-0655, 2017 WL 588717, at *1 (D. Ariz. Feb. 14, 2017).

Here, Defendants purposefully directed their activities toward Arizona by planning and directing Plaintiffs' separations from their families and detentions in punitive conditions in Arizona. Arizona has been a focal point of Defendants' wrongful actions: Defendants and their agents caused harm to Plaintiffs at numerous ports of entry along Arizona's border with Mexico; and Defendants caused cruel and inhumane separations at CBP border stations, including in Nogales and San Luis, Arizona; at detention centers in Phoenix, Camp Verde, and Eloy, Arizona; and at facilities under contract with ORR including in Mesa, Arizona. (Compl. ¶ 45.)

Defendants' primary argument—that Plaintiffs' allegations relate to *Plaintiffs'* own contacts with the forum, rather than Defendants'—is a smokescreen. Defendants point to *Walden* v. *Fiore* (Mot. at 18), but that case explains only that plaintiffs' contacts with a forum are *on their own* inadequate to support jurisdiction. 571 U.S. 277, 279 (2014). Here, Plaintiffs pleaded that each *Defendant* directed his or her activities toward Arizona:

- Multiple Defendants, including Sessions and Nielsen, traveled to Arizona in connection with these matters. Defendants' travel to Arizona was well-covered in the press and cannot be disputed.[6]

- The "White House Defendants," Kelly and Miller, participated in meetings to plan family separations in 2017 and 2018 and directed John/Jane Doe DHS

---

[6] *See, e.g.*, CBS News, *Attorney General Jeff Sessions Speaks at U.S.-Mexico Border*, YOUTUBE (Apr. 11, 2017), https://youtu.be/NEN5u3HZHj4; Fox Business, *DHS Secretary Nielsen Visits the Yuma Border Patrol Station*, YOUTUBE (Apr. 4, 2019), https://youtu.be/5UqN0zlsQFM; Arizona Public Media, *CBP Commissioner Visit*, YOUTUBE (June 29, 2018), https://youtu.be/y--RrT3nV6Y. The Court may take judicial notice of these publicly broadcast appearances. *See, e.g.*, *Daniels-Hall* v. *Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (explaining that courts may consider facts subject to judicial notice on motions to dismiss) (citing Fed. R. Evid. 201). In the alternative, jurisdictional discovery would confirm these visits and others by Defendants to Arizona. *See Walden*, 571 U.S. at 285 ("although physical presence in the forum . . . is not a prerequisite . . . [it] is certainly a relevant contact"). Plaintiffs can provide the Court with a disc with the video files cited above upon request.

Defendants to separate families in the four southern border states, including Arizona. (Compl. ¶¶ 123–25, 152–53.)

- The "DHS Defendants," Nielsen, McAleenan, Homan, Cissna, and Provost, planned the Family Separation Pilot Program and/or helped draft the December 2017 Family Separation Memo, which described and paved the way for effecting widespread family separations along the southern border, including in Arizona. (*Id*. ¶¶ 134, 142). Homan, Cissna, McAleenan, and Nielsen ordered CBP and ICE to separate families in Arizona and other border states. (*Id*. ¶¶ 151–53, 165.)

- The "DOJ Defendants," Sessions and Hamilton, drafted memoranda and/or participated in discussions after the critical 2018 Family Separation Memo, and directed CBP and ICE to separate families in Arizona and other southern border states in 2018. (*Id*. ¶¶ 152–53.) Defendant Hamilton had also previously provided strategic comments on the 2017 Memo, setting the stage for those separations. (*Id*. ¶ 142.)

- The "ORR/HHS Defendants," Azar, Wynne, and Lloyd participated in family separation planning meetings in early 2017 and 2018, and "rushed to license more Arizona facilities to house the growing number of tender age children" in their custody as a result of the family separation conspiracy that they had helped plan. (*Id*. ¶¶ 125–26, 201.)

Accordingly, Defendants intended to, and did, cause effects in Arizona through family separations, punitive detention conditions, and other violations at CBP Border Patrol Centers, ICE Detention Centers, and ORR facilities in Arizona. These actions were not directed at northern border states, airports, or any other ports of entry. (*Id*. ¶ 240.) This is precisely the kind of forum-directed conduct that the Supreme Court used to distinguish

*Calder* from *Walden*, on which Defendants rely.  *See Walden*, 571 U.S. at 287 (noting that defendants in *Calder* called sources and caused injury in California).

Defendants rely on case law stating that supervisory, nationwide policymaking does not provide grounds for jurisdiction in any particular state.  (Mot. at 19–21.)  But those are not the facts here:  Defendants were personally involved in and directed specific, geographically targeted acts.[7]

*First*, nearly all of Defendants' cases involved promulgation of *nationwide* policies that were not targeted at any particular part of the country.[8]  For example, the policy in *Munns* v. *Clinton* was that "America does not negotiate with terrorists."  822 F. Supp. 2d 1048, 1054 (E.D. Cal. 2011).  The *Munns* Court's reasoning, echoed in other cases Defendants cite, is that a finding of jurisdiction "would essentially subject the individual Defendants to personal liability in every state . . . regardless of how tenuous their actual contacts."  *Id*. at 1078.  But this is not a case of unbounded potential liability in any state.  Defendants targeted only Arizona and three other southern border states.  And the forum state need not be the only state targeted.  *See Amini* v. *Pro Custom Solar LLC*, No. 8:17-cv-2244, 2018 WL 6133632, at *5–6 (C.D. Cal. Aug. 13, 2018) (finding purposeful

---

[7]  Defendants cite *K.O.* v. *Sessions*, but that case only confirms that, under the effects test, there is jurisdiction in Arizona.  No. 4:18-cv-40149, 2020 WL 533461, at *3–6 (D. Mass. Feb. 3, 2020).  In *K.O.*, plaintiffs were separated at the southern border, but sued federal officials in Massachusetts, because the plaintiffs resided in Massachusetts.  *Id*. at *1, 4.  The court dismissed for lack of personal jurisdiction, because, unlike here, plaintiffs could not point to any contacts defendants had with Massachusetts that were purposeful and related to plaintiffs' claims, which were connected to Massachusetts solely by the fact that plaintiffs resided there.  *Id*. at *5–6.

[8]  *See, e.g.*, *Oksner* v. *Blakey*, No. 4:07-cv-02273, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007), *aff'd*, 347 F. App'x 290 (9th Cir. 2009) (FAA policy targeting class members "in all 50 states"); *Moss* v. *U.S. Secret Serv.*, No. 1:06-cv-03045, 2007 WL 2915608, at *18–19 (D. Or. Oct. 7, 2007) (Secret Service protest management guidelines for all Presidential visits nationwide); *Mahmud* v. *Oberman*, 508 F. Supp. 2d 1294, 1302 (N.D. Ga. 2007), *aff'd sub nom. Mahmud* v. *U.S. Dep't of Homeland Sec.*, 262 F. App'x 935 (11th Cir. 2008) (nationwide TSA administration of licenses).

1  availment in California where out-of-state defendants told telemarketing company to

2  "develop leads" in three different states, including California).

3       *Second*, Defendants here were personally involved in the details of the challenged

4  activities.  Defendants cite several cases where plaintiffs failed to allege that defendants

5  actively participated in or directed the challenged conduct, and omissions alone were not

6  found sufficient to establish forum contacts.[9]  Defendants rely on *Perez* v. *United States*,

7  for instance, where "high-ranking officials supervised/implemented federal border-security

8  policy" (Mot. at 19 n.11), but *Perez*'s complaint alleged that defendants "were responsible

9  for failing to put a stop to the Rocking Policy [agents shooting to kill rock-throwers] after

10 they became aware"—not that they affirmatively directed agents to kill rock-throwers in

11 California.  *See* No. 3:13-cv-1417, 2014 WL 4385473, at *7–9 (S.D. Cal. Sept. 3, 2014).

12 Here, Defendants did not simply sit in Washington, D.C. and abstain from interfering; they

13 were personally involved in planning and directing family separations in Arizona.  The

14 Ninth Circuit has repeatedly held that officials' personal involvement in geographically

15 specific directives constitutes purposeful direction.[10]  Defendants' actions reflected both

16 elements of purposeful direction.

17

18  [9]  *See, e.g.*, *Yellowbear* v. *Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015) (prison

19  supervisor's "passive receipt" of mail requesting religious accommodation insufficient
    to support availment); *Claasen* v. *Brown*, No. 1:94-cv-1018, 1996 WL 79490, at *2

20  (D.D.C. Feb. 16, 1996) (no minimum contacts alleged other than those "flowing from
    [defendants'] status . . . as federal employees or supervisors"); *Wag-Aero, Inc.,* v.

21  *United States*, 837 F. Supp. 1479, 1484–85 (E.D. Wis. 1993) (only misconduct alleged
    was failure to train and restrain subordinates).  Further, Defendants' cases are not only

22  distinguishable but also entirely out of circuit.

23  [10]  *See, e.g.*, *Ibrahim*, 538 F.3d at 1258–59; *Soler* v. *Cty. of San Diego*, 762 F. App'x 383,

24  385–86 (9th Cir. 2019) (exercising jurisdiction over Arkansas officers who coordinated
    police efforts to arrest and detain plaintiff in California); *Ziegler* v. *Indian River Cty.*,

25  64 F.3d 470, 474–76 (9th Cir. 1995) (same).  *See also Maney* v. *Ratcliff*, 399 F. Supp.
    760, 768–69 (E.D. Wis. 1975) (out-of-state defendants avail themselves of forum when

26  they make use of local officers and systems to carry out directives).

Moreover, Defendants also had minimum contacts with Arizona through the actions of their in-state agents, which are attributable to Defendants because Defendants exercised sufficient "control" over the in-state actors. *See Ochoa* v. *J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1189–92 (9th Cir. 2002) (defendant issued instructions to in-state agent and "expect[ed] that its instructions would be followed," demonstrating control); *see also Biliack* v. *Paul Revere Life Ins. Co.*, 265 F. Supp. 3d 1003, 1009 (D. Ariz. 2017) (physician defendants contacted plaintiff's doctors in Arizona to influence them to deny plaintiff's disability claims).  Jurisdiction has been found proper based on acts of a defendant's subordinates, even where there was no "formal" agency relationship, and where both in-state and out-of-state actors providing directions were government employees. *See, e.g.*, *Stadt* v. *Univ. of Rochester*, 921 F. Supp. 1023, 1026 (W.D.N.Y. 1996) (out-of-state government official subject to jurisdiction in individual capacity suit based on allegations that he directed in-state subordinates to act in forum).

Defendants drafted directions and directly ordered CBP and ICE agents in Arizona to separate immigrant families. (*See, e.g.*, Compl. ¶¶ 152–53, 165.)  Defendants thereby demonstrated the "fundamental criterion" for agency:  control over in-state defendants. *Ochoa*, 287 F.3d at 1190.  Accordingly, the agents' actions in separating families may be attributed to the agents' actions in separating families to out-of-state Defendants as the requisite minimum contacts.

### (b)    The Court's Exercise of Jurisdiction is Reasonable

For the reasonableness prong of the "minimum contacts" test, the burden shifts to defendants to present a "compelling case" that the exercise of jurisdiction would be unreasonable. *Dole Food Co.*, 303 F.3d at 1108, 1114.  This is a "heavy burden," and the Ninth Circuit has repeatedly concluded that the exercise of jurisdiction would be reasonable even where defendants made "strong argument[s]" to the contrary, and even

where more of the reasonableness factors favored defendants than plaintiffs.  *Id.* at 1117 (compiling cases).

Here, Defendants make no effort to address any of the seven factors the Ninth Circuit considers.  *Ziegler*, 64 F.3d at 475–76.  The Ninth Circuit's reasonableness test weighs in Plaintiffs' favor, and Defendants cannot overcome the presumption in favor of jurisdiction.  *Id.*  In particular, the state's "special interest in exercising jurisdiction over those who have committed tortious acts within the state," *Data Disc, Inc.* v. *Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1288 (9th Cir. 1977), weighs heavily in favor of keeping this case in Arizona.  Courts in the forum should have the opportunity to prevent inhumane, unconstitutional treatment that occurred in this state, particularly where the balance of the reasonableness factors weighs in favor of retaining jurisdiction.[11]

### 2.    This Court Has Conspiracy Jurisdiction Over Defendants

This Court can additionally exercise jurisdiction over Defendants on the independent ground that they conspired with in-state actors to direct activities in Arizona, thereby satisfying the elements required for conspiracy jurisdiction.  Jurisdiction on this basis would extend to all claims alleged here, as pendent personal jurisdiction extends to all claims that share a common nucleus of operative fact.  *Picot* v. *Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).  Multiple appellate and district courts have accepted conspiracy jurisdiction as an independent basis for jurisdiction over co-conspirators.  *See, e.g.*, *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 86–87 (2d Cir. 2018) (citing *Unspam*

---

[11]  Other supporting factors include the extent of purposeful interjection into the forum's affairs—Defendants intended to impact thousands of people within the state. *Freestream Aircraft (Berm.) Ltd.* v. *Aero Law Grp.*, 905 F.3d 597, 607 (9th Cir. 2018). In addition, Defendants have not suggested, and cannot suggest, an alternate forum at this point where all Defendants, including John/Jane Doe Defendants acting in Arizona, would clearly be subject to jurisdiction, thus favoring Plaintiffs' forum choice. *BBK Tobacco & Foods LLP* v. *Juicy eJuice*, No. 2:13-cv-00070, 2014 WL 1686842, at *8 (D. Ariz. Apr. 29, 2014) (defendants' mere suggestion of other fora "does not resolve the issue that the other defendants may not have citizenship or ties to those states").

1    *Techs., Inc.* v. *Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)); *Textor* v. *Bd. of Regents of N.*

2    *Ill. Univ.*, 711 F.2d 1387, 1392–93 (7th Cir. 1983); *Melea, Ltd.* v. *Jawer SA*, 511 F.3d 1060,

3    1070 (10th Cir. 2007); *Mandelkorn* v. *Patrick*, 359 F. Supp. 692, 695–97 (D.D.C. 1973);

4    *Maricopa Cty.* v. *Am. Petrofina, Inc.*, 322 F. Supp. 467, 469 (N.D. Cal. 1971) (exercising

5    jurisdiction under Arizona long-arm statute based on conspiracy theory because "a

6    conspiracy, no matter where made, creates a destructive force which extends into the

7    state").[12]  As the Seventh Circuit explained in *Textor*, "if plaintiff's complaint alleges an

8    actionable conspiracy then the minimum contacts test has been met" for all defendants.

9    711 F.2d at 1392–93 (citations omitted).

10        To establish jurisdiction based on a conspiracy, Plaintiffs must allege an actionable

11    conspiracy and in-forum acts in furtherance of that conspiracy.  *Id*.  This test was satisfied

12    in *Textor*, where plaintiffs had alleged that "defendants agreed to follow a systematic

13    campaign of discrimination against women's athletics" in order to suppress women's

14    salaries, and subsequently that one of the defendants engaged in the required acts "[i]n

15    furtherance of, and in accordance with, this conspiracy" in Illinois.  *Id*. at 1393.  The court

16    therefore exercised personal jurisdiction over out-of-state defendants who would not have

17    otherwise been reached by Illinois' long arm statute.  *Id*. at 1389–90.  Here, Plaintiffs have

18    similarly satisfied this test by alleging that out-of-state and in-state actors conspired to

19    separate Plaintiffs in violation of the law, and acted in furtherance thereof by meeting to

20    plan and providing directions to separate families in Arizona.  (Compl. ¶¶ 339–40.)  These

21    allegations confer jurisdiction over all conspirators, including Defendants here.[13]

22

23    [12]   The Ninth Circuit has rejected particular claims of conspiracy jurisdiction but only in cases where, unlike here, no conspiracy was adequately alleged in the first place.  *See,*

24    *e.g.*, *Chirila* v. *Conforte*, 47 F. App'x 838, 843 (9th Cir. 2002) (conspiracy claim too "conclusory"); *Underwager* v. *Channel 9 Australia*, 69 F.3d 361, 364 (9th Cir. 1995)

25    (alleging "no facts to even suggest" conspiracy).

26    [13]   This Court also may order jurisdictional discovery from Defendants.  *Data Disc*, 557 F.2d at 1285 n.1.  Although Plaintiffs believe no jurisdictional discovery is necessary

### B.   PLAINTIFFS HAVE ADEQUATELY PLEADED *BIVENS* CAUSES OF ACTION FOR VIOLATIONS OF THE FOURTH AND FIFTH AMENDMENTS

It is well established that suits against federal officials for damages can be an avenue for relief for violations of constitutional rights, through what are known as *Bivens* claims. *See generally Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *see also Davis* v. *Passman*, 442 U.S. 228 (1979); *Carlson* v. *Green*, 446 U.S. 14 (1980).   *Bivens* is the appropriate vehicle for Plaintiffs here to hold Defendants accountable for the irreversible harms they have suffered.   In assessing whether a *Bivens* remedy is available, courts first look to whether the case arises in a new context.   *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1859 (2017).   The type of Fourth and Fifth Amendment claims brought by Plaintiffs do not present a new context.   And even if they did, a *Bivens* remedy is still available unless (1) an alternative remedy can adequately address plaintiffs' injuries and claims, and (2) other special factors counsel against providing the remedy.   *Id.* at 1857. Here, no other remedy will adequately compensate Plaintiffs, and none of the other so-called "special factors" argued by Defendants counsels against applying *Bivens* here.

### 1.   This Action Does Not Arise in a New Context

Plaintiffs' claims fall within the core of *Bivens*.   403 U.S. at 395; *see Abbasi*, 137 S. Ct. at 1856 (recognizing "continued force" and "necessity" of *Bivens* "in the search-and-seizure context in which it arose").   In order to arise in a "new context," a claim must be "meaningful[ly]" different from prior *Bivens* cases.   *See Abbasi*, 137 S. Ct. at 1859.   The Supreme Court has not defined precisely when this threshold is crossed.   *Compare Hernandez* v. *Mesa*, 140 S. Ct. 735, 743–44 (2020) (declining to offer specific factors for new context analysis), *with Abbasi*, 137 S. Ct. at 1859–60 (suggesting factors to guide new

---

here, such discovery "may appropriately be granted" in lieu of dismissal on jurisdictional grounds at this stage of the case. *Id.*; *see also Mitan* v. *Feeney*, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007) (explaining only "'colorable' showing" necessary to support jurisdictional discovery).

context analysis).   Rather, the touchstone of a "meaningful" difference is "the risk of disruptive intrusion by the Judiciary into the functioning of other branches."  *Hernandez*, 140 S. Ct. at 743–44.   Significantly, *Abbasi* "does not require . . . perfect factual symmetry."  *Brunoehler* v. *Tarwater*, 743 F. App'x 740, 744 (9th Cir. 2018); *Abbasi*, 137 S. Ct. at 1865 ("[T]rivial" differences "will not suffice.").  All claims contain differences; not all differences are meaningful.  *See Castellanos* v. *United States*, No. 3:18-cv-0428, 2020 WL 619336, at *6 (S.D. Cal. Feb. 10, 2020) (asking if case "*fundamentally* differ[s]" from prior *Bivens* cases).  Plaintiffs' claims do not arise in a new context; rather, they follow from precedent and preserve the separation of powers.

The constitutional rights at issue here—challenges under the Fourth and Fifth Amendments (Compl. ¶¶ 280–336)—are the same rights that the *Bivens* remedy has vindicated since its inception.[14]  *See Bivens*, 403 U.S. at 397; *Davis*, 442 U.S. at 245, 249; *Carlson*, 446 U.S. at 16.  *Bivens* itself recognized a damages remedy for an unconstitutional search or seizure under the Fourth Amendment—a claim that Plaintiffs bring here. Following on *Bivens*, numerous courts, including in the Ninth Circuit, also have sustained damages actions under the Fourth Amendment.  *See, e.g.*, *Brunoehler*, 743 F. App'x at 744 (permitting claim for warrantless search and seizure arising from purported securities violations); *Ioane* v. *Hodges*, 939 F.3d 945, 952 (9th Cir. 2018) (permitting claim against Internal Revenue Service ("IRS") agents who monitored plaintiff in her bathroom); *Chavez* v. *United States*, 683 F.3d 1102, 1111–12 (9th Cir. 2012) (permitting claim against Border

---

[14]   Although *Hernandez* counsels that "a claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," 140 S. Ct. at 743, plaintiff's claims in that case were premised on extraterritorial conduct—the shooting of a Mexican citizen on Mexican soil—that the *Hernandez* Court found impinged on the Executive's foreign policy prerogatives in a unique way given the extraterritorial component.  *Id*.  In contrast to *Hernandez*, Plaintiffs' injuries occurred on United States soil.  Therefore, because here the "risk of judicial intrusion" is low, any alleged differences in the constitutional right at issue are insufficiently "meaningful" to create a new context.  *Id*.

Patrol supervisor for unlawful traffic stops); *see also Prado* v. *Perez*, No. 1:18-cv-9806, 2020 WL 1659848, at *10 (S.D.N.Y. Apr. 3, 2020) (whether claim arises under Fourth Amendment "weighs heavily" in court's finding that claim did not present new context).

Likewise, *Bivens* remedies have long been available under the Fifth Amendment. In *Davis,* the Supreme Court confirmed that a *Bivens* remedy was available for violations of the Fifth Amendment's guarantee of equal protection.  *Davis*, 442 U.S. at 245, 249. *Davis* concerned gender discrimination, and the equal protection claim here is based on national origin discrimination, but that is not a "meaningful" difference.  Then, in *Carlson*, the Court endorsed a *Bivens* remedy for deliberate indifference to the medical needs of a federal prisoner in violation of the Eighth Amendment.  *See Carlson*, 446 U.S. at 19–21. When non-prisoner detainees assert claims functionally equivalent to those in *Carlson*, as in this case, they are governed by the Fifth rather than Eighth Amendment, but a *Bivens* remedy is still available.  *See Bistrian* v. *Levi*, 912 F.3d 79, 91 (3d Cir. 2018) (finding pretrial detainee's claim was not new *Bivens* context because "it is a given that the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts"); *Papa* v. *United States*, 281 F.3d 1004, 1010– 11 (9th Cir. 2002) (finding detained immigrant's deliberate indifference claim arose under Fifth Amendment).

Defendants suggest that the context of this action—immigration—renders it unsusceptible to a *Bivens* challenge.  (Mot. at 23.)  Not so.  The Ninth Circuit recognizes *Bivens* remedies in the immigration context.  *See, e.g.*, *Lanuza* v. *Love*, 899 F.3d 1019, 1033–34 (9th Cir. 2018) (endorsing *Bivens* remedy against immigration official for fraud in connection with removal proceedings); *Chavez*, 683 F.3d at 1111 (same, against CBP supervisor for unlawful traffic stops); *Papa*, 281 at 1010–11 (same, against Immigration and Naturalization Service ("INS") officers for deliberate indifference in connection with

murder of immigrant detainee); *Guerra* v. *Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986) (same, against INS officials for warrantless search and seizure conducted with local police officers).  In *Abbasi*, the government specifically argued that immigration made the case a new context and also was a "special factor" counseling hesitation, Brief for Petitioners at 22–23, 29–30, 137 S. Ct. 1863, but the Supreme Court declined to accept those arguments, 137 S. Ct. at 1159–60.  There is no "sound reason[]" to permit a convicted person to recover damages for deliberate indifference, as in *Carlson*, yet deny a similar remedy to civil immigration detainees.  *See Abbasi*, 137 S. Ct. at 1858.  If anything, immigration detainees should be entitled to more protection than convicted persons, because they may not be punished at all—neither cruelly and unusually nor otherwise.

Defendants also argue that there is some new "statutory or other legal mandate" under which Defendants operated that would defeat a *Bivens* claim.  (Mot. at 22.)  But, as in *Bivens*, Defendants here are not alleged to have been acting within the bounds of a statutory or legal mandate, but outside of one.  *Bivens*, 403 U.S. at 389.  Likewise, in *Davis*, the defendant engaged in gender-based employment discrimination that was outside the power conferred by statute or other legal provision.  *See Davis*, 442 U.S. at 245.  And in *Carlson*, no mandate provided defendants with the discretion to withhold treatment and exacerbate the plaintiff's asthma attack.  *See Carlson*, 446 U.S. at 16 n.1.  In each case, a *Bivens* remedy was permitted.[15]

---

[15]  Even if this Court were to find that some directive or plan that Defendants or their superiors created constituted a legal mandate, that does not support finding a new context here.  Where officers create legal mandates through their own misconduct, such mandates are akin to no legal mandate at all.  *See Brunoehler*, 743 F. App'x at 743 n.4.  In *Brunoehler*, defendant federal officers were alleged to have illegally obtained a search warrant.  *Id.* at 742 & n.1.  The Ninth Circuit explained that, even though the defendants in *Brunoehler* acted pursuant to a "warrant," while the agents in *Bivens* did not, *Brunoehler* did not present a new context because neither case involved a *valid* warrant.  *Id.*; *cf. Prado*, 2020 WL 1659848, at *10 (concluding that warrant that did not permit defendants' search and seizure activities was not legal mandate for purposes of new context analysis).  Likewise, Defendants here acted without a legal mandate in

Defendants argue that "working for a variety of agencies" under different "legal mandates" presents a new context. (Mot. at 23.) *Bivens* claims have been endorsed against officers working for all manner of agencies, spanning the Federal Bureau of Investigation ("FBI"), the IRS, and the INS. *See Brunoehler*, 743 F. App'x at 744; *Ioane*, 939 F.3d at 949; *Guerra*, 783 F.2d at 1375; *see also Prado*, 2020 WL 1659848, at *11 ("It cannot be that the character of the law enforcement officer, without more, automatically converts a plaintiff's claim into a 'new context.'"). *Bivens* remedies have also been permitted against high-level officials. *See Davis*, 442 U.S. at 230; *Carlson*, 446 U.S. at 16; *Lanuza*, 899 F.3d at 1022–23, 1034 (permitting *Bivens* claims against Assistant Chief Counsel of ICE); *Chavez*, 683 F.3d at 1111 (same, against Border Patrol supervisor).

Defendants' remaining arguments do nothing to distinguish this case from precedent. Defendants claim that this case risks "significant and disruptive intrusion by the Judiciary into the functioning of both Congress . . . and the Executive Branch," (Mot. at 23), but nothing about this damages action can be said to be disruptive given how egregious Defendants' actions were and that a court has already found the separations "brutal" and unconstitutional. *Ms. L. Order Den. Mot. to Dismiss*, 310 F. Supp. 3d at 1167. Further, a remedy is particularly noninvasive here where the public and the judiciary have caused the Executive Branch to end family separations, and the government itself sought to end the practice through an Executive Order. (*See* Compl. ¶ 217.) Defendants also claim that judicial guidance on Plaintiffs' pleaded claims "is far less particular than the specific, binding guidance available" in prior cases (Mot. at 23), but this is contradicted by the extensive case law detailed in Section III.C below. Finally, to the extent that Defendants rely on the existence of novel special factors to argue that this case presents a new context, those are addressed and rejected in Section III.B.2 and are belied by the obvious illegality

planning and directing family separations, in violation of Plaintiffs' constitutional rights.

of such shockingly cruel actions.

**2.    Even If the Court Concludes This Case Presents a New Context, "Special Factors" Do Not Counsel Against a *Bivens* Remedy**

Even if the Court concludes Plaintiffs' claims present a new context, no special factors counsel in favor of withholding a *Bivens* remedy.  *Bivens* embodies the principle that wrongdoers who exercise government power should be accountable for rights violations.  *See, e.g.*, *Minneci* v. *Pollard*, 565 U.S. 118, 127 (2012) (recognizing role of *Bivens* in providing redress to plaintiffs against employees of federal rather than private prisons).  The special factors analysis is performed at a high level of specificity, focusing on the concrete facts of the case.  *See, e.g.*, *Wilkie* v. *Robbins*, 551 U.S. 537, 555–62 (2007). Defendants ignore this instruction and instead focus on abstraction.  But the specific details here are important:  Plaintiffs do not have access to adequate alternative remedies that compensate them for their past injuries and hold governmental wrongdoers accountable. Further, no separation-of-powers concerns are implicated because Plaintiffs' claims do not challenge federal policy, have never been impugned by Congress, do not implicate foreign policy or national security, and do not burden prosecutorial discretion.  Finally, Plaintiffs' claims are eminently workable.

**(a)    Adequate Alternative Remedies Are Unavailable**

Based on Ninth Circuit case law, the availability of alternative remedies can be a "special factor" when choosing whether to afford a *Bivens* remedy.  *Lanuza*, 899 F.3d at 1032.  But alternative remedies weigh against the application of *Bivens* only when they are "adequate" to protect the constitutional interests at issue—*i.e.*, when they provide incentives that deter unconstitutional conduct "while also providing roughly similar compensation to victims of violations."  *See Minneci,* 565 U.S. at 130.  The *Bivens* remedy protects plaintiffs' interest in holding to account federal officers who violate their constitutional rights.  Where alternative remedies protect other interests, those remedies

1    are inadequate—regardless of the quantity or magnitude of the relief.  *See Lanuza*, 899

2    F.3d at 1032; *Rodriguez* v. *Swartz*, 899 F.3d 719, 742 (9th Cir. 2018).  Defendants offer

3    several other claims that they suggest are viable alternatives, but none are.

4         **FTCA claims.**  Defendants argue that state substantive law, brought via Federal

5    Tort Claims Act ("FTCA") claims or state tort suits, provides adequate substitutes for

6    *Bivens* remedies "considered with other factors."  (Mot. at 26 n.15.)  And although the

7    named Plaintiffs can and will bring FTCA claims, Defendants concede (*id.*) that the

8    Supreme Court has explicitly considered and rejected the contention that an FTCA claim

9    against the United States is an alternative remedy to a *Bivens* claim against an individual.

10   *Carlson*, 446 U.S. at 19–23.  Defendants cannot explain how the FTCA, alone or in tandem,

11   displaces *Bivens* when it is "crystal clear that Congress views FTCA and *Bivens* as parallel,

12   complementary causes of action."  *Id*. at 20; *Prado*, 2020 WL 1659848, at *12, 14, 16

13   (allowing *Bivens* and FTCA claims arising out of ICE officer's search and seizure to

14   proceed past motion to dismiss).  Moreover, here the FTCA is a particularly unsuitable

15   replacement.  Because of Defendants' actions, many putative class members are currently

16   back in the dangerous conditions from which they initially fled, with limited access to

17   American lawyers, little or no access to American courts, and now with the added burden

18   of trauma stemming from their separation and detention.  In any event, Congress has made

19   clear that the FTCA was not intended to displace *Bivens* remedies.

20        **State tort claims.**  State tort claims, if available, may, in certain circumstances,

21   serve as an adequate substitute for *Bivens* claims brought against non-governmental

22   defendants.  *See Corr. Servs. Corp.* v. *Malesko*, 534 U.S. 61, 73 (2001).  But Congress has

23   foreclosed state tort claims brought against federal employees.  In 1984—after *Bivens*,

24   *Davis*, and *Carlson* were decided—Congress passed the Westfall Act, which amended the

25   FTCA to immunize federal officers from state tort suits for acts taken in the scope of their

26

employment.  *Osborn* v. *Haley*, 549 U.S. 225, 229 (2007).  Notably, the DOJ can represent Defendants in this case only *because* they acted within the scope of their federal employment.  *See* 28 C.F.R. § 50.15(a) (stating that United States may represent federal employee who is sued for actions which appear to have been carried out within scope of employment).  Thus, after the Westfall Act, Plaintiffs cannot bring their claims against federal officers under state law.  *Rodriguez*, 899 F.3d at 740–41.

**Habeas petition, injunctive relief, and APA claims.**  Defendants also argue that already-granted relief, such as in *Jacinto-Castanon de Nolasco* v. *U.S. Immigration & Customs Enforcement*, 319 F. Supp. 3d 491, 505 (D.D.C. 2018), *Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. at 1149–50, and *Ms. J.P.* v. *Barr*, No. 2:18-cv-6081, 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019), provides adequate alternative remedies.  (Mot. at 25.) They do not.  Those cases seek injunctive relief, habeas corpus relief, and relief for violation of the Administrative Procedure Act ("APA").  Such remedies are inadequate to redress the constitutional violations Plaintiffs suffered.  Injunctive and habeas remedies vindicate a plaintiff's interest in stopping current, ongoing rights violations.  By contrast, *Bivens* claims seek to redress past wrongs.  *Bistrian*, 912 F.3d at 92 (explaining that remedies that "give[] no retrospective relief" are "no[t] true alternative remedies"); *see Cuevas* v. *United States*, 2018 WL 1399910, at *4 (D. Colo. Mar. 19, 2018) (finding, where prison officials released plaintiff's information, injunctive relief was insufficient to "un-ring this particular bell," and that administrative remedies were insufficient where plaintiff might not recover damages); *see also Minneci,* 565 U.S. at 130 (explaining that, to be "adequate alternative," relief must provide "roughly similar compensation").  Habeas and injunctive relief are also not viable remedies for any of these constitutional violations, in particular those arising from the initial separations, which were effected without warning and therefore could not have been anticipated by Plaintiffs.  *See City of L.A.* v. *Lyons*, 461

U.S. 95, 105 (1983).

Defendants argue that *Abbasi* supports a finding that habeas is an adequate alternative.  (Mot. at 25.)  But *Abbasi* noted that the "scope or availability" of habeas was "not before the Court."  137 S. Ct. at 1863.  And in *Bistrian*, the court found that habeas relief would not address Plaintiffs' harms arising from a prison yard attack that federal officers failed to prevent.  *Bistrian*, 912 F.3d at 84, 92.  Where, as in *Bistrian*, the harms to Plaintiffs have already been sustained, habeas is "no[t a] true alternative remed[y] counseling against allowing a *Bivens* remedy."  *Id.*

Likewise, APA claims do not allow Plaintiffs to seek money damages for past violations of constitutional rights.  Instead, they require courts to set aside agency action that is "arbitrary and capricious," and courts' review is confined to ensuring that agency action is kept "within the bounds of reasoned decisionmaking."  *Dep't of Commerce* v. *New York*, 139 S. Ct. 2551, 2569 (2019).  Defendants' reliance on *Western Radio Services Co.* v. *U.S. Forest Services*, 578 F.3d 1116 (9th Cir.) (Mot. at 24–25) is thus misplaced. There, plaintiffs sought to reverse allegedly unconstitutional delays and inaction.  *W. Radio Servs.*, 578 F.3d at 1118.  Here, Plaintiffs seek a monetary remedy, and there is no agency action to reverse.

### (b)   Plaintiffs' Claims Are Based on Defendants' Misconduct, Not Governmental Policymaking or Enforcement

Citing *Abbasi*, Defendants contend that a *Bivens* remedy is unavailable because Plaintiffs are challenging a policy of separating families.  (Mot. at 32–36.)[16]  Defendants' argument is incorrect.

*First*, on a motion to dismiss, the complaint's allegations control.  Plaintiffs do not allege that they are challenging a "policy" as opposed to widespread egregious actions in

---

[16]  For good reason, Defendants do not appear to argue that Plaintiffs' punitive unconstitutional conditions claims should be dismissed on the ground that they were part of a policy.

violation of federal law and the Constitution. *Abbasi* specifically contemplates *Bivens* actions for unconstitutionally harsh treatment that is not imposed as a matter of "official policy." 137 S. Ct. at 1853 (distinguishing between claims against warden and claims based on official policy). Indeed, Defendants themselves have denied that there was a "policy" to separate families.[17] Defendants have previously publicly stated that, to the extent that any policy is implicated, it is only the "Zero Tolerance" policy, which directed prosecutions for illegal entry; any family separations, Defendants claim, were incidental to those prosecutions.[18]

*Second*, the conduct at issue here—whether deemed policy-related or not—is not the type of high-level executive policymaking and enforcement that Defendants argue is not subject to a *Bivens* remedy under *Abbasi*. Despite the Complaint's focus on Defendants' individual activities, Defendants contend that Plaintiffs' "real grievance is with national immigration policies of the Executive Branch." (Mot. at 32.) But conduct does not automatically constitute a "policy" for the purposes of *Bivens* just because the conduct is undertaken by a federal official. Further, even if discovery were to show that there was some type of a formal family separation "policy,"[19] *Abbasi* does not dictate that

---

[17] For example, Commander White stated that "during [his] entire tenure" at ORR, he "was advised [by various government officials] that there was no policy that resulted in the separations of children." *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the H. Subcomm. on Oversight and Investigations*, 116th Cong. (2019) (statement of Cmdr. Jonathan White). Defendant Nielsen has also publicly disclaimed any family separation policy on numerous occasions. (*See, e.g.*, Compl. ¶ 216 ("We do not have a policy of separating families at the border. Period.").) (*See also* Compl. ¶ 126.)

[18] Defendants cite *Mejia-Mejia* v. *U.S. Immigration & Customs Enforcement*, but there, unlike here, plaintiffs purported to challenge a "policy." *See* No. 1:18-cv-1445, 2019 WL 4707150, at *4 (D.D.C. Sept. 26, 2019). Thus, whatever the validity of that decision, it is distinguishable from this action.

[19] Regardless of whether Defendants' misconduct constituted a policy, a *Bivens* remedy is appropriate. However, if the Court believes that resolving whether Defendants' misconduct constitutes a policy is ultimately dispositive to the availability of a *Bivens*

there is no *Bivens* remedy available for this kind of policy.  *Abbasi* involved the extraordinary and unique national security crisis of September 11, a fact integral to the Court's opinion.  *Id*. at 1861 (stressing that policies were developed in time of "crisis" and emphasizing that "[a]llowing a damages suit in this context, or in a like context in other circumstances, would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch").  This case is far from that context and involves abhorrent practices denounced by a wide variety of people and groups, including religious leaders from many denominations and elected officials of differing political beliefs.  Moreover, the policy at issue in *Abbasi* was not one that the government had forsworn, but one the government believed was critical to its future national security mission and the country's safety.  Thus, the Supreme Court found that an attack on the policy would involve an intrusion into the government's *ongoing* national security efforts.  *Id*. at 1860 (emphasizing that action at issue was "high-level executive policy created in the wake of a major terrorist attack on American soil").  By contrast, here the President issued an Executive Order in 2018 denouncing family separations and ending the practice.  Thus, this case is wholly unlike *Abbasi* (even assuming the existence of a "policy" as that term was employed by the Supreme Court for *Bivens* purposes).

Further, the Court did not find that the *Abbasi* policy's *purpose* was to impose unconstitutionally harsh conditions.  *Cf. Ashcroft* v. *Iqbal*, 556 U.S. 662, 676–77 (2009) (explaining that purposeful discrimination "involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group" (citation omitted)).  By contrast, Plaintiffs have pleaded that—

---

remedy, Plaintiffs are entitled to discovery on that point. *See Ignatiev* v. *United States*, 238 F.3d 464, 465 (D.C. Cir. 2001) (reversing dismissal of FTCA claims where lower court failed to allow discovery as to threshold question of "existence . . . of internal governmental policies").

whether construed as a policy or not—Defendants' actions were devised for the *purpose* of harming and abusing Plaintiffs, not in spite of such treatment.  (*See* Compl. ¶¶ 152, 215, 239–40, 249, 251.)  That the purported "policy" at issue here was created specifically to impose brutal conditions sets it apart from the policy in *Abbasi* and puts it squarely within the core of *Bivens*.  Thus, this case is wholly unlike *Abbasi* (even assuming existence of "policy" as that term was employed by Supreme Court for *Bivens* purposes).  Finally, Plaintiffs are not seeking to hold Defendants accountable for anything but their own unconstitutional conduct.  *Id.* (noting that one reason to forbid claim in *Abbasi* was because "*Bivens* is not designed to hold officers responsible for acts of their subordinates").

### (c)      Congress Did Not Intend to Bar a *Bivens* Remedy

Defendants fail to offer any explicit declaration that Congress intended to bar a *Bivens* remedy.  Without such a statement, there is no reason counseling against applications of this remedy in this case.  *See Bivens*, 403 U.S. at 397; *Davis*, 442 U.S. 246–47; *Carlson*, 446 U.S. at 19.  Defendants instead point to unrelated statutes, non-legislative Congressional action, and instances of Congressional *inaction* in order to divine an intent to bar a *Bivens* remedy here.  None of this purported evidence is persuasive.

The statutes identified by Defendants do not demonstrate an intent to preclude *Bivens* remedies for family separations.  (Mot. at 27–29 (identifying Immigration and Nationality Act ("INA"), Homeland Security Act ("HSA"), TVPRA, and 12 statutes addressing trafficking victims).)  All but two of the statutes identified as purportedly speaking to immigration were enacted before Defendants began separating parents and children at the border and are therefore of little relevance to whether a *Bivens* remedy should be available here.[20]  *See Abbasi*, 137 S. Ct. at 1862 (analyzing Congressional

---

[20]   The INA was enacted in 1952, the HSA was enacted in 2002, and the TVPRA was enacted in 2008.  The statutes addressing trafficking victims were enacted in 2000, 2003, 2004, 2005, 2006, 2008, 2013, 2015, 2016, and 2018.

activity *after* allegedly unconstitutional conduct began).  The only statutes enacted after family separations began are the Combating Human Trafficking in Commercial Vehicles Act, Pub. L. No. 115-99, 131 Stat. 2242 (2018), and the No Human Trafficking on Our Roads Act, Pub. L. No. 115-106, 131 Stat. 2265 (2018). (*See* Mot. at 29 n.16.)  Defendants argue that because these two statutes constitute "legislation to care for UACs and combat human trafficking," they implicitly preclude a damages remedy for separating children that arrived with parents.  (Mot. at 29.)  But statutes enacted to ensure appropriate care of immigrant children and to promote family reunification cannot reasonably be construed to endorse the forcible separation of parents from their own children, absent a finding that the parent is dangerous or unfit.  The statutes also do not address parent Plaintiffs, and therefore cannot remotely be construed as any endorsement of family separations by Congress.  While the INA was amended after family separations began, if anything, the statute "contemplate[s] that civil actions would be maintained against . . . federal immigration officers" for constitutional violations, and so it cannot be read as intended to preclude *Bivens* remedies.  *See Lanuza*, 899 F.3d at 1031 (finding that INA did not counsel hesitation in affording *Bivens* remedy); *see also Prado*, 2020 WL 1659848, at *11 (same).  In sum, none of these statutes bars damages remedies for unconstitutional family separations.

As for Defendants' reliance on Congressional oversight, hearings, and proposed legislation (Mot. at 29–30), none constitutes "explicit congressional declaration[s]" as required by *Bivens*, 403 U.S. at 397.  For example, Defendants refer to four Congressional hearings discussing family separations, but they do not explain how these hearings bar a *Bivens* remedy or are in tension with this action in any way.  (*See* Mot. at 30.)  Defendants also rely on proposed legislation that was referred to committee in June 2018 but has had no further activity since then.  (*See id.* (citing Keep Families Together Act, S. 3036, 115th

Cong. (2018), and Protect Kids and Parents Act, S. 3091, 115th Cong. (2018)).)  This proposed legislation cannot be sufficient to raise separation-of-powers concerns and foreclose a damages remedy.

Defendants conversely argue that Congressional *inaction* precludes a *Bivens* remedy for family separations.  But "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."  *Burns* v. *United States*, 501 U.S. 129, 136 (1991) (quoting *Ill. Dep't of Public Aid* v. *Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983)).  There are many other explanations for Congress's silence, none of which is addressed by Defendants.  Further, Defendants' argument is contrary to their own public statements.  (Mot. at 30–31.) Defendants have publicly conceded that they pursued family separations because Congress had *failed to take action* against family immigration that "Congress has failed to pass effective legislation that serves the national interest—that closes dangerous loopholes and fully funds a wall along our southern border."  Press Release, Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://tinyurl.com/y96nsut6. (*See also* Compl. ¶¶ 155–64, 217–18.)  Defendants argue— inconsistently—that Congress acted intensely enough in the immigration context to bar Plaintiffs' claims for damages, but also failed to act to such a degree that the administration was forced to act.  Congress's silence in immigration legislation, including that relied on by Defendants, preserves the damages remedy available to Plaintiffs here.  (*See* Mot. at 27–29.)

Defendants rely on *Abbasi* to infer that Congressional silence implies that Congress disfavors a *Bivens* remedy for unconstitutional family separations.  (Mot. at 27, 30–31.) But in *Abbasi*, nearly 16 years of Congressional silence had elapsed since September 11; by contrast, less than two years have passed since Defendants began separating families.

*Compare Abbasi*, 137 S. Ct. at 1862, *with* Compl. ¶ 8.  Congressional interest was also considerably more "frequent and intense" in the aftermath of the September 11 attacks.

### (d)  National Security and Foreign Policy Concerns Do Not Weigh Against Creating a *Bivens* Remedy Here

Defendants have failed to show that national security and foreign policy concerns counsel against a *Bivens* remedy.  The "simple fact that this is an immigration case does not mean that issues of national security, diplomacy or foreign policy are necessarily implicated." *Lanuza*, 899 F.3d at 1027 n.4.  As the Supreme Court cautioned in *Abbasi*, "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" 137 S. Ct. at 1862.  There is no principled reason that the same would not be true for foreign policy concerns as well.

The immigration enforcement cases Defendants cite are far afield.  Each implicates vastly different national security or foreign affairs concerns, such as fighting terrorism or addressing foreign espionage.  *See, e.g.*, *Abbasi*, 137 S. Ct. at 1852; *Bank Markazi* v. *Peterson*, 136 S. Ct. 1310, 1317 (2016); *Mirmehdi* v. *United States*, 689 F.3d 975, 979 (2012); *Reno* v. *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 473 (1999); *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 581 (1952).  For example, in one of the few damages cases Defendants cite, *Doe* v. *Rumsfeld*, the defendants were accused of subjecting a government contractor to military detention *in Iraq*, where the government contractor was responsible for developing "intelligence through contacts with local Iraqis and to discover threats to the Marine unit." 683 F.3d 390, 392 (D.C. Cir. 2012).

The Supreme Court's recent decision in *Hernandez* does not support Defendants' contention that national security issues are presented in this case.  Indeed, *Hernandez* is completely inapposite as the harm occurred on foreign soil. 140 S. Ct. at 741.  Here, by contrast, Plaintiffs' claims are premised on mistreatment in the U.S., caused or facilitated by Defendants days or weeks after Plaintiffs crossed the border, while they were held in

1    immigration detention, or across the country in various ORR facilities.  *Id.*

2                     **(e)**     **The Claims Do Not Implicate Prosecutorial Discretion**

3            Defendants mischaracterize the challenged conduct described in the Complaint.

4    Plaintiffs challenge Defendants' conduct in separating parents and children, not their

5    prosecutorial discretion.  (*See* Compl. ¶¶ 280–336; *see also infra* Section III.E.)

6    Specifically, Plaintiffs in this case do not challenge that some parents were separated from

7    their children during the brief period when they were incarcerated for the misdemeanor of

8    illegal entry, but rather, that their children were not returned to them after their release,

9    often for months.  Thus, because Plaintiffs are not challenging prosecutorial discretion, the

10   *Bivens* claims do not raise separation-of-powers concerns.  Further, as explained in the

11   Complaint and ignored by Defendants, certain of the Parent Plaintiffs were separated from

12   their children, but *not* prosecuted.  (Compl. ¶¶ 71, 82, 117.)

13                    **(f)**     **A *Bivens* Remedy Is a Workable Cause of Action Here**

14           Defendants fail to support their contention that a *Bivens* remedy would be

15   unworkable.  Although Defendants offer no definition of workability, they focus on the

16   possibility that similar *Bivens* cases will flood the courts, the potential for financial impact

17   on Defendants, and the inability to tailor a *Bivens* remedy in the class action context.  (Mot.

18   at 36–38.)  Defendants' argument fails on all of these conceptions of "workability."

19           *First*, insofar as Defendants argue that a remedy here would expose them to

20   significant damages, such a result cannot be used to escape responsibility for historically

21   egregious misconduct.  Quite the opposite should be true.  Further, indemnification of

22   federal officials renders it almost guaranteed that Defendants will not in fact face any dire

23   financial consequences.  In sum, the argument that overwhelming financial responsibility

24   should counsel against *Bivens* remedies here is completely unavailing.

25           Moreover, as the Supreme Court found in *Davis*, claims of unworkability can be

26

answered with the experience of the courts in the context of § 1983—the state officer equivalent to *Bivens*.  *Davis*, 442 U.S. at 248.  Decades ago the Supreme Court endorsed claims against high ranking state officials under § 1983.  *See Scheuer* v. *Rhodes*, 416 U.S. 232, 249–50 (1974).  The Court has not since reversed course on the basis of any ensuing flood of lawsuits.  *See, e.g.*, *Rehberg* v. *Paulk*, 566 U.S. 356, 363 (2012) (Supreme Court has since followed "functional approach" in identifying which government official acts merit immunity and which, such as those in *Scheuer*, do not).  A *Bivens* remedy is completely consistent with the Supreme Court's cautious approach.

*Second*, Defendants argue that the class action vehicle makes the claims asserted here "unworkable."  Defendants cite *Ashcroft* v. *Iqbal* for the proposition that *Bivens* claims must be brought against federal officials for their "own individual actions."  (Mot. at 38 (citing 556 U.S. 662, 676 (2009)).)  That Defendants' individual actions violated the constitutional rights of many families is not a reason to decline to apply *Bivens*.  Indeed, by aggregating claims in a class action, Plaintiffs should be alleviating Defendants' concerns over litigation floodgates.  (Mot. at 40.)

## C.    QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS

The claims in this case are not barred by qualified immunity because Plaintiffs plead facts showing:  (1) Defendants violated constitutional rights, and (2) the rights were "clearly established."  *Keates* v. *Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) ("If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." (internal quotation marks omitted)).  A right is clearly established where "a reasonable official would understand that what he is doing violates that right."  *Wilson* v. *Layne*, 526 U.S. 603, 614–15 (1999) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)); *Advanced Bldg. & Fabrication, Inc.* v. *Cal. Highway Patrol*,

918 F.3d 654, 660 (9th Cir. 2019) (affirming denial of qualified immunity where "contours" of plaintiffs' Fourth Amendment right were "sufficiently clear" (citation omitted)).

Defendants contend that there was an "absence of case law at the time of Plaintiffs' separation that would have put Defendants on notice of any clearly established right."[21] (Mot. at 40.)  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002); *see also id.* (explaining that previous cases need not be "fundamentally similar" nor "materially similar" for officials to be on notice).  "[I]n an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law."  *Maxwell* v. *Cty. of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013) (quoting *Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004)).  This is that "obvious" case.  No official could reasonably have concluded that this egregious conduct, involving tearing babies, toddlers, and young children away from their parents, was lawful.  *Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1145–46 (finding separating families is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" (internal quotation marks omitted)).

In any event, the case law has long been settled with respect to Plaintiffs' Fourth and Fifth Amendment claims.  Defendants merely mischaracterize the rights that they violated in an attempt to evade this long-settled law.

Before Defendants engaged in the misconduct at issue here, any reasonable official in their positions would have known that forcibly separating parents and children without

---

[21] With regard to Plaintiffs' equal protection claims, no such case law is necessary.  *Elliot-Park* v. *Manglona*, 592 F.3d 1003, 1008–09 (9th Cir. 2010) (holding that right to be free from discrimination is so well established that "all public officials must be charged with knowledge of it" (quoting *Flores* v. *Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980))); *see infra* at Section III.C.5.

cause, keeping them separated indefinitely, and detaining them in punitive conditions violates their constitutional rights.

### 1. Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Family Integrity

Plaintiffs' Fifth Amendment substantive due process interest in remaining together with their families was clearly established at the time of Defendants' misconduct (Count I).

The Supreme Court "has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ.* v. *LaFleur*, 414 U.S. 632, 639 (1974); *see also Moore* v. *City of E. Cleveland*, 431 U.S. 494, 503–04 (1977) (recognizing that the Constitution protects "the sanctity of the family"); *Hardwick* v. *Cty. of Orange*, 844 F.3d 1112, 1116 (9th Cir. 2017) ("[T]he Supreme Court has recognized this fundamental right in many cases."); *Wallis* v. *Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) ("Parents and children have a well-elaborated constitutional right to live together without governmental interference." (citing *Santosky* v. *Kramer*, 455 U.S. 745, 753 (1982) and other Supreme Court precedent)).[22]

Indeed, courts around the country considering the family separations at issue in this case have repeatedly found that plaintiffs had a Fifth Amendment right to family integrity, relying on longstanding case law. *See, e.g.*, *Ms. L. Order Den. Mot. to Dismiss*, 302 F. Supp. 3d at 1161 ("[I]t has long been settled that the liberty interest identified in the Fifth

---

[22]  It is well established that the Fifth Amendment's due process clause enshrines the same substantive due process rights as the Fourteenth Amendment's.  *See Gonzales* v. *Carhart*, 550 U.S. 124, 156–58 (2007) (relying on Fourteenth Amendment substantive due process case law to resolve substantive due process claim as against federal government); *M.G.U.* v. *Nielsen*, 325 F. Supp. 3d 111, 119 (D.D.C. 2018) (relying on cases interpreting Fourteenth Amendment Due Process Clause to find that right to family integrity is well-established fundamental right that clearly implicates protection of Fifth Amendment Due Process Clause).

Amendment provides a right to family integrity or to familial association."); *id.* at 1164 ("[E]ach Plaintiff has demonstrated that the right to family integrity encompasses her particular situation."); *W.S.R.* v. *Sessions*, 318 F. Supp. 3d 1116, 1124 n.4 (N.D. Ill. 2018) (granting preliminary injunction in part because "claim for reunification is likely to succeed based on the substantive due process right to family integrity"); *Jacinto-Castanon de Nolasco* v. *U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (finding that *Troxel* v. *Granville*, 530 U.S. 57, 65–66 (2000), clearly establishes that "parents have a fundamental interest in family integrity"); *M.G.U.* v. *Nielsen*, 325 F. Supp. 3d 111, 119 (D.D.C. 2018) (same); *J.S.G. ex. rel. J.S.R.* v. *Sessions*, 330 F. Supp. 3d 731, 741–42 (D. Conn. 2018) (explaining that plaintiffs' right to family integrity is protected by the Constitution, and defendants violated that right by separating plaintiffs from their parents at border (citing *Bohn* v. *Cty. of Dakota*, 722 F.2d 1433, 1435 (8th Cir. 1985))). Thus, there can be no serious dispute that Plaintiffs' right to family integrity was clearly established at the time Defendants separated Plaintiffs.

Courts have thus consistently held that a violation of the clearly established right to family integrity overcomes a defense of qualified immunity.  For example, in *Keates*, the Ninth Circuit reversed the lower court's dismissal on qualified immunity grounds because the facts gave rise to a violation of the clearly established right to familial association, where the defendants separated a child with no reasonable ground to fear for her safety. 883 F.3d at 1240; *see also Anderson-Francois* v. *Cty. of Sonoma*, 415 F. App'x 6, 9 (9th Cir. 2011) (holding that defendant was not entitled to qualified immunity because he did not have reasonable cause to remove children from plaintiff's custody without warrant); *Bhatti* v. *Cty. of Sacramento*, 281 F. App'x 764, 766 (9th Cir. 2008) (reversing grant of summary judgment on qualified immunity grounds where defendant removed child from home without warrant and absent imminent risk of serious harm).

Defendants argue that their conduct furthered the government's "legitimate interest in prosecuting illegal entrants," and that "[a]ny associated interference with the right to family integrity . . . was incidental to such enforcement," and highly "context-dependent." (Mot. at 41–43.) Defendants therefore argue that they could not have violated due process by carrying out their jobs.  (*Id.*)  Defendants' argument is deeply flawed.

*First*, Defendants ignore that many of the separations did *not* involve prosecutions for illegal entry because the families sought asylum at a port of entry and did not cross illegally.  Yet they still were wrongfully separated from their children.[23]  (*See, e.g.*, Compl. ¶¶ 77, 92, 111.)   In numerous cases, Defendants *knowingly* and forcibly separated vulnerable, lawful asylum seekers from their children, well aware that many had not violated any United States laws.  (*See, e.g.*, *id.* ¶¶ 156–59, 167.)  Defendants thus cannot hide behind the facade of immigration enforcement to diminish the constitutional harm they inflicted on Plaintiffs' clearly established Fifth Amendment right to family integrity.

*Second*, even in those cases where a parent was detained for the misdemeanor of illegal entry for a few days, Defendants completely fail to address the fact that they unconstitutionally *continued* to keep families separated for many months with no basis for doing so after the parent was released from incarceration.  Thus, even in instances where an individual may have been validly arrested for improper entry, Defendants violated their right to family integrity by continuing to keep those individuals separated from their families even after the disposition of their cases, when there was no longer a valid law enforcement purpose for continued separation.  (*See id.* ¶ 161 (alleging that parents jailed for approximately 48 hours or less were separated from their children and not reunited even

---

[23]  *See supra* Section II; *see also C.M.* v. *United States*, No. 2:19-cv-5217, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020) ("The United States has cited to no statute explicitly authorizing the government to detain parents and children in separate facilities before it has charged either with a crime.  Indeed, no such statute exists.").

after parent was returned to ICE custody).)  *See also Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1137 ("And families that were separated due to entering the United States illegally between ports of entry have not been reunited following the parent's completion of criminal proceedings and return to immigration detention.").[24]

Accordingly, Defendants violated Plaintiffs' clearly established right to family integrity and are not entitled to qualified immunity.

### 2. Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Substantive Due Process Right to Receive Adequate Medical Care While in Custody

Plaintiffs have a clearly established right to receive adequate health care while in immigration custody, and Defendants violated this right by failing to provide mental health and other care to severely traumatized parents and children (Count II).  *See Tatum* v. *Winslow*, 122 F. App'x 309, 312 (9th Cir. 2005) (affirming district court's denial of qualified immunity because it was clearly established that officers could not "deny or delay access to medical care"); *Ross* v. *Krueger*, No. 2:13-cv-0355, 2015 WL 1470534, at *13 (D. Nev. Mar. 31, 2015) (denying summary judgment on qualified immunity where "all [d]efendants would understand that denying [p]laintiff necessary medical care . . . would violate these rights").  Defendants appear to concede that this right was clearly established, and instead argue only that these claims should be brought solely against line officers, not all Defendants.  (*See* Mot. at 45.)

---

[24]  Defendants cite a portion of a decision in *Ms. L.* v. *U.S. Immigration & Customs Enforcement*, 415 F. Supp. 3d 980, 988 (S.D. Cal. 2020), that declined to enjoin defendants from separating a discrete number of parents due to the seriousness of the parents' prior criminal convictions.  As alleged here, and as the *Ms. L.* Court found, the exclusion for those few parents with serious criminal histories does not apply to the vast majority of families that were separated at the border.  *Id.* at 989, 994 n.9 (explaining that these exclusions would "impact relatively few").  Such exclusions offer no excuse for Defendants' egregious conduct inflicted upon thousands of families and no basis to grant broad qualified immunity at this stage of the proceedings.

Defendants ignore that Plaintiffs' allegations here show that *each* Defendant directly caused or conspired to cause the denial of appropriate health care.  For example, the Complaint explains that the "DHS Defendants and HHS/ORR Defendants failed to prepare or warn those who would be responsible for the care of separated children that a substantial number of young, traumatized children would be entering ORR custody.  As a result, ORR facilities and foster families failed to provide necessary medical, mental health, and other services to separated children, exacerbating their trauma."  (Compl. ¶ 185; *see also id.* ¶ 187.)   The Complaint also alleges that in response to Commander White expressing concerns that separating families would cause children severe trauma, Defendants Lloyd and Wynne told Commander White that they need not plan for increased numbers of separated children.   (*Id.* ¶ 136.)   Defendant Lloyd later admitted in Congressional testimony that he was fully aware of the severe mental health consequences that would result from Defendants' actions.  (*Id.* ¶ 206.)  And as the Complaint repeatedly alleges, the HHS/ORR Defendants failed to "adequately warn shelters about the separations and failed to adopt policies or practices, or provide training, to ensure that separated children would be properly treated."  (*See, e.g.*, *id.*)  Each of DHS Defendants' and HHS/ORR Defendants' failures, Plaintiffs allege, "intensified the damage that children experienced from the separation from their parents."  (*Id.* ¶ 211.)   Each Defendant separately, and as part of a conspiracy, directly deprived Plaintiffs of their constitutional rights.  (Compl. ¶¶ 339–40.)

Defendants therefore are not entitled to qualified immunity.

### 3. Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Be Free From Punitive Treatment Without Due Process

Plaintiffs have a clearly established right to be free from punitive treatment, which Defendants violated by, among other things, forcibly separating and then delaying

reunification of families, failing to provide meaningful information to parents and children regarding each other's locations and well-being, and subjecting Plaintiffs to abusive conditions (Count III).  (Compl. ¶ 305.)  *See Demery* v. *Arpaio*, 378 F.3d 1020, 1029, 1033 (9th Cir. 2004) (affirming district court's decision to grant preliminary injunction because placing webcams in pretrial detention center violates "substantive due process rights of pretrial detainees by subjecting them to punishment"); *Davison* v. *Carona*, No. 8:06-cv-1258, 2010 WL 4345752, at *13 (C.D. Cal. Sept. 29, 2010) (finding clearly established law supported punitive conditions of confinement claim for non-criminal detainee who was denied "warm bedding in a cold cell or clean and dry bedding after a cell was flooded with rainwater and urine").

Indeed, just recently, a court in this district found that the conditions of CBP holding cells were likely unconstitutionally punitive.  *See Unknown Parties* v. *Nielsen*, No. 4:17-cv-00250, 2020 WL 813774, at *1 (D. Ariz. Feb. 19, 2020).  Explaining that the individuals in CBP custody "cannot be punished because they have not yet been convicted," *id.* at *2 (quoting *Lynch* v. *Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984)), the court stated that "Plaintiffs are protected under the Fifth Amendment from being held without due process of law under conditions that amount to punishment." *Id.* (citing *Wong Wing* v. *United States*, 163 U.S. 228, 237 (1896)).  Specifically, the court found that the plaintiffs were likely to prevail on their claims with respect to the same punitive conditions Plaintiffs faced in this case:  overcrowding, cold temperatures, unsanitary cells, lack of adequate personal hygiene materials, and insufficient food and water.  *Compare id.* at *5, *with* Compl. ¶¶ 61, 65, 67, 78, 93, 103.

Defendants do not—and cannot—deny that Plaintiffs' right to be free from punitive treatment without due process was clearly established.  And contrary to Defendants' assertions, these claims need not "be brought against the line-level officers and/or

custodians who allegedly committed the particular infraction." (Mot. at 45 (citing *Iqbal*, 556 U.S. at 676).)  As discussed above, the allegations here show that *each* Defendant separately, and as part of a conspiracy, directed the harms alleged.  *See supra* Section III.A.1(a).  In addition, Plaintiffs allege that "DHS Defendants intentionally withheld" information from Plaintiffs as to where they would be going and when they would be able to see their parents or children again, and "HHS/ORR Defendants instructed those within their chain of command to withhold this information." (*Id.* ¶ 170.)  Plaintiffs also allege that the DHS and HHS/ORR Defendants failed to develop a process in which families could communicate with one another, exacerbating the punitive conditions.  (*See id.* ¶ 173.)  Thus, Plaintiffs allege, "[b]y separating parents and children, keeping families apart, and restricting (and even eliminating) their communication during the period of separation, the White House, DHS, and HHS/ORR Defendants deliberately imposed, and were deliberately indifferent to, punitive conditions of confinement on Plaintiffs and Class Members." (*Id.* ¶ 168.)  And in any event, Plaintiffs *are* asserting such claims against the John/Jane Doe Defendants here.

Defendants thus are not entitled to qualified immunity.

### 4.    Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Procedural Due Process

Plaintiffs have a clearly established right to notice and a hearing when the government removes a child from a parent and continues to keep them separated indefinitely (Count IV).  *See, e.g.*, *Ram* v. *Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997) (explaining that "[p]reexisting law clearly required [officials] to provide [the father] with notice and a hearing before they interfered with his custodial rights"); *see also Santosky*, 455 U.S. at 770 (requiring hearing under constitutionally proper standards before terminating parental rights).  Defendants argue that class members, many of whom were never arrested for illegal entry, had no such procedural due process right.  But they fail to

explain why there was no such right in the face of such clearly established law, particularly for those parents who were never arrested for illegal entry or for those who were kept separated from their children well after the disposition of their criminal cases. *See Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1145 ("Ms. C. completed her criminal sentence in 25 days, but it took nearly eight months to be reunited with her son.").

Defendants also argue that even if Plaintiffs had a procedural due process right, it "only requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" (Mot. at 47 (quoting *Mathews* v. *Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted)).)  But there was *no process* at all before or even after the separations.  There was no notice before families were separated. (*See, e.g.*, Compl. ¶¶ 2–7.)  There was no hearing to determine the fitness of the parent—neither before nor after separation.  Far from satisfying the factors set out in *Mathews*, Defendants did not provide *any* opportunity to be heard, let alone an opportunity at a meaningful time or in a meaningful manner.  *See* 424 U.S. at 335 (setting forth three-factor test governing constitutional sufficiency of procedures).

Defendants point to ORR guidelines, which allow parents to submit reunification applications only *after* their children have already been taken from them, and only after the parents have found their way out of DHS custody.  (Mot. at 48.)[25]  Decades of case law, however, demands far more comprehensive procedures *before* the devastating step of taking a child away from her parent. *See Ram*, 118 F.3d at 1310 (holding that "it was clear that a parent had a constitutionally protected right to the care and custody of his children and that he could not be summarily deprived of that custody without notice and a hearing,

---

[25] *See Children Entering the United States Unaccompanied:  Section 2, Safe and Timely Release from ORR*, U.S. Dep't of Health & Human Servs. (Jan. 30, 2015), https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2.

1   except when the children were in imminent danger"); *Wallis*, 202 F.3d at 1138, 1141

2   (same); *Robinson* v. *Tripler Army Med. Ctr.*, No. 05-17011, 2009 WL 688922, at *4 (9th

3   Cir. Mar. 17, 2009) (same).

4         In any event, Defendants' conduct prevented agencies from communicating with

5   one another or keeping track of where parents or children were being detained, making

6   meaningless any alleged process found in ORR guidelines.   Indeed, ongoing efforts to

7   reunify families continue to face obstacles to this day because of the agencies'

8   disorganization and poor recordkeeping.  (Compl. ¶¶ 173, 229, 230.)  While they were

9   separated, parents could not communicate with the ORR facilities that held their children.

10  They often did not know where in the country their children were being held, let alone in

11  which facilities.  (*Id.* ¶¶ 63, 97, 163, 174.)  As a result, Plaintiffs had no meaningful

12  opportunity to utilize ORR's processes.  As the *Ms. L.* Court pointedly stated:  "Placing the

13  burden on the parents to find and request reunification with their children under the

14  circumstances presented here is backwards."  *Ms. L. Order Granting Prelim. Inj.*, 310 F.

15  Supp. 3d at 1145.  Defendants thus cannot point to any meaningful notice or opportunity

16  to be heard.

17        Moreover, Defendants callously suggest they could not have violated Plaintiffs'

18  procedural due process right because "all families identified in this Complaint were

19  reunited before it was filed."  (Mot. at 48.)  But the fact that Defendants were forced to

20  reunite families by a federal court injunction months later—and only with the assistance of

21  non-governmental third parties—does not absolve Defendants of the damage they inflicted

22  by infringing on Plaintiffs' procedural due process right in the first instance.

23        Defendants thus are not entitled to qualified immunity for their violations of

24  Plaintiffs' clearly established Fifth Amendment right to procedural due process.

25

26

### 5.      Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Equal Protection Under the Law

Defendants also violated Plaintiffs' clearly established Fifth Amendment right to equal protection (Count V).

Defendants first argue that Plaintiffs have not identified a suspect classification or fundamental right because all families intercepted at the southern border were separated. But Plaintiffs specifically allege that Defendants intentionally and disparately targeted Central American families for separation.  (Compl. ¶¶ 320–26.)  This conduct constitutes discrimination based on national origin, which is subject to strict scrutiny.  *See City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  Plaintiffs need not show that discriminatory animus is the sole motivating factor behind Defendants' actions in order to sustain their equal protection claim.  *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Arce* v. *Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).

In these circumstances, the discrimination was not tailored to achieve any legitimate—let alone compelling—governmental purpose, and it violated clearly established law.  "[T]he constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it."  *Flores* v. *Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980) (citing *Cooper* v. *Aaron*, 358 U.S. 1 (1958)).  "[B]ecause the non-discrimination principle is so clear," it may be found to be clearly established even where there is no "prior case with identical, or even materially similar, facts."  *Elliot-Park*, 592 F.3d at 1008; *see also Hernandez* v. *Cate*, 918 F. Supp. 2d 987, 1020 (C.D. Cal. 2013) (holding that *Johnson* v. *California*, 543 U.S. 499 (2005), clearly established that differential treatment based on national origin violated law, even in prison context).

Not only is the right to be free from discrimination based on national origin clearly established, but Defendants intentionally violated that right.  To survive a dispositive

motion, a facially neutral action must only be plausibly motivated by discriminatory reasons, taking into consideration its actual disparate impact, background, and the defendants' departure from normal procedures or substantive conclusions. *Ave. 6E Invs., LLC* v. *City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (citing *Vill. of Arlington Heights*, 429 U.S. at 266–68). Here, Central Americans "were overwhelmingly affected by Defendants' unlawful conduct: more than 95 percent of the separated families identified as *Ms. L.* class members are from Central America." (Compl. ¶¶ 164, 240.) Moreover, the Trump Administration and Defendants themselves expressed hostility toward Central Americans and an intent to punish Central American families at the southern border. (*Id.* ¶¶ 128, 144, 169, 239–56.) Finally, Defendants departed from normal, transparent decision-making processes (*id.* ¶¶ 128, 132–33, 201, 206, 216–17), ignoring expert warnings as to the unprecedented and dangerous nature of family separations (*id.* ¶¶ 126, 130–31, 140, 147, 152, 177, 193, 212–14).

Taking these factors together, as the Court is required to here, Defendants' alternative explanations for the family separations ring hollow. (*See* Mot. at 49.) A plaintiff's complaint may be dismissed only when a defendant's plausible alternative explanation is "so convincing that plaintiff's explanation is *im*plausible." *Starr* v. *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Here, Plaintiffs allege that Defendants explicitly sought to deter future Central American immigrants by targeting Central Americans already detained in southern border states for punitive, disparate treatment. (Compl. ¶¶ 128, 215.) Particularly given that many of the Complaint's allegations of discriminatory purpose recite Defendants' own hateful words and actions, Plaintiffs' explanations for Defendants' conduct are far from "implausible." *Cf. Iqbal*, 556 U.S. at 662 (accepting alternative explanation where there was no adequate allegation that discrimination was defendants' express purpose).

Because Defendants cannot dispute that Plaintiffs' equal protection claims stem from violations of clearly established law, they pivot to arguing that a heightened standard of review does not apply here because "[d]istinctions on the basis of nationality may be drawn in the immigration field by Congress or the Executive." (Mot. at 49 (citation omitted).) Not so. Defendants' cited authorities relate to the federal government's power to exclude noncitizens; however, as far back as 1896, the Supreme Court recognized in *Wong Wing* v. *United States* that "[i]t does not follow that, because the government may expel aliens or exclude them from coming to this country, it can confine them at hard labor in a penitentiary before deportment, or subject them to any harsh and cruel punishment." 163 U.S. 228, 241 (1896). Defendants cite *Jean* v. *Nelson*, 727 F.2d 957, 963 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985), but there, the Eleventh Circuit drew a distinction between differential treatment and conditions during detention, as opposed to decisions relating to admission or parole.[26] The discriminatory separation of immigrant families in detention is distinct from any executive decision as to charging, parole, admission, or deportation, and instead relates to conditions of temporary confinement while *awaiting* those decisions.

Finally, even if this Court were to find that heightened scrutiny was not warranted here, there is still no rational relationship between Defendants' disparate treatment and any purported legitimate government interest. Defendants identify no legitimate governmental interest in ripping children from their parents' arms, detaining them separately in inhumane

---

[26] *Cf. Trump* v. *Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (concerning entry into United States); *Narenji* v. *Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (concerning reporting requirement for immigrant students from particular countries, potentially resulting in deportation); *Rajah* v. *Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (concerning registration requirement for young, male immigrants from certain countries, potentially resulting in deportation).

conditions for indefinite periods, or in taking these actions disproportionately against Central American immigrants at the southern border, but not asylum seekers elsewhere.[27]

Defendants thus are not entitled to qualified immunity on the equal protection claim.

### 6.   Defendants Violated Plaintiffs' Clearly Established Fourth Amendment Right Against Unreasonable Seizures

Defendants violated Plaintiffs' clearly established Fourth Amendment right by separating parents and children without reasonable cause (*e.g.*, where they were not arrested or charged with a crime) and also by continuing to keep them apart (seized) without reasonable cause (*e.g.*, even after the disposition of any criminal case) (Count VI). (Compl. ¶¶ 330–36.)[28]   Plaintiffs have a clearly established Fourth Amendment right to be free from "unreasonable seizures" absent reasonable cause to believe the children seized from their parents are in imminent danger.  *See Keates*, 883 F.3d at 1236; *see also Kirkpatrick* v. *Cty. of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016) (acknowledging that social worker's removal of child from parental custody implicated Fourth Amendment). Where a seizure has occurred, the relevant question is whether that seizure was unreasonable.  *See Terry* v. *Ohio*, 392 U.S. 1, 9 (1968).

---

[27] *See, e.g.*, *Ariz. Dream Act Coalition* v. *Brewer*, 757 F.3d 1053, 1058, 1067 (9th Cir. 2014) (preliminarily enjoining defendants' policy of preventing Deferred Action for Childhood Arrival recipients from obtaining driver's licenses, which had no rational basis and thus likely violated Equal Protection Clause); *U.S. Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 534, 538 (1973) (finding violation where purpose of classification was merely to "harm a politically unpopular group"); *see also Bunyan* v. *Camacho*, 770 F.2d 773, 776 (9th Cir. 1985) (striking down statute where "the statute's distinction between different classes of resident civil servants with college degrees [was] not rationally related to the asserted goal of rewarding, encouraging and compensating persons for the alleged sacrifices").

[28] Though Defendants suggest that Fourth Amendment protections do not apply to Plaintiffs (Mot. at 52), the Ninth Circuit applies the Fourth Amendment to civil proceedings, including with respect to immigration detention. *See, e.g.*, *Melendres* v. *Arpaio*, 695 F.3d 990, 1000–01 (9th Cir. 2012).

Here, Plaintiffs allege that Defendants ordered children to be torn away from their parents—sometimes literally.  (*See* Compl. ¶ 62 ("The guards took Jaime and tore Mateo from Ana's arms as he tried to cling to her."); *id.* ¶ 104 (describing Jairo's horror as he watched CBP officers violently tear crying child from his mother's arms, while repeatedly striking mother).)   Plaintiffs also allege that Defendants continued to keep children separated from their parents for months, even though parents were either not in criminal custody or in criminal custody for only short periods of time.  (*See id.* ¶¶ 95–98 (explaining that Defendants kept Jorge separated from his eight-year-old daughter for two months); *id.* ¶¶ 83–89 (alleging that, after being separated, Lorena was detained for another three months before ICE officers tricked her into consenting to her own removal, which then led to 16-month separation).)

In the face of these well-pleaded allegations, Defendants argue that Plaintiffs do not allege "any seizure in a constitutionally-recognized sense," and that "[a]fter [their] initial apprehension . . . any constitutional challenge to government custody might arguably implicate the Fifth Amendment . . . , but not the Fourth Amendment."  (Mot. at 51.) Defendants are wrong.  *Keates*, 883 F.3d at 1236 ("[W]e evaluate the claims of children who are taken into state custody under the Fourth Amendment right to be free from unreasonable seizures." (citation omitted)); *see also id.* (finding Fourth Amendment violation when government seized child from parents without exigent circumstances); *Kirkpatrick*, 843 F.3d at 792 (same).

Taking Plaintiffs' allegations as true at the motion-to-dismiss stage, Defendants had no reasonable cause to believe that the parents posed any danger to their own children, whom they brought to the United States specifically to seek safety and refuge.  In fact, "[i]n some cases, Defendants offered no reason or justification for the separation[s]."  (Compl. ¶ 156; *see also id.* ¶ 157 ("At other times, when a family presented themselves legally at a

1   port of entry to apply for asylum, Defendants would claim that they were unsure that the

2   adult traveling with the child was truly the parent and then separate the child, without taking

3   any steps to verify parentage.").)

4        Moreover, as Defendants acknowledge, a Fourth Amendment violation can

5   continue through many phases of detention, not just during an initial apprehension.  (*See*

6   Mot. at 51 (citing *Robins* v. *Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985) (finding that

7   seizure continues "throughout the time the arrestee is in the custody of the arresting

8   officers")); *see also Manuel* v. *City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017) (stating that

9   detainee's "ensuing pretrial detention, no less than his original arrest, violated his Fourth

10   Amendment rights").)

11        Further, Defendants had no reasonable cause to continue the seizures by keeping

12   families apart for extended periods after their initial separations.  "Some families remained

13   forcibly separated for many months or even a year or more," even though many of the

14   parents were not in criminal custody or were in criminal custody only for brief periods.

15   (*See* Compl. ¶¶ 162–63.)   Any reasonable officer should have known that forcibly

16   removing children from their parents without reasonable cause and then keeping the

17   parents and children from each other for extended periods of time violated their Fourth

18   Amendment right.  *See Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1145–46

19   ("A practice of this sort implemented in this way is likely to be 'so egregious, so

20   outrageous, that it may fairly be said to shock the contemporary conscience,' interferes

21   with rights 'implicit in the concept of ordered liberty,' and is so 'brutal' and 'offensive'

22   that it [does] not comport with traditional ideas of fair play and decency." (citations

23   omitted) (internal quotation marks omitted)); *see also C.M.*, 2020 WL 1698191, at *4

24   (quoting *Ms. L.* Order Granting Prelim. Inj. and denying Government's motion to dismiss

25   plaintiffs' FTCA claims based on constitutional rights violations).

26

1   Defendants thus are not entitled to qualified immunity for their violations of

2   Plaintiffs' clearly established Fourth Amendment right.

3   **D.   PLAINTIFFS' SECTION 1985 & 1986 CLAIMS SHOULD NOT BE DISMISSED**

4   Defendants appear to make two arguments in support of their motion to dismiss

5   Plaintiffs' claims under 42 U.S.C. §§ 1985(3) and 1986.  (*See* Mot. at 56–59.)  First,

6   Defendants argue that Plaintiffs have failed to plead facts sufficient to set forth a claim on

7   which relief can be granted.  Second, they argue that the Conspiracy Defendants are entitled

8   to qualified immunity.  Each argument should be rejected.

9   **1.   Plaintiffs Have Adequately Pleaded Facts Supporting Each Element of Their Statutory Claims**

10

11   Defendants' motion to dismiss for failure to allege facts sufficient to state a claim

12   should be denied.  To sustain a claim under § 1985(3), Plaintiffs must plead:

13   (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

14   privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property

15   or deprived of any right or privilege of a citizen of the United States.

16   *United Bhd. of Carpenters & Joiners of Am. Local 610* v. *Scott*, 463 U.S. 825, 828–29

17   (1983); *see also Fazaga* v. *Fed. Bureau of Investigation*, 916 F.3d 1202, 1245 (9th Cir.

18   2019).

19   The Complaint alleges all four of the required elements.  On elements one and two,

20   Plaintiffs allege that the Conspiracy Defendants conspired among themselves, and possibly

21   with others, and that they did so to deprive Plaintiffs and other putative class members of

22   their Fourth and Fifth Amendment rights.  Plaintiffs allege that this conspiracy was

23   motivated by animus toward Central Americans based on their race, ethnicity, and/or

24   national origin and was organized to target citizens of the nations that President Trump has

25   labelled as "shithole countries" and whom he describes as "animals" who are "invading"

26

- 50 -

or "infesting" the United States.[29]   (Compl. ¶¶ 240–56.)   Plaintiffs allege that the Conspiracy Defendants agreed among themselves to separate families from these countries to harm Plaintiffs, and others similarly situated, in an effort to deter others from these countries from immigrating to the United States.  (*See, e.g.*, *id.* ¶¶ 123–64.)  And, finally, Plaintiffs allege that the conspiracy was successfully executed and directly resulted in the violation of Plaintiffs' constitutional rights to equal protection and due process.  (*Id.* ¶¶ 337–42.)  These allegations are set forth in substantial factual detail and are corroborated by publicly available information that Defendants have not contested and indeed cannot contest.   There can be no dispute that Plaintiffs' allegations satisfy the first two of the required elements.

Plaintiffs' allegations also satisfy elements three and four.  Plaintiffs allege specific overt acts by each of the Conspiracy Defendants in furtherance of the conspiracy.  They allege that the Conspiracy Defendants successfully executed a multi-stage plan to separate families, describing each Conspiracy Defendant's role in the plan.  (*Id.* ¶¶ 123–77.)  And they set forth detailed accounts of the profound physical and psychological harm inflicted on Plaintiffs as a direct result of the Conspiracy Defendants' prolonged and unlawful separation of Plaintiffs from their families.  (*Id.* ¶¶ 59–122.)  Plaintiffs' allegations are clearly sufficient to state a claim under § 1985(3).  *See Iqbal*, 556 U.S. at 678.

Defendants' arguments regarding Plaintiffs' § 1986 claims are wholly derivative of their § 1985(3) arguments; they argue (Mot. at 58–59) that the § 1986 claim should be dismissed because Plaintiffs have failed to allege a § 1985 claim.  *See* 42 U.S.C. § 1986 (requiring underlying violation of § 1985).   Because the § 1985(3) allegations are

---

[29]  Defendants do not argue that Plaintiffs have failed to plead the "class-based, invidiously discriminatory animus" element of their claims, and the Court should thus consider that element to be satisfied.  (Mot. at 56–57 (quoting *Trerice* v. *Pedersen*, 769 F.2d 1398, 1402 (9th Cir. 1985)).)

sufficient, Defendants' arguments fail as to the § 1986 claim as well.

### (a) Sections 1985 and 1986 Authorize Claims Against Federal Officials

Defendants also make a legal argument that Plaintiffs' statutory claims should be dismissed because it has "not been clearly established" that § 1985(3) applies to "federal actors at all . . . let alone federal actors who formulate general policy." (Mot. at 57.) Defendants are incorrect. While a related section of the federal civil rights statute, 42 U.S.C. § 1983, applies only to officials acting under color of *state* law,[30] it is well-settled that § 1985(3) is more expansive and authorizes actions against defendants that § 1983 does not reach. *Griffin* v. *Breckenridge*, 403 U.S. 88, 97–99 (1971). Indeed, § 1985(3) creates a cause of action against any "two or more persons" who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). The Supreme Court has emphasized that the civil rights statutes are to be "accord[ed] . . . *a sweep as broad as (their) language*," and the Court has specifically rejected the argument that § 1985(3), like its counterpart, is cognizable only against state officials. *Griffin*, 403 U.S. at 97 (emphasis added). And the vast majority of courts that have considered the question have concluded that § 1985 authorizes claims against federal officials, including high-level officers with policymaking authority.[31]

---

[30] Section 1983 provides a cause of action against "[e]very person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,* subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added).

[31] Indeed, § 1985 cases against federal officials are legion. *See, e.g.*, *Turkmen* v. *Hasty*, 789 F.3d 218, 262–64 (2d Cir. 2015) (holding that plaintiffs stated § 1985(3) claims against former high-level federal officials), *overruled on other grounds by Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1865–69 (2017); *Hobson* v. *Wilson*, 737 F.2d 1, 19 (D.C. Cir. 1984) ("[S]ection 1985(3) encompasses actions against federal officers, subject, of

1   The cases that Defendants cite are not to the contrary.  *Canlis* v. *San Joaquin*

2   *Sheriff's Posse Comitatus* did not address whether § 1985(3) reaches federal officials.  641

3   F.2d 711, 719–20 (9th Cir. 1981).  Indeed, *Canlis* reinforces the consensus that the statute

4   must be read broadly, consistent with its remedial purpose.  *See id.*; *Griffin*, 403 U.S. at 97;

5   *see also Hobson*, 737 F.2d at 20 ("We have not found either in case law or in the language

6   of the statute any reason to exclude all federal officers from the meaning of the word

7   'persons' in section 1985(3).").

8   Defendants' only other authority is a 2017 district court case, *DeBolt* v. *Rose*, No.

9   4:15-cv-0215, 2017 WL 3701002 (D. Ariz. Mar. 31, 2017), which they cite for the

10   proposition that federal officials have sovereign immunity from § 1985 actions and that

11   this Court therefore lacks subject matter jurisdiction.  (Mot. at 57.)  However, Defendants

12   fail to note that since *DeBolt* was decided, the Supreme Court has made clear that the

13   sovereign immunity analysis in that case was incorrect.  The Supreme Court held in *Lewis*

14   v. *Clarke*, that where a plaintiff seeks damages against a government official in his

15   individual capacity and does not seek a judgment that would be enforceable against the

16   sovereign, sovereign immunity does not apply.  137 S. Ct. 1285, 1291–92 (2017).  Because

17   Plaintiffs seek damages from individual Defendants who are sued only in their individual

18   rather than official capacities, sovereign immunity does not apply.  *See id*.

19   **(b)**   **Plaintiffs Have Adequately Alleged a Conspiracy that Is Cognizable Under Section 1985(3)**

20   Defendants also argue that Plaintiffs' factual allegations cannot support their

21   § 1985(3) civil conspiracy claims because the named Defendants are a single legal entity

22

23   course, to considerations of qualified immunity."), *cert. denied*, 470 U.S. 1084 (1985),

24   *overruled in part on other grounds by Leatherman* v. *Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993); *Spagnola* v. *Mathis*, 809 F.2d

25   16, 29 (D.C. Cir. 1986) (collecting cases); *La Unión del Pueblo Entero* v. *Ross*, 353 F.

26   Supp. 3d 381, 397–98 (D. Md. 2018) (asserting § 1985(3) claims against Commerce Secretary).

1  under the intracorporate conspiracy doctrine.  (Mot. at 57–58.)  This argument fails both

2  because it is not established that the intracorporate conspiracy doctrine applies to civil

3  rights claims, and because even if it did, Defendants here are employees of a variety of

4  different government agencies, and thus cannot be said to be part of the same "department."

5      The intracorporate conspiracy doctrine developed in the context of antitrust law and

6  holds that an employee acting within the scope of his employment is an agent of his

7  employer.  Thus, under traditional agency principles, the employee and the employer are a

8  single legal entity.  *See Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).

9  Because a conspiracy requires an unlawful agreement between two or more "persons,"

10  there can be no conspiracy where the only parties to an agreement are (1) a corporation and

11  its employees or (2) multiple employees of a single corporation.  *Id.*

12      The Supreme Court has not extended the doctrine to civil rights claims.  *See Abbasi*,

13  137 S. Ct. at 1868.  Even if the doctrine did apply in the context of civil rights claims (and

14  it does not), it would not apply to the Conspiracy Defendants here.  Courts that have

15  considered the question have speculated that, at most, the doctrine *might* preclude liability

16  for conspiracies exclusively among employees of *a single government agency*.  For

17  example, in *Abbasi*, the Supreme Court noted that the doctrine could conceivably apply to

18  "officers in the same branch of the Government (the Executive Branch) and in the same

19  Department (the Department of Justice)."  137 S. Ct. at 1868; *see Turkmen*, 789 F.3d at

20  263 n.46.  But the Defendants here are not from a single Department in the same branch of

21  government; rather, they include government officials and employees from multiple

22  agencies organized under different sources of executive and statutory authority, including

23  officers from the DOJ, DHS, and HHS, as well as officials in the White House.  There is

24  no case that suggests that officials from different Departments can fairly be considered a

25

26

single "person" for purposes of the intracorporate conspiracy doctrine.[32]   The doctrine therefore does not bar Plaintiffs' statutory claims.

### 2. Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Section 1985(3) and 1986 Claims

Defendants argue that they are entitled to qualified immunity as to Plaintiffs' §§ 1985(3) and 1986 claims for the same reasons that they are entitled to qualified immunity as to the constitutional violations underlying Plaintiffs' *Bivens* claims.   As discussed above in Section III.C, these arguments should be rejected.

Defendants argue in addition that because it is an "open issue" whether § 1985(3) prohibited them from conspiring to violate Plaintiffs' constitutional rights, they are entitled to qualified immunity.   (Mot. at 57–58.)   The theory appears to be that even if the Conspiracy Defendants violated Plaintiffs' clearly established constitutional rights, and even if it would have been apparent to a reasonable official that his conduct was unlawful, they nonetheless are entitled to qualified immunity unless it also would be apparent that Plaintiffs could seek damages under § 1985(3).   (*Id*. at 57–58.)   Put differently, Defendants argue that they are entitled to knowingly deprive Plaintiffs of their constitutional rights, so long as they do not know that they could be held liable under these specific statutes.   (*Id.*)

This argument—not surprisingly—is squarely foreclosed by the case law.   The operative question when considering qualified immunity is whether the defendant "violate[d] 'clearly established statutory *or* constitutional rights of which a reasonable person would have known.'"   *Tolan* v. *Cotton*, 572 U.S. 650, 655 (2014) (per curiam) (emphasis added) (quoting *Hope*, 536 U.S. at 739); *see also Keates*, 883 F.3d at 1234–35.

---

[32]   Indeed, in other contexts, the Supreme Court has emphasized that "[we] for more than a century ha[ve] held that the term 'Departmen[t]' refers only to 'a part or division of the executive government, as the Department of State, or of the Treasury,' expressly 'creat[ed]' and 'giv[en] . . . the name of a department' by Congress."   *Freytag* v. *C.I.R.*, 501 U.S. 868, 886 (1991) (quoting *United States* v. *Germaine*, 99 U.S. 508, 510–11 (1878)).

1   Under that standard, if a plaintiff can show that a defendant unreasonably violated her

2   rights as a matter of clearly established constitutional law, she need not also demonstrate

3   that the defendant would be aware of the precise theory of resulting civil liability.  *See*

4   *Keates*, 883 F.3d at 1234–40.   Plaintiffs have pleaded facts sufficient to show that

5   reasonable officials would have understood the Conspiracy Defendants' conduct to be

6   unlawful under the Fourth and Fifth Amendments.   These allegations preclude the

7   Conspiracy Defendants from claiming qualified immunity. *See id.*; *see also Hobson*, 737

8   F.2d at 27–29 (holding defendant federal officials not entitled to qualified immunity on

9   § 1985(3) claims given clearly established constitutional law).

10      *Abbasi*, cited by Defendants, is not to the contrary.  The Supreme Court there

11   considered whether the defendant federal officials were entitled to qualified immunity for

12   claims arising from their treatment of detainees following the terrorist attacks of September

13   11. *Abbasi*, 137 S. Ct. at 1843.  Critically, the Court did not find that the alleged conduct

14   violated the plaintiffs' constitutional rights for purposes of its qualified immunity analysis,

15   and therefore did not address whether the defendants would be entitled to qualified

16   immunity if the conduct were in fact obviously unconstitutional.  *See id.* at 1866–69.

17   Moreover, the Court cited the decades-old rule that a plaintiff can overcome qualified

18   immunity by showing either a statutory *or* a constitutional violation, making clear that even

19   where it is uncertain whether a defendant's conduct violated a particular statute, the

20   defendant is not entitled to qualified immunity where—as here—that conduct would have

21   been understood by a reasonable official to have been unconstitutional.  *Id.* at 1871.

22      Even if Defendants' view of qualified immunity doctrine were the law—and it is

23   not—the Conspiracy Defendants still would not be entitled to qualified immunity because

24   reasonable officials would not have understood the conduct alleged in the Complaint to be

25   lawful under § 1985(3).  Indeed, the concept defies logic.  If the individual Conspiracy

26

1    Defendants had unilaterally violated Plaintiffs' clearly established Fourth and Fifth

2    Amendment rights, or had acted in concert with a private party to do so, qualified immunity

3    would not protect them.  *See supra* Section III.C.  No reasonable official could have

4    believed that the statute permitted Defendants to conspire to undertake that same

5    unconstitutional conduct collectively, or that qualified immunity would shield them under

6    those circumstances.  *See, e.g.*, *Hobson*, 737 F.2d at 27–29.

7         Defendants' sole argument to the contrary is that Defendants could reasonably have

8    believed that their conduct was permissible under the intracorporate conspiracy doctrine.

9    (Mot. at 57–58.)  Defendants rely again on *Abbasi* and, specifically, the Supreme Court's

10   conclusion that officials within DOJ could reasonably have thought that their conduct was

11   lawful under § 1985(3).  (*Id.*)  The Court's analysis turned entirely on the possibility that

12   the intracorporate conspiracy doctrine could have been thought by reasonable officials to

13   apply to the defendants' agreement, given that all of them were technically agents of the

14   same agency—the Justice Department.  *Abbasi*, 137 S. Ct. at 1868.  But *Abbasi*'s analysis

15   does not extend here for the reasons discussed above, *supra* Section III.D.1(b)—namely

16   that the Conspiracy Defendants are not all executive-branch officers "in the same

17   Department," *Abbasi*, 137 S. Ct. at 1867.  (Compl. ¶¶ 26–43.)

18        Defendants cite no case, and there is none, suggesting that the intracorporate

19   conspiracy doctrine applies in cases involving multiple federal agencies; and the very few

20   federal courts that have considered the argument have squarely rejected it.  Indeed, the

21   court to most recently consider this argument found it "specious at best."  *Ali* v. *Raleigh*

22   *Cty.*, No. 5:17-cv-3386, 2018 WL 4101517, at *11 (S.D.W. Va. Aug. 28, 2018).[33]

23

---

24   [33]  *See also Bailey* v. *Pataki*, No. 1:08-cv-8563, 2010 WL 4237071, at *5 (S.D.N.Y. Oct.
     26, 2010) (distinguishing decisions applying intracorporate conspiracy doctrine on
25   ground that "the cases involve members of the same state agency, whereas multiple
     agencies were here involved").
26

1    Defendants' qualified immunity arguments as to § 1986 are predicated entirely on

2    their arguments as to Plaintiffs' § 1985(3) claims.  (Mot. at 57–58.)  Because Defendants'

3    § 1985(3) arguments fail, and Plaintiffs' § 1986 claim is based on violations of clearly

4    established law, Defendants' § 1986 arguments fail as well.

5    **E.    DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY**

6    Defendants also argue that they are entitled to absolute immunity because the Zero

7    Tolerance directive was part of their prosecutorial and policymaking functions, particularly

8    for Defendant Sessions, who issued that directive.  (Mot. at 59–60.)  This argument

9    misconstrues the nature of Plaintiffs' claims.  As discussed above with regard to Plaintiffs'

10   *Bivens* claims, Plaintiffs do *not* challenge Defendant Sessions' or any other Defendant's

11   authority to issue or implement the Zero Tolerance directive to prosecute every case of

12   illegal entry.  Rather, Plaintiffs challenge Defendants' actions to unlawfully separate and

13   detain families.  As discussed above, some Plaintiffs were separated although there was no

14   prosecution, and others were kept apart well after the prosecution had ended.  Thus, the

15   actions complained of here were *not* related to any prosecutorial function or decision, and

16   various government officials, including Defendant Nielsen, have stated that those actions

17   were not taken pursuant to a government policy.  *See supra* p. 26 n.18.

18   Prosecutors are absolutely immune only "in initiating a prosecution and in

19   presenting the [government's] case," insofar as their conduct is "intimately associated with

20   the judicial phase of the criminal process."  *Imbler* v. *Pachtman*, 424 U.S. 409, 430–31

21   (1976); *see also Burns* v. *Reed*, 500 U.S. 478, 494 (1991) (explaining that absolute

22   immunity applies "only for actions that are connected with the prosecutor's role in judicial

23   proceedings, not for every litigation-inducing conduct").  And while absolute immunity

24   can apply to officials responsible for supervising prosecutions, *Romano* v. *Bible*, 169 F.3d

25   1182, 1186 (9th Cir. 1999), absolute immunity does *not* extend to conduct that "ha[s] no

26

functional tie to the judicial process just because" an official is a prosecutor or policymaker, *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 277 (1993).  Thus, where officials engage in conduct outside their legitimate prosecutorial or policymaking functions, they are not entitled to absolute immunity.  *See Buckley*, 509 U.S. at 277–78 (denying absolute immunity for prosecutors who made false and prejudicial statements to press regarding evidence in criminal proceeding against plaintiff); *see also Hardwick*, 844 F.3d at 1116 (denying absolute immunity where officials falsified evidence to separate mother from child because such conduct was outside officials' legitimate role in prosecuting mother).

Plaintiffs allege that Defendants engaged in misconduct unrelated to the creation or implementation of the Zero Tolerance prosecution directive or any other prosecutorial function.  Defendants separated families unlawfully, kept them separated, and forced them to live in unconstitutionally punitive conditions without access to adequate beds, food, medical care, or counsel.  *See supra* Section II.A.  These egregious rights violations occurred independent of any judicial proceedings against Plaintiffs, many of whom— including all of the child Plaintiffs—were never charged with any crime.  Others who were charged with a crime remained separated even after the disposition of their criminal cases.  Defendants thus are not entitled to absolute immunity because their conduct was an egregious attempt to deter Plaintiffs (and others) from pursuing their legitimate rights to seek asylum, untethered to any legitimate prosecutorial or policymaking function.

**IV.   CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss should be denied.

Respectfully submitted,

By: /s/ Jacqueline P. Rubin

Jacqueline P. Rubin
(admitted *pro hac vice*)
Geoffrey R. Chepiga
(admitted *pro hac vice*)
Emily Goldberg
(admitted *pro hac vice*)
Hallie S. Goldblatt
(admitted *pro hac vice*)
Steven C. Herzog
(admitted *pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Alexander A. Reinert
(admitted *pro hac vice*)
55 Fifth Avenue, Room 1005
New York, NY 10003
(212) 790-0403

*Attorneys for Plaintiffs A.I.I.L., on
behalf of herself and her minor
children, J.A.H.I. and M.E.H.I.;
L.L.H.O., on behalf of herself and
her minor child, K.E.O.H.; J.L.V.A,
on behalf of himself and his minor
child, D.S.V.H.; J.I.S., on behalf of
himself and his minor child,
B.L.S.P.; and J.J.P.B., on behalf of
himself and his minor child,
A.E.P.F.*

April 22, 2020

Lee Gelernt
(admitted *pro hac vice*)
Anand Balakrishnan
(admitted *pro hac vice*)
Daniel A. Galindo
(admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660

Stephen Kang
(admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(917) 620-3555

Christine Keeyeh Wee
ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, AZ 85011
(602) 650-1854

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that a true copy of the above document was served upon the attorney

3

of record for each other party by means of the District Clerk's CM/ECF electronic filing

4

system on April 22, 2020.

5

6

/s/ Jacqueline P. Rubin
Jacqueline P. Rubin

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26