JOSEPH H. HUNT
Assistant Attorney General
Civil Division
C. SALVATORE D'ALESSIO, JR.
Acting Director
MARY HAMPTON MASON
(New York Bar No. 2255198)
Senior Trial Counsel
PAUL QUAST
(Colorado Bar No. 49154)
Trial Attorney
Constitutional & Specialized Tort Litigation
Torts Branch, Civil Division
Department of Justice
Box 7146 Washington, DC 20044
Email: paul.c.quast@usdoj.gov
Telephone: (202) 616-4150

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

A.I.I.L., et al.,

        Plaintiffs,

v.

Jefferson Beauregard Sessions, III, et al.,

        Defendants.

No. CV-19-00481-TUC-JAS

**REPLY IN SUPPORT OF
MOTION TO DISMISS**

# TABLE OF CONTENTS

I.   PLAINTIFFS' REQUEST THAT THE COURT PERMIT PERSONAL JURISDICTION OVER FEDERAL POLICYMAKERS SUED IN THEIR PERSONAL CAPACITIES IS WHOLLY CONTRARY TO LAW ................................................................................. 1

  A.  Federal Oversight and Policymaking Do Not Constitute "Purposeful Direction" ... 2

  B.  Plaintiffs' New and Limited Travel-Related Allegations Do Not Establish Personal Jurisdiction Over Any Defendant .............................................................. 5

  C.  Plaintiffs' Newly Alleged "Agency" and "Conspiracy" Theories Do Not Establish Personal Jurisdiction Over Any Defendant ............................................. 7

II.  THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO CREATE AN ENTIRE NEW CLASS OF *BIVENS* LITIGATION .................................................................. 10

  A.  The Context in which Plaintiffs' Allegations Arise Is New ................................. 10

  B.  "Alternative, Existing Processes" Are Available .................................................. 11

  C.  Other Special Factors Counsel Hesitation .......................................................... 15

    1.  The "Conduct" Plaintiffs Challenge is the Creation of Policy ......................... 15

    2.  Congressional Action in this Arena Counsels Hesitation ................................. 17

    3.  Plaintiffs' Claims Implicate National and Border Security .............................. 18

    4.  Plaintiffs Challenge Prosecutorial Policy ....................................................... 20

    5.  Expanding Bivens Here Would be Unworkable ................................................ 20

III. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS ...................................... 21

  A.  Plaintiffs Do Not Allege A Clearly Established Constitutional Violation ............. 21

  B.  Plaintiffs Do Not Allege A Clearly Established Statutory Violation .................... 23

IV.  PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY ................................................................................... 30

CONCLUSION ............................................................................................................. 30

Defendants have advanced multiple grounds for dismissing this unprecedented attempt to sue high-ranking federal officials personally for alleged constitutional violations stemming from national immigration policy. Plaintiffs respond by asking the Court to create a new species of *Bivens* litigation, with the effect of permitting personal-capacity suits against policymakers across the country. Such a decision would have profound policy implications appropriately addressed, if at all, by Congress. As explained in Defendants' motion and below, all of Plaintiffs' claims should be dismissed with prejudice.

## I.   PLAINTIFFS' REQUEST THAT THE COURT PERMIT PERSONAL JURISDICTION OVER FEDERAL POLICYMAKERS SUED IN THEIR PERSONAL CAPACITIES IS WHOLLY CONTRARY TO LAW

As Defendants' opening brief ("MTD") shows, the Complaint does not satisfy Plaintiffs' burden of establishing personal jurisdiction over any of the fifteen Defendants. *See* MTD at 15–21. In the Opposition ("Opp."), Plaintiffs do not dispute – nor could they – that the Complaint's many allegations about Plaintiffs' own contacts with Arizona have no bearing on the jurisdictional analysis. Opp. at 10; *see* MTD at 18–19. Plaintiffs instead claim that Defendants' high-level government positions and responsibilities trigger personal jurisdiction in one of three ways – two of which Plaintiffs never raised in the Complaint. Opp. at 8–16. First, Plaintiffs argue, Defendants' alleged policymaking activities and supervisory authority in the federal immigration arena amount to "purposeful direction" within the meaning of the specific jurisdiction test, despite the substantial body of caselaw uniformly rejecting such a conclusion. *Id.* at 8–13; *see* MTD at 19–21.[1] Second, Plaintiffs improperly make new allegations in the Opposition that some alleged Arizona travel by three Defendants demonstrates "purposeful direction" allowing specific jurisdiction. Opp. at 10. Third, Plaintiffs make new allegations that some unidentified Defendants have broad supervisory authority over unidentified employees in Arizona (relatedly advancing an unrecognized theory of "conspiracy jurisdiction"), and those

---

[1] Plaintiffs do not suggest that general jurisdiction applies, Opp. at 9 n.5, and it does not, MTD at 16–17.

employees' forum contacts should count as Defendants' own. *Id.* at 14–16. Plaintiffs are wrong on all counts and have not carried their burden of establishing personal jurisdiction over any Defendant. *See* MTD at 15–17 (describing burden); Fed. R. Civ. P. 12(b)(2).

## A. Federal Oversight and Policymaking Do Not Constitute "Purposeful Direction"

Plaintiffs' first argument fails because the Opposition does not – and cannot – explain away the voluminous case law precluding specific jurisdiction based on the allegations of the Complaint. *See* MTD at 19–21 (and citations therein). In the Complaint, Plaintiffs characterize Defendants' alleged jurisdictional contacts as either planning (from Washington, D.C.) family separations and detentions in Arizona and other states, or ordering line-level agency employees to separate families in Arizona and elsewhere. *See id.* at 19 (discussing Complaint's allegations involving Defendants); Opp. at 10–11 (describing jurisdictional allegations as pleading that twelve Defendants allegedly participated in meetings/discussions and other planning in 2017 or 2018 and eight Defendants allegedly directed "John/Jane Doe" line-level agents or "CBP and ICE" to separate families). As Defendants' motion makes clear, neither these alleged policymaking activities nor Defendants' ultimate authority over unknown subordinates constitute "minimum contacts" under a "purposeful direction" theory or any other. *See* MTD at 19–21. Plaintiffs do not directly dispute this, but instead half-heartedly attempt to distinguish some (not all) of Defendants' cases in one of two ways, then cite four additional cases they claim support their position but actually do not. Opp. at 9–13.

First, Plaintiffs say, "Defendants were personally involved in the details of the challenged activities" here, *id.* at 12–13, while in *Yellowbear*, *Claasen*, *Wag-Aero*, and *Perez*,[2] "plaintiffs failed to allege that defendants actively participated in or directed the challenged conduct," Opp. at 13. Plaintiffs appear to confuse the two types of jurisdictional

---

[2] *Yellowbear v. Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015), *Claasen v. Brown*, No. Civ. A. 94-1018-GK, 1996 WL 79490, at *2 (D.D.C. Feb. 16, 1996), *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1484-85 (E.D. Wis. 1993)), and *Perez v. United States*, No. 13CV1417-WQH-BGS, 2014 WL 4385473, at *7–9 (S.D. Cal. Sept. 3, 2014).

"contacts" they claim. Defendants do not disagree that federal policymakers may *oversee federal policy* within their purview; by definition, such officials participate in making and advancing public policy as part of their duties. But *Yellowbear*, *Claasen*, *Wag-Aero*, and *Perez* all reject Plaintiffs' *other* proposed ground for personal jurisdiction, Opp. at 10–11; MTD at 19 n.10. – that is, some Defendants' alleged status as the "ultimate supervisor[ ] of federal agents operating in" Arizona, *Wag-Aero*, 837 F. Supp. at 1485 – and make clear this type of "broad supervisory authority" does not suffice, *Yellowbear*, 612 F. App'x at 921; *see Perez*, 2014 WL 4385473, at *8; *Claasen*, 1996 WL 79490, at *2. Thus, the four cases hardly undermine Defendants' position, but in fact support it. *Id.*; *see also Stone v. Derosa*, No. CV 07-0680-PHX-PGR (CRP), 2009 WL 798930, at *1 (D. Ariz. Mar. 25, 2009) (no personal jurisdiction over head of Bureau of Prisons ("BOP"), even though "a BOP policy [was] a critical issue in [the] case").

Second, Plaintiffs say, "nearly all of Defendants' cases involved promulgation of *nationwide* policies that were not targeted at any particular part of the country," while here, "Defendants targeted only Arizona and three other southern border states." Opp. at 12 (emphasis original). Plaintiffs cite no law supporting their "what-state-does-the-federal-policy-target?" rule for personal jurisdiction over high-ranking officials, because there is none. As Defendants' cases show, it is the nature of the high-level conduct alleged – not whether it seems to impact some states "more" than others (whatever that might mean[3]) – that drives the jurisdictional analysis. *See* MTD at 19–21. In *Perez*, for example, plaintiffs challenged a federal "Rocking Policy" governing agents "along the southern border" of the United States. 2014 WL 4385473, at *8. The court found plaintiffs failed to satisfy "the purposeful direction test" for officials who allegedly approved the policy, because their "supervisory responsibilities and alleged implementation" did not suffice – regardless of

---

[3] Here, for instance, Plaintiffs in part challenge policymaking directed toward all federal prosecutors in the United States, not just the "border" states. *See* MTD at 15 (providing link to April 6, 2018, Zero-Tolerance Memorandum, which in turn references April 11, 2017, "Renewed Commitment to Criminal Immigration Enforcement" memorandum to all federal prosecutors).

the policy's "targeted" focus toward "border" states, including California. *Id.* Other cases Defendants cited likewise resolved the jurisdictional question without examining whether a challenged policy "targeted" particular states or not. *See, e.g.*, *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1078 (E.D. Cal. 2011) (deciding personal jurisdiction without assessing states potentially "targeted" by policies and rejecting effects-based analysis); *Rank v. Hamm*, No. 204-0997, 2007 WL 894565, at *11–13 (S.D.W. Va. Mar. 21, 2007) (rejecting plaintiffs' *Calder* "effects test" argument and noting difficulty in ascertaining what states federal policy might implicate). Again, the contours of the alleged official conduct – not whether it appeared "geographically specific" to the forum state, Opp. at 13 – determined the jurisdictional outcome. The recent decision in *K.O. v. Sessions*, a personal-capacity lawsuit similar to this one, is instructive. No. CV 18-40149-TSH, 2020 WL 533461, at *2–8 (D. Mass. Feb. 3, 2020). There, the court followed the usual rule that high-level policy planning and oversight connects the acting official to the location of such activity, not to the area of the country it supposedly affects the most. *Id.* at *8 (dismissing for lack of personal jurisdiction and transferring case to D.C. federal court "where venue would be proper, and the defendants would be subject to personal jurisdiction").

Finally, Plaintiffs claim the "Ninth Circuit has repeatedly held that *officials' personal involvement in geographically specific directives constitutes purposeful direction.*" Opp. at 13 & *id.* n.10 (citing three Ninth Circuit cases and one District of Wisconsin case) (emphasis added). Plaintiffs misrepresent what the four cases say. In all of them, defendants were line-level or local government employees (not federal "officials"), accused of particular, direct actions (not issuing federal "directives") toward the complaining party. *Ibrahim v. DHS*, 538 F.3d 1250, 1258–59 (9th Cir. 2008); *Soler v. Cty. of San Diego*, 762 F. App'x 383, 385–86 (9th Cir. 2019); *Ziegler v. Indian River Cty.*, 64 F.3d 470, 474–76 (9th Cir. 1995); *Maney v. Ratcliff*, 399 F. Supp. 760, 768–69 (E.D. Wis. 1975). Defendants here are fifteen Cabinet heads, Senate-confirmed appointees, and high-ranking executive officers, sued for alleged action in planning and implementing national immigration and prosecutorial policy or broadly "supervising" their chain-of-

command from Washington, D.C. Plaintiffs' cases have nothing to do with personal jurisdiction in *this* scenario and cannot negate the wealth of legal authority Defendants cite. MTD at 19–21.[4]

### B. Plaintiffs' New and Limited Travel-Related Allegations Do Not Establish Personal Jurisdiction Over Any Defendant

In their second argument, Plaintiffs allege for the first time that "[m]ultiple Defendants, including Sessions and Nielsen, traveled to Arizona in connection with these matters" and thereby "directed his or her activities toward Arizona" for purposes of specific jurisdiction. Opp. at 10. According to Plaintiffs, this travel "was well-covered in the press," as reflected by three YouTube videos they cite. *Id.* at 10 n.6. To begin with, however, the Complaint alleges nothing at all about any Defendant visiting Arizona at any time. *See generally* Compl. It is axiomatic that Plaintiffs cannot augment their pleading through an opposition brief.[5] For this reason alone, the Court should not consider Plaintiffs' belated statements about three Defendants' alleged Arizona travel.

Furthermore, even if the Court did so, Plaintiffs' proposed new allegations do not remedy the personal jurisdiction problem anyway. Even assuming Defendants Sessions,

---

[4] Because Plaintiffs' policy/oversight allegations do not show "purposeful direction," Plaintiffs necessarily have not shown "relatedness" either. Defendants made a similar point in their motion, MTD at 21 n.13, and therefore did not fail to "contest the second prong" of the specific jurisdiction test, as Plaintiffs inaccurately state, Opp. at 9; *see Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) (if plaintiff "fails at the first step" of specific jurisdiction, "jurisdictional inquiry ends and the case must be dismissed"). Defendants address the third prong of the test *infra* p. 8 n.8.

[5] *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1237 & n.23 (C.D. Cal. 2013) (where plaintiff's jurisdictional-contacts allegation appears for "[t]he first time . . . in . . . [o]pposition" to a motion to dismiss, court "will not consider that allegation"), *citing Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998); *Horne v. U.S. Dep't of Educ.*, No. CV-08-1141-PHX-MHM, 2009 WL 775432, at *5 (D. Ariz. Mar. 23, 2009) (plaintiffs cannot "amend their Complaint by making new allegations in an opposition" to a motion to dismiss); *see Boschetto*, 539 F.3d at 1015 (in deciding personal jurisdiction without an evidentiary hearing, "this court only inquires into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction") (citation, internal quotation marks, and alterations omitted).

Nielsen, and McAleenan made trips to Arizona as may be depicted in the videos,[6] and even assuming such travel amounted to "purposeful direction" under the first prong of the specific jurisdiction test (which Defendants do not concede), Plaintiffs have alleged no facts suggesting this travel meets the second prong. Plaintiffs have not asserted, in other words, that the three trips were "the but-for cause" of their claims, nor could they. Opp. at 10; *see Terracom*, 49 F.3d at 561 ("The second prong of the specific jurisdiction test is met if 'but for' the contacts between the defendant and the forum state, the cause of action would not have arisen."). None of the claims in the lawsuit depends on Defendants Nielsen, Sessions, McAleenan, or any other Defendant visiting Arizona, because again, Plaintiffs challenge policymaking and oversight activity that occurred in Washington, D.C. MTD at 19 (discussing allegations involving Defendants). Plaintiffs' claims would be the same with or without the referenced trips or other similar ones. *Id.*; Opp. at 10; *see, e.g., ScaleMP, Inc. v. TidalScale, Inc.*, Case No. 18-cv-04716-EDL, 2019 WL 7877939, at *11 n.7 (N.D. Cal. Mar. 6, 2019) (no personal jurisdiction in California, despite defendant's travel there; those "contacts with the forum state are irrelevant," because plaintiff "has not alleged that [defendant] engaged in any tortious conduct during those contacts"). Since the three Defendants' alleged travel did not give rise to Plaintiffs' claims, such "contacts" cannot

---

[6] Defense counsel has watched but in no way verified the authenticity, accuracy, or relevance of the cited videos. And Defendants dispute that the Court may take "judicial notice of these publicly broadcast appearances," Opp. at 10 n.6, given that judicial notice extends only to "[f]acts . . . generally known within the trial court's territorial jurisdiction," or which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201. Plaintiffs do not explain what "facts" they seek to establish through judicial notice, nor are any such facts apparent, apart from (possibly) the existence of the three videos on the Internet. As for Plaintiffs' assertion that "jurisdictional discovery would confirm these visits and others by Defendants to Arizona," Opp. at 10 n.6, courts do not permit jurisdictional discovery where, as here, plaintiff makes no showing that discovery would aid in establishing jurisdictionally relevant facts. *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (affirming denial of jurisdictional discovery in absence of showing it could overcome jurisdictional defects); *see Boschetto*, 539 F.3d at 1020 (affirming denial of "request for discovery, which was based on little more than a hunch that it might yield jurisdictionally relevant facts").

justify personal jurisdiction over those Defendants or any other. *See*, *e.g.*, *Eaton v. Davis*, No. Civ. 01-854-AS, 2002 WL 31441217, at \*4 (D. Or. Feb. 28, 2002) (no personal jurisdiction where plaintiff's "claims would be the same" regardless of defendants' alleged interaction with Oregon, and plaintiff thus "failed to establish that 'but for' defendants' [contacts] he would not have his section 1983 claims").[7]

### C. Plaintiffs' Newly Alleged "Agency" and "Conspiracy" Theories Do Not Establish Personal Jurisdiction Over Any Defendant

Plaintiffs next argue that Defendants "also had minimum contacts with Arizona through the actions of their in-state agents, which are attributable to Defendants because Defendants exercised sufficient 'control' over the in-state actors." Opp. at 14 (citing three cases). In particular, Plaintiffs say, "Defendants drafted directions and directly ordered CBP and ICE agents in Arizona to separate immigrant families," and so "the agents' actions in separating families may be attributed to . . . out-of-state Defendants as the requisite minimum contacts." *Id.* Again, Plaintiffs made no such "agency" allegations and pled no "agency" theory of personal jurisdiction in the Complaint. *See generally* Compl. The Court should not consider the new theory now. *See supra* p. 5.

Even if the Court does so, the assertion that unidentified forum contacts by some unidentified subordinates in Arizona can be imputed to the fifteen policymakers has no merit. Opp. at 14. The *K.O.* court roundly rejected just such an argument against eleven of the Defendants a few months ago. 2020 WL 533461, at \*5 & n.5. In *K.O.*, Plaintiffs "[sought] to attribute the actions and contacts of unknown agents to their superiors," but the court found "[s]uch indirect contacts do not constitute 'purposeful availment'" by the high-ranking defendants, regardless of their ultimate authority over the subordinates. *Id.*

---

[7] As discussed *supra* n.4, Plaintiffs' assertion that Defendants "do not contest the second prong" of the specific jurisdiction test is wrong. Opp. at 9. In any event, Plaintiffs never contended before filing their Opposition that any alleged travel produced jurisdictional contacts. Thus, Defendants could not have "contest[ed]" the second prong as to those absent allegations until now. *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (cited by Plaintiffs) is not to the contrary, as it does nothing more than state the specific jurisdiction test and apply it in a wholly different situation. Opp. at 9.

(citing *Wormley v. United* States, 601 F. Supp. 2d 27, 34 (D.D.C. 2009), *Claasen*, 1996 WL 79490, at *2, and *Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003)). Furthermore, *K.O.* said, "[e]ven if the Court were to accept the 'contacts by implication' theory espoused by the Plaintiffs," it would not apply, "since Plaintiffs have not proffered any evidence which would link any given John Doe [employee] to a specific agency sufficient to 'implicate' any specific Defendant." 2020 WL 533461, at *5 n.5. "Instead, Plaintiffs['] assertions are based on she[e]r speculation and in[n]uendo." *Id.*

So too here. Plaintiffs do not specify in the Complaint or Opposition which "in-state agents" took what specific action allegedly attributable to which Defendant at what agency when. Opp. at 14. And, Plaintiffs' vague contention that the "Defendants drafted directions and directly ordered" law enforcement officers to separate families, *id.*, does no more than impermissibly point back to high-level officials' "broad supervisory authority" as grounds for bringing them into the forum, *Yellowbear*, 612 F. App'x at 921. Moreover, none of the cases Plaintiffs cite – nor any other to Defendants' knowledge – remotely endorses the idea that line-level federal employees carrying out day-to-day job duties have an "agency" relationship with their high-level leadership for purposes of jurisdictional contacts. Opp. at 14. Indeed, the three cases Plaintiffs reference either involve no agency principles at all (*Biliack v. Paul Revere Life Ins. Co.*, 265 F. Supp. 3d 1003, 1008–1009 (D. Ariz. 2017)); identify an agency relationship between a farming company and its labor recruiter with no similarity to the principal-agent scenario Plaintiffs propose here (*Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182, 1189–92 (9th Cir. 2002)); or discuss agency under the New York long-arm statute as applied to federal employees with a much closer, more specific relationship than here in a decision pre-dating much of Defendants' case law (*Stadt v. Univ. of Rochester*, 921 F. Supp. 1023, 1025–26 (W.D.N.Y. 1996)). Opp. at 14. Plaintiffs' belatedly raised "'contacts by implication' theory" does not discharge Plaintiffs' burden. *K.O.*, 2020 WL 533461, at *5 n.5.[8]

---

[8] Since Plaintiffs have not met their burden on the first two prongs of the specific

Relatedly, Plaintiffs' unpled claim that the Court may "exercise jurisdiction over Defendants on the independent ground that they conspired with in-state actors to direct activities in Arizona" also fails. Opp. at 15–16; *see supra* p. 5. While Plaintiffs state that "[m]ultiple appellate and district courts have accepted conspiracy jurisdiction," the Ninth Circuit has not. Opp. at 15. Instead, the Ninth Circuit has found "a great deal of doubt surrounding the legitimacy" of such a theory and observed that the Northern and Southern Districts of California both rejected it. *Chirila v. Conforte*, 47 F. App'x 838, 842 (9th Cir. 2002). So has this Court. *Stone*, 2009 WL 798930, at *3. Beyond that dispositive problem, Plaintiffs have not alleged any cognizable "conspiracy." *See* MTD at 56–59. This also forecloses "conspiracy jurisdiction." *Chirila*, 47 F. App'x at 843. At bottom, Plaintiffs have

jurisdiction test, the Court need not reach the "reasonableness" issue. *See* MTD at 21 n.13; *Boschetto*, 539 F.3d at 1016 (plaintiff's failure at the first step ends jurisdictional inquiry and requires dismissal). To the extent the Court does consider it, Defendants have "a compelling case" that exercising personal jurisdiction would be unreasonable under the Ninth Circuit's seven-factor test. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002). First, as other parts of the jurisdictional analysis have shown, Defendants did not "purposeful[ly] inject[ ]" themselves into Arizona's "affairs," but instead implemented policy objectives that implicated Arizona and many other states. *Id.*; *see Rank*, 2007 WL 894565, at *12–13 (finding in favor of high-level official on reasonableness inquiry). Second, the burden on Defendants of responding to this case in Arizona is significant. *Id.* Apart from logistical challenges and the financial cost to Defendants and the government, there are legal, policy, and practical concerns that weigh against requiring high-level government officials to respond to litigation nationwide simply because they exercise national authority. Taking the third, fourth, fifth, and seventh factors together, although Arizona may have an interest in adjudicating the lawsuit, the District of Columbia does as well. *Id.* Not only were most Defendants based in the Washington, D.C., area at the time of the challenged events, multiple other lawsuits arising out of similar family separation issues have proceeded or remain pending there. *See, e.g.*, *Jacinto-Castanon de Nolasco v. U.S. ICE*, 319 F. Supp. 3d 491 (D.D.C. 2018); *K.O. v. Sessions*, NO. 1:20-cv-00309-RC (D.D.C). Turning to the sixth factor, the forum's importance to Plaintiffs, their argument that Defendants "cannot suggest[ ] an alternate forum at this point where all Defendants, including John/Jane Doe Defendants acting in Arizona, would clearly be subject to jurisdiction, thus favoring Plaintiffs' forum choice," is misplaced. Opp. at 15 n.11. Again, *K.O.* is proceeding in D.C. against eleven Defendants after transfer from Massachusetts for lack of personal jurisdiction. As for the unidentified "John/Jane Doe Defendants," they are not parties to the lawsuit, and Plaintiffs' allegations against them do not resemble those against high-ranking policymakers anyway. *See* MTD at 18 n.9.

no legally tenable ground for establishing personal jurisdiction over any Defendant, and the case should be dismissed under Rule 12(b)(2).

## II.   THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO CREATE AN ENTIRE NEW CLASS OF *BIVENS* LITIGATION

### A.   The Context in which Plaintiffs' Allegations Arise Is New

"[I]t is glaringly obvious" that all of Plaintiffs' purported *Bivens* claims "involve a new context, *i.e.*, one that is meaningfully different." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020); *see* MTD at 22–24. "[E]ven a modest extension is still an extension," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017), and the Supreme Court's "understanding of a 'new context' is broad." *Hernandez*, 140 S. Ct. at 743. Plaintiffs baldly assert that their claims fall within "core" *Bivens* territory because they involve the same amendments as *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980). Opp. at 17. But that fact adds nothing to the new context inquiry, and the Supreme Court has explicitly rejected such a superficial analysis. *See Hernandez*, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."). Instead, the Supreme Court has given a non-exclusive list of differences that can render a context new – all of which are present here. *Abbasi*, 137 S. Ct. at 1860, MTD at 22–24.

Plaintiffs' caselaw adds no more. Opp. at 18–19. Even assuming (incorrectly) that the Fourth Amendment decisions cited by Plaintiffs were relevant to the new context analysis, *Abbasi*, 137 S. Ct. at 1859 (only *Bivens*, *Davis*, and *Carlson* are relevant),[9] none of those cases involves the number and degree of differences this case presents. Plaintiffs' Fifth and Eighth Amendment cases do not involve the same rights at issue here and cannot be compared to the damages remedy Plaintiffs seek against high-level government officials

---

[9] *Accord Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2019 WL 5653444, at *3 (D. Ariz. Oct. 31, 2019) ("It is immaterial whether this Court, the Ninth Circuit Court of Appeals, or other district and appellate courts have recognized a particular *Bivens* claim.").

for creating national immigration policy. And although Plaintiffs argue that the immigration and criminal contexts at issue here are not new, the only post-*Abbasi* case cited in support of that proposition, *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018), says the exact opposite. *Id.* at 1028 (holding that it is "ineluctable" that a claim in the immigration and prosecution context is "new").[10]

Underlying Plaintiffs' arguments is the notion that this context is not new because they allege *unconstitutional* conduct. *See, e.g.*, Opp. at 20 (arguing that their allegations of unconstitutional conduct fall outside of any "statutory or legal mandate," just as *Bivens*, *Davis*, and *Carlson* did); *id.* at 21 (challenging unconstitutional conduct cannot be "disruptive"). But every potential *Bivens* claim involves allegations of unconstitutional conduct – that cannot be what makes a context "new." Plaintiffs' other arguments ask this Court to ignore the kinds of meaningful differences identified in *Abbasi*, or interpret those listed differences to render them meaningless. *See, e.g.*, *id.* (arguing that Defendants' ranks do not matter because *Bivens* has been applied to "high-level officials" before); *id.* (arguing that creating a remedy here would be "particularly noninvasive" because Plaintiffs successfully used an alternative process to gain relief). This case "easily" presents a new context, *Abbasi*, 137 S. Ct. at 1865, and Plaintiffs' suggestions to the contrary are meritless.

**B.   "Alternative, Existing Processes" Are Available**

In their opening brief, Defendants demonstrated that Plaintiffs have other potential avenues to address the alleged constitutional concerns raised, and these processes are sufficient to preclude a new *Bivens* remedy. MTD at 24–27. Those alternatives include pursuing official capacity injunctive, APA, and/or habeas relief; suit under state tort law; and/or a suit under the Federal Tort Claims Act ("FTCA"). *Id.*[11] In response, Plaintiffs

---

[10] The other cases cited do not engage in new context or *Bivens* analyses. Opp. at 19–20.

[11] *See Unknown Parties v. Nielsen*, No. CV-15-00250-TUC-DCB, 2020 WL 813774, at *22 (D. Ariz. Feb. 19, 2020) (ordering CBP to provide certain detainees with certain conditions and a medical assessment); Opp. at 40 (admitting that *Unknown Parties v. Nielsen* overlaps substantially with their claims).

argue none of these avenues is "adequate" because they do not "compensate them for their past injuries and hold governmental wrongdoers accountable" as an individual damages action would. Opp. at 22 (citing *Minneci v. Pollard*, 565 U.S. 118, 130 (2012)). Plaintiffs' argument misapprehends *Minneci* specifically and *Bivens* jurisprudence in general.

As an initial matter, Plaintiffs' use of the term "adequate alternative remedies," Opp. at 24, and their proffered standard for measuring the sufficiency of an "alternative, existing *process*" misstate the legal inquiry in several important respects. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (emphasis added). The correct inquiry focuses on the existence of a *process* or "avenue" for relief, not the availability of a particular remedy to a particular individual (or even class of individuals). *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) ("So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[ ] judicial imposition of a new substantive liability."). Central to Plaintiffs' argument is the notion that the processes available to them are insufficient because they do not "hold[] to account federal officers" or provide damages for past harms. Opp. at 22, 24. But it is black letter law, abundant in the immigration context, that alternative processes need not "punish" officers or offer monetary relief at all.[12] Even in situations where a plaintiff has no possibility of relief, courts still refrain from implying a remedy if other special factors are present. *United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford . . . an 'adequate' federal remedy.").[13]

---

[12] *See Abbasi*, 137 S. Ct. at 1865 ("alternative remedies available" could include "a writ of habeas corpus," an "injunction requiring the warden to bring his prison into compliance," or "some other form of equitable relief"); *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) ("The absence of monetary damages in the alternative remedial scheme is not ipso facto a basis for a *Bivens* claim."); *see also Schweiker v. Chilicky*, 487 U.S. 412, 428 (1988) ("agree[ing] that suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the 'belated restoration of back benefits,'" but declining to create *Bivens* remedy where Congress did not).

[13] Plaintiffs' reliance on *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), is misplaced. *See* Opp. 23–24. After *Hernandez*, but *before* Plaintiffs' filing, the Supreme Court vacated

Indeed, the Supreme Court does not require that available processes provide similar compensation, or backwards looking relief, particularly where those processes are created at the federal level. *See, e.g.*, *Bush v. Lucas*, 462 U.S. 367, 388 (1983) (declining to create *Bivens* action even where existing federal processes "do not provide complete relief"). Plaintiffs urge this Court to follow a standard purportedly set out in *Minneci*, 565 U.S. at 130. But *Minneci* does not state any standard for considering alternative *federal* avenues or processes. *Minneci* was considering an alternative *state-law tort regime* against a private actor (which, of course, could not provide injunctive or forward-looking relief against the government and would not implicate the separation-of-powers concerns animating *Abbasi*). And in *Minneci*, the Court held that state tort law's deterrence and compensation against employees of a private BOP contractor were sufficient (not required) to *deny* a *Bivens* remedy. 565 U.S. at 130. Its analysis is inapplicable to alternative federal avenues against the federal government. Indeed, Plaintiffs make much of the availability of these federal avenues to address government conduct elsewhere in their brief, Opp. at 21, 35–36, when urging that a judicially-created damages remedy would not be "intrusive" or that the law was clearly established, but ask this Court to ignore those avenues when considering whether to imply a backwards looking non-statutory damages remedy.

*Lanuza* adds nothing to Plaintiffs' argument. 899 F.3d at 1032. There, the defendant allegedly "criminally obstructed" plaintiff's access to the relevant processes. *Id.* ("Love's submission of the forged I-826 form completely barred Lanuza from using the INA's remedial scheme."). Here, Plaintiffs do not and cannot allege they were obstructed from accessing available processes. MTD at 24–26. In fact, they had federal court review and were successful. Compl. ¶ 75; *see also Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83. Courts, including the Supreme Court in *Abbasi* and elsewhere, have found that processes which provide injunctive relief are not only relevant, but "of central importance" to

---

and remanded the Ninth Circuit's decision in *Rodriguez*. *Swartz v. Rodriguez*, 140 S. Ct. 1258 (Mem) (2020); *see Rodriguez v. Swartz*, No. 15-16410, 2020 WL 1685930, at *1 (9th Cir. Apr. 7, 2020) (remanding to district for proceedings consistent with *Hernandez*).

1   deciding whether to imply a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862; *see also Malesko*,
2   534 U.S. at 74 (explaining plaintiff was not "in search of a remedy as in *Bivens* and *Davis*"
3   and refusing to imply one in part because plaintiff could seek an injunction); *Mirmehdi v.*
4   *United States*, 689 F.3d 975, 982 (9th Cir. 2012) ("The availability of habeas [in the
5   immigration context] is another remedy.").

6       Plaintiffs would also have this Court ignore the case law holding that APA review
7   can foreclose *Bivens*. *See, e.g.*, *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116,
8   1123 (9th Cir. 2009); *Miller v. U.S. Dep't of Agr. Farm Servs. Agency*, 143 F.3d 1413,
9   1416 (11th Cir. 1998); *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011); *see also*
10  *Wilkie*, 551 U.S. at 553–54, 561 (relying in part on availability of "administrative and
11  judicial review" in deciding not to imply *Bivens* remedy). Plaintiffs cite no cases to the
12  contrary and attempt to distinguish *Western Radio* (which is binding) by arguing that they
13  are seeking money damages, whereas those plaintiffs sought injunctive relief. But plaintiffs
14  in *Western Radio* did seek money damages. 578 F.3d at 1122 ("At the outset, we note that
15  *Wilkie* itself gave us a strong indication that the APA constitutes an 'alternative, existing
16  process' for Western's damages claims based on agency actions and inactions."). And, as
17  discussed above, it is black letter law that plaintiffs need not receive money or "complete
18  relief" through the APA or other processes. *Id.* at 1120; *see also Vance v. Rumsfeld*, 701
19  F.3d 193, 205 (7th Cir. 2012) ("The normal means to handle defective policies and
20  regulations is a suit under the [APA] or an equivalent statute, not an award of damages
21  against the policy's author . . . even if that regulation imposes billions of dollars in
22  unjustified costs before being set aside."). Like Plaintiffs here, the plaintiffs in those cases
23  had an opportunity to end allegedly ongoing violations. There, as here, the ability to
24  challenge alleged unconstitutional conduct (or policy) through official-capacity relief –
25  whatever the avenue – "provided a faster and more direct route to relief than a suit for
26  money damages." *Abbasi*, 137 S. Ct. at 1863. That is enough to preclude a *Bivens* remedy.[14]

27  _____

28  [14] Plaintiffs argue that the FTCA and state law claims are not alternative processes. Opp.

### C.  Other Special Factors Counsel Hesitation

#### 1.  The "Conduct" Plaintiffs Challenge is the Creation of Policy

The premise running throughout Plaintiffs' arguments is that they are challenging "Defendants' *conduct*," not government policy. Opp. at 25–28. Plaintiffs contend they cannot be challenging any government policy because administration officials denied the existence of any "family separation" policy. *Id.*[15] But as Plaintiffs themselves say, at this point, the parties are bound by the allegations in the Complaint, and the Complaint alleges a "pattern, practice, or custom," Compl. ¶¶ 288, 298, 307, 315, 324, of "widespread family separations." *Id.* ¶ 9. Plaintiffs cannot evade the repeated statements of the Supreme Court precluding *Bivens* remedies for constitutional challenges to government or agency-wide policy by substituting in the words "pattern, practice, or custom" for "policy."[16]

In any event, Plaintiffs' argument is based on an illusory distinction between Defendants' "conduct" and government "policy." Defendants of course are or were high-ranking policymakers. Plaintiffs do not allege that they were separated due to the acts of some lone officer failing to follow the rules. To the contrary, the "conduct" Plaintiffs challenge was the creation (purportedly by Defendants) of the rules themselves – national

---

at 23–24. But Defendants have never claimed that the FTCA standing alone is sufficient to preclude a *Bivens* remedy. Rather, as the Supreme Court has noted in the modern era, MTD at 26, the potential availability of state law or related FTCA remedies should be considered alongside the other factors counselling hesitation, as numerous courts have done. *See Turkmen v. Ashcroft*, No. 02CV2307DLISMG, 2018 WL 4026734, at *10–11 (E.D.N.Y. Aug. 13, 2018) (listing cases and holding that the FTCA provides an alternative process).

[15] The fact that officials disclaim the existence of *a particular* policy does not mean that the government had no policies related to the alleged conduct. The Department of Justice had a policy of prosecuting DHS referrals of § 1325(a) violations. Compl. ¶¶ 158–162. Just because that policy allegedly resulted in separating parents referred for prosecution and their children does not mean the government had a "policy" of separating families.

[16] Plaintiffs' suggestion that discovery may be needed to determine whether they challenge policy, Opp. at 26 n.19, is meritless. Defendants take as true Plaintiffs' non-conclusory factual allegations. No further factual elaboration is needed, or permissible, "[u]ntil th[e] threshold immunity question is resolved." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

immigration and related prosecutorial policy (allegedly to deter immigration from particular countries). Numerous other facets of the Complaint make it crystal clear that Plaintiffs are suing over federal policy, regardless of what they now try to label it. Compl. ¶ 271 (proposing class of "thousands of children"); *id.* ¶ 145 (alleging plans to separate families "all along the southern border"); *id.* ¶¶ 26–37, 39–41 (suing Defendants for their roles as agency heads, rather than line-level officers); *id.* ¶¶ 9, 123, 140, 239 (alleging family separation aimed at deterring entire populations from regions and countries).[17]

Labels aside, the underlying claims implicate the exact concerns discussed by the Supreme Court in *Abbasi* and *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994), as precluding a non-statutory damages remedy. In *Meyer*, the Court declined to create a *Bivens* action against a federal agency because doing so would involve decisions about federal fiscal policy and end-run the government's sovereign immunity. 510 U.S. at 486. In *Abbasi*, the Court again declined to create a *Bivens* action against high-ranking government officials, noting "[e]ven if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy." 137 S. Ct. at 1860. Such an inquiry would require "that the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question" – an unacceptable result.[18] *Abbasi*, 137 S. Ct. at 1860–61. Plaintiffs also attempt to distinguish their case from *Mejia-Mejia v. U.S. ICE*, No. CV 18-1445 (PLF), 2019 WL 4707150

---

[17] Conversely, if Plaintiffs are not at least alleging that Defendants participated in the creation of some national policy, then they have failed to adequately allege that these Defendants did anything improper, requiring dismissal. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

[18] *Abbasi*'s national security considerations do not distinguish it. *See* Opp. at 26–27. As discussed below, Section III.C.3, this case involves national security. But, more fundamentally, the line of *Bivens* cases that lead to *Abbasi*'s "policy" discussion extends far outside the national security context. *See Meyer*, 510 U.S. at 473–74 (savings and loan officer suing banking agency); *Malesko*, 534 U.S. at 63 (prisoner suing private prison).

(D.D.C. Sept. 26, 2019), by claiming that they are not challenging "policy." But *Mejia-Mejia* rejected the same argument. *Id.* at *4. Plaintiffs offer no principled reason why their claims should not be rejected too. All of the concerns counseling hesitation in creating a *Bivens* action against federal policymakers are present here, regardless of how Plaintiffs recast their claims.[19]

### 2. *Congressional Action in this Arena Counsels Hesitation*

Plaintiffs argue that this Court should ignore Congress' extensive activity in the immigration arena because Congress has not made an "explicit declaration" that it "intended to bar a *Bivens* remedy." Opp. at 28. But no such explicit declaration is needed to counsel hesitation (although it would certainly bar a *Bivens* extension). It is enough that Congress' action has been "frequent and intense" and Congress has not created a damages remedy. *Abbasi*, 137 S. Ct. at 1862 (quoting *Schweiker*, 487 U.S. at 413).

Plaintiffs' efforts to downplay Congress' actions do not hold water. Many statutes have been enacted recently in immigration and border enforcement, including laws to address the custody and care of minor children, *see* MTD at 11–14, 27–31. In fact, Congress passed additional laws in response to the very separations Plaintiffs propose for class-based relief, including laws to address the mental health needs of such children. MTD at 29–30. Congress' interest in custodial care of minor children and immigration enforcement, including the particular decisions challenged here, has clearly been "frequent and intense." *Schweiker*, 487 U.S. at 425–26 (Congressional interest "frequent and intense" where Congress enacted reform legislation on *two* occasions); *see Tun-Cos*, 922 F.3d at 527 ("Congress's legislative actions in this area persuasively indicate that Congress did not want a money damages remedy against ICE agents for their allegedly wrongful conduct . . . ."). Although Plaintiffs argue that only congressional activity *after* the alleged events take place can counsel hesitation, precedent confirms the opposite. *See, e.g.*, *Bush*, 462 U.S. at 381–90 (discussing long history of Congressional action in the area before

---

[19] *Cf. Tun-Cos v. Perrotte*, 922 F.3d 514, 527 (4th Cir. 2019) (rejecting similar attempt to recast allegations (by amendment) where purpose was "to avoid this very discussion").

declining to imply a *Bivens* remedy); *Tun-Cos*, 922 F.3d at 526 (same). *Abbasi* does not support Plaintiffs' contentions and, in fact, relied on the types of non-legislative Congressional oversight that Plaintiffs urge this Court to ignore. *See* Opp. at 29–30; *Abbasi*, 137 S. Ct. at 1862 (inspector general report evidenced Congress' interest).[20] *Abbasi* also rejected the same reasoning Plaintiffs now rely on regarding Congressional silence. *Compare* 137 S. Ct. at 1862 ("This silence is notable because it is likely that high-level policies will attract the attention of Congress.") *with* Opp. at 30.

### 3. *Plaintiffs' Claims Implicate National and Border Security*

Plaintiffs' attempt to diminish the national security ramifications of this case runs head on into the Supreme Court's recent ruling in *Hernandez*, 140 S. Ct. 735. In *Hernandez*, the Court refused to extend *Bivens* to a cross-border shooting case where a line-level Border Patrol agent standing in the United States shot and killed a fifteen-year-old boy playing a game on the Mexican side of the border. 140 S. Ct. at 741. The Court held that one factor counselling hesitation was national security. Rejecting plaintiffs' contrary arguments, the Court explained, "[o]ne of the ways in which the Executive protects this country is by attempting to control the movement of people and goods across the border, and that is a daunting task." *Id.* at 746. The charge of protecting the country in this task, including "the responsibility for attempting to prevent the illegal entry of dangerous persons," "rests primarily with the U.S. Customs and Border Protection Agency." *Id.* (citing 6 U.S.C. § 211(c)(5)).[21] "Since regulating the conduct of agents at the

---

[20] As in *Abbasi*, "at Congress' behest" and on their own initiative, Inspectors General of multiple departments have compiled reports on the government's alleged family separation practices. *Abbasi*, 137 S. Ct. at 1862; *see, e.g.*, Compl. ¶¶ 16, 194; Department of Homeland Security Office of Inspector General, DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families, OIG-20-06 (November 2019).

[21] For a snapshot of the work CBP does each day to protect the nation, *see* U.S. Customs and Border Protection, Snapshot: A Summary of CBP Facts and Figures (January 2020) https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/CBP-Snapshot-Feb-2020.pdf; *see* MTD at 13 n.5 (discussing judicial notice).

border unquestionably has national security implications, the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Id.* at 747.

Like the *Hernandez* plaintiffs, Plaintiffs here characterize the alleged conduct as "not involv[ing] national security," but that "misses the point." 140 S. Ct. at 746; *see* Opp. at 31. As in *Hernandez*, the question here "is not whether national security requires" the conduct alleged, "but whether the Judiciary should alter the framework established by the political branches" for choosing when to create a damages remedy. 140 S. Ct. at 746; *see* 8 U.S.C. § 1103(a)(1) (tasking the Secretary of Homeland Security "with the administration and enforcement" of the Immigration and Nationality Act ("INA")). In order for the government to control the admission of persons into the United States and protect "its territorial integrity and national security," *United States v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015), the Executive is constitutionally empowered to stop and detain ("control the movement of") those who have entered without inspection. *Hernandez*, 140 S. Ct. at 746. That necessarily raises the question of how to detain those individuals and whether to refer offenders for criminal prosecution, sufficiently linking those detention decisions to the Executive's national security prerogatives to give the courts "reason to pause" before extending a damages remedy Congress did not provide. *Id.* at 743.

Indeed, Plaintiffs' proposed challenge to Executive policymaking raises substantially *more* separation-of-powers concerns than the actions of a CBP officer/agent at the border. Enforcing the terms and conditions on which aliens enter the United States at an international border is delegated by the Constitution to the political branches and is a core sovereign function. *See* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"), cl. 3 ("regulate Commerce with foreign Nations"); U.S. Const. art. VI, § 4 ("The United States shall . . . protect each [state] against Invasion"); *see, e.g.*, *Toll v. Moreno*, 458 U.S. 1, 10 (1982) ("Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, its power '[t]o regulate Commerce with foreign Nations', *id.*, cl. 3, and its broad authority

over foreign affairs."); *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998) (quoting *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889)) ("[F]or more than a century, it has been universally acknowledged that Congress possesses authority over immigration policy as 'an incident of sovereignty.'"). The creation of the cause of action Plaintiffs seek would stymie, or at least interfere with, the political branches' primacy in matters affecting territorial sovereignty and national security.

### 4. *Plaintiffs Challenge Prosecutorial Policy*

Plaintiffs say they do not challenge prosecutorial policymaking. Opp. at 32. That statement is contradicted by the Complaint and, if true, means that many (if not all) of the Defendants have no connection to the alleged separations. In fact, the Complaint alleges that separations occurred because the government allegedly referred the adult Plaintiffs for prosecution. Compl. ¶¶ 160–62. Plaintiffs' claims thus raise separation-of-powers concerns related to the Executive's power to enforce the laws. *See* MTD at 35–36.

### 5. *Expanding* Bivens *Here Would be Unworkable*

Defendants have explained in detail why the proposed remedy here is unworkable. MTD at 36–38. Plaintiffs attempt to dismiss these arguments in sweeping fashion, Opp. at 32–33, but fail to distinguish Defendants' points and authorities on this issue. Plaintiffs do not dispute that creating a *Bivens* remedy here would place an incredible burden on federal policymakers, the government, and the judiciary. MTD at 36–37. Instead, they focus on judicial competence, noting that the courts have some experience in claims against high-level state officials that could aid them in crafting a *Bivens* remedy. Opp. at 32–33 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235 (1974) (challenging the deployment of the National Guard on the Kent State campus)). But that is exactly the point. In § 1983 Congress acted; in *Bivens* it did not. *Abbasi*, 137 S. Ct. at 1854 (comparing § 1983 and *Bivens*); *see also Stanley*, 483 U.S. at 684 (distinguishing between immunity and cause of action inquiries). In any event, Defendants do not argue that the proposed remedy is unworkable simply because they are or were high-ranking federal officials. Defendants discussed the many hazards of extending *Bivens* here: chilling national policymaking, the broad and diverse

scope of government action challenged, the massive number of claims, the enormous financial stakes, and the difficulty of determining policymakers' subjective motives. MTD 36–38.[22] And the Supreme Court has not created *Bivens* remedies in cases where multiple defendants, subject to different standards and mandates, are sued for a broad-reaching course of conduct. In fact, the only three Supreme Court cases ever allowing *Bivens* actions to proceed are notably uniform in their simplicity, with allegations of discrete constitutional violations by discrete individuals against a single individual. *Bivens*, 403 U.S. at 389 (entry into and search of apartment and manacling without probable cause); *Davis*, 442 U.S. at 230 (firing on the basis of sex); *Carlson*, 446 U.S. at 16 n.1 (failure to treat asthma).

Although Plaintiffs contend that a class action will alleviate the torrent of cases that (as Plaintiffs implicitly concede) would result from extending *Bivens* here, the undersigned are not aware of a single case allowing a *Bivens* class action to proceed. Relatedly, Plaintiffs argue that an individual-capacity action is a workable way to remedy unconstitutional policies of the government because of indemnification. But indemnification is discretionary, *see* 28 C.F.R. § 50.15(a)(8)(iii), and would be decided by an administration perhaps years from now after liability hypothetically is established. And Plaintiffs cannot use the vehicle of *Bivens* to end-run sovereign immunity. *See generally Meyer*, 510 U.S. 471 (discussing *Bivens* claims against agencies and sovereign immunity).

## III.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS

### A. Plaintiffs Do Not Allege A Clearly Established Constitutional Violation

Defendants demonstrated that they are entitled to qualified immunity for all of Plaintiffs' claims. MTD at 41–59. Plaintiffs disagree, arguing it was "obvious" that Defendants' alleged conduct was unlawful and that "the case law has long been settled with respect to Plaintiffs' Fourth and Fifth Amendment claims." Opp. at 34. But in making this

---

[22] Another court in this district recently held that workability concerns associated with extending *Bivens* to a substantive due process claim counselled hesitation. *Matthews v. United States*, No. CV 18-04096-PHX-DLR (DMF) (D. Ariz. Apr. 9, 2020).

argument Plaintiffs repeatedly stitch together a variety of legal principles from a variety of contexts and ask the Court to hold (for the first time) the law is clearly established. Such attempts to develop the law cannot, by definition, show a violation of clearly established law. *See Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 200–201 (2001)) ("[Plaintiff] has not brought to our attention, and our independent research does not reveal, case law involving the particular circumstances presented by this case. . . . It is insufficient that the broad principle underlying a right is well-established. 'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"). Contrary to Plaintiffs' assertions, Opp. at 34 n.21, this level of specificity is required for all of their claims, including equal protection. *Walker*, 370 F.3d at 978. Furthermore, district court and out-of-Circuit cases from disparate contexts cannot form the basis of clearly established law or a "consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); MTD at 45. But reliance on such cases infects *all* of Plaintiffs' qualified immunity arguments. Opp. 34–49. Similarly, the Court's dicta in *Hope v. Pelzer*, 536 U.S. 730 (2002), does not clearly establish the parameters of permissible or impermissible government activity in novel contexts such as immigration and prosecutorial discretion where government interests are at their apex, and subsequent decisions make clear that particularity remains central to the immunity analysis. *See, e.g.*, *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curium) (collecting recent Supreme Court cases).[23]

As explained in Defendants' principal brief, MTD at 41–59, no precedent existed to put the Defendants on notice they could be personally liable for creating government policies to: (1) refer all 8 U.S.C. § 1325(a) offenders for prosecution, *see* Compl. ¶ 158; (2) prosecute those offenders, *see id.* ¶¶ 160–62; (3) classify the children of those referred

---

[23] Plaintiffs do not respond to Defendants' arguments regarding personal participation. MTD 54–56. Plaintiffs thus do not dispute that Defendants Morgan and Albence are not alleged to have taken any action here and must be dismissed. *Iqbal*, 556 U.S. at 676.

for prosecution as unaccompanied, *see id.* ¶¶ 56, 200, 227, 231; (4) follow the terms of the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), *see id.* ¶ 58; or (5) take all of those actions simultaneously. Plaintiffs make the "classic" qualified immunity errors of either defining the rights at issue too generally or relying on caselaw post-dating the conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts—and the Ninth Circuit in particular . . . not to define clearly established law at a high level of generality."). Having failed to identify a single pre-conduct case addressing the situation confronted by Defendants here, Plaintiffs fail to demonstrate the violation of any clearly established constitutional right.[24] Therefore, Defendants are entitled to qualified immunity on all of Plaintiffs' constitutional claims.

### B.  Plaintiffs Do Not Allege A Clearly Established Statutory Violation

Plaintiffs contend that they have alleged a conspiracy and that Defendants are not otherwise entitled to qualified immunity. Opp. at 53–58. Plaintiffs are wrong. Plaintiffs' argument that they can overcome qualified immunity for their *statutory* claims by showing that Defendants violated their clearly established *constitutional* rights, Opp. at 56, is wholly without merit.[25] Federal employees are entitled to qualified immunity where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That means – as the Supreme Court and this Circuit have held with respect to the very statute at issue here (42 U.S.C. § 1985(3)) – if the law is unclear with respect to *either* the application of

---

[24] *See, e.g.*, Opp. at 35 (citing cases from disparate contexts for overarching "right to family integrity"); *id.* at 35–36 (citing post-conduct cases); *id.* at 36 (citing inapplicable exigent circumstances cases); *id.* at 38 (citing cases for broad propositions regarding right to medical care); *id.* at 40 (citing general and post-conduct cases about punishing detainees); *id.* at 41 (citing general cases about parental rights); *id.* at 44–47 (citing cases for high-level equal protection rights); *id.* at 49 (citing Fifth, rather than Fourth, Amendment case).

[25] Even if true, such a theory would be unavailing for the distinct reason that Plaintiffs fail to allege the violation of any clearly established equal protection right or liberty interest. *See* MTD at 42–44 (lack of clearly established right to be detained with family); *id.* at 48–51 (equal protection claims); MTD at 56–57 (listing § 1985(3) elements).

a statute *or* a relevant constitutional provision, qualified immunity bars suit. *See Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1245 (9th Cir. 2019) (citing *Abbasi,* 137 S. Ct. at 1866) ("*Abbasi* makes clear that intracorporate liability was not clearly established at the time of the events in this case and that the Agent Defendants are therefore entitled to qualified immunity from liability under § 1985(3)."). Contrary to Plaintiffs' baseless interpretation, Opp. at 56, *Abbasi* held that the defendants there would be entitled to qualified immunity on the § 1985(3) claim even if the underlying constitutional allegations were otherwise well pleaded, because it was not clear whether the conspiracy element of § 1985(3) had been met. 137 S. Ct. at 1869. Similarly, in *Fazaga*, rather than decide if the FBI agents violated the First or Fifth amendments, 916 F. 3d at 1245, the Ninth Circuit asked whether "the Agent Defendants could reasonably have known that agreements entered into or agreed-upon policies devised with other employees of the FBI could subject them to conspiracy liability under § 1985(3)." *Id.* at 1245–46. The court held they could not. *Id.* at 1246. Although Plaintiffs characterize the reasoning of *Abbasi* and *Fazaga* as "def[ying] logic," Opp. at 56, these cases are binding and their principles sound.[26] Allowing Plaintiffs to bypass immunity where their allegations fail to satisfy a necessary statutory or constitutional element in a way that is clearly established would deprive officers of the "fair notice" that qualified immunity provides. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).[27]

    Plaintiffs' main contention is that Defendants can be said to have conspired together because they "are employees of a variety of different government agencies." Opp. at 54.

---

[26] Unlike in *Keates* v. *Koile*, 883 F.3d 1228 (9th Cir. 2018), the question here is not whether Defendants were "aware of the precise theory of . . . liability," Opp. at 56, such as whether Plaintiffs' well-established rights are properly housed in one constitutional amendment or another. There is only one potential source of Plaintiffs' statutory claims: § 1985(3).

[27] Plaintiffs' citation to *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), Opp. at 54, is deeply misleading – particularly Plaintiffs' notation that it was "*overruled on other grounds by Ziglar v. Abbasi.*" Opp. at 52 n.31. *Abbasi* unquestionably overruled *Turkmen*'s § 1985(3) holding; *Turkmen* is no longer good law on that point. 137 S. Ct. at 1869.

Plaintiffs claim the law Defendants cite is not sufficiently on point, Opp. at 55, and suggest that "[t]he Supreme Court has not extended the [intracorporate conspiracy] doctrine to civil rights claims." Opp. at 54. But Plaintiffs carry the burden to show that their § 1985(3) rights were clearly established at the time of Defendants' actions, *see Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017), not the reverse. And in light of *Abbasi*, Plaintiffs cannot meet that burden. In other words, given *Abbasi* – which is largely on all fours here – it is Plaintiffs' burden to cite controlling case law (or a "robust consensus" of persuasive authority), *D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018), that the intracorporate conspiracy doctrine is clearly inapplicable in the context pled – specifically, that an alleged agreement between multiple, high-level employees of the Executive Branch (including White House officials) can constitute a conspiracy for § 1985(3) purposes.

To carry their burden, Plaintiffs cite two unpublished, out-of-circuit district court opinions for the proposition that the intracorporate conspiracy doctrine does not apply "in cases involving multiple federal agencies." Opp. at 57 (citing *Ali v. Raleigh Cty.*, No. 5:17-cv-3386, 2018 WL 4101517 (S.D.W. Va. Aug. 28, 2018) and *Bailey v. Pataki*, No. 1:08-cv-8563, 2010 WL 4237071 (S.D.N.Y. Oct. 26, 2010)). But two out-of-circuit district court decisions cannot clearly establish a proposition of this nature for qualified immunity purposes. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Additionally, *neither* of those decisions involved federal agencies or even suits against individual federal employees and thus are not sufficiently context-specific. *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)) ("The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. . . . This requires a high 'degree of specificity.'"). *Ali* post-dated the conduct here and involved multiple different governments (the *state* police, *county* sheriff, and *city* police), not the single government at issue here. 2018 WL 4101517, at *11. *Bailey* noted that the law in this "area is far from settled" and declined to apply the intracorporate conspiracy doctrine to a claim involving multiple state agencies on summary

judgment, while noting that the question may be "revisited at trial depending on how the conspiracy claims are presented to the jury." 2010 WL 4237071, at *5.[28]

Not only is Plaintiffs' scant law legally insufficient to clearly establish a proposition for qualified immunity purposes, in the analogous context of alleged conspiracies among multiple state, city, or local government departments, the vast majority of courts have applied the intracorporate conspiracy doctrine to bar claims.[29] As one court has explained:

[28] Plaintiffs also cite *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381 (D. Md. 2018), for the proposition that § 1985(3) can apply to federal actors at all. Opp. 53–54 n.31; *but see Alharbi v. Miller*, 368 F. Supp. 3d 527, 568 (E.D.N.Y. 2019) (disagreeing and holding that "consistent with the clear purpose behind the Civil Rights Act," "§ 1985(3) is inapplicable to federal officers"). *La Union*, which did not discuss qualified immunity and involved a conspiracy between federal *and* state defendants, is inapposite.

[29] *See, e.g.*, *Steele v. Rochester City Police Dep't*, No. 6:16-CV-06022-MAT, 2016 WL 1274710, at *4 (W.D.N.Y. Apr. 1, 2016) ("The conduct alleged here falls squarely within the bounds of the intracorporate conspiracy doctrine, because Plaintiff complains of harm caused by the employees of two City agencies, RPD and RAS, acting solely within the scope of their employment."); *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 519 (S.D.N.Y.), *on reconsideration in part,* 133 F. Supp. 3d 563 (S.D.N.Y. 2015) (applying the intracorporate conspiracy doctrine ("ICC") to an agreement between the New York Fire Department and Police Department); *Kelley v. D.C.*, 893 F. Supp. 2d 115, 117 (D.D.C. 2012) (ICC barred § 1985(3) conspiracy claims against D.C., the D.C. Chief of Police, and the D.C. Attorney General); *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1075 (D. Ariz. 2012), *aff'd sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013) (county sheriff and county attorney); *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131, 157 (E.D.N.Y. 2011), *amended*, No. 08 CV 2876 DRH AKT, 2011 WL 5156340 (E.D.N.Y. Oct. 28, 2011) ("Here, all of the individual defendants are employees of the same entity: the Town of Southampton. It matters not that they hail from different departments within the Town's governing structure; they are still covered by the doctrine and therefore any claims that they conspired amongst themselves necessarily fails."); *Dunlop v. City of New York*, No. 06 CIV. 0433 (RJS), 2008 WL 1970002, at *9 (S.D.N.Y. May 6, 2008) ("Indeed, it is well-settled that the doctrine bars conspiracy claims alleging concerted action by employees and/or the heads of various departments within a single municipal entity, at least where the complaint fails to allege that the various entities were effectively acting as separate entities in carrying out the alleged conspiracy."); *Allen v. City of Chicago*, 828 F. Supp. 543, 564 (N.D. Ill. 1993) (applying ICC to mayor, a city commissioner, and members of the city council); *see also Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (city, city fire chief, and city manager); *Coker v. State of Alabama*, No. 516CV00891KOBTMP,

> The individual defendants here are employees of the defendant City of Yonkers. True, they work for different departments of the City, but that is of no more moment in the municipal context than it would be if the individual defendants worked for the Mainframe and Personnel Divisions of IBM and were accused of conspiring with their employer corporation to discriminate against another employee.

*McEvoy v. Spencer*, 49 F. Supp. 2d 224, 226 (S.D.N.Y. 1999). This analogy to the corporate world is apt and helps to explain why the doctrine applies equally in these circumstances.

Originally a principle of antitrust law, the intracorporate conspiracy doctrine has been applied to civil rights cases – despite Plaintiffs' claims to the contrary, Opp. at 56 – by a majority of circuit courts of appeals. *See Fazaga*, 916 F.3d at 1246 n.41 (discussing the split in circuits). As explained in *Abbasi*, the logic of the doctrine is simple:

> Conspiracy requires an agreement . . . between or among two or more separate persons. When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people.

137 S. Ct. at 1867 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). As the Court has explained in the antitrust context, the doctrine applies to

---

2016 WL 4492833, at *1 (N.D. Ala. July 1, 2016), *report and recommendation adopted sub nom. Coker v. Alabama*, No. 516CV00891KOBTMP, 2016 WL 4479921 (N.D. Ala. Aug. 25, 2016) (state, state Department of Corrections, state Board of Pardons and Paroles, and members of the Board); *Molina v. Brown Cty.*, No. 6:13-CV-048-C, 2015 WL 11143472, at *4 (N.D. Tex. Mar. 17, 2015), *aff'd*, 616 F. App'x 163 (5th Cir. 2015) (county elections administrator, county judge, and county attorney); *Britt v. Jackson Cty., Miss.*, No. 1:11-CV-00074-HSO, 2012 WL 2460534, at *1 (S.D. Miss. June 27, 2012) (county board of supervisors, tax assessor, and tax assessor employee); *York v. Riley*, No. 2:09CV1163-MEF, 2010 WL 3034655, at *2 (M.D. Ala. July 15, 2010), *report and recommendation adopted*, No. 2:09CV1163-MEF, 2010 WL 3038321 (M.D. Ala. Aug. 3, 2010) (governor, director of state unemployment & claims, director of state department of revenue, and state attorney general); *Santulli v. Town of Brookhaven*, No. 08-CV-1355 (TCP), 2009 WL 10709085, at *1 (E.D.N.Y. Sept. 16, 2009) (town, fire marshals, code inspector, assistant town attorney); *Jackson v. Signh*, No. CIV. A. H-06-2920, 2007 WL 2818322, at *1 (S.D. Tex. Sept. 25, 2007) (city, city controller, city controller staff, and senior assistant city attorney); *cf. Ezell v. Wells*, No. 2:15-CV-00083-J, 2015 WL 4191751, at *18 (N.D. Tex. July 10, 2015) (distinguishing "outlier" decision that declined to apply ICC where multiple city departments were involved).

"coordinated activity" between corporate divisions, "autonomous units," or even wholly-owned subsidiaries. *Copperweld*, 467 U.S. at 771–73. The exact form of the corporation is irrelevant. *Id.* at 772. The hallmarks of the doctrine are common purpose and, more critically, control. *Id.* at 771–72 ("But in reality a parent and a wholly owned subsidiary always have a 'unity of purpose or a common design.' They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.").

As explained in Defendants' principal brief, MTD at 58, coordinated action between the White House, Cabinet officials, and their high-level subordinates in forming national policy cannot, consonant with constitutional structure, be labeled a "conspiracy." To use the analogy from *Copperweld*, agents of the Executive Branch are "not unlike a multiple team of horses drawing a vehicle under the control of a single driver," the President. 467 U.S. at 771. As in the antitrust context, "the very notion of an 'agreement' . . . between" the White House and Cabinet officials "lacks meaning." *Id.* Executive departments are not vested with independent constitutional authority or "persona" that could "agree" to joint action with the Executive: they are a "subdivision of the power of the Executive . . . for the more convenient exercise of that power." *United States v. Germaine*, 99 U.S. 508, 510–11 (1878). As in the antitrust context, even if there are "disagreements" between agents of the Executive, the Executive "may assert full control at any moment if the [agent] fails to act in the [Executive's] best interests." *Copperweld*, 467 U.S. at 771–72; *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) (remarks of Madison)) ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.").

Indeed, as explained in Defendants' principal brief, in the immigration enforcement arena, the authority of the Executive has been painstakingly (if not perfectly) defined by Congress. MTD at 11–14 (discussing the Homeland Security Act, INA, and TVPRA). Congress has vested responsibility over immigration matters in multiple Executive

Departments, including (as relevant here) the Departments of Justice, Homeland Security, and Health and Human Services. Unquestionably, the leadership and ultimate control of these departments rests in a single head, the President, who has the power to appoint and remove the leaders of those departments. *See* 28 U.S.C. § 503 (Justice); 6 U.S.C. § 112 (Homeland Security); 42 U.S.C. § 3501 (Health and Human Services). Coordination between these department heads and their subordinates in the creation of national policy, particularly when White House involvement is alleged, *see* Compl. ¶¶ 28–29, 123, 125, 146, 152, 167–68, 239, must be understood as the action of a single entity, the Executive Branch, rather than a conspiracy between "two or more persons." 42 U.S.C. § 1985(3).

And, as discussed in *Abbasi*, "other sound reasons" also counsel against a holding that § 1985(3) clearly applies to "conversations and agreements between and among federal officials." 137 S. Ct. at 1868. These sound reasons include encouraging "open discussion among federal officers" and "[c]lose and frequent consultations to facilitate the adoption and implementation of policies," which are both "essential to the orderly conduct of governmental affairs." *Id.* True, *Abbasi* itself involved actions of a cabinet official (the Attorney General) and heads of sub-agencies (the FBI and former INS), but if anything, these "sound reasons" are even more important where, as here, the alleged agreement took place between various high-level Executive officials at the direction of the White House. *See* 137 S. Ct. at 1868 ("Were those discussions, and the resulting policies, to be the basis for private suits seeking damages against the officials as individuals, the result would be to chill the interchange and discourse that is necessary for the adoption and implementation of governmental policies."); *Fazaga*, 916 F.3d at 1246 (agents could not have anticipated liability under § 1985(3), because "neither this court nor the Supreme Court had held that

an intracorporate agreement could subject federal officials to liability under § 1985(3)").[30] Therefore, Plaintiffs' § 1985(3) and § 1986 claims must be dismissed.[31]

## IV.   PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY

Plaintiffs argue that none of the Defendants is entitled to absolute immunity because neither the initial separation nor subsequent refusal to reunite was intimately associated with the judicial phase of the criminal process. Opp. at 58–59. But the Complaint itself states that at least some of the separations were caused by the United States' prosecuting Plaintiffs or referring them for prosecution. Compl. ¶¶ 160–62. The core activity protected by absolute prosecutorial immunity is the decision to initiate a prosecution. *See Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). To the extent Plaintiffs allege that former Attorney General Sessions, or any other Defendant, announced the prioritization of a class of criminal offenders, that decision is protected by absolute immunity. *See Dellums v. Powell*, 660 F.2d 802, 806 n.13 (D.C. Cir. 1981) (explaining that the Attorney General is entitled to absolute immunity for issuing general instructions to initiate prosecutions against entire classes of offender); Compl. ¶ 158.

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[30] Indeed, one of the purposes of the Homeland Security Act of 2002, which delegated the relevant authority here between DHS and HHS, was to foster communication between government agencies. *See* H.R. Rep. No. 107-609, at 63 (2002) ("The Secretary will also work to consolidate the Federal Government's homeland security related communications and communications systems to better work with other parts of government. . . .").

[31] Contrary to Plaintiffs' assertions, Opp. 53, Defendants do not argue that they are entitled to sovereign immunity. However, to the extent the Court finds that Plaintiffs' statutory claims challenge only the action of a single entity, the Executive Branch, sovereign immunity would bar that independent entity-based claim, *see DeBolt v. Rose*, No. 4:15-CV-00215, 2017 WL 3701002 at *2 (D. Ariz. Mar. 31, 2017) (Soto, J.) (collecting cases).

1

Dated this 2nd day of June, 2020.

2

3

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

4

5

C. SALVATORE D'ALESSIO, JR.
Acting Director
Constitutional & Specialized Tort Litigation
Torts Branch, Civil Division

6

7

8

MARY HAMPTON MASON
Senior Trial Counsel
Constitutional & Specialized Tort Litigation
Torts Branch, Civil Division

9

10

11

*/s/ Paul Quast*
PAUL QUAST

12

13

*Counsel for Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by means of the District Clerk's CM/ECF electronic filing system on June 2, 2020.

*/s/ Paul Quast*
Paul Quast