Jacqueline P. Rubin (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Lee Gelernt (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660

Attorneys for Plaintiffs

*(Additional Counsel for Plaintiffs Listed on Signature Page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

A.I.I.L., et al.,

                    Plaintiffs,

          - v -

Jefferson Beauregard Sessions III, et al.,

                    Defendants.

No. 4:19-cv-00481-TUC-JCH

**PLAINTIFFS' OPPOSITION TO INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**Oral Argument Requested**

Assigned to the
Hon. John C. Hinderaker

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ..................................................................................................1

II. BACKGROUND ...................................................................................................3

III. ARGUMENT.........................................................................................................7

    A.  THIS COURT HAS PERSONAL JURISDICTION OVER
        ALL DEFENDANTS ...................................................................................8

        1.  Defendants Purposefully Directed Activities at Arizona ........................9

        2.  Plaintiffs' Claims Arise Out of Defendants' Actions in
            Arizona.....................................................................................................15

        3.  The Court's Exercise of Jurisdiction Is Reasonable ..............................16

    B.  PLAINTIFFS ADEQUATELY PLEAD *BIVENS* CLAIMS
        FOR VIOLATIONS OF THE FOURTH AND FIFTH
        AMENDMENTS ......................................................................................17

        1.  This Action Does Not Arise in a New Context ......................................17

        2.  Even if the Court Concludes That This Case Presents a New
            Context, "Special Factors" Do Not Counsel Against a *Bivens*
            Remedy ....................................................................................................22

    C.  QUALIFIED IMMUNITY DOES NOT SHIELD
        DEFENDANTS .........................................................................................35

        1.  Defendants Violated Plaintiffs' Clearly Established Fifth
            Amendment Right to Family Integrity (Count I) ....................................36

        2.  Defendants Violated Plaintiffs' Clearly Established Fifth
            Amendment Substantive Due Process Right to Receive
            Adequate Medical Care While in Custody (Count II)............................40

        3.  Defendants Violated Plaintiffs' Clearly Established Fifth
            Amendment Right to Be Free From Punitive Treatment
            Without Due Process (Count III) ............................................................41

        4.  Defendants Violated Plaintiffs' Clearly Established Fifth
            Amendment Right to Procedural Due Process (Count IV)....................43

        5.  Defendants Violated Plaintiffs' Clearly Established Fifth
            Amendment Right to Equal Protection (Count V)................................45

6.    Defendants Violated Plaintiffs' Clearly Established Fourth Amendment Right Against Unreasonable Seizures (Count VI)..............49

D.    PLAINTIFFS' SECTION 1985 & 1986 CLAIMS SHOULD NOT BE DISMISSED ........................................................................52

    1.    Plaintiffs Adequately Plead Facts Supporting Each Element of Their Statutory Claims ..........................................................52

    2.    Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Section 1985(3) and 1986 Claims ...........................................56

E.    DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY ..........................................................................59

IV.    CONCLUSION ..........................................................................60

1

## **TABLE OF AUTHORITIES**

2

3 **CASES**                                               **PAGE(S)**

4 *Advanced Bldg. & Fabrication, Inc.* v. *Cal. Highway Patrol,*
5    918 F.3d 654 (9th Cir. 2019) .......................................................35

6 *Ali* v. *Raleigh Cty.,*
   No. 5:17-cv-3386, 2018 WL 4101517 (S.D.W. Va. Aug. 28, 2018)...........................58

7 *Anderson-Francois* v. *Cty. of Sonoma,*
8    415 F. App'x 6 (9th Cir. 2011) ....................................................38

9 *Arce* v. *Douglas,*
   793 F.3d 968 (9th Cir. 2015) .....................................................45

10 *Ariz. Dream Act Coalition* v. *Brewer,*
11    757 F.3d 1053 (9th Cir. 2014) ...................................................49

12 *Ashcroft* v. *Iqbal,*
13    556 U.S. 662 (2009) ...............................................29, 34, 42, 47, 53

14 *Ave. 6E Invs., LLC* v. *City of Yuma, Ariz.,*
   818 F.3d 493 (9th Cir. 2016) .....................................................46

15 *Bailey* v. *Pataki,*
16    No. 1:08-cv-8563, 2010 WL 4237071 (S.D.N.Y. Oct. 26, 2010)................................58

17 *Bank Markazi* v. *Peterson,*
   136 S. Ct. 1310 (2016) ...........................................................33
18

19 *BBK Tobacco & Foods LLP* v. *Juicy eJuice,*
   No. CV-13-00070, 2014 WL 1686842 (D. Ariz. Apr. 29, 2014) ................................16

20 *Bhatti* v. *Cty. of Sacramento,*
21    281 F. App'x 764 (9th Cir. 2008) .................................................38

22 *Biliack* v. *Paul Revere Life Ins. Co.,*
   265 F. Supp. 3d 1003 (D. Ariz. 2017) .............................................13
23

24 *Bistrian* v. *Levi,*
   912 F.3d 79 (3d Cir. 2018) ...................................................19, 25, 26

25 *Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics,*
26    403 U.S. 388 (1971) .............................................................*passim*

*BK Sterling, LLC* v. *Affinity Grp. Mgmt. Co., Inc.*,
No. CV-15-00060, 2016 WL 10611187 (D. Ariz. Mar. 29, 2016) ...............................15

*Brunoehler* v. *Tarwater*,
743 F. App'x 740 (9th Cir. 2018) ...............................................................................18, 21

*Buckley* v. *Fitzsimmons*,
509 U.S. 259 (1993) ..............................................................................................................60

*Bunyan* v. *Camacho*,
770 F.2d 773 (9th Cir. 1985) ..............................................................................................49

*Burns* v. *Reed*,
500 U.S. 478 (1991) ..............................................................................................................60

*Burns* v. *United States*,
501 U.S. 129 (1991) ..............................................................................................................31

*C.M.* v. *United States*,
No. 2:19-cv-5217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ...........................38, 51

*Calder* v. *Jones*,
465 U.S. 783 (1984) ...............................................................................................................9

*Carlson* v. *Green*,
446 U.S. 14 (1980) ..................................................................................................*passim*

*Castellanos* v. *United States*,
No. 3:18-cv-0428, 2020 WL 619336 (S.D. Cal. Feb. 10, 2020) ..................................18

*Charles Schwab Corp.* v. *Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ..................................................................................................14

*Chavez* v. *United States*,
683 F.3d 1102 (9th Cir. 2012) ..................................................................... 19, 20, 21

*Chirila* v. *Conforte*,
47 F. App'x 838 (9th Cir 2002) ..........................................................................................14

*City of Cleburne, Tex.* v. *Cleburne Living Ctr.*,
473 U.S. 432 (1985) ..............................................................................................................45

*City of L.A.* v. *Lyons*,
461 U.S. 95 (1983) ................................................................................................................26

*Cleveland Bd. of Educ.* v. *LaFleur*,
414 U.S. 632 (1974) ..............................................................................................................36

- iv -

*Copperweld Corp.* v. *Indep. Tube Corp.*,
   467 U.S. 752 (1984) .................................................................................55

*Corr. Servs. Corp.* v. *Malesko*,
   534 U.S. 61 (2001) ...................................................................................24

*Cousins* v. *Lockyer*,
   568 F.3d 1063 (9th Cir. 2009) ...................................................................7

*Cuevas* v. *United States*,
   2018 WL 1399910 (D. Colo. Mar. 19, 2018) ............................................25

*Daniels-Hall* v. *Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ...................................................................11

*Data Disc, Inc.* v. *Sys. Tech. Assocs., Inc.*,
   557 F.2d 1280 (9th Cir. 1977) ..................................................................16

*Davis* v. *Passman*,
   442 U.S. 228 (1979) ...........................................................................*passim*

*Davison* v. *Carona*,
   No. 8:06-cv-1258, 2010 WL 4345752 (C.D. Cal. Sept. 29, 2010) .............41

*Demery* v. *Arpaio*,
   378 F.3d 1020 (9th Cir. 2004) ..................................................................41

*Dep't of Homeland Sec.* v. *Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) .............................................................................48

*Doe* v. *Rumsfeld*,
   683 F.3d 390 (D.C. Cir. 2012) .................................................................33

*Dole Food Co., Inc.* v. *Watts*,
   303 F.3d 1104 (9th Cir. 2002) ..............................................................8, 16

*Elliot-Park* v. *Manglona*,
   592 F.3d 1003 (9th Cir. 2010) ............................................................35, 46

*Fazaga* v. *Fed. Bureau of Investigation*,
   916 F.3d 1202 (9th Cir. 2019) ..................................................................52

*Flores* v. *Pierce*,
   617 F.2d 1386 (9th Cir. 1980) ..................................................................46

*Freestream Aircraft (Berm.) Ltd.* v. *Aero Law Grp.*,
   905 F.3d 597 (9th Cir. 2018) ....................................................................16

*Freytag* v. *C.I.R.*,
    501 U.S. 868 (1991)...................................................................................................55

*Gonzales* v. *Carhart*,
    550 U.S. 124 (2007)...................................................................................................37

*Griffin* v. *Breckenridge*,
    403 U.S. 88 (1971).....................................................................................................54

*Guerra* v. *Sutton*,
    783 F.2d 1371 (9th Cir. 1986) ...........................................................................20, 21

*Guertin* v. *State*,
    912 F.3d 907 (6th Cir. 2019) ...................................................................................34

*Hardwick* v. *Cty. of Orange*,
    844 F.3d 1112 (9th Cir. 2017) ...................................................................36, 37, 60

*Harisiades* v. *Shaughnessy*,
    342 U.S. 580 (1952)...................................................................................................33

*Hernandez* v. *Cate*,
    918 F. Supp. 2d 987 (C.D. Cal. 2013).....................................................................46

*Hernandez* v. *Mesa*,
    140 S. Ct. 735 (2020)...........................................................................17, 18, 24, 33

*Hobson* v. *Wilson*,
    737 F.2d 1 (D.C. Cir. 1984)........................................................................54, 57, 58

*Hope* v. *Pelzer*,
    536 U.S. 730 (2002)...................................................................................................35

*Ibrahim* v. *Dep't of Homeland Sec.*,
    No. C-06-00545, 2006 WL 2374645 (N.D. Cal. Aug. 16, 2006) ................................12

*Ibrahim* v. *Dep't of Homeland Sec.*,
    538 F.3d 1250 (9th Cir. 2008) .......................................................................9, 11, 12

*Ignatiev* v. *United States*,
    238 F.3d 464 (D.C. Cir. 2001)..................................................................................28

*Imbler* v. *Pachtman*,
    424 U.S. 409 (1976)............................................................................................59, 60

*Ioane* v. *Hodges*,
    939 F.3d 945 (9th Cir. 2018) ...............................................................................18, 21

*J.S.G. ex. rel. J.S.R.* v. *Sessions*,
   330 F. Supp. 3d 731 (D. Conn. 2018)............................................................................37

*Jacinto-Castanon de Nolasco* v. *U.S. Immigr. & Customs Enf't*,
   319 F. Supp. 3d 491 (D.D.C. 2018).......................................................................25, 37

*Jean* v. *Nelson*,
   727 F.2d 957 (11th Cir. 1984) ....................................................................................47

*Johnson* v. *California*,
   543 U.S. 499 (2005)....................................................................................................46

*K.O.* v. *U.S. Immigr. & Customs Enf't*,
   436 F. Supp. 3d 442 (D. Mass. 2020)..........................................................................15

*K.O.* v. *U.S. Immigr. & Customs Enf't*,
   468 F. Supp. 3d 350 (D.D.C. 2020).....................................................................*passim*

*Keates* v. *Koile*,
   883 F.3d 1228 (9th Cir. 2018) ............................................................................*passim*

*Kirkpatrick* v. *Cty. of Washoe*,
   843 F.3d 784 (9th Cir. 2016) ................................................................................49, 50

*Kyko Glob., Inc.* v. *Prithvi Info. Sols. Ltd.*,
   No. 2:18-CV-01290, 2020 WL 1159439 (W.D. Pa. Mar. 10, 2020) ...........................14

*Lineberry* v. *Johnson*,
   No. 17 Civ. 04124, 2018 WL 4232907 (S.D.W. Va. Aug. 10, 2018) ..........................19

*La Unión del Pueblo Entero* v. *Ross*,
   353 F. Supp. 3d 381 (D. Md. 2018)..............................................................................54

*Lanuza* v. *Love*,
   899 F.3d 1019 (9th Cir. 2018) ............................................................................*passim*

*Leafty* v. *Aussie Sonoran Capital LLC*,
   No. CV-15-00655, 2017 WL 588717 (D. Ariz. Feb. 14, 2017)....................................9

*Liberty Media Holdings, LLC* v. *Does 1-62*,
   No. 11-CV-575, 2012 WL 628309 (S.D. Cal. Feb. 24, 2012)......................................9

*London-Sire Records, Inc.* v. *Doe 1*,
   542 F. Supp. 2d 153 (D. Mass. 2008)...........................................................................9

*M.G.U.* v. *Nielsen*,
   325 F. Supp. 3d 111 (D.D.C. 2018).............................................................................37

*Manuel* v. *City of Joliet, Ill.*,
  137 S. Ct. 911 (2017) ........................................................................................51

*Mathews* v. *Eldridge*,
  424 U.S. 319 (1976) ..........................................................................................43

*Mavrix Photo, Inc.* v. *Brand Techs., Inc.*,
  647 F.3d 1218 (9th Cir. 2011) .............................................................................8

*Maxwell* v. *Cty. of San Diego*,
  708 F.3d 1075 (9th Cir. 2013) ...........................................................................36

*McDaniels* v. *United States*,
  No. 14 Civ. 02594, 2018 WL 7501292 (C.D. Cal. Dec. 28, 2018) ...........................19

*Melea, Ltd.* v. *Jawer SA*,
  511 F.3d 1060 (10th Cir. 2007) .........................................................................14

*Melendres* v. *Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ............................................................................49

*Minneci* v. *Pollard*,
  565 U.S. 118 (2012) ................................................................... 22, 23, 25, 26

*Mirmehdi* v. *United States*,
  689 F.3d 975 (2012) ..........................................................................................33

*Moore* v. *City of E. Cleveland*,
  431 U.S. 494 (1977) ..........................................................................................36

*U.S. Dep't of Agric.* v. *Moreno*,
  413 U.S. 528 (1973) ..........................................................................................49

*Ms. J.P.* v. *Barr*,
  No. 2:18-cv-6081, 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019) .............................25

*Ms. L.* v. *U.S. Immigr. & Customs Enf't*,
  302 F. Supp. 3d 1149 (S.D. Cal. 2018) ...................................... 4, 5, 22, 37

*Ms. L.* v. *U.S. Immigr. & Customs Enf't*,
  310 F. Supp. 3d 1133 (S.D. Cal. 2018) ................................................*passim*

*Ms. L.* v. *U.S. Immigr. & Customs Enf't*,
  415 F. Supp. 3d 980 (S.D. Cal. 2020) ...........................................................4, 39

*Munns* v. *Clinton*,
  822 F. Supp. 2d 1048 (E.D. Cal. 2011) .............................................................12

*Myers* v. *Bennett Law Offices*,
   238 F.3d 1068 (9th Cir. 2001) ........................................................................13

*Narenji* v. *Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) ........................................................................47

*Dep't of Commerce* v. *New York*,
   139 S. Ct. 2551 (2019) ...................................................................................26

*Ochoa* v. *J.B. Martin & Sons Farms, Inc.*,
   287 F.3d 1182 (9th Cir. 2002) ...................................................................13, 14

*Oksner* v. *Blakey*,
   No. C 07-2273, 2007 WL 3238659 (N.D. Cal. Oct. 31, 2007) ................12, 13

*Oksner* v. *Blakey*,
   347 F. App'x 290 (9th Cir. 2009) .............................................................12, 13

*Osborn* v. *Haley*,
   549 U.S. 225 (2007) ......................................................................................25

*Panavision Int'l, L.P.* v. *Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) .......................................................................15

*Papa* v. *United States*,
   281 F.3d 1004 (9th Cir. 2002) ..................................................................19, 20

*Peña Arita* v. *United States*,
   470 F. Supp. 3d 663 (S.D. Tex. 2020) ...........................................................28

*Perez* v. *United States*,
   No. 13CV1417, 2014 WL 4385473 (S.D. Cal. Sept. 3, 2014) .......................12

*Prado* v. *Perez*,
   No. 1:18-cv-9806, 2020 WL 1659848 (S.D.N.Y. Apr. 3, 2020) .........*passim*

*Pumphrey* v. *Coakley*,
   No. 15 Civ. 14430, 2018 WL 1359047 (S.D.W. Va. Mar. 16, 2018) ............19

*Rajah* v. *Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ..........................................................................47

*Ram* v. *Rubin*,
   118 F.3d 1306 (9th Cir. 1997) ..................................................................43, 44

*Reno* v. *Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ......................................................................................33

*Reynaga Hernandez* v. *Skinner*,
  969 F.3d 930 (9th Cir. 2020) ..................................................................56, 57

*Robinson* v. *Tripler Army Med. Ctr.*,
  No. 05-17011, 2009 WL 688922 (9th Cir. Mar. 17, 2009)............................44

*Ross* v. *Krueger*,
  No. 2:13-cv-0355, 2015 WL 1470534 (D. Nev. Mar. 31, 2015) ...................40

*Santosky* v. *Kramer*,
  455 U.S. 745 (1982)...............................................................................37, 43

*Scheuer* v. *Rhodes*,
  416 U.S. 232 (1974)........................................................................................34

*Sky Billiards, Inc.* v. *Loong Star Inc.*,
  No. EDCV 14-00921, 2014 WL 12601022 (C.D. Cal. Sept. 4, 2014) ...........9

*Soler* v. *Cty. of San Diego*,
  762 F. App'x 383 (9th Cir. 2019) .................................................................12

*Spagnola* v. *Mathis*,
  809 F.2d 16 (D.C. Cir. 1986) ........................................................................54

*Stadt* v. *Univ. of Rochester*,
  921 F. Supp. 1023 (W.D.N.Y. 1996)..............................................................13

*Starr* v. *Baca*,
  652 F.3d 1202 (9th Cir. 2011) ................................................................46, 47

*Stirling Homex Corp.* v. *Homasote Co.*,
  437 F.2d 87 (2d Cir. 1971) ..............................................................................8

*Tanzin* v. *Tanvir*,
  __ S. Ct. __, 2020 WL 7250100 (Dec. 10, 2020)..........................................24

*Tatum* v. *Winslow*,
  122 F. App'x 309 (9th Cir. 2005) .................................................................40

*Taylor* v. *Riojas*,
  No. 19-1261, 2020 WL 6385693 (Nov. 2, 2020).........................................35

*Terry* v. *Ohio*,
  392 U.S. 1 (1968)..........................................................................................50

*Textor* v. *Bd. of Regents of N. Ill. Univ.*,
  711 F.2d 1387 (7th Cir. 1983) .....................................................................14

*Tolan* v. *Cotton*,
  572 U.S. 650 (2014) (per curiam)..........................................................................56, 59

*Troxel* v. *Granville*,
  530 U.S. 57 (2000)..........................................................................................................37

*Trump* v. *Hawaii*,
  138 S. Ct. 2392 (2018)....................................................................................................47

*Turkmen* v. *Hasty*,
  789 F.3d 218 (2d Cir. 2015) .......................................................................................54, 55

*Underwager* v. *Channel 9 Aust.*,
  69 F.3d 361 (9th Cir. 1995) ............................................................................................14

*United Bhd. of Carpenters & Joiners of Am. Local 610* v. *Scott*,
  463 U.S. 825 (1983)........................................................................................................52

*Unknown Parties* v. *Nielsen*,
  No. 4:15-cv-00250, 2020 WL 813774 (D. Ariz. Feb. 19, 2020) ...................................41

*Unspam Techs., Inc.* v. *Chernuk*,
  716 F.3d 322 (4th Cir. 2013) ..........................................................................................14

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)....................................................................................................45, 46

*W. Radio Servs. Co.* v. *U.S. Forest Serv.*,
  578 F.3d 1116 (9th Cir.) .................................................................................................26

*W.S.R.* v. *Sessions*,
  318 F. Supp. 3d 1116 (N.D. Ill. 2018)............................................................................37

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
  715 F.3d 716 (9th Cir. 2013) ..........................................................................................15

*Wake Up & Ball LLC* v. *Sony Music Ent. Inc.*,
  119 F. Supp. 3d 944 (D. Ariz. 2015) ................................................................................7

*Walden* v. *Fiore*,
  571 U.S. 277 (2014)........................................................................................................10

*Wallis* v. *Spencer*,
  202 F.3d 1126 (9th Cir. 2000) ....................................................................................37, 44

*Warfield* v. *Gardner*,
  346 F. Supp. 2d 1033 (D. Ariz. 2004) ..............................................................................8

*Wilkie* v. *Robbins*,
  551 U.S. 537 (2007)..................................................................................22

*Williams* v. *Baker*,
  No. 16 Civ. 1540, 2020 WL 5814109 (E.D. Cal. Sept. 14, 2020)................24

*Williams* v. *Yamaha Motor Co. Ltd.*,
  851 F.3d 1015 (9th Cir. 2017) ....................................................................13

*Wilson* v. *Layne*,
  526 U.S. 603 (1999)..................................................................................35

*Wong Wing* v. *United States*,
  163 U.S. 228 (1896)..................................................................................47

*Yahoo! Inc.* v. *La Ligue Contre Le Racisme et L'Antisemitisme*,
  433 F.3d 1199 (9th Cir. 2006) .....................................................................8

*Yellowbear* v. *Ashe*,
  612 F. App'x 918 (10th Cir. 2015)..............................................................12

*Ziegler* v. *Indian River Cty.*,
  64 F.3d 470 (9th Cir. 1995) ........................................................................16

*Ziglar* v. *Abbasi*,
  137 S. Ct. 1843 (2017)........................................................................*passim*

**STATUTES**

5 U.S.C. § 704...............................................................................................26

8 U.S.C. § 1101 et seq. ..........................................................................30, 31

8 U.S.C. § 1158(a)(1) ....................................................................................3

8 U.S.C. § 1225(b) .........................................................................................3

8 U.S.C. § 1325(a) ......................................................................................28

42 U.S.C. § 1983...........................................................................................34

42 U.S.C. § 1985(3).............................................................................*passim*

42 U.S.C. § 1986.................................................................................*passim*

Pub. L. No. 107-296, 116 Stat. 2165 (2002) ...........................................30

Pub. L. No. 110-457, 122 Stat. 5044 (2008) ...........................................30

Pub. L. No. 115-106, 131 Stat. 2265 (2018) ...........................................................30

Pub. L. No. 115-99, 131 Stat. 2242 (2018) .............................................................30

**OTHER AUTHORITIES**

28 C.F.R. § 50.15(a) .............................................................................................25

4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1067.6 (4th ed. 2020) ....................................................................................8

# I.   INTRODUCTION

Plaintiffs in this action are some of the thousands of children and parents cruelly separated in Arizona and other southern border states by Individual Defendants (hereinafter, "Defendants"). Plaintiffs bring claims on behalf of themselves and similarly situated persons to hold Defendants accountable for this inhumane and unlawful conduct, which has caused severe physical, emotional, and psychological harms. Defendants move for dismissal, arguing that Plaintiffs have no remedy because this case challenges federal immigration policy. Their argument rests on a mischaracterization of the law and the facts, as well as of Plaintiffs' allegations. Defendants acted pursuant to an unconstitutional scheme to cause pain to Plaintiffs and other Central Americans seeking asylum and other relief in the United States. And Plaintiffs' claims are grounded in well-established constitutional and statutory rights.

Beginning in 2017, Defendants conspired to cruelly and deliberately separate thousands of immigrant parents and their children. Defendants separated families without warning or explanation, without affording Plaintiffs any chance to say goodbye or know if or when they would ever see each other again, and without regard for Plaintiffs' rights or dignity. Children like Andrés, then six years old, were torn kicking and screaming from their parents' arms. Defendants provided families with little-to-no information about each other's whereabouts, and parents and children went weeks or months without *any* communication. Karina, then 13 years old, was traumatized by 16 months of separation from her mother, without any regard for her preexisting mental health issues. Defendants perpetrated these nightmares without any plan to reunify the families they had torn apart. Parents and children began to be reunified only after a federal district court judge granted a preliminary injunction halting these cruel, abusive, and unlawful practices. *Ms. L.* v. *U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018) ("*Ms. L. Order Granting Prelim. Inj.*"). Plaintiffs have alleged the central role

that Individual Defendants played in effectuating the family separations, which has been confirmed through recent and ongoing government investigations and media reports. *See, e.g.*, Michael D. Shear, et al., *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. TIMES (Oct. 21, 2020), https://tinyurl.com/ShearArticle (reporting on Defendant Sessions' insistence that children be separated from their parents so as to deter immigration).

Defendants caused wounds that will never heal. Their motion to dismiss is an attempt to avoid having to account for their conduct. Each of Defendants' arguments should be rejected.

*First*, this Court has personal jurisdiction over all Defendants because Defendants' and their agents' conduct was directed at Plaintiffs in Arizona, and Plaintiffs' claims arise out of such conduct.

*Second*, Plaintiffs are entitled to damages because their *Bivens* claims do not arise in a "new context," given that constitutional claims for physical seizures and punitive treatment have long been cognizable in the immigration context, and no "special factors" counsel against a remedy because Plaintiffs' claims arise from individual conduct and do not threaten the separation of powers.

*Third*, qualified immunity is inappropriate because all of the constitutional rights Defendants violated were clearly established. Any reasonable official would have understood that Defendants' cruel treatment violated these rights.

*Fourth*, Plaintiffs' claims are cognizable under 42 U.S.C. §§ 1985(3) and 1986, and qualified immunity is no shield. This Court should reject the argument that federal officials are immune from liability because they *conspired* to violate clearly established rights.

1    *Finally*, Defendants are not entitled to absolute immunity, as the treatment of

2    parents and children was separate from and occurred independent of any prosecutorial

3    decisions. In some cases, there was not even a prosecution.

4    **II.    BACKGROUND**

5          Beginning in 2017, Defendants forcibly separated thousands of immigrant parents

6    and children who sought refuge in this country. (First Amended Complaint ("FAC") ¶¶ 2,

7    8, 135–69, 236.)[1] Indeed, the United States does not dispute that it separated thousands

8    of children from their parents. (*Id.* ¶¶ 227, 236, 274.) Many of these children were of so-

9    called "tender age," meaning that they were under 12 years old; some were mere babies

10   who could not yet speak. (*Id.* ¶¶ 141, 187, 193, 203.)[2] The resulting "separation crisis"

11   was one of the worst human rights abuses in modern American history. Even to this day,

12   a large number of families remain separated. (*Id.* ¶ 227.) The American Academy of

13   Pediatrics called family separation "child abuse." *American Academy of Pediatrics Head*

14   *Says Separating Families Is "Child Abuse,"* CNN NEWS (June 18, 2018),

15   https://tinyurl.com/AAPFamilySeparation.

16         Defendants—including current and former officials in the Department of Justice

17   ("DOJ"), the Department of Homeland Security ("DHS"), the Department of Health and

18   Human Services ("HHS"), the Office of Refugee Resettlement ("ORR"), and the White

19   House—ordered and participated in the planning of family separations, oversaw and

20   created the punitive conditions of families' confinement, and failed in fulfilling their

21

22   [1] Noncitizens arriving in the U.S. may apply for asylum, withholding of removal, or
     other immigration relief. *See* 8 U.S.C. § 1158(a)(1); *see also* 8 U.S.C. § 1225(b).

23   [2] "Unaccompanied children" or "UCs"—children under 18 years old without
24   immigration status who enter the United States and have neither a parent nor a legal
     guardian in the country, or who are taken away from their parents or guardians—move
25   into the custody of ORR, where certain protections apply (FAC ¶¶ 58–59), including
     that facilities holding UCs must be "safe and sanitary" and consistent with the
26   "concern for the particular vulnerability of minors." *Flores* v. *Reno*, No. 2:85-cv-
     4544, Stipulated Settlement Agreement (C.D. Cal. Jan. 17, 1997).

reunification responsibilities. (*Id.* ¶¶ 27–44, 125–31, 135–37, 143–66, 169–213, 227–35.) Defendants also include as-yet-unidentified officers in Arizona and elsewhere at the border who effected the separations. (*Id.* ¶¶ 39, 43, 64–65, 68–69, 79–80, 82–89, 95–96, 98, 104, 106–07, 109–10, 114–16, 120–21, 127, 143, 155–56, 168, 171, 180–81, 184.)[3]

All Defendants inflicted this inhumane trauma on these parents and children deliberately, and with shocking cruelty: separating families without warning or explanation and without opportunities to say goodbye, and often carrying out the separations through dishonest explanations as to where the children were going. (*Id.* ¶¶ 2, 82, 96, 230.) Neither parents nor children were told if or when they would ever see each other again. (*Id.* ¶¶ 2, 65, 116.) Defendants sent parents and children to different detention facilities, shelters, and foster homes, often thousands of miles apart. (*Id.* ¶¶ 2, 10, 72, 89, 97, 110, 117, 172.) Once the parents and children were separated, Defendants failed to give parents information about their children's whereabouts or well-being, and continued to deny them information as to whether or when they would ever see their children again. (*Id.* ¶¶ 2, 65, 68, 83, 86, 98, 116, 232.) Likewise, children were not told why they were separated or if they would ever be reunited with their parents. (*Id.* ¶¶ 2, 10, 67, 97, 232.) Many of the separated families were unable to speak with each other for weeks or months at a time, and some children were not yet old enough to talk. (*Id.* ¶¶ 165, 175, 185, 212, 230, 232.)

---

[3] Various federal agencies are involved when a noncitizen is detained. Noncitizens are typically first taken to CBP facilities, which are intended for short-term stays. (FAC ¶ 56.) Single adults are typically transferred to ICE custody. (*Id.* ¶ 57.) Prior to Defendants' use of forced family separations in 2017, a child was typically separated from a parent or legal guardian only where there were specific concerns that the parent represented a danger to the child or was otherwise unfit. *See generally Ms. L.* v. *U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018) ("*Ms. L. Order Den. Mot. to Dismiss*"). If the parent and child were not released, they could be housed together in family detention centers, avoiding separation. *Ms. L.* v. *U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980, 993 (S.D. Cal. 2020) ("*Ms. L. Order Den. Mot. to Enforce Prelim. Inj.*").

1     Many of the separated parents were never prosecuted.  (*Id.* ¶¶ 73, 84, 169, 222.)

2 Those who were prosecuted for the misdemeanor of illegal entry usually received a

3 sentence of time served, yet Defendants used the opportunity of their brief incarceration

4 (approximately 48 hours or less) to take their children away indefinitely and keep them

5 separated for months *after* the parents had been released.  (*Id.* ¶ 163.) Accordingly, the

6 *Ms. L.* court found that, even if the initial separation of a parent and child were lawful so

7 that parents could be prosecuted, "separating [parents] from their minor children, and

8 failing to reunify [parents] with those children, without any showing the parent is unfit or

9 presents a danger to the child," combined with, among other things, "the lack of any

10 effective procedures or protocols" warranted a preliminary injunction because the

11 practice "shocked the conscience."  310 F. Supp. 3d at 1145; *see also Ms. L. Order Den.*

12 *Mot. to Dismiss*, 302 F. Supp. 3d at 1167 (explaining alleged conduct "is brutal, offensive,

13 and fails to comport with traditional notions of fair play and decency").

14     Defendants knew that, once separated, the information about parents and their

15 children would no longer be linked in the government's databases. (FAC ¶¶ 11, 39, 229–

16 35.) As the *Ms. L.* court concluded, Defendants kept better track of property than they

17 did of separated children.  (*Id.* ¶¶ 12, 225, 231.) Information about government officials'

18 knowledge of their failure to track continues to come to light.  *See* Maria Sacchetti, *House*

19 *Democrats Call Trump's Family Separations 'Reckless Incompetence and Intentional*

20 *Cruelty,'* WASH. POST (Oct. 29, 2020), https://tinyurl.com/MSacchettiArticle.

21     Defendants knew that their conduct was cruel, inhumane, and unconstitutional,

22 and that ripping families apart—without warning, without regard for their rights and

23 dignity, and without a plan as to how to track and to reunify them—would cause lasting

24 damage to affected parents and children.  They were motivated by animus toward Central

25 American immigrants, openly seeking to punish them by separating families only in

26 Arizona and other states along the southern border, where Central Americans enter the

United States and would be affected disproportionately. (*Id.* ¶¶ 125, 130, 142–45, 148, 154, 242.) Defendants have expressed unbridled hostility to this group and stated their intent to prevent future immigration from Central America. (*Id.* ¶¶ 130, 146, 171, 217, 241–58.) Indeed, Defendants ignored expert warnings as to how dangerous and harmful separations would be (*id.* ¶¶ 128, 132–33, 138, 142, 149, 154, 156, 179, 214–16), and departed from standard decision-making processes in planning and executing family separations (*id.* ¶¶ 130, 134–38, 143, 152–56, 202, 208, 218–19, 233–35). As intended, Defendants' actions overwhelmingly and disproportionately harmed Central Americans. (*Id.* ¶¶ 166, 242.) Defendants have offered no other plausible, legitimate governmental purpose motivating their actions.

Words cannot convey the suffering Defendants inflicted on each individual Plaintiff. Ana, Mateo, and Jaime fled Guatemala to seek asylum in the United States. (*Id.* ¶ 61.) They were forcibly separated by CBP officers soon after crossing the border, with then seven-year-old Mateo in tears as he was torn from Ana's arms. (*Id.* ¶¶ 61–64.) Ana was never criminally charged in connection with her entry and ultimately reunited with her sons only after they were separated for almost two months. (*Id.* ¶¶ 73, 76.)

Lorena and her daughter Karina fled El Salvador to escape violence and threatened kidnapping. (*Id.* ¶¶ 78, 79.) They were separated after three days in custody and only reunited *16 months* later; in the interim, Lorena was denied every request to speak with her daughter or learn her whereabouts, while Karina's depression and anxiety went untreated, leading her to contemplate suicide. (*Id.* ¶¶ 85–86, 89–91.) Like Ana, Lorena was never charged in connection with her entry. (*Id.* ¶ 84.)

Jorge and his then seven-year-old daughter Diana fled Honduras to escape death threats, intimidation, and violence. (*Id.* ¶ 94.) After one day in custody, while Diana was sleeping, a CBP officer removed Jorge from their cell, and they did not see each other again for two months. (*Id.* ¶¶ 96–97, 100.) During their separation, Jorge suffered from

1   debilitating headaches, dizzy spells, nausea, vomiting, loss of appetite, and insomnia, yet

2   he received no medical care despite his repeated requests. (*Id.* ¶ 98.) Even after reuniting

3   with her father, Diana continues to experience separation anxiety and remains deeply

4   suspicious of strangers. (*Id.* ¶ 101.)

5       Jairo and his then three-year-old daughter Beatriz fled Guatemala and arrived in

6   the United States in December 2017. (*Id.* ¶ 103.) After two days in detention, CBP

7   officers forced Jairo to give them Beatriz, who was crying and clinging to her father. (*Id.*

8   ¶¶ 105–07.) After five months, Jairo and Beatriz were finally reunited in Guatemala. (*Id.*

9   ¶ 109.) Upon her return, Jairo noticed that Beatriz had a scar on her back and bruises on

10  her legs, and Beatriz told her dad that, while she was in ORR custody, a woman had hit

11  her with a belt. (*Id.* ¶ 110.)

12      Jacinto and his then six-year-old son Andrés fled Honduras when Jacinto's life

13  was threatened, and they sought asylum in the U.S. from CBP agents on May 16, 2018.

14  (*Id.* ¶ 113.) After Jacinto and Andrés were detained for two days, CBP officers forcibly

15  took Andrés, kicking and screaming, from his father, ignoring Jacinto's cries that his son

16  had a heart murmur. (*Id.* ¶ 115.) They were reunited nearly one year later. (*Id.* ¶ 122.)

17  **III.   ARGUMENT**

18      On a motion to dismiss, "[a]ll allegations of material fact are taken as true and

19  construed in the light most favorable to the nonmoving party." *Cousins* v. *Lockyer*, 568

20  F.3d 1063, 1067 (9th Cir. 2009) (quoting *Silvas* v. *E\*Trade Mortg. Corp.*, 514 F.3d 1001,

21  1003 (9th Cir. 2008)); *see also Wake Up & Ball LLC* v. *Sony Music Ent. Inc.*, 119 F.

22  Supp. 3d 944, 954 (D. Ariz. 2015).

23

24

25

26

## A.   THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS

In evaluating specific jurisdiction, federal courts in Arizona look to the state's long-arm statute, which "provides for personal jurisdiction coextensive with the limits of federal due process." *See Warfield* v. *Gardner*, 346 F. Supp. 2d 1033, 1038 (D. Ariz. 2004) (citing Ariz. R. Civ. P. 4.2(a)). Due process requires only that: (1) the defendant purposefully directed activities toward or purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or relates to those forum-related activities, and (3) the exercise of jurisdiction is reasonable. *Yahoo! Inc.* v. *La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006) (en banc). Plaintiffs have the burden of establishing the first two prongs; defendants must then present a "compelling case" that the exercise of jurisdiction would be unreasonable. *Dole Food Co., Inc.* v. *Watts*, 303 F.3d 1104, 1108, 1114 (9th Cir. 2002). At the motion-to-dismiss stage, Plaintiffs need only make a *prima facie* showing of personal jurisdiction, and all allegations of fact must be accepted as true and read in the light most favorable to Plaintiffs.[4]   *Mavrix Photo, Inc.* v. *Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).

Plaintiffs have made the necessary *prima facie* showing: Defendants purposefully directed tortious conduct at Arizona and actually produced injuries there. Moreover, the contacts of in-state agents and co-conspirators may be imputed to all Defendants. Further,

---

[4] Defendants fault Plaintiffs for failing to plead the various theories under which this Court has personal jurisdiction over each Defendant in the FAC. But there is no such pleading requirement: The Federal Rules are clear that the "short and plain statement" requirement is for federal subject matter jurisdiction only, not personal jurisdiction. *See, e.g.*, *Stirling Homex Corp.* v. *Homasote Co.*, 437 F.2d 87, 88 (2d Cir. 1971); 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1067.6 (4th ed. 2020) ("[P]laintiffs are not required to plead the basis for personal jurisdiction over defendants.").

Defendants do not meaningfully contest that Plaintiffs satisfy the second requirement, in that their claims arise from Defendants' activities in Arizona—nor do they analyze the "reasonableness" factors of the third prong, which weigh in Plaintiffs' favor. Defendants' arguments against personal jurisdiction rely on their own mischaracterization of the pleadings—that the allegations merely "describe high-level policymaking activity and efforts to implement national policy." (Mtn. at 16 n.9.) At a minimum, this Court can and should allow jurisdictional discovery to assess Defendants' forum contacts.[5]

### 1.    Defendants Purposefully Directed Activities at Arizona

The Supreme Court and Ninth Circuit have long found "purposeful direction" supports personal jurisdiction where defendants "intended to, and did, cause tortious injury" to a plaintiff in the forum, even if defendants' actions were performed outside of it. *See Calder* v. *Jones*, 465 U.S. 783, 787 & n.6, 789 (1984); *see also Ibrahim* v. *Dep't of Homeland Sec.*, 538 F.3d 1250, 1258–59 (9th Cir. 2008) (jurisdiction proper over out-of-state federal official who issued orders intended to affect plaintiff's detention in forum). Here, Defendants intended to and did cause effects in Arizona. Moreover, Defendants' agents and co-conspirators purposefully directed their activities at Arizona.[6]

---

[5]   Plaintiffs expressly preserve, and do not waive, any arguments regarding general jurisdiction, should discovery show that any Defendant resides in Arizona. Defense counsel's assertion that it is not aware that any Defendant resides in Arizona is not evidence. (Mtn. at 14 n.7.) *See, e.g.*, *Sky Billiards, Inc.* v. *Loong Star Inc.*, No. EDCV 14-00921, 2014 WL 12601022, at \*4 (C.D. Cal. Sept. 4, 2014) (explaining that motion briefing cannot supply jurisdictional facts); *see also Leafty* v. *Aussie Sonoran Capital LLC*, No. CV-15-00655, 2017 WL 588717, at \*1 (D. Ariz. Feb. 14, 2017).

[6]   Defendants' agents and co-conspirators include John/Jane Doe Defendants, many of whom are line officers stationed in Arizona. Plaintiffs allege that Defendants have numerous contacts with Arizona. This Court can and should allow jurisdictional discovery regarding their contacts with and actions in the forum. *See Liberty Media Holdings, LLC* v. *Does 1-62*, No. 11-CV-575, 2012 WL 628309, at \*3 (S.D. Cal. Feb. 24, 2012) (finding it "premature" to dismiss action for lack of jurisdiction because all defendants had yet to be identified); *London-Sire Records, Inc.* v. *Doe 1*, 542 F. Supp. 2d 153, 180–81 (D. Mass. 2008) (denying Doe defendant's motion to quash for lack of personal jurisdiction because jurisdictional discovery might establish jurisdiction).

*First*, Defendants purposefully directed their activities at Arizona by planning, directing, and effecting Plaintiffs' tortious separations from their families and detentions in punitive conditions in Arizona. The effects of Defendants' wrongful actions were intentionally felt in Arizona: Defendants caused harm to Plaintiffs at numerous ports of entry along Arizona's border with Mexico. Defendants caused cruel and inhumane separations at CBP border stations in Nogales and San Luis, Arizona; at detention centers in Phoenix, Camp Verde, and Eloy, Arizona; and at facilities under contract with ORR including in Mesa, Arizona. (FAC ¶ 47.) Arizona was the focus of Defendants' actions in part because of its significance as an immigration gateway—its border with Mexico stretches 370 miles and accounts for a substantial portion of entries into the United States. (FAC ¶ 48.)

Defendants' primary argument—that Plaintiffs' allegations relate only to *Plaintiffs'* own contacts with the forum—is a smokescreen. Defendants point to *Walden* v. *Fiore* (Mtn. at 17), but that case explains only that plaintiffs' contacts with a forum are *on their own* inadequate to support jurisdiction. 571 U.S. 277, 279 (2014). Here, the identified and John/Jane Doe Defendants directed their activities toward Arizona:

- The "DHS Defendants," Nielsen, McAleenan, Homan, Cissna, and Provost, planned the Family Separation Pilot Program and/or helped draft the December 2017 Family Separation Memo, which described and paved the way for effecting widespread family separations along the southern border, including in Arizona. (FAC ¶¶ 136, 144). Homan, Cissna, McAleenan, and Nielsen ordered CBP and ICE to separate families in Arizona and other border states. (*Id*. ¶¶ 153–55, 167.)

- The "DOJ Defendants," Sessions and Hamilton, drafted memoranda and/or participated in discussions after the critical 2018 Family Separation Memo, and directed CBP and ICE to separate families in Arizona and other southern border

states in 2018. (*Id.* ¶¶ 154–56.)  Defendant Hamilton had also provided strategic comments on the 2017 Memo, setting the stage for those separations. (*Id.* ¶ 144.)

- The "HHS/ORR Defendants," Azar, Wynne, and Lloyd, participated in family separation planning meetings in early 2017 and 2018, and "rushed to license more Arizona facilities to house the growing number of tender age children" in their custody as a result of the family separation conspiracy that they had helped plan. (*Id.* ¶¶ 127–28, 203.)

- The "White House Defendants," Kelly and Miller, participated in meetings to plan family separations in 2017 and 2018 and directed John/Jane Doe DHS Defendants to separate families in four southern border states, including Arizona. (*Id.* ¶¶ 125–27, 154–55.)

- Multiple Defendants, including Sessions and Nielsen, traveled to Arizona in connection with these matters. Defendants' travel to Arizona was well covered in the press and cannot be disputed.[7]

The Ninth Circuit has found purposeful direction in cases with far less forum-directed conduct.  In *Ibrahim*, the Ninth Circuit held that specific jurisdiction was proper over a Virginia-based federal official whose sole contact with California was a telephone call in which he ordered the California police to detain the plaintiff at a San Francisco

---

[7] Publicly available sources indicate that Defendants traveled to Arizona in connection with Plaintiffs' claims, and that jurisdictional discovery will uncover additional forum contacts.  *See, e.g.*, CBS News, *Attorney General Jeff Sessions Speaks at U.S.-Mexico Border*, YOUTUBE (Apr. 11, 2017), https://youtu.be/NEN5u3HZHj4; Fox Business, *DHS Secretary Nielsen Visits the Yuma Border Patrol Station*, YOUTUBE (Apr. 4, 2019), https://youtu.be/5UqN0zlsQFM; Arizona Public Media, *CBP Commissioner Visit*, YOUTUBE (June 29, 2018), https://youtu.be/y--RrT3nV6Y.  The Court may take judicial notice of public news reports or permit jurisdictional discovery (or both).  *See, e.g.*, *Daniels-Hall* v. *Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (citing Fed. R. Evid. 201) (explaining that courts may consider facts subject to judicial notice on motions to dismiss).

airport.  538 F.3d at 1258–59.  In so holding, the Ninth Circuit found that purposeful direction was satisfied because the order was "performed with the purpose of having its consequences felt by someone" in California.  *Id.* at 1259 (quotation marks omitted).  This was so even though the official did not even place the call to California (the California police called him), and even though the official's job was to field such phone calls "from all parts of the country," not just California.  *See Ibrahim* v. *Dep't of Homeland Sec.*, No. C-06-00545, 2006 WL 2374645, at *9 (N.D. Cal. Aug. 16, 2006); *see also Soler* v. *Cty. of San Diego*, 762 F. App'x 383, 385–86 (9th Cir. 2019) (affirming jurisdiction over Arkansas officials who "coordinated . . . efforts" to issue a warrant for plaintiff's "arrest and detention in California," and "communicated with California officials on several occasions over the phone and email" in connection with the arrest and detention).  Defendants in this case engaged in far more extensive efforts to coordinate and facilitate the detention and separation of Plaintiff families.

By contrast, Defendants' cases are inapplicable here as they relate to either undifferentiated nationwide policies or officials acting in merely supervisory capacities.  *See, e.g.*, *Munns* v. *Clinton*, 822 F. Supp. 2d 1048, 1054, 1078 (E.D. Cal. 2011) (finding that a general policy that "America does not negotiate with terrorists" "would essentially subject the individual Defendants to personal liability in every state . . . regardless of how tenuous their actual contacts"); *Perez* v. *United States*, No. 13CV1417, 2014 WL 4385473, at *8 (S.D. Cal. Sept. 3, 2014) (finding no jurisdiction where "high-ranking officials . . . were responsible for failing to put a stop to" pattern of officer behavior responsible for plaintiff's death); *Yellowbear* v. *Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015) (finding a prison supervisor's "passive receipt" of letters and emails insufficient).

Indeed, Defendants cite only a single Ninth Circuit case on this point, *Oksner* v. *Blakey*, and that case does not counsel against personal jurisdiction here.  *Oksner* v. *Blakey*, No. C 07-2273, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007), *aff'd*, 347 F.

App'x 290 (9th Cir. 2009). In *Oksner*, commercial pilots sued officials in California district court for enforcing a nationwide Federal Aviation Administration rule setting age limits on pilots performing certain flight operations. 2007 WL 3238659, at *9. The court found jurisdiction lacking because "Plaintiffs' only factual allegations with respect to the individual Defendants [are] that they enforced the [rule] on a nationwide basis." *Id*. The Ninth Circuit affirmed. *Oksner*, 347 F. App'x at 292. But Defendants here did not merely enforce a generic nationwide rule; they planned and implemented a geographically targeted effort to separate and detain families.

Second, the FAC also alleges that Defendants' agents and co-conspirators intended to and did cause effects in Arizona, and this Court may impute those contacts to Defendants in assessing purposeful direction. The Ninth Circuit has held that an agency relationship between out-of-state defendants and in-state agents can establish jurisdiction over those defendants where they exercised sufficient "control" over their agents. *See, e.g.*, *Ochoa* v. *J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1189–92 (9th Cir. 2002); *Myers* v. *Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001). In *Ochoa*, specific jurisdiction over an out-of-state defendant was proper where that defendant issued instructions to an in-state agent and "expect[ed] that its instructions would be followed," demonstrating control. 287 F.3d at 1190. Indeed, no "formal" agency relationship is necessary to impute contacts to out-of-state defendants. *Williams* v. *Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1024–25 (9th Cir. 2017) (holding that "some standard of agency continues to be relevant to . . . specific jurisdiction," but not adhering to one in particular) (quotation marks omitted); *Biliack* v. *Paul Revere Life Ins. Co.*, 265 F. Supp. 3d 1003, 1009 (D. Ariz. 2017) (physician defendants contacted plaintiff's doctors in Arizona to influence them to deny plaintiff's disability claims); *Stadt* v. *Univ. of Rochester*, 921 F. Supp. 1023, 1026 (W.D.N.Y. 1996) (out-of-state government official subject to jurisdiction in individual capacity suit based on allegations that he directed in-state

1    subordinates to act in forum).  Here, Plaintiffs allege that Defendants drafted directions

2    and directly ordered CBP and ICE agents in Arizona to separate immigrant families (*see,

3    e.g.*, FAC ¶¶ 154–55, 167), thereby satisfying the "fundamental criterion" for agency:

4    control over in-state defendants.  *Ochoa*, 287 F.3d at 1190.  Accordingly, the agents'

5    actions in separating families may be attributed to out-of-state Defendants as the requisite

6    minimum contacts.

7          This Court can also impute the contacts of *co-conspirators* to out-of-state

8    Defendants under a conspiracy theory of jurisdiction, which several courts have recently

9    affirmed.  *See Kyko Glob., Inc.* v. *Prithvi Info. Sols. Ltd.*, No. 2:18-CV-01290, 2020 WL

10   1159439, at *31 (W.D. Pa. Mar. 10, 2020), *reconsid. den.*, 2020 WL 3654951 (W.D. Pa.

11   July 6, 2020) (exercising conspiracy jurisdiction over foreign co-conspirators by

12   "imputing the contacts of resident coconspirators to foreign coconspirators"); *see also*

13   *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 86–87 (2d Cir. 2018) (citing

14   *Unspam Techs., Inc.* v. *Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)); *Melea, Ltd.* v. *Jawer*

15   *SA*, 511 F.3d 1060, 1070 (10th Cir. 2007).[8]

16         To impute the contacts of co-conspirators to out-of-state conspirators, plaintiffs

17   must allege an actionable conspiracy and in-forum acts in furtherance of that conspiracy.

18   *Textor* v. *Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392–93 (7th Cir. 1983).

19   Plaintiffs here specifically alleged that out-of-state and in-state actors conspired to

20   separate Plaintiffs in violation of their civil and constitutional rights, and acted in

21

22   [8]   The Ninth Circuit has not yet adopted or rejected conspiracy jurisdiction, but in two
      cases has explicitly avoided the issue.  *Chirila* v. *Conforte*, 47 F. App'x, 838, 843 (9th
23    Cir. 2002) (avoiding ruling on conspiracy jurisdiction because plaintiff failed to
      adequately plead antecedent conspiracy claim); *Underwager* v. *Channel 9 Aust.*, 69
24    F.3d 361, 364 (9th Cir. 1995) (same).  In those cases, defendants' purported co-
      conspirators were their *sole* connections to the forum (*id.*); whereas, here, Plaintiffs
25    plead that Defendants themselves purposefully directed activities at Arizona directly.
      Conspiracy jurisdiction would merely serve to expand the relevant jurisdictional
26    contacts.

furtherance of that conspiracy by meeting to plan and provide directions to separate families in Arizona. (FAC ¶¶ 341–42.) Plaintiffs adequately pleaded that multiple Defendants actively participated in a conspiracy to plan and execute family separations in violation of Section 1985. (FAC ¶¶ 137, 154, 156, 197, 242, 339–44.) These contacts establish the purposeful direction of these co-conspirators, many of whom acted in Arizona, and can be imputed to Defendants.[9]

## 2. Plaintiffs' Claims Arise Out of Defendants' Actions in Arizona

Plaintiffs' claims also plainly "arise out of" Defendants' Arizona contacts. *See Panavision Int'l, L.P.* v. *Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998). The Ninth Circuit requires, at most, that defendants' forum contacts constitute a but-for cause of plaintiffs' injuries. Claims arising from collective action by multiple defendants regularly satisfy this causation requirement. *See*, *e.g.*, *BK Sterling, LLC* v. *Affinity Grp. Mgmt. Co., Inc.*, No. CV-15-00060, 2016 WL 10611187, at *9 (D. Ariz. Mar. 29, 2016) (although allegations did not "relate specifically to any [defendant]" and plaintiff "grouped [them] together," "arising out of" prong was satisfied); *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 744 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc.* v. *Learjet, Inc.*, 575 U.S. 373 (2015) (same, where defendants "worked together"). Moreover, the causal link is even stronger here because there is no need to unwind an intricate chain of causation to connect Defendants' out-of-state conduct with Plaintiffs' in-state injuries— Plaintiffs' injuries were caused directly by Defendants' tortious conduct directing that immigrant families be separated at the border.

---

[9] Outside the Ninth Circuit, the District of Massachusetts in *K.O.* v. *U.S. Immigr. & Customs Enf't* dismissed plaintiffs' conspiracy jurisdiction theory without analysis. 436 F. Supp. 3d 442, 451 & n.5 (D. Mass. 2020). But in that case, even the purported "agents" had tenuous contacts with the forum state, Massachusetts, limited to "phone calls" and "correspondence" with plaintiffs' relatives after separation. Here, Defendants' agents engaged in substantial acts in Arizona, including actually carrying out the separations and detentions that the high-ranking Defendants ordered.

### 3. The Court's Exercise of Jurisdiction Is Reasonable

Where, as here, plaintiffs satisfy the first two prongs of jurisdiction, the burden shifts to defendants to present a "compelling case" that the exercise of jurisdiction would be unreasonable. *Dole Food Co., Inc.*, 303 F.3d at 1108, 1114. This is a "heavy burden," and the Ninth Circuit has repeatedly concluded that even "strong argument[s]" that jurisdiction is unreasonable—which are not present here—are insufficient to defeat jurisdiction. *Id.* at 1117 (compiling cases).

Here, Defendants make no effort to address any of the seven reasonableness factors, the balance of which weigh in Plaintiffs' favor. *Ziegler* v. *Indian River Cty.*, 64 F.3d 470, 475–76 (9th Cir. 1995). In particular, Arizona has a "special interest in exercising jurisdiction over those who have committed tortious acts within the state." *Data Disc, Inc.* v. *Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1288 (9th Cir. 1977). This Court should have the opportunity to rectify and prevent inhumane, unconstitutional treatment occurring in Arizona. The extent of Defendants' purposeful interjection into the forum's affairs also favors jurisdiction, as Defendants intended to impact thousands of people within Arizona. *Freestream Aircraft (Berm.) Ltd.* v. *Aero Law Grp.*, 905 F.3d 597, 607 (9th Cir. 2018). Further, Defendants do not and cannot suggest an alternate forum where all Defendants, including John/Jane Doe Defendants acting in Arizona, would clearly be subject to jurisdiction, thus favoring Plaintiffs' forum choice. *BBK Tobacco & Foods LLP* v. *Juicy eJuice*, No. CV-13-00070, 2014 WL 1686842, at *8 (D. Ariz. Apr. 29, 2014) (mere suggestion of other fora "does not resolve the issue that the other defendants may not have citizenship or ties to those states").

### B.   PLAINTIFFS ADEQUATELY PLEAD *BIVENS* CLAIMS FOR VIOLATIONS OF THE FOURTH AND FIFTH AMENDMENTS

It is well established that suits against federal officials for damages can be an avenue for relief for violations of constitutional rights, through what are known as *Bivens* claims. *See generally Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *see also Davis* v. *Passman*, 442 U.S. 228 (1979); *Carlson* v. *Green*, 446 U.S. 14 (1980). *Bivens* is the appropriate vehicle for Plaintiffs here to hold Defendants accountable for the irreversible harms they have suffered. In assessing whether a *Bivens* remedy is available, courts first look to whether the case arises in a new context. *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1859 (2017). The types of Fourth and Fifth Amendment claims brought by Plaintiffs do not present a new context. And even if they did, a *Bivens* remedy is still available unless (1) an alternative remedy can adequately address plaintiffs' injuries and claims, and (2) other special factors counsel against providing the remedy. *Id.* at 1857. Here, no other remedy will adequately compensate Plaintiffs, and none of the other so-called "special factors" argued by Defendants counsels against applying *Bivens* here.

#### 1.   This Action Does Not Arise in a New Context

Plaintiffs' claims fall within the core of *Bivens*. 403 U.S. at 395; *see Abbasi*, 137 S. Ct. at 1856 (recognizing "continued force" and "necessity" of *Bivens* "in the search-and-seizure context in which it arose"). In order to arise in a "new context," a claim must be "meaningful[ly]" different from prior *Bivens* cases. *See Abbasi*, 137 S. Ct. at 1859. The Supreme Court has not defined precisely when this threshold is crossed. *Compare Hernandez* v. *Mesa*, 140 S. Ct. 735, 743–44 (2020) (declining to offer specific factors for new context analysis), *with Abbasi*, 137 S. Ct. at 1859–60 (suggesting factors to guide new context analysis). Rather, the touchstone of a "meaningful" difference is "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Hernandez*,

140 S. Ct. at 743–44. Significantly, *Abbasi* "does not require . . . perfect factual symmetry." *Brunoehler* v. *Tarwater*, 743 F. App'x 740, 744 (9th Cir. 2018); *Abbasi*, 137 S. Ct. at 1865 ("[T]rivial" differences "will not suffice."). All claims contain differences; not all differences are meaningful. *See Castellanos* v. *United States*, No. 3:18-cv-0428, 2020 WL 619336, at *6 (S.D. Cal. Feb. 10, 2020) (asking if case "*fundamentally* differ[s]" from prior *Bivens* cases) (emphasis in original); *Prado* v. *Perez*, No. 1:18-cv-9806, 2020 WL 1659848, at *10 (S.D.N.Y. Apr. 3, 2020) (declining to find new context in case involving arrest and search by ICE officer because constitutional right at stake was the same as in *Bivens*). Plaintiffs' claims do not arise in a new context; rather, they follow from precedent and preserve the separation of powers.

The constitutional rights at issue here—challenges under the Fourth and Fifth Amendments (FAC ¶¶ 282–338)—are the same rights that the *Bivens* remedy has vindicated since its inception.[10] *See Bivens*, 403 U.S. at 397; *Davis*, 442 U.S. at 245, 249; *Carlson*, 446 U.S. at 16. *Bivens* itself recognized a damages remedy for an unconstitutional search or seizure under the Fourth Amendment—a claim that Plaintiffs bring here. Following *Bivens*, numerous courts, including in the Ninth Circuit, have sustained damages actions under the Fourth Amendment. *See, e.g.*, *Brunoehler*, 743 F. App'x at 744 (permitting claim for warrantless search and seizure arising from purported securities violations); *Ioane* v. *Hodges*, 939 F.3d 945, 952 (9th Cir. 2018) (permitting claim against Internal Revenue Service ("IRS") agents who monitored plaintiff in her

---

[10] Although *Hernandez* counsels that "a claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," 140 S. Ct. at 743, plaintiff's claims there were premised on extraterritorial conduct—the shooting of a Mexican citizen on Mexican soil—that the Court found impinged on the Executive's foreign policy prerogatives. *Id*. In contrast to *Hernandez*, Plaintiffs' injuries occurred on United States soil. Therefore, because here the "risk of judicial intrusion" is low, any alleged differences in the constitutional right at issue are insufficiently "meaningful" to create a new context. *Id*.

bathroom); *Chavez* v. *United States*, 683 F.3d 1102, 1111–12 (9th Cir. 2012) (permitting claim against Border Patrol supervisor for unlawful traffic stops); *see also Prado*, 2020 WL 1659848, at *10 (whether claim arises under Fourth Amendment "weighs heavily" in court's finding that claim did not present new context).

Likewise, *Bivens* remedies have long been available under the Fifth Amendment. In *Davis,* the Supreme Court confirmed that a *Bivens* remedy was available for violations of the Fifth Amendment's guarantee of equal protection. 442 U.S. at 245, 249. *Davis* concerned gender discrimination, and the equal protection claim here is based on national origin discrimination, but that is not a "meaningful" difference. Then, in *Carlson*, the Court endorsed a *Bivens* remedy for deliberate indifference to the medical needs of a federal prisoner in violation of the Eighth Amendment. *See* 446 U.S. at 19–21. When non-prisoner detainees assert claims functionally equivalent to those in *Carlson*, as in this case, they are governed by the Fifth rather than Eighth Amendment, but a *Bivens* remedy is still available. *See Bistrian* v. *Levi*, 912 F.3d 79, 91 (3d Cir. 2018) (finding pretrial detainee's claim was not new *Bivens* context because "it is a given that the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts"); *Papa* v. *United States*, 281 F.3d 1004, 1010–11 (9th Cir. 2002) (finding detained immigrant's deliberate indifference claim arose under Fifth Amendment).[11]

---

[11] Many courts have concluded that excessive force claims, which are governed by an entirely different standard than deliberate indifference claims, do not require an extension of *Carlson*. *See, e.g.*, *McDaniels* v. *United States*, No. 14 Civ. 02594, 2018 WL 7501292, at *5 (C.D. Cal. Dec. 28, 2018), *rep. and rec. adopted*, No. 14 Civ. 02594, 2019 WL 1045132 (C.D. Cal. Mar. 5, 2019); *Pumphrey* v. *Coakley*, No. 15 Civ. 14430, 2018 WL 1359047, at *5 (S.D.W. Va. Mar. 16, 2018), *vacated on other grounds*, No. 15 Civ. 14430, 2019 WL 5390015 (S.D.W. Va. Oct. 21, 2019) (recognizing that *Carlson* governs excessive force claim); *Lineberry* v. *Johnson*, No. 17 Civ. 04124, 2018 WL 4232907, at *9 (S.D.W. Va. Aug. 10, 2018), *rep. and rec. adopted sub nom. Lineberry* v. *United States*, 2018 WL 4224458 (S.D.W. Va. Sept. 5, 2018).

1      Defendants suggest that the context of this action—immigration—renders it

2  unsusceptible to a *Bivens* challenge. (Mtn. at 21–22.) Not so. The Ninth Circuit

3  recognizes *Bivens* remedies in the immigration context. *See, e.g.*, *Lanuza* v. *Love*, 899

4  F.3d 1019, 1033–34 (9th Cir. 2018) (endorsing *Bivens* remedy against immigration

5  official for fraud in connection with removal proceedings); *Chavez*, 683 F.3d at 1111

6  (same, against CBP supervisor for unlawful traffic stops); *Papa*, 281 at 1010–11 (same,

7  against Immigration and Naturalization Service ("INS") officers for deliberate

8  indifference in connection with murder of immigrant detainee); *Guerra* v. *Sutton*, 783

9  F.2d 1371, 1375 (9th Cir. 1986) (same, against INS officials for warrantless search and

10 seizure conducted with local police officers). In *Abbasi*, the government specifically

11 argued that immigration made the case a new context and also was a "special factor"

12 counseling hesitation, Brief for Petitioners at 22–23, 29–30, 137 S. Ct. 1863, but the

13 Supreme Court declined to accept those arguments, 137 S. Ct. at 1159–60. There is no

14 "sound reason[]" to permit a convicted person to recover damages for deliberate

15 indifference, as in *Carlson*, yet deny a similar remedy to civil immigration detainees. *See*

16 *Abbasi*, 137 S. Ct. at 1858. If anything, immigration detainees should be entitled to more

17 protection than convicted persons because they may not be punished at all—neither

18 cruelly and unusually nor otherwise.

19      Defendants also argue that there is some new "statutory or other legal mandate"

20 under which Defendants operated that would defeat a *Bivens* claim. (Mtn. at 22–23.) But,

21 as in *Bivens*, Defendants here are not alleged to have been acting within the bounds of a

22 statutory or legal mandate. *Bivens*, 403 U.S. at 389. Likewise, in *Davis*, the defendant

23 engaged in gender-based employment discrimination that was outside the power

24 conferred by statute or other legal provision. *See* 442 U.S. at 245. And in *Carlson*, no

25 mandate provided defendants with the discretion to withhold treatment and exacerbate

26

1    the plaintiff's asthma attack.  *See* 446 U.S. at 16 n.1.  In each case, a *Bivens* remedy was

2    permitted.[12]

3         Defendants argue that "work[ing] for a variety of agencies" under different "legal

4    mandates" presents a new context.  (Mtn. at 22–23.)  *Bivens* claims have been endorsed

5    against officers working for all manner of agencies, spanning the Federal Bureau of

6    Investigation ("FBI"), the IRS, and the INS.  *See Brunoehler*, 743 F. App'x at 744; *Ioane*,

7    939 F.3d at 949; *Guerra*, 783 F.2d at 1375; *see also Prado*, 2020 WL 1659848, at *11

8    ("It cannot be that the character of the law enforcement officer, without more,

9    automatically converts a plaintiff's claim into a 'new context.'").  *Bivens* remedies have

10   also been permitted against high-level officials.  *See Davis*, 442 U.S. at 230; *Carlson*, 446

11   U.S. at 16; *Lanuza*, 899 F.3d at 1022–23, 1034 (permitting *Bivens* claims against

12   Assistant Chief Counsel of ICE); *Chavez*, 683 F.3d at 1111 (same, against Border Patrol

13   supervisor).

14        Defendants' remaining arguments do not distinguish this case from precedent.

15   Defendants claim that this case risks "significant and disruptive intrusion by the Judiciary

16   into the functioning of both Congress . . . and the Executive Branch" (Mtn. at 23), but

17   nothing about this damages action can be said to be disruptive given how egregious

18

19   ───────────────────

20   [12] Even if this Court were to find that some directive or plan that Defendants or their
     superiors created constituted a legal mandate, that does not support finding a new
21   context.  Where officers create legal mandates through their own misconduct, such
     mandates are akin to no legal mandate at all.  *See Brunoehler*, 743 F. App'x at 743
22   n.4.  In *Brunoehler*, defendant federal officers were alleged to have illegally obtained
     a search warrant.  *Id.* at 742 & n.1.  The Ninth Circuit explained that, even though the
23   defendants in *Brunoehler* acted pursuant to a "warrant," while the agents in *Bivens*
     did not, *Brunoehler* did not present a new context because neither case involved a
24   *valid* warrant.  *Id.*; *cf. Prado*, 2020 WL 1659848, at *10 (concluding that warrant that
     did not permit defendants' search and seizure activities was not legal mandate for
25   purposes of new context analysis).  Likewise, Defendants acted without a legal
     mandate in planning and directing family separations, in violation of Plaintiffs'
26   constitutional rights.

1   Defendants' actions were and that a court has already found the separations "brutal" and

2   unconstitutional. *Ms. L. Order Den. Mot. to Dismiss*, 302 F. Supp. 3d at 1167. Further,

3   a remedy is particularly noninvasive here where the public and the judiciary have caused

4   the Executive to end family separations, and the government itself sought to end the

5   practice through an Executive Order. (*See* FAC ¶ 219.) Defendants also claim that

6   judicial guidance on Plaintiffs' pleaded claims "is far less particular than the specific,

7   binding guidance available" in prior cases (Mtn. at 23), but this is contradicted by the

8   extensive case law detailed in Section III.C below. Finally, to the extent that Defendants

9   rely on the existence of novel special factors to argue that this case presents a new context,

10  those are addressed and rejected in Section III.B.2 below and are belied by the obvious

11  illegality of such shockingly cruel actions.

12
13
> **2.      Even if the Court Concludes That This Case Presents a New Context, "Special Factors" Do Not Counsel Against a *Bivens* Remedy**

14  Even if the Court concludes Plaintiffs' claims present a new context, no special

15  factors counsel in favor of withholding a *Bivens* remedy. *Bivens* embodies the principle

16  that wrongdoers who exercise government power should be accountable for rights

17  violations. *See, e.g.*, *Minneci* v. *Pollard*, 565 U.S. 118, 127 (2012) (recognizing role of

18  *Bivens* in providing redress to plaintiffs against employees of federal rather than private

19  prisons). The special factors analysis is performed at a high level of specificity, focusing

20  on the concrete facts of the case. *See, e.g.*, *Wilkie* v. *Robbins*, 551 U.S. 537, 555–62

21  (2007). Defendants ignore this instruction and instead focus on abstraction. But the

22  specific details here are important: Plaintiffs do not have access to adequate alternative

23  remedies that compensate them for their past injuries and hold individual governmental

24  wrongdoers accountable. Further, no separation-of-powers concerns are implicated

25  because Plaintiffs' claims do not challenge federal policy, have never been impugned by

26

1  Congress, do not implicate foreign policy or national security, and do not burden

2  prosecutorial discretion. Finally, Plaintiffs' claims are eminently workable.

3  (a) **Adequate Alternative Remedies Are Unavailable**

4  In the Ninth Circuit, the availability of alternative remedies can be a "special

5  factor" when choosing whether to afford a *Bivens* remedy. *Lanuza*, 899 F.3d at 1032.

6  Alternative remedies weigh against the application of *Bivens* only when they are

7  "adequate" to protect the constitutional interests at issue—*i.e.*, when they provide

8  incentives that deter unconstitutional conduct "while also providing roughly similar

9  compensation to victims of violations." *See Minneci*, 565 U.S. at 130. The *Bivens* remedy

10  protects plaintiffs' interest in holding to account federal officers who violate their

11  constitutional rights. Where alternative remedies protect other interests, those remedies

12  are inadequate—regardless of the quantity or magnitude of the relief. *See Lanuza*, 899

13  F.3d at 1032. Defendants offer several other claims that they suggest are viable

14  alternatives, but none are.

15  **FTCA claims.** Defendants argue that state substantive law, brought via Federal

16  Tort Claims Act ("FTCA") claims or state tort suits, provides adequate substitutes for

17  *Bivens* remedies "considered with other factors." (Mtn. at 26.) First, this position

18  conflicts with the United States' motion to dismiss—also filed by the Department of

19  Justice—in which it argues that this Court lacks subject matter jurisdiction over Plaintiffs'

20  FTCA claims. (U.S. Mtn. to Dismiss at 11, *A.I.I.L.* v. *Sessions*, No. 4:19-cv-00481-JCH

21  (D. Ariz. Nov. 23, 2020).) Remedies that the United States argues that this Court has no

22  jurisdiction to provide clearly cannot substitute for *Bivens* remedies. Further, the

23  Supreme Court itself has explicitly considered and rejected the contention that an FTCA

24  claim against the United States is an alternative remedy to a *Bivens* claim against an

25  individual. *Carlson*, 446 U.S. at 19–23. Defendants concede as much. (Mtn. at 26 n.15.)

26  Defendants cannot explain how the FTCA, alone or in tandem, displaces *Bivens* when it

is "crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Carlson*, 446 U.S., at 20; *see also K.O.* v. *U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350, 357 n.3 (D.D.C. 2020) ("A plaintiff may pursue *Bivens* claims against officials in their individual capacities alongside FTCA claims against the United States for common law tort violations."); *Prado*, 2020 WL 1659848, at *12, 14, 16 (allowing *Bivens* and FTCA claims arising out of ICE officer's search and seizure to proceed past motion to dismiss). Congress never sought to displace *Bivens* through the FTCA—twice within the past year the Supreme Court has confirmed this understanding of the FTCA, as amended in 1988 by the Westfall Act. *Hernandez*, 140 S. Ct. at 748 n.9 (acknowledging that the Westfall Act "permits" *Bivens* claims and that "[b]y enacting this provision, Congress made clear that it was not attempting to abrogate *Bivens*."); *Tanzin* v. *Tanvir*, __ S. Ct. __, 2020 WL 7250100, at *4 (Dec. 10, 2020) (noting that Westfall Act "left open claims for constitutional violations . . . ."); *see also Williams* v. *Baker*, No. 16 Civ. 1540, 2020 WL 5814109, at *7 (E.D. Cal. Sept. 14, 2020) (relying on *Hernandez* for proposition that "[t]he Westfall Act thus contemplates the continued application of *Bivens*."). Moreover, here the FTCA is a particularly unsuitable replacement. Because of Defendants' actions, many putative class members are currently back in the dangerous conditions from which they initially fled, with limited access to American lawyers, little or no access to American courts, and now with the added burden of trauma stemming from their separation and detention. In any event, Congress has made clear that the FTCA was not intended to displace *Bivens* remedies.

**State tort claims.** State tort claims, if available, may, in certain circumstances, serve as an adequate substitute for *Bivens* claims brought against non-governmental defendants. *See Corr. Servs. Corp.* v. *Malesko*, 534 U.S. 61, 73 (2001). But Congress has foreclosed state tort claims brought against federal employees. In 1988—after *Bivens*, *Davis*, and *Carlson* were decided—Congress passed the Westfall Act, which amended

the FTCA to immunize federal officers from state tort suits for acts taken in the scope of their employment. *Osborn* v. *Haley*, 549 U.S. 225, 229 (2007). Notably, the DOJ can represent Defendants in this case only *because* they acted within the scope of their federal employment. *See* 28 C.F.R. § 50.15(a) (stating that United States may represent federal employee who is sued for actions which appear to have been carried out within scope of employment). Thus, after the Westfall Act, Plaintiffs cannot bring their claims against federal officers under state law. Further, state tort law claims are not an effective substitute for a *Bivens* remedy. *See Minneci*, 565 U.S. at 126 (finding state law tort claims are not adequate alternative for *Bivens* claims brought against federal prison employees); *Bivens*, 403 U.S. at 392-95 (rejecting the argument that state tort claims are an adequate alternative to protect constitutional interests).

**Habeas petition, injunctive relief, and APA claims.** Defendants also argue that cases in which separated families were already granted some relief, such as in *Jacinto-Castanon de Nolasco* v. *U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 505 (D.D.C. 2018), *Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. at 1149–50, and *Ms. J.P.* v. *Barr*, No. 2:18-cv-6081, 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019), provide adequate alternative remedies. (Mtn. at 25–26.) They do not. Those cases seek injunctive relief, habeas corpus relief, and relief for violation of the Administrative Procedure Act ("APA"). Such remedies are inadequate to redress the constitutional violations Plaintiffs suffered. Injunctive and habeas remedies vindicate a plaintiff's interest in stopping current, ongoing rights violations. By contrast, *Bivens* claims seek to redress past wrongs. *Bistrian*, 912 F.3d at 92 (explaining that remedies that "give[] no retrospective relief" are "no[t] true alternative remedies"); *see Cuevas* v. *United States*, 2018 WL 1399910, at *4 (D. Colo. Mar. 19, 2018) (finding, where prison officials released plaintiff's information, injunctive relief was insufficient to "un-ring this particular bell," and that administrative remedies were insufficient where plaintiff might not recover damages); *see also Minneci,*

565 U.S. at 130 (explaining that, to be "adequate alternative," relief must provide "roughly similar compensation").   Habeas and injunctive relief are also not viable remedies for any of these constitutional violations, in particular those arising from the initial separations, which were effected without warning and therefore could not have been anticipated by Plaintiffs.  *See City of L.A.* v. *Lyons*, 461 U.S. 95, 105 (1983).

Defendants argue that *Abbasi* supports a finding that habeas is an adequate alternative.  (Mtn. at 25.) But *Abbasi* noted that the "scope or availability" of habeas was "not before the Court."  137 S. Ct. at 1863.  And in *Bistrian*, the court found that habeas relief would not address plaintiffs' harms arising from a prison yard attack that federal officers failed to prevent.  *Bistrian*, 912 F.3d at 84, 92.  Where, as in *Bistrian*, the harms to plaintiffs have already been sustained, habeas is "no true alternative remed[y] counseling against allowing a *Bivens* remedy."  *Id.* at 92.

Likewise, APA claims do not allow plaintiffs to seek money damages for past violations of constitutional rights.  Instead, they require courts to set aside agency action that is "arbitrary and capricious," and courts' review is confined to ensuring that agency action is kept "within the bounds of reasoned decisionmaking."  *Dep't of Commerce* v. *New York*, 139 S. Ct. 2551, 2569 (2019).  Defendants' reliance on *W. Radio Servs. Co.* v. *U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir.) (Mtn. at 24–25) thus is misplaced.  There, plaintiffs sought to reverse allegedly unconstitutional delays and inaction.  *W. Radio Servs.*, 578 F.3d at 1118.  Here, Plaintiffs seek a monetary remedy, and it is not clear that the constitutional violations alleged here constitute "final agency action[s]" for purposes of APA review.  *Id.* at 1122; 5 U.S.C. § 704.

**(b)      Plaintiffs' Claims Are Based on Defendants' Misconduct, Not Governmental Policymaking or Enforcement**

Citing *Abbasi*, Defendants contend that a *Bivens* remedy is unavailable because Plaintiffs are challenging a policy of separating families.  (Mtn. at 33.)[13]  Defendants' argument is incorrect.

*First*, on a motion to dismiss, the complaint's allegations control.  Plaintiffs do not allege that they are challenging a "policy" as opposed to egregious individual actions in violation of federal law and the Constitution.  *Abbasi* specifically contemplates *Bivens* actions for unconstitutionally harsh treatment that is not imposed as a matter of "official policy."   137 S. Ct. at 1853 (distinguishing between claims against warden and claims based on official policy).   Indeed, Defendants themselves have denied that there was a "policy" to separate families.[14]  Defendants have previously publicly stated that, to the extent that any policy is implicated, it is only the "Zero Tolerance" directive, which directed prosecutions for illegal entry; any family separations, Defendants claim, were incidental to those prosecutions.

Defendants' authorities to the contrary are neither on point nor binding.  *K.O.* rejected a *Bivens* remedy because the court found that plaintiffs challenged the government's promulgation of a "policy" of family separation.  *K.O.* v. *U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350, 365 (D.D.C. 2020).  But plaintiffs in *K.O.* pleaded

---

[13]   Defendants do not appear to argue that Plaintiffs' punitive unconstitutional conditions claims should be dismissed on the ground that they were part of a policy.

[14]   For example, Commander White stated that "during [his] entire tenure" at ORR, he "was advised [by various government officials] that there was no policy that resulted in the separations of children."  *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the H. Subcomm. on Oversight and Investigations*, 116th Cong. (2019) (statement of Cmdr. Jonathan White). Defendant Nielsen has also publicly disclaimed any family separation policy on numerous occasions.  (*See, e.g.*, FAC ¶ 218 ("We do not have a policy of separating families at the border.  Period.").)

no such thing. *K.O.* failed to take plaintiffs' allegations as true, as a court is required to do at the motion-to-dismiss stage, including plaintiffs' allegation that the individual conduct of defendants—not a policy—violated federal law. *Id.* at 365. Whatever the correct understanding of the pleadings in *K.O.*, Plaintiffs here do not challenge an immigration policy. *See, supra* pp. 1, 27. *Peña Arita* v. *United States* is inapplicable here for similar reasons. 470 F. Supp. 3d 663, 696–98 (S.D. Tex. 2020). In *Peña Arita*, plaintiffs pleaded their claims as a direct challenge to the Zero Tolerance directive to prosecute all individuals who committed the misdemeanor of unlawful entry or re-entry under 8 U.S.C. § 1325(a). *See id.* at 697 (quoting Pls.' Resp. in Opp. to U.S. Mtn. to Dismiss at 20, *Peña Arita* v. *United States*, 470 F. Supp. 3d 663 (S.D. Tex. 2020) ("Plaintiffs clearly complain of the impact of governmental policy as promulgated by the Executive Branch and seek relief from that policy in this Court.")). By contrast, Plaintiffs here do not challenge a policy of the Executive Branch—or CBP agents emboldened by such a policy. Instead, Plaintiffs contend that their injuries arose from Defendants' own "cruel[] and inhumane[]" practice of separating Plaintiff families and other Central Americans seeking asylum and other relief in the United States. (FAC ¶¶ 1–7.)

  *Second*, the conduct at issue here—whether deemed policy-related or not—is not the type of high-level executive policymaking and enforcement that Defendants argue is not subject to a *Bivens* remedy under *Abbasi*.[15] If Defendants mean to suggest that *Abbasi* forecloses any *Bivens* claim that is based in part on a policy, they are mistaken. At most, *Abbasi* suggests that the specific policy implications counseled hesitation, not that any

---

[15] A *Bivens* remedy is appropriate whether or not Defendants' misconduct constituted a policy. However, if the Court believes that resolving whether Defendants' misconduct constituted a policy is dispositive to the availability of a *Bivens* remedy, Plaintiffs are entitled to discovery on that point. *See Ignatiev* v. *United States*, 238 F.3d 464, 465 (D.C. Cir. 2001) (reversing dismissal of FTCA claims where lower court failed to allow discovery as to threshold question of "existence . . . of internal governmental policies").

person harmed by an unconstitutional policy is barred from seeking damages through a *Bivens* claim.   Further, *Abbasi* involved the extraordinary and unique national security crisis of September 11, a fact integral to the Court's opinion.   *Id.* at 1861 (stressing that policies were developed in time of "crisis" and emphasizing that "[a]llowing a damages suit in this context, or in a like context in other circumstances, would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch").   This case is far from that context and involves abhorrent practices denounced by a wide variety of people and groups, including religious leaders from many denominations and elected officials of differing political beliefs.   Moreover, the policy at issue in *Abbasi* was not one that the government had forsworn, but one it believed was critical to its future national security mission and the country's safety.   Thus, the Supreme Court found that an attack on the policy would intrude on the government's *ongoing* national security efforts.   *Id.* at 1860 (emphasizing that action at issue was "high-level executive policy created in the wake of a major terrorist attack on American soil").   By contrast, here the President issued an Executive Order in 2018 denouncing—and ending—family separations.

Of note is that the Court did not find that the *Abbasi* policy's *purpose* was to impose unconstitutionally harsh conditions.   *Cf. Ashcroft* v. *Iqbal*, 556 U.S. 662, 676–77 (2009) (explaining that purposeful discrimination "involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group" (citation omitted)).   By contrast, Plaintiffs have pleaded that—whether construed as a policy or not—Defendants' actions were devised for the *purpose* of harming and abusing Plaintiffs, not in spite of such treatment.   (*See* FAC ¶¶ 154, 217, 242–258.) That any purported "policy" here would have been created specifically to impose brutal conditions would set it apart from the policy in *Abbasi* and would put it squarely within the core of *Bivens*.

**(c)    Congress Did Not Intend to Bar a *Bivens* Remedy**

1

2        Absent any explicit declaration that Congress intended to bar a *Bivens* remedy,

3   there is no reason counseling against application of this remedy in this case. *See Bivens*,

4   403 U.S. at 397; *Davis*, 442 U.S. 246–47; *Carlson*, 446 U.S. at 19.  Defendants offer no

5   such declaration and instead point to unpersuasive and unrelated statutes, non-legislative

6   congressional action, and instances of congressional *inaction* in order to divine a

7   supposed intent to bar a *Bivens* remedy where there is none.

8        The statutes identified by Defendants do not demonstrate an intent to preclude

9   *Bivens* remedies for family separations.  (Mtn. at 26–29 (identifying Immigration and

10  Nationality Act, 8 U.S.C. § 1101 et seq. ("INA"), Homeland Security Act of 2002, Pub.

11  L. No. 107-296, 116 Stat. 2165 (2002) ("HSA"), William Wilberforce Trafficking

12  Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044

13  (2008), and 12 statutes addressing trafficking victims).)    All but two of the statutes

14  identified as purportedly speaking to immigration were enacted before Defendants began

15  separating parents and children at the border and are therefore of little relevance to

16  whether a *Bivens* remedy should be available here.[16]   *See Abbasi*, 137 S. Ct. at 1862

17  (analyzing congressional activity *after* allegedly unconstitutional conduct began).  The

18  only statutes enacted after family separations began are the Combating Human

19  Trafficking in Commercial Vehicles Act, Pub. L. No. 115-99, 131 Stat. 2242 (2018), and

20  the No Human Trafficking on Our Roads Act, Pub. L. No. 115-106, 131 Stat. 2265

21  (2018). (*See* Mtn. at 29 n.16.)  Both of these statutes exist to ensure appropriate care of

22  immigrant children and to promote family reunification, and cannot reasonably be

23  construed to endorse the forcible separation of parents from their own children, absent a

24

25  [16]   The INA was enacted in 1952, the HSA was enacted in 2002, and the TVPRA was
26  enacted in 2008.  The statutes addressing trafficking victims were enacted in 2000,
    2003, 2004, 2005, 2006, 2008, 2013, 2015, 2016, and 2018.

finding that the parent is dangerous or unfit. And while the INA was amended after family separations began, if anything, the statute "contemplate[s] that civil actions would be maintained against . . . federal immigration officers" for constitutional violations, and so it cannot be read as intended to preclude *Bivens* remedies. *See Lanuza*, 899 F.3d at 1031 (finding that INA did not counsel hesitation in affording *Bivens* remedy); *see also Prado*, 2020 WL 1659848, at *11 (same). In sum, none of these statutes bars damages remedies for unconstitutional family separations.

As for Defendants' reliance on congressional oversight, hearings, and proposed legislation (Mtn. at 29–31), none constitutes "explicit congressional declaration[s]" as required by *Bivens*, 403 U.S. at 397. For example, Defendants refer to four congressional hearings discussing family separations, but they do not explain how these hearings bar a *Bivens* remedy or are in tension with this action in any way. (*See* Mtn. at 29–31.) Defendants also rely on proposed legislation that was referred to committee in June 2018 but has had no further activity since then. (*See id.* (citing Keep Families Together Act, S. 3036, 115th Cong. (2018), and Protect Kids and Parents Act, S. 3091, 115th Cong. (2018)).) This proposed legislation cannot be sufficient to raise separation-of-powers concerns and foreclose a damages remedy.

Defendants conversely argue that congressional *inaction* precludes a *Bivens* remedy for family separations. But "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *Burns* v. *United States*, 501 U.S. 129, 136 (1991) (quoting *Ill. Dep't of Public Aid* v. *Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983)). There are many other explanations for Congress's silence, none of which is addressed by Defendants. Further, Defendants' argument is contrary to their own public statements. (Mtn. at 30–31.) Defendants have publicly conceded that they pursued family separations because Congress had *failed to take action* against family immigration and because "Congress has

failed to pass effective legislation that serves the national interest—that closes dangerous loopholes and fully funds a wall along our southern border." Press Release, Dep't of Justice, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), https://tinyurl.com/y96nsut6. (*See also* FAC ¶¶ 157–66.) Defendants argue—inconsistently—that Congress acted intensely enough in the immigration context to bar Plaintiffs' claims for damages, but also failed to act to such a degree that the Trump Administration was forced to act. Congress's silence in immigration legislation, including that relied on by Defendants, preserves the damages remedy available to Plaintiffs here. (*See* Mtn. at 28–30.)

Defendants rely on *Abbasi* to infer that congressional silence implies that Congress disfavors a *Bivens* remedy for unconstitutional family separations. (Mtn. at 30.) But in *Abbasi*, nearly 16 years of congressional silence had elapsed since September 11; by contrast, less than two years have passed since Defendants began separating families. *Compare Abbasi*, 137 S. Ct. at 1862, *with* FAC ¶ 8. Congressional interest was also considerably more "frequent and intense" in the aftermath of the September 11 attacks.

### (d)     National Security and Foreign Policy Concerns Do Not Weigh Against a *Bivens* Remedy Here

Defendants have failed to show that national security and foreign policy concerns counsel against a *Bivens* remedy. The "simple fact that this is an immigration case does not mean that issues of national security, diplomacy or foreign policy are necessarily implicated." *Lanuza*, 899 F.3d at 1027 n.4. As the Supreme Court cautioned in *Abbasi*, "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" 137 S. Ct. at 1862. There is no principled reason that the same would not be true for foreign policy concerns as well.

The immigration enforcement cases Defendants cite are far afield. Each implicates vastly different national security or foreign affairs concerns, such as fighting terrorism or

addressing foreign espionage.  *See, e.g.*, *Abbasi*, 137 S. Ct. at 1852; *Bank Markazi* v. *Peterson*, 136 S. Ct. 1310, 1317 (2016); *Mirmehdi* v. *United States*, 689 F.3d 975, 979 (2012); *Reno* v. *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 473 (1999); *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 581 (1952).  For example, in one of the few damages cases Defendants cite, *Doe* v. *Rumsfeld*, the defendants were accused of subjecting a government contractor to military detention *in Iraq*, where the government contractor was responsible for developing "intelligence through contacts with local Iraqis and to discover threats to the Marine unit."  683 F.3d 390, 392 (D.C. Cir. 2012).

The Supreme Court's recent decision in *Hernandez* does not support Defendants' contention that national security issues are presented in this case.  Indeed, *Hernandez* is inapposite as the harm occurred on foreign soil.  140 S. Ct. at 741.  Here, by contrast, Plaintiffs' claims are premised on mistreatment in the U.S., caused or facilitated by Defendants days or weeks after Plaintiffs crossed the border, while they were held in U.S. immigration detention, or across the country in various ORR facilities.  *Id.*

### (e)   The Claims Do Not Implicate Prosecutorial Discretion

Defendants mischaracterize the challenged conduct described in the FAC.  Plaintiffs challenge Defendants' conduct in separating parents and children, not their prosecutorial discretion.   (*See* FAC ¶¶ 282–338; *see also infra* Section III.E.)  Specifically, Plaintiffs do not challenge that some parents were separated from their children during the brief period when they were incarcerated for the misdemeanor of illegal entry, but rather challenge that their children were not returned to them after the parents' release, often for months.   Thus, because Plaintiffs' *Bivens* claims do not implicate prosecutorial discretion, they do not raise separation-of-powers concerns.  Further, as explained in the FAC and ignored by Defendants, certain of the parent Plaintiffs were separated from their children, but *not* prosecuted.  (*Id.* ¶¶ 73, 84.)

1

### (f)  A *Bivens* Remedy Is a Workable Cause of Action Here

2  Defendants do not convincingly argue that a *Bivens* remedy here would be

3  unworkable. A *Bivens* remedy here would not lead to a flood of similar *Bivens* claims,

4  would not unduly impact Defendants financially, and is not incompatible with the class

5  action vehicle. (Mtn. at 36–38.)

6  *First*, there is no basis to expect that a *Bivens* remedy here would open the litigation

7  floodgates. Suits under Section 1983—the state officer equivalent to *Bivens*—have been

8  permitted against high-ranking state officers for decades without any indication that a

9  deluge of cases requires curtailing the remedy. *See Scheuer* v. *Rhodes*, 416 U.S. 232,

10  249–50 (1974); *see also Guertin* v. *State*, 912 F.3d 907, 935 (6th Cir. 2019) (permitting

11  Section 1983 claims to proceed against state and city officials purportedly responsible for

12  water crisis in Flint, Michigan); *see also Davis*, 442 U.S. at 248 ("We do not perceive the

13  potential for such a deluge. By virtue of 42 U.S.C. § 1983, a damages remedy is already

14  available to redress injuries such as petitioner's when they occur under color of state

15  law."). *Second*, a remedy here would not expose Defendants to undue financial impact.

16  In fact, it is more likely that defendants found liable for *Bivens* claims would face

17  *insufficient* sanctions. Indemnification of federal officials almost guarantees that

18  Defendants will not face any dire financial consequences. *Third,* the class action vehicle

19  does not render the claims asserted here "unworkable." Defendants argue that class action

20  *Bivens* claims are unworkable because such claims must be brought against federal

21  officials for their "own individual actions." (Mtn. at 38 (citing *Iqbal*, 556 U.S. at 676).)

22  That Defendants' individual actions violated the constitutional rights of many families is

23  not a reason to decline to apply *Bivens*. Indeed, aggregating claims in a class action avoids

24  inefficient and duplicative serial lawsuits, alleviating Defendants' concerns that providing

25  a remedy here would open the litigation floodgates. (Mtn. at 36–37.)

26

## C.   QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS

Plaintiffs' claims are not barred by qualified immunity because the FAC pleads facts showing that: (1) Defendants violated constitutional rights, and (2) the rights were "clearly established." *Keates* v. *Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) ("If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." (internal quotation marks omitted)). A right is clearly established where "a reasonable official would understand that what he is doing violates that right." *Wilson* v. *Layne*, 526 U.S. 603, 614–15 (1999) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)); *Advanced Bldg. & Fabrication, Inc.* v. *Cal. Highway Patrol*, 918 F.3d 654, 660 (9th Cir. 2019) (affirming denial of qualified immunity where "contours" of plaintiffs' Fourth Amendment right were "sufficiently clear" (citation omitted)).

Defendants contend that there was an "absence of case law at the time of Plaintiffs' separation that would have put Defendants on notice of any clearly established right."[17] (Mtn. at 40.) But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002); *see also id.* (explaining that previous cases need not be "fundamentally similar" nor "materially similar" for officials to be on notice). Last term, the Supreme Court summarily rejected prison officials' qualified immunity defense even though no prior case had held that the precise prison conditions at issue violated the Eighth Amendment's prohibition on cruel and unusual punishment. *See Taylor* v. *Riojas*, No. 19-1261, 2020

---

[17] With regard to Plaintiffs' equal protection claims, no such case law is necessary. *Elliot-Park* v. *Manglona*, 592 F.3d 1003, 1008–09 (9th Cir. 2010) (holding that right to be free from discrimination is so well established that "all public officials must be charged with knowledge of it" (quoting *Flores* v. *Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980))); *see infra* at Section III.C.5.

WL 6385693, at *1 (Nov. 2, 2020). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.* (citing *Hope*, 536 U.S. at 741); *see also Maxwell* v. *Cty. of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013) ("[I]n an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." (quoting *Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004))). This is that "obvious" case. No official could have reasonably concluded that this egregious conduct, involving tearing babies, toddlers, and children away from their parents, was lawful. *Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1145–46 (finding separating families is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" (internal quotation marks omitted)).

In any event, the case law has long been settled with respect to Plaintiffs' Fourth and Fifth Amendment claims. Defendants merely mischaracterize the rights that they violated in an attempt to evade this long-settled law.

Before Defendants engaged in the misconduct at issue here, any reasonable official in their positions would have known that forcibly separating parents and children without cause, keeping them separated indefinitely, and detaining them in punitive conditions violates their constitutional rights.

### 1.    Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Family Integrity (Count I)

Plaintiffs' Fifth Amendment substantive due process interest in remaining together with their families was clearly established at the time of Defendants' misconduct.

The Supreme Court "has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ.* v. *LaFleur*, 414 U.S. 632, 639 (1974); *see also Moore* v. *City of E. Cleveland*, 431 U.S. 494, 503–04 (1977) (recognizing that the Constitution protects "the sanctity of the family"); *Hardwick* v. *Cty.*

*of Orange*, 844 F.3d 1112, 1116 (9th Cir. 2017) ("[T]he Supreme Court has recognized this fundamental right in many cases."); *Wallis* v. *Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) ("Parents and children have a well-elaborated constitutional right to live together without governmental interference." (citing *Santosky* v. *Kramer*, 455 U.S. 745, 753 (1982) and other Supreme Court precedent)).[18]

Indeed, courts around the country considering the family separations at issue in this case have repeatedly found that plaintiffs had a clearly established Fifth Amendment right to family integrity, relying on long-standing case law. *See, e.g.*, *Ms. L. Order Den. Mot. to Dismiss*, 302 F. Supp. 3d at 1161 ("[I]t has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association."); *id.* at 1164 ("[E]ach Plaintiff has demonstrated that the right to family integrity encompasses her particular situation."); *W.S.R.* v. *Sessions*, 318 F. Supp. 3d 1116, 1124 n.4 (N.D. Ill. 2018) (granting preliminary injunction in part because "claim for reunification is likely to succeed based on the substantive due process right to family integrity"); *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 499 (finding that *Troxel* v. *Granville*, 530 U.S. 57, 65–66 (2000), clearly establishes that "parents have a fundamental interest in family integrity"); *M.G.U.*, 325 F. Supp. 3d at 119 (same); *J.S.G. ex. rel. J.S.R.* v. *Sessions*, 330 F. Supp. 3d 731, 741–42 (D. Conn. 2018) (explaining that plaintiffs' right to family integrity is protected by the Constitution, and defendants violated that right by separating plaintiffs from their parents at border (citing *Bohn* v. *Cty.*

---

[18] It is well established that the Fifth Amendment's due process clause enshrines the same substantive due process rights as the Fourteenth Amendment's. *See Gonzales* v. *Carhart*, 550 U.S. 124, 156–58 (2007) (relying on Fourteenth Amendment substantive due process case law to resolve substantive due process claim against federal government); *M.G.U.* v. *Nielsen*, 325 F. Supp. 3d 111, 119 (D.D.C. 2018) (relying on cases interpreting Fourteenth Amendment Due Process Clause to find that right to family integrity is well-established fundamental right that clearly implicates protection of Fifth Amendment Due Process Clause).

1   *of Dakota*, 722 F.2d 1433, 1435 (8th Cir. 1985))). Thus, there can be no serious dispute

2   that Plaintiffs' right to family integrity was clearly established at the time Defendants

3   separated Plaintiffs.

4          Courts thus have consistently held that a violation of the clearly established right

5   to family integrity overcomes a defense of qualified immunity. For example, in *Keates*,

6   the Ninth Circuit reversed the lower court's dismissal on qualified immunity grounds

7   because the facts gave rise to a violation of the clearly established right to familial

8   association, where the defendants separated a child with no reasonable ground to fear for

9   her safety. 883 F.3d at 1240; *see also Anderson-Francois* v. *Cty. of Sonoma*, 415 F.

10  App'x 6, 9 (9th Cir. 2011) (holding that defendant was not entitled to qualified immunity

11  because he did not have reasonable cause to remove children from plaintiff's custody

12  without warrant); *Bhatti* v. *Cty. of Sacramento*, 281 F. App'x 764, 766 (9th Cir. 2008)

13  (reversing grant of summary judgment on qualified immunity grounds where defendant

14  removed child from home without warrant and absent imminent risk of serious harm).

15         Defendants argue that their conduct furthered the government's "legitimate

16  interest in prosecuting illegal entrants," and that "[a]ny associated interference with the

17  right to family integrity . . . was incidental to such enforcement" and highly "context-

18  dependent." (Mtn. at 42–44.) Defendants therefore argue that they could not have

19  violated due process by carrying out their jobs. (*Id.*) Defendants' argument is deeply

20  flawed.

21         *First*, Defendants ignore that many of the separations did *not* involve prosecutions

22  for illegal entry because the families sought asylum at a port of entry and did not cross

23  illegally. Yet parents still were wrongfully separated from their children.[19]  (*See, e.g.*,

---

19  *See supra* Section II; *see also C.M.* v. *United States*, No. 2:19-cv-5217, 2020 WL
    1698191, at *3 (D. Ariz. Mar. 30, 2020) ("The United States has cited to no statute
    explicitly authorizing the government to detain parents and children in separate
    facilities before it has charged either with a crime. Indeed, no such statute exists.").

FAC ¶¶ 79, 94, 113.)  In numerous cases, Defendants *knowingly* and forcibly separated vulnerable, lawful asylum seekers from their children, well aware that many had not violated any United States laws. (*See, e.g.*, *id.* ¶¶ 158–62, 169.)  Defendants thus cannot hide behind the facade of immigration enforcement to diminish the constitutional harm they inflicted on Plaintiffs' clearly established Fifth Amendment right to family integrity.

 *Second*, even in those cases where a parent was briefly detained for the misdemeanor of illegal entry, Defendants completely fail to address the fact that they unconstitutionally *continued* to keep families separated for many months with no basis for doing so after the parent was released from detention.  Thus, even in instances where an individual may have been validly arrested for improper entry, Defendants violated Plaintiffs' right to family integrity by continuing to keep those individuals separated from their families after the disposition of their cases, when there was no longer a valid law enforcement purpose for continued separation.  (*See id.* ¶ 163 (alleging that parents jailed for approximately 48 hours or less were separated from their children and not reunited even after parent was returned to ICE custody).)  *See also Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1137 ("And families that were separated due to entering the United States illegally between ports of entry have not been reunited following the parent's completion of criminal proceedings and return to immigration detention.").[20]

---

[20] Defendants cite *Ms. L. Order Den. Mot. to Enforce Prelim. Inj.*, 415 F. Supp. 3d at 988, which declined to enjoin defendants from separating a discrete number of parents due to the seriousness of the parents' prior criminal convictions.  (Mtn. at 11–12.)  As alleged here, and as the *Ms. L.* court found, the exclusion for those parents with criminal histories does not apply to the vast majority of families that were separated at the border.  415 F. Supp. 3d at 989, 994 n.9 (explaining that these exclusions would "impact relatively few").  Such exclusions offer no excuse for Defendants' egregious conduct inflicted upon thousands of families and no basis to grant broad qualified immunity at this stage of the proceedings.

1
2

## 2. Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Substantive Due Process Right to Receive Adequate Medical Care While in Custody (Count II)

3      Plaintiffs have a clearly established right to receive adequate health care while in

4 immigration custody, and Defendants violated this right by failing to provide mental

5 health and other care to severely traumatized parents and children.  *See Tatum* v. *Winslow*,

6 122 F. App'x 309, 312 (9th Cir. 2005) (affirming district court's denial of qualified

7 immunity because it was clearly established that officers could not "deny or delay access

8 to medical care"); *Ross* v. *Krueger*, No. 2:13-cv-0355, 2015 WL 1470534, at *13 (D.

9 Nev. Mar. 31, 2015) (denying summary judgment on qualified immunity where "all

10 [d]efendants would understand that denying [p]laintiff necessary medical care . . . would

11 violate these rights").   Defendants appear to concede that this right was clearly

12 established, and instead argue only that these claims should be brought solely against line

13 officers, not all Individual Defendants.  (*See* Mtn. at 45–46.)

14      Defendants ignore, however, that Plaintiffs' allegations show that *each* Defendant

15 directly caused or conspired to cause the denial of appropriate health care. For example,

16 the FAC explains that the "DHS Defendants and HHS/ORR Defendants failed to prepare

17 or warn those who would be responsible for the care of separated children that a

18 substantial number of young, traumatized children would be entering ORR custody.  As

19 a result, ORR facilities and foster families failed to provide necessary medical, mental

20 health, and other services to separated children, exacerbating their trauma."  (FAC ¶ 187;

21 *see also id.* ¶ 189.)  The FAC further alleges that in response to Commander White

22 expressing concerns that separating families would cause children severe trauma,

23 Defendants Lloyd and Wynne told Commander White that they need not plan for

24 increased numbers of separated children.  (*Id.* ¶ 138.) Defendant Lloyd later admitted in

25 congressional testimony that he was fully aware of the severe mental health consequences

26 that would result from Defendants' actions.  (*Id.* ¶ 208.)  And as the FAC repeatedly

alleges, the HHS/ORR Defendants failed to "adequately warn shelters about the separations and failed to adopt policies or practices, or provide training, to ensure that separated children would be properly treated." (*See, e.g.*, *id.*) Each of DHS Defendants' and HHS/ORR Defendants' failures, Plaintiffs allege, "intensified the damage that children experienced from the separation from their parents." (*Id.* ¶ 213.) Each Individual Defendant, separately and as part of a conspiracy (*id.* ¶¶ 154, 341–42), directly deprived Plaintiffs of their constitutional rights.

### 3. Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Be Free From Punitive Treatment Without Due Process (Count III)

Plaintiffs have a clearly established right to be free from punitive treatment, which Defendants violated by, among other things, forcibly separating and then delaying reunification of families, failing to provide meaningful information to parents and children regarding each other's locations and well-being, and subjecting Plaintiffs to abusive conditions. (FAC ¶ 307.) *See Demery* v. *Arpaio*, 378 F.3d 1020, 1029, 1033 (9th Cir. 2004) (affirming district court's grant of preliminary injunction because placing webcams in pretrial detention center violates "substantive due process rights of pretrial detainees by subjecting them to punishment"); *Davison* v. *Carona*, No. 8:06-cv-1258, 2010 WL 4345752, at *13 (C.D. Cal. Sept. 29, 2010) (finding clearly established law supported punitive conditions of confinement claim for non-criminal detainee denied "warm bedding in a cold cell or clean and dry bedding after a cell was flooded with rainwater and urine").

Indeed, this year, a court in this District found that the conditions of CBP holding cells were likely unconstitutionally punitive. *See Unknown Parties* v. *Nielsen*, No. 4:15-cv-00250, 2020 WL 813774, at *1 (D. Ariz. Feb. 19, 2020). Explaining that the individuals in CBP custody "cannot be punished because they have not yet been convicted," *id.* at *2 (quoting *Lynch* v. *Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984)),

the court stated that "Plaintiffs are protected under the Fifth Amendment from being held without due process of law under conditions that amount to punishment." *Id.* (citing *Wong Wing* v. *United States*, 163 U.S. 228, 237 (1896)). Specifically, the court found that the plaintiffs were likely to prevail on their claims with respect to the same punitive conditions Plaintiffs faced in this case: overcrowding, cold temperatures, unsanitary cells, lack of adequate personal hygiene materials, and insufficient food and water. *Compare id.* at *5, *with* FAC ¶¶ 63, 67, 69, 80, 95, 105.

Defendants do not—and cannot—deny that Plaintiffs' right to be free from punitive treatment without due process was clearly established. And contrary to Defendants' assertions, these claims need not "be brought against the line-level officers and/or custodians who allegedly committed the particular infractions." (Mtn. at 46 (citing *Iqbal*, 556 U.S. at 676).) As discussed above, the allegations here show that *each* Individual Defendant, separately and as part of a conspiracy, directed the harms alleged. *See supra* Section III.A.1. In addition, Plaintiffs allege that "DHS Defendants intentionally withheld" information from Plaintiffs as to where they would be going and when they would be able to see their parents or children again, and "HHS/ORR Defendants instructed those within their chain of command to withhold this information." (FAC ¶ 172.) Plaintiffs also allege that the DHS and HHS/ORR Defendants failed to develop a process in which families could communicate with one another, exacerbating the punitive conditions. (*See id.* ¶ 175.) Thus, Plaintiffs allege, "[b]y separating parents and children, keeping families apart, and restricting (and even eliminating) their communication during the period of separation, the White House, DHS, and HHS/ORR Defendants deliberately imposed, and were deliberately indifferent to, punitive conditions of confinement on Plaintiffs and Class Members." (*Id.* ¶ 170.) And in any event, Plaintiffs *are* asserting such claims against the John/Jane Doe Defendants here.

1
2

**4.    Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Procedural Due Process (Count IV)**

3
4
5
6
7
8
9
10
11
12
13
14
15

Plaintiffs have a clearly established right to notice and a hearing when the government removes a child from a parent and continues to keep them separated indefinitely. *See, e.g.*, *Ram* v. *Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997) (explaining that "[p]reexisting law clearly required [officials] to provide [the father] with notice and a hearing before they interfered with his custodial rights"); *see also Santosky*, 455 U.S. at 770 (requiring hearing under constitutionally proper standards before terminating parental rights). Defendants argue that class members, many of whom were never arrested for illegal entry, had no such procedural due process right. But they fail to explain why there was no such right in the face of such clearly established law, particularly for those parents who were never arrested for illegal entry or for those who were kept separated from their children well after the disposition of their criminal cases. *See Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1145 ("Ms. C. completed her criminal sentence in 25 days, but it took nearly eight months to be reunited with her son.").

16
17
18
19
20
21
22
23
24
25

Defendants also argue that even if Plaintiffs had a procedural due process right, it "only requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" (Mtn. at 48 (quoting *Mathews* v. *Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted)).) But there was *no process* at all before or even after the separations. There was no notice before families were separated. (*See, e.g.*, FAC ¶¶ 2–7.) There was no hearing to determine the fitness of the parent—neither before nor after separation. Far from satisfying the factors set out in *Mathews*, Defendants did not provide *any* opportunity to be heard, let alone an opportunity at a meaningful time or in a meaningful manner. *See* 424 U.S. at 335 (setting forth three-factor test governing constitutional sufficiency of procedures).

26

1  Defendants cite a wholly irrelevant report about releasing unaccompanied children

2 to parents, not children who came with their parents and were ripped away from them.

3 (Mtn. at 48.)[21]  Decades of case law, however, demands far more comprehensive

4 procedures *before* the devastating step of taking a child away from her parent. *See Ram*,

5 118 F.3d at 1310 (holding that "it was clear that a parent had a constitutionally protected

6 right to the care and custody of his children and that he could not be summarily deprived

7 of that custody without notice and a hearing, except when the children were in imminent

8 danger"); *Wallis*, 202 F.3d at 1138, 1141 (same); *Robinson* v. *Tripler Army Med. Ctr.*,

9 No. 05-17011, 2009 WL 688922, at *4 (9th Cir. Mar. 17, 2009) (same).

10  In any event, Defendants' conduct prevented agencies from communicating with

11 one another or keeping track of where parents or children were being detained, making

12 meaningless any alleged process found in ORR guidelines.  Indeed, ongoing efforts to

13 reunify families face obstacles to this day because of the agencies' disorganization and

14 poor record-keeping.  (FAC ¶¶ 175, 231, 232.) Status Report at 10, *Ms. L.* v. *U.S. Immigr.*

15 *& Customs Enf't*, No. 18-cv-00428 (S.D. Cal. Dec. 2, 2020), ECF. No. 560 (indicating

16 that, as late as December 2020, the federal government was still releasing phone numbers

17 for separated family members that it had not previously disclosed).  While they were

18 separated, parents could not communicate with the ORR facilities that held their children.

19 They often did not know where in the country their children were held, let alone in which

20 facilities.   (FAC ¶¶ 65, 99, 165, 176.)  As a result, Plaintiffs had no meaningful

21 opportunity to utilize ORR's processes.  As the *Ms. L.* court pointedly stated: "Placing

22

23

---

24 [21] *See Children Entering the United States Unaccompanied: Section 2, Safe and Timely*
    *Release from ORR*, U.S. Dep't of Health & Human Servs. (Jan. 30, 2015),
25 https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-
    unaccompanied-section-2#2.2;  *see also* Order Following Status Conference at 2,
26 *Ms. L.* v. *U.S. Immigr. & Customs Enf't*, No. 18-cv-0428 (S.D. Cal. July 10, 2020),
    ECF No. 101.

the burden on the parents to find and request reunification with their children under the circumstances presented here is backwards." *Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp.3d at 1145. Defendants thus cannot point to any meaningful notice or opportunity to be heard.

Defendants callously suggest they could not have violated Plaintiffs' procedural due process right because "all families identified in the FAC were reunited before this case was filed." (Mtn. at 48.) But the fact that Defendants were forced to reunite families by a federal court injunction months later—and only with the assistance of non-governmental third parties—does not absolve Defendants of the damage they inflicted by infringing on Plaintiffs' procedural due process right in the first instance.

### 5.     Defendants Violated Plaintiffs' Clearly Established Fifth Amendment Right to Equal Protection (Count V)

Defendants also violated Plaintiffs' clearly established Fifth Amendment right to equal protection. Defendants first argue that Plaintiffs have not identified a suspect classification or fundamental right because all families intercepted at the southern border were separated. But Plaintiffs specifically allege that Defendants intentionally and disparately targeted Central American families for separation. (FAC ¶¶ 322–28.) This conduct constitutes discrimination based on national origin, which is subject to strict scrutiny. *See City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Plaintiffs need not show that discriminatory animus is the sole motivating factor behind Defendants' actions in order to sustain their equal protection claim. *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Arce* v. *Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).

In these circumstances, the discrimination was not tailored to achieve any legitimate—let alone compelling—governmental purpose, and it violated clearly established law. "[T]he constitutional right to be free from such invidious discrimination

1    is so well established and so essential to the preservation of our constitutional order that

2    all public officials must be charged with knowledge of it." *Flores* v. *Pierce*, 617 F.2d

3    1386, 1392 (9th Cir. 1980) (citing *Cooper* v. *Aaron*, 358 U.S. 1 (1958)). "[B]ecause the

4    non-discrimination principle is so clear," it may be found to be clearly established even

5    where there is no "prior case with identical, or even materially similar, facts." *Elliot-*

6    *Park*, 592 F.3d at 1008; *see also Hernandez* v. *Cate*, 918 F. Supp. 2d 987, 1020 (C.D.

7    Cal. 2013) (holding that *Johnson* v. *California*, 543 U.S. 499 (2005), clearly established

8    that differential treatment based on national origin violated law, even in prison context).

9        Not only is the right to be free from discrimination based on national origin clearly

10   established, but Defendants intentionally violated that right. To survive a dispositive

11   motion, a facially neutral action must only be plausibly motivated by discriminatory

12   reasons, taking into consideration its actual disparate impact, background, and the

13   defendants' departure from normal procedures or substantive conclusions. *Ave. 6E Invs.,*

14   *LLC* v. *City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (citing *Vill. of Arlington*

15   *Heights*, 429 U.S. at 266–68). Here, Central Americans "were overwhelmingly affected

16   by Defendants' unlawful conduct: more than 95 percent of the separated families

17   identified as *Ms. L.* class members are from Central America." (FAC ¶¶ 166,

18   242.) Moreover, the Trump Administration and Defendants themselves expressed

19   hostility toward Central Americans and an intent to punish Central American families at

20   the southern border. (*Id.* ¶¶ 130, 146, 171, 242–58.) Finally, Defendants departed from

21   normal, transparent decision-making processes (*id.* ¶¶ 130, 134–35, 203, 208, 218–19),

22   ignoring expert warnings as to the unprecedented and dangerous nature of family

23   separations (*id.* ¶¶ 128, 132–33, 142, 149, 154, 156, 179, 195, 212–16).

24       Taking these factors together, as the Court is required to here, Defendants'

25   alternative explanations for family separations ring hollow. (*See* Mtn. at 48–49.) A

26   plaintiff's complaint may be dismissed only when a defendant's plausible alternative

1    explanation is "so convincing that plaintiff's explanation is *im*plausible." *Starr* v. *Baca*,

2    652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original).  Here, Plaintiffs allege that

3    Defendants explicitly sought to target Central Americans already detained in southern

4    border states for punitive, disparate treatment.  (FAC ¶¶ 130, 217.)  Given that many of

5    the FAC's allegations of discriminatory purpose recite Defendants' own hateful words

6    and actions, Plaintiffs' explanations for Defendants' conduct are far from "implausible."

7    *Cf. Iqbal*, 556 U.S. at 662 (accepting alternative explanation absent adequate allegation

8    that discrimination was defendants' express purpose).

9           Because Defendants cannot dispute that Plaintiffs' equal protection claims stem

10   from violations of clearly established law, they pivot to arguing that a heightened standard

11   of review does not apply here because "[d]istinctions on the basis of nationality may be

12   drawn in the immigration field by Congress or the Executive."   (Mtn. at 49 (citation

13   omitted).)  Not so.  Defendants' cited authorities relate to the federal government's power

14   to exclude noncitizens; however, as far back as 1896, the Supreme Court recognized in

15   *Wong Wing* v. *United States* that "[i]t does not follow that, because the government may

16   expel aliens or exclude them from coming to this country, it can confine them at hard

17   labor in a penitentiary before deportment, or subject them to any harsh and cruel

18   punishment."  163 U.S. 228, 241 (1896).  Defendants cite *Jean* v. *Nelson*, 727 F.2d 957,

19   963 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985), but there, the Eleventh Circuit drew a

20   distinction between differential treatment and conditions during detention, as opposed to

21   decisions relating to admission or parole.[22]  The discriminatory separation of immigrant

22

23   _____

24   [22]  *Cf. Trump* v. *Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (concerning entry into United
     States); *Narenji* v. *Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (concerning reporting

25   requirement for immigrant students from particular countries, potentially resulting in
     deportation); *Rajah* v. *Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (concerning

26   registration requirement for young, male immigrants from certain countries,
     potentially resulting in deportation).

families in detention is distinct from any executive decision as to charging, parole, admission, or deportation, and instead relates to temporary confinement while *awaiting* those decisions.

Defendants claim that *Dep't of Homeland Sec.* v. *Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (plurality by Roberts, C.J.), demonstrates that Defendants did not act with animus. (Mtn. at 65–66.) There, the Court ruled that the Trump Administration's rescission of the Deferred Action for Childhood Arrivals ("DACA") program was unlawful under the APA. But a plurality of the Court went on to reason—despite it being unnecessary to the judgment—that the plaintiffs failed to adequately plead that the decision to rescind DACA violated the equal protection clause. *Id*. at 1915. Even if it were binding, that reasoning does not apply here. Plaintiffs do not challenge a single act rescinding a "cross-cutting" immigration relief program that applied to all countries, races, and ethnicities. *Id*. Rather, Plaintiffs contend that Defendants intentionally and disparately targeted Central American families for separation in Arizona and elsewhere along the southern border, and therefore challenge a collective pattern of actions. (FAC ¶¶ 320–28; *see supra* p. 45.) Unlike in *Regents*, Defendants here intentionally focused their unlawful efforts on southern border states, intending to target Central American immigrants entering from Mexico and they planned and implemented their unlawful conduct outside of normal agency procedures without any consideration of their lawfulness. (FAC ¶¶ 125, 130, 142–46, 148, 154, 171, 217, 241–58; *see supra* pp. 10–11.) In fact, Defendants separated families at the southern border after holding meetings that purposefully excluded experts who would have alerted Defendants to the unlawfulness of their plans. (FAC ¶¶ 154, 156.) Finally, unlike in *Regents*, 140 S. Ct. at 1915–16, Plaintiffs plead multiple, contemporaneous disparaging statements by Defendants, many of which Defendants made while actually planning or carrying out the family separations at issue in this case. (*See* FAC ¶¶ 79, 253.)

1    Even if this Court were to find that heightened scrutiny was not warranted, there

2    is still no rational relationship between Defendants' disparate treatment and any purported

3    legitimate government interest.  Defendants identify no legitimate governmental interest

4    in ripping children from their parents' arms, detaining them separately in inhumane

5    conditions for indefinite periods, or in taking these actions disproportionately against

6    Central American immigrants at the southern border, but not asylum seekers elsewhere.[23]

7

8

### 6.    Defendants Violated Plaintiffs' Clearly Established Fourth Amendment Right Against Unreasonable Seizures (Count VI)

9    Defendants violated Plaintiffs' clearly established Fourth Amendment right by

10   separating parents and children without reasonable cause (*e.g.*, where they were not

11   arrested or charged with a crime) and also by continuing to keep them apart (seized)

12   without reasonable cause (*e.g.*, even after the disposition of any criminal case).  (FAC

13   ¶¶ 332–38.)[24]  Plaintiffs have a clearly established Fourth Amendment right to be free

14   from "unreasonable seizures" absent reasonable cause to believe the children seized from

15   their parents are in imminent danger.  *See Keates*, 883 F.3d at 1236; *see also Kirkpatrick*

16   v. *Cty. of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016) (acknowledging that social worker's

17

---

18   [23]  *See, e.g.*, *Ariz. Dream Act Coalition* v. *Brewer*, 757 F.3d 1053, 1058, 1067 (9th Cir.

19   2014) (preliminarily enjoining defendants' policy of preventing DACA recipients
     from obtaining driver's licenses, which had no rational basis and thus likely violated

20   Equal Protection Clause); *U.S. Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 534, 538
     (1973) (finding violation where purpose of classification was merely to "harm a

21   politically unpopular group"); *see also Bunyan* v. *Camacho*, 770 F.2d 773, 776 (9th
     Cir. 1985) (striking down statute where "the statute's distinction between different

22   classes of resident civil servants with college degrees [was] not rationally related to
     the asserted goal of rewarding, encouraging and compensating persons for the alleged

23   sacrifices").

24   [24]  Though Defendants suggest that Fourth Amendment protections do not apply to
     Plaintiffs because that Amendment was "tailored explicitly for the criminal justice

25   system" (Mtn. at 52), the Ninth Circuit applies the Fourth Amendment to civil
     proceedings, including with respect to immigration detention. *See, e.g.*, *Melendres* v.

26   *Arpaio*, 695 F.3d 990, 1000–01 (9th Cir. 2012).

removal of child from parental custody implicated Fourth Amendment). Where a seizure has occurred, the relevant question is whether that seizure was unreasonable. *See Terry* v. *Ohio*, 392 U.S. 1, 9 (1968).

Here, Plaintiffs allege that Defendants ordered children to be torn away from their parents—sometimes literally. (*See* FAC ¶ 64 ("The guards took Jaime and tore Mateo from Ana's arms as he tried to cling to her."); *id.* ¶ 106 (describing Jairo's horror as he watched CBP officers violently tear crying child from his mother's arms, while repeatedly striking mother).) Plaintiffs also allege that Defendants continued to keep children separated from their parents for months, even though parents were either not in criminal custody or had been in criminal custody for only short periods of time. (*See id.* ¶¶ 97– 100 (explaining that Defendants kept Jorge separated from his eight-year-old daughter for two months); *id.* ¶¶ 85–91 (alleging that, after being separated, Lorena was detained for another three months before ICE officers tricked her into consenting to her own removal, which then led to 16-month separation).)

In the face of these well-pleaded allegations, Defendants argue that Plaintiffs do not allege "any seizure in a constitutionally recognized sense," and that "[a]fter [their] initial apprehension . . . any constitutional challenge to government custody might arguably implicate the Fifth Amendment . . . , but not the Fourth Amendment." (Mtn. at 53.) Defendants are wrong. *Keates*, 883 F.3d at 1236 ("[W]e evaluate the claims of children who are taken into state custody under the Fourth Amendment right to be free from unreasonable seizures." (citation omitted)); *see also id.* (finding Fourth Amendment violation when government seized child from parents without exigent circumstances); *Kirkpatrick*, 843 F.3d at 792 (same).

Taking Plaintiffs' allegations as true at the motion-to-dismiss stage, Defendants had no reasonable cause to believe that the parents posed any danger to their own children, whom they brought to the United States specifically to seek safety and refuge. In fact, "[i]n

some cases, Defendants offered no reason or justification for the separation[s]." (FAC ¶ 158; *see also id.* ¶ 159 ("At other times, when a family presented themselves legally at a port of entry to apply for asylum, Defendants would claim that they were unsure that the adult traveling with the child was truly the parent and then separate the child, without taking any steps to verify parentage.").)

Moreover, as Defendants acknowledge, a Fourth Amendment violation can continue through many phases of detention, not just during an initial apprehension. (*See* Mtn. at 53 (citing *Robins* v. *Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985) (finding that seizure continues "throughout the time the arrestee is in the custody of the arresting officers")); *see also Manuel* v. *City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017) (stating that detainee's "ensuing pretrial detention, no less than his original arrest, violated his Fourth Amendment rights").)

Further, Defendants had no reasonable cause to continue the seizures by keeping families apart for extended periods after their initial separations. "Some families remained forcibly separated for many months or even a year or more," even though many of the parents were not in criminal custody or were in criminal custody only for brief periods. (*See* FAC ¶¶ 164–65.) Any reasonable officer should have known that forcibly removing children from their parents without reasonable cause and then keeping the parents and children from each other for extended periods of time violated their Fourth Amendment rights. *See Ms. L. Order Granting Prelim. Inj.*, 310 F. Supp. 3d at 1145–46 ("A practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' interferes with rights 'implicit in the concept of ordered liberty,' and is so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." (citations omitted) (internal quotation marks omitted)); *see also C.M.*, 2020 WL 1698191, at *4

1  (quoting *Ms. L. Order Granting Prelim. Inj.* and denying government's motion to dismiss

2  plaintiffs' FTCA claims based on constitutional rights violations).

3
### D.   PLAINTIFFS' SECTION 1985 & 1986 CLAIMS SHOULD NOT BE DISMISSED
4

5  Defendants appear to make two arguments in support of their motion to dismiss

6  Plaintiffs' claims under 42 U.S.C. §§ 1985(3) and 1986. (*See* Mtn. at 57–59.) *First*,

7  Defendants argue that Plaintiffs have failed to plead facts sufficient to set forth a claim

8  on which relief can be granted. *Second*, they argue that the Conspiracy Defendants (FAC

9  ¶ 154) are entitled to qualified immunity. Each argument should be rejected.

10
### 1.   Plaintiffs Adequately Plead Facts Supporting Each Element of Their Statutory Claims
11

12  Defendants' motion to dismiss for failure to allege facts sufficient to state a claim

13  should be denied. To sustain a claim under Section 1985(3), Plaintiffs must plead:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; and (3) an
> act in furtherance of the conspiracy; (4) whereby a person is either
> injured in his person or property or deprived of any right or privilege
> of a citizen of the United States.

18  *United Bhd. of Carpenters & Joiners of Am. Local 610* v. *Scott*, 463 U.S. 825, 828–29

19  (1983); *Fazaga* v. *Fed. Bureau of Investigation*, 916 F.3d 1202, 1245 (9th Cir. 2019).

20  The FAC alleges all four of the required elements. On the first two elements,

21  Plaintiffs allege that the Conspiracy Defendants conspired among themselves, and

22  possibly with others, and that they did so to deprive Plaintiffs and other putative class

23  members of their Fourth and Fifth Amendment rights. Plaintiffs allege that this

24  conspiracy was motivated by animus toward Central Americans based on their race,

25  ethnicity, and/or national origin and was organized to target citizens of the nations that

26  President Trump has labeled as "shithole countries" and whom he describes as "animals"

1   who are "invading" or "infesting" the United States.[25] (FAC ¶¶ 242–58.) Plaintiffs allege

2   that the Conspiracy Defendants agreed among themselves to separate families from these

3   countries to harm Plaintiffs, and others similarly situated, in an effort to deter others from

4   these countries from immigrating to the United States. (*See, e.g.*, *id.* ¶¶ 125–66.) Finally,

5   Plaintiffs allege that the conspiracy was successfully executed and directly resulted in the

6   violation of Plaintiffs' constitutional rights to equal protection and due process. (*Id.*

7   ¶¶ 341–44.)   These allegations are set forth in substantial factual detail and are

8   corroborated by publicly available information that Defendants do not and cannot contest.

9   There is no dispute that Plaintiffs' allegations satisfy the first two required elements.

10   Plaintiffs' allegations also satisfy the third and fourth elements.   Plaintiffs allege

11   specific overt acts by each of the Conspiracy Defendants in furtherance of the conspiracy.

12   They allege that the Conspiracy Defendants successfully executed a multi-stage plan to

13   separate families, describing each Conspiracy Defendant's role. (*Id.* ¶¶ 125–79.) And

14   they set forth detailed accounts of the profound physical and psychological harm inflicted

15   on Plaintiffs as a direct result of the Conspiracy Defendants' prolonged and unlawful

16   separation of Plaintiffs from their families. (*Id.* ¶¶ 61–124.) Plaintiffs' allegations are

17   clearly sufficient to state a claim under Section 1985(3). *See Iqbal*, 556 U.S. at 678.

18   Defendants' arguments regarding Plaintiffs' Section 1986 claims are wholly

19   derivative of their Section 1985(3) arguments; they argue (Mtn. at 58–59) that the Section

20   1986 claim should be dismissed because Plaintiffs fail to allege a Section 1985 claim.

21   *See* 42 U.S.C. § 1986 (requiring underlying Section 1985 violation). Because the Section

22   1985(3) allegations suffice, Defendants' arguments fail as to the Section 1986 claim.

23

24

---

25   [25] Defendants do not argue that Plaintiffs have failed to plead the "class-based,
     invidiously discriminatory animus" element of their claims, and the Court should thus

26   consider that element to be satisfied. (Mtn. at 57 (quoting *Trerice* v. *Pedersen*, 769
     F.2d 1398, 1402 (9th Cir. 1985)).)

**(a)**      **Sections 1985 and 1986 Authorize Claims Against Federal Officials**

Defendants do not contest that Section 1985(3) applies to federal officers. Section 1985(3) creates a cause of action against any "two or more persons" who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). The Supreme Court has emphasized that the civil rights statutes are to be "accord[ed] . . . *a sweep as broad as (their) language*," and it has specifically rejected the argument that Section 1985(3), like its counterpart, is cognizable only against state officials. *Griffin* v. *Breckenridge*, 403 U.S. 88, 97 (1971) (emphasis added).[26]

**(b)**      **Plaintiffs Have Adequately Alleged a Conspiracy That Is Cognizable Under Section 1985(3)**

Defendants argue that Plaintiffs' factual allegations cannot support the Section 1985(3) civil conspiracy claims because the named Defendants are a single legal entity under the intracorporate conspiracy doctrine. (Mtn. at 58.) This argument fails because it is not established that the doctrine applies to civil rights claims, and even if it did, Defendants are employees of a variety of different government agencies, and thus cannot be said to be part of the same "department." The intracorporate conspiracy doctrine developed in the context of antitrust law and holds that an employee acting

---

[26] Indeed, Section 1985 cases against federal officials are legion. *See, e.g.*, *Turkmen* v. *Hasty*, 789 F.3d 218, 262–64 (2d Cir. 2015) (plaintiffs stated Section 1985(3) claims against former high-level federal officials), *overruled on other grounds by Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1865–69 (2017); *Hobson* v. *Wilson*, 737 F.2d 1, 19 (D.C. Cir. 1984) ("[S]ection 1985(3) encompasses actions against federal officers . . . ."), *cert. denied*, 470 U.S. 1084 (1985), *overruled in part on other grounds by Leatherman* v. *Tarrant Cty. Narc. Intel. & Coord'n Unit*, 507 U.S. 163 (1993); *Spagnola* v. *Mathis*, 809 F.2d 16, 29 (D.C. Cir. 1986) (collecting cases); *La Unión del Pueblo Entero* v. *Ross*, 353 F. Supp. 3d 381, 397–98 (D. Md. 2018) (Section 1985(3) claim against Commerce Secretary).

within the scope of his employment is an agent of his employer. Thus, under traditional agency principles, the employee and the employer are a single legal entity. *See Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). Because a conspiracy requires an unlawful agreement between two or more "persons," there can be no conspiracy where the only parties to an agreement are (1) a corporation and its employees or (2) multiple employees of a single corporation. *Id.*

The Supreme Court has not extended the doctrine to civil rights claims. *See Abbasi*, 137 S. Ct. at 1868. Even if the doctrine did apply in the context of civil rights claims (it does not), it would not apply to the Conspiracy Defendants here. Courts that have considered the question have speculated that, at most, the doctrine *might* preclude liability for conspiracies exclusively among employees of *a single government agency*. For example, in *Abbasi*, the Supreme Court noted that the doctrine could conceivably apply to "officers in the same branch of the Government (the Executive Branch) and in the same Department (the Department of Justice)." 137 S. Ct. at 1868; *see Turkmen*, 789 F.3d at 263 n.46. But Defendants here are not from a single department in the same branch of government; rather, they include government officials and employees from multiple agencies organized under different sources of executive and statutory authority, including officers from the DOJ, DHS, and HHS, as well as officials in the White House. [27] The doctrine therefore does not bar Plaintiffs' statutory claims.

---

[27] Indeed, in other contexts, the Supreme Court has emphasized that "[we] for more than a century ha[ve] held that the term 'Departmen[t]' refers only to 'a part or division of the executive government, as the Department of State, or of the Treasury,' expressly 'creat[ed]' and 'giv[en] . . . the name of a department' by Congress." *Freytag* v. *C.I.R.*, 501 U.S. 868, 886 (1991) (quoting *United States* v. *Germaine*, 99 U.S. 508, 510–11 (1878)). Defendants rely on *K.O.*, 468 F. Supp. 3d at 366–71, a case in which a D.C. district court speculated (but did not hold) that the intracorporate conspiracy doctrine might apply to officers conspiring across multiple distinct departments of the federal Executive Branch. But *K.O.* did not address allegations like those here. The *K.O.* court relied upon the theory that the intracorporate conspiracy doctrine might apply to federal employees whose duties "require them to speak and work with other

- 55 -

1

2

## 2.  Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Section 1985(3) and 1986 Claims

3

4

5

6

Defendants argue that they are entitled to qualified immunity as to Plaintiffs' Section 1985(3) and 1986 claims for the same reasons that they are entitled to qualified immunity as to the constitutional violations underlying Plaintiffs' *Bivens* claims. As discussed above in Section III.C, these arguments should be rejected.

7

8

9

10

11

12

13

According to Defendants, even if they violated Plaintiffs' clearly established constitutional rights, and even if it would have been apparent to a reasonable official that his conduct was unlawful, Defendants nonetheless are entitled to qualified immunity unless it also would be apparent that Plaintiffs could bring Section 1985(3) claims. (Mtn. at 56–59.) Put differently, Defendants argue that they are entitled to knowingly deprive Plaintiffs of their constitutional rights, so long as they do not know that they could be held liable under these specific conspiracy statutes. (*Id.*)

14

15

16

17

18

19

20

21

22

23

This argument—not surprisingly—is squarely foreclosed by the case law. The operative question when considering qualified immunity is whether the defendant "violate[d] 'clearly established statutory *or* constitutional rights of which a reasonable person would have known.'" *Tolan* v. *Cotton*, 572 U.S. 650, 655 (2014) (per curiam) (emphasis added) (quoting *Hope*, 536 U.S. at 739); *see also Keates*, 883 F.3d at 1234–35. Under that standard, if a plaintiff can show that a defendant unreasonably violated her rights as a matter of clearly established constitutional law, she need not also demonstrate that the defendant would be aware of the precise theory of resulting liability. *See Keates*, 883 F.3d at 1234–40; *cf. Reynaga Hernandez* v. *Skinner*, 969 F.3d 930, 941–44 (9th Cir. 2020) (affirming denial of qualified immunity despite the fact that a statutory

24

25

26

officials outside their own departments."  468 F. Supp. 3d at 371. Here, Plaintiffs allege that Defendants were not performing their ordinary course duties—they met in secret and intentionally left out of discussions those who would have opposed separations. (*See* FAC ¶ 156.)

- 56 -

requirement for liability under Section 1983—the integral participant doctrine—was not clearly established in the Ninth Circuit). Plaintiffs have pleaded facts sufficient to show that reasonable officials would have understood the Conspiracy Defendants' conduct to be unlawful under the Fourth and Fifth Amendments. These allegations preclude the Conspiracy Defendants from claiming qualified immunity. *See id.*; *see also Hobson*, 737 F.2d at 27–29 (holding defendant federal officials not entitled to qualified immunity on Section 1985(3) claims given clearly established constitutional law).

*Abbasi*, cited by Defendants, is not to the contrary. As noted above, the Supreme Court there considered whether the defendant federal officials were entitled to qualified immunity for claims arising from their treatment of detainees following the terrorist attacks of September 11. *Abbasi*, 137 S. Ct. at 1843. Critically, the Court did not find that the alleged conduct violated the plaintiffs' constitutional rights for purposes of qualified immunity, and therefore did not address whether the defendants would be entitled to immunity if the conduct were indeed obviously unconstitutional. *See id.* at 1866–69. Moreover, the Court cited the decades-old rule that a plaintiff can overcome qualified immunity by showing either a statutory *or* a constitutional violation, making clear that even where it is uncertain whether a defendant's conduct violated a particular statute, the defendant is not entitled to qualified immunity where—as here—that conduct would have been understood by a reasonable official to be unconstitutional. *Id.* at 1871.

Even if Defendants' view of qualified immunity doctrine were the law—and it is not—the Conspiracy Defendants still would not be entitled to qualified immunity because reasonable officials would not have understood the conduct alleged in the FAC to be lawful under Section 1985(3). Indeed, the concept defies logic. If individual Conspiracy Defendants had unilaterally violated Plaintiffs' clearly established Fourth and Fifth Amendment rights, or had acted in concert with a private party to do so, qualified immunity would not protect them. *See supra* Section III.C. No reasonable official could

have believed that the statute permitted Defendants to conspire to undertake that same unconstitutional conduct collectively. *See, e.g.*, *Hobson*, 737 F.2d at 27–29.

Defendants' sole argument to the contrary is that Defendants could reasonably have believed that their conduct was permissible under the intracorporate conspiracy doctrine. (Mtn. at 57–59.) Defendants rely again on *Abbasi* and, specifically, the Supreme Court's conclusion that officials within DOJ could reasonably have thought that their conduct was lawful under Section 1985(3). (*Id.*) The Court's analysis turned entirely on the possibility that the intracorporate conspiracy doctrine could have been thought by reasonable officials to apply to the defendants' agreement, given that they were technically agents of the same agency—the Justice Department. *Abbasi*, 137 S. Ct. at 1868. But *Abbasi*'s analysis does not extend here for the reasons discussed above— namely that the Conspiracy Defendants are not all Executive Branch officers "in the same Department," *Abbasi*, 137 S. Ct. at 1867. (FAC ¶¶ 27–44.)

Defendants cite no binding case, and there is none, suggesting that the intracorporate conspiracy doctrine applies in cases involving multiple federal agencies; and most federal courts that have considered the argument have squarely rejected it. *See, e.g.*, *Ali* v. *Raleigh Cty.*, No. 5:17-cv-3386, 2018 WL 4101517, at *11 (S.D.W. Va. Aug. 28, 2018).[28] Defendants' only other authority, *K.O.*, 468 F. Supp. 3d at 366–71, erred in applying qualified immunity to bar plaintiffs' Section 1985(3) and Section 1986 claims, and in any case, the court there addressed allegations that are factually distinct from those here. Based in part on its erroneous application of the intracorporate conspiracy doctrine, *see supra* p. 55 n.27, the *K.O.* court ignored that the operative question for qualified immunity is whether defendants "violate[d] 'clearly established statutory *or*

---

[28] *See also Bailey* v. *Pataki*, No. 1:08-cv-8563, 2010 WL 4237071, at *5 (S.D.N.Y. Oct. 26, 2010) (distinguishing decisions applying intracorporate conspiracy doctrine on ground that "the cases involve members of the same state agency, whereas multiple agencies were here involved").

constitutional rights of which a reasonable person would have known.'" *Tolan* v. *Cotton*, 572 U.S. 650, 656 (2014) (emphasis added) (citation omitted).   Under that standard, where a defendant violates clearly established constitutional rights, a plaintiff need not also demonstrate that the defendant would be aware of the precise statutory theory of liability.   Here, Plaintiffs plead facts sufficient to show violations of clearly established constitutional rights, and Defendants are not entitled to qualified immunity, whether or not the intracorporate conspiracy doctrine applies.   Defendants' qualified immunity arguments as to Section 1986 are predicated entirely on their arguments as to Plaintiffs' Section 1985(3) claims.   (Mtn. at 57–58.)   Because Defendants' Section 1985(3) arguments fail, so too must their Section 1986 arguments.

### E.   DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY

Defendants also argue that they are entitled to absolute immunity because the Zero Tolerance directive was part of their prosecutorial and policymaking functions, particularly for Defendant Sessions, who issued that directive.   (Mtn. at 59–60.)   This argument misconstrues the nature of Plaintiffs' claims.   As discussed above with regard to Plaintiffs' *Bivens* claims, Plaintiffs do *not* challenge Defendant Sessions's or any other Defendant's authority to issue or implement the Zero Tolerance directive to prosecute every case of illegal entry.   Rather, Plaintiffs challenge Defendants' actions to unlawfully separate and detain families.   As discussed above, some Plaintiffs were separated even though there was no prosecution, and others were kept apart well after any prosecution had ended.   Thus, the actions at issue here were *not* related to any prosecutorial function or decision, and various government officials, including Defendant Nielsen, have stated that those actions were not taken pursuant to a government policy.   *See supra* p. 27 n.14.

Prosecutors are absolutely immune only "in initiating a prosecution and in presenting the [government's] case," insofar as their conduct is "intimately associated with the judicial phase of the criminal process."   *Imbler* v. *Pachtman*, 424 U.S. 409, 430–

31 (1976); *see also Burns* v. *Reed*, 500 U.S. 478, 494 (1991) (explaining that absolute immunity applies "only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct"). Absolute immunity does *not* extend to conduct with "no functional tie to the judicial process just because" an official is a prosecutor or policymaker. *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 277 (1993). Thus, where officials engage in conduct outside their legitimate prosecutorial or policymaking functions, they are not entitled to absolute immunity. *See id.* at 277–78 (denying absolute immunity for prosecutors who made false and prejudicial statements to press regarding evidence in criminal proceeding against plaintiff); *see also Hardwick*, 844 F.3d at 1116 (denying absolute immunity where officials falsified evidence to separate mother from child because such conduct was outside officials' legitimate role in prosecuting mother).

Plaintiffs allege that Defendants engaged in misconduct unrelated to the creation or implementation of the Zero Tolerance prosecution directive or any other prosecutorial or policymaking function. Defendants separated families unlawfully, kept them separated, and forced them to live in unconstitutionally punitive conditions without access to adequate beds, food, medical care, or counsel. *See supra* Section II. These egregious rights violations occurred independent of any judicial proceedings against Plaintiffs, many of whom—including all of the child Plaintiffs—were never charged with any crime. Others who were charged with a crime remained separated even after the disposition of their criminal cases. Defendants thus are not entitled to absolute immunity because their conduct was an egregious attempt to deter Plaintiffs (and others) from pursuing their legitimate rights to seek asylum, untethered to any legitimate prosecutorial or policymaking function.

**IV.    CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss should be denied.

Respectfully submitted,

By: /s/ *Jacqueline P. Rubin*

Jacqueline P. Rubin
(admitted *pro hac vice*)
Geoffrey R. Chepiga
(admitted *pro hac vice*)
Emily Goldberg
(admitted *pro hac vice*)
Hallie S. Goldblatt
(admitted *pro hac vice*)
Steven C. Herzog
(admitted *pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Alexander A. Reinert
(admitted *pro hac vice*)
55 Fifth Avenue, Room 1005
New York, NY 10003
(212) 790-0403

*Attorneys for Plaintiffs A.I.I.L., on behalf of herself and her minor children, J.A.H.I. and M.E.H.I.; L.L.H.O., on behalf of herself and her minor child, K.E.O.H.; J.L.V.A., on behalf of himself and his minor child, D.S.V.H.; J.I.S., on behalf of himself and his minor child, B.L.S.P.; and J.J.P.B., on behalf of himself and his minor child, A.E.P.F.*

December 23, 2020

Lee Gelernt
(admitted *pro hac vice*)
Anand Balakrishnan
(admitted *pro hac vice*)
Daniel A. Galindo
(admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660

Stephen Kang
(admitted *pro hac vice*)
Spencer Amdur
(admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(917) 620-3555

Christine Keeyeh Wee
ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, AZ 85011
(602) 650-1854

1

## CERTIFICATE OF SERVICE

2     I hereby certify that a true copy of the above document was served upon the

3 attorney of record for each other party by means of the District Clerk's CM/ECF

4 electronic filing system on December 23, 2020.

5

6                          /s/ *Jacqueline P. Rubin*
                           Jacqueline P. Rubin
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26