BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division
C. SALVATORE D'ALESSIO, JR.
Acting Director
Torts Branch, Civil Division
MARY HAMPTON MASON
(New York Bar No. 2255198)
Senior Trial Counsel
PAUL QUAST
(Colorado Bar No. 49154)
Trial Attorney
Constitutional & Specialized Tort Litigation
Torts Branch, Civil Division
Department of Justice
Box 7146 Washington, DC 20044
Email: paul.c.quast@usdoj.gov
Telephone: (202) 616-4150

Attorneys for the Individual Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| A.I.I.L., *et al.*, | No. CV-19-00481-TUC-JCH |
| Plaintiffs, | |
| v. | **REPLY IN SUPPORT OF MOTION TO DISMISS** |
| Jefferson Beauregard Sessions, III, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

I.     PLAINTIFFS' ARGUMENTS FOR PERSONAL JURISDICTION OVER THE FEDERAL POLICYMAKERS ARE CONTRARY TO LAW. ........................................ 1

     A.    Federal Oversight and Policymaking Do Not Constitute "Purposeful Direction." ........................................................................................................ 2

     B.    Plaintiffs' New and Limited Travel-Related Allegations Do Not Establish Personal Jurisdiction Over Any Defendant. .................................................... 5

     C.    Plaintiffs' Newly Alleged "Agency" and "Conspiracy" Theories Do Not Establish Personal Jurisdiction Over Any Defendant. .................................. 7

II.    THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO CREATE A NEW CLASS OF *BIVENS* LITIGATION ................................................................... 10

     A.    The Context In Which Plaintiffs' Allegations Arise Is New ...................... 10

     B.    "Alternative, Existing Processes" Are Available ....................................... 12

     C.    Other Special Factors Counsel Hesitation .................................................. 15

           1.    *The "Conduct" Plaintiffs Challenge is the Creation of Policy* ....... 15

           2.    *Congressional Action in this Arena Counsels Hesitation* ................ 17

           3.    *Plaintiffs' Claims Implicate National and Border Security* ............. 18

           4.    *Plaintiffs Challenge Prosecutorial Policy* ........................................ 19

           5.    *Expanding* Bivens *Here Would be Unworkable* .............................. 19

III.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS ................................. 21

     A.    Plaintiffs Do Not Allege A Clearly Established Constitutional Violation . 21

     B.    Plaintiffs Do Not Allege A Clearly Established Statutory Violation.......... 24

IV.   PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY ........................................................................... 29

CONCLUSION............................................................................................................. 30

1

2

3    Defendants' opening brief ("MTD") demonstrated numerous fundamental problems
with Plaintiffs' lawsuit requiring dismissal. Plaintiffs respond by asking the Court to
authorize a new species of *Bivens* litigation against high-ranking federal policymakers in
courts across the country. But the creation of a new class of cases is a decision with
profound policy implications, appropriately addressed, if at all, by Congress. Plaintiffs'
claims should be dismissed with prejudice.

4

5

6

7

8    ## I.    PLAINTIFFS' ARGUMENTS FOR PERSONAL JURISDICTION OVER THE FEDERAL POLICYMAKERS ARE CONTRARY TO LAW.

9    As explained in Defendants' MTD, the First Amended Complaint ("FAC") does not
satisfy Plaintiffs' burden of establishing personal jurisdiction over any of the fifteen
Defendants. *See* MTD at 13–19. In their Opposition, Plaintiffs do not dispute – nor could
they – that the FAC's many allegations about Plaintiffs' own contacts with Arizona have
no bearing on the jurisdictional analysis. Opp. at 10; *see* MTD at 16–17; *Walden v. Fiore*,
571 U.S. 277, 283–91 (2014). Plaintiffs instead claim that Defendants' high-level
government positions and responsibilities trigger personal jurisdiction in one of three ways
– two of which Plaintiffs never raised anywhere in the FAC. Opp. at 8–16.[1] First, Plaintiffs
argue, Defendants' alleged policymaking activities and supervisory authority in the federal
immigration arena amount to "purposeful direction" within the meaning of the specific
jurisdiction test, despite the substantial body of caselaw uniformly rejecting such a
conclusion. *Id.* at 9–13; *see* MTD at 17–19. Second, Plaintiffs improperly make new,
unsupported allegations in the Opposition that some alleged Arizona travel by three
Defendants demonstrates "purposeful direction" allowing specific jurisdiction. Opp. at 11.
Third, Plaintiffs improperly make new, unsupported allegations in the Opposition that
some unidentified Defendants have broad supervisory authority over unidentified

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] Plaintiffs' suggestion that they need not plead facts supporting personal jurisdiction is wrong. Opp. at 8 n.4; *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (personal jurisdiction analysis turns on plaintiff's pleadings and affidavits); *see, e.g.*, *Hatfield v. Hatfield*, No. CV14-1844 PHX DGC, 2014 WL 7330997, at *2 (D. Ariz. Dec. 19, 2014) (dismissing defendant for lack of personal jurisdiction where "none of the factual allegations in the amended complaint establish a basis for personal jurisdiction").

employees in Arizona (relatedly advancing an unrecognized theory of "conspiracy jurisdiction"), and those employees' forum contacts should count as the Defendants' own. *Id.* at 8, 13–15. Plaintiffs are wrong on all counts and have not carried their burden of establishing personal jurisdiction over any Defendant. *See* MTD at 13–15 (describing Plaintiffs' burden); Fed. R. Civ. P. 12(b)(2).[2]

## A. Federal Oversight and Policymaking Do Not Constitute "Purposeful Direction."

Plaintiffs' first argument fails, because the Opposition does not – and cannot – explain away the voluminous case law precluding specific jurisdiction based on allegations of either Washington, D.C.-based planning for family separations and detentions in Arizona and other states, or Defendants' high-level supervision of line-level agency employees who allegedly separated families in Arizona and elsewhere. *See* MTD at 17–19 (discussing the FAC's allegations involving Defendants and applicable caselaw); Opp. at 10–11 (similarly describing jurisdictional allegations as pleading that twelve Defendants allegedly participated in meetings/discussions and other planning for family separations in 2017 or 2018, and eight Defendants allegedly directed "John/Jane Doe" line-level agents or "CBP and ICE" to separate families). As Defendants' motion makes clear, neither these alleged policymaking activities nor Defendants' ultimate authority over unknown subordinates constitutes "minimum contacts" under a "purposeful direction" theory or any other. *See* MTD at 15–19. Plaintiffs do not directly dispute this, but instead identify two cases they claim support specific personal jurisdiction but actually do not, then half-heartedly attempt to distinguish four (and only four) of Defendants' cases. Opp. at 11–13.

---

[2] Plaintiffs identify no facts suggesting general personal jurisdiction could apply, Opp. at 9 n.5, and it does not, MTD at 14–16. Indeed, the delivery addresses Plaintiffs used for service of process demonstrate that they know none of the Defendants resides in Arizona. As for Plaintiffs' suggestion that "discovery" could show otherwise, Opp. at 9 n.5, courts do not permit jurisdictional discovery without a showing that it would aid in establishing jurisdictionally relevant facts. *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (affirming denial of jurisdictional discovery in absence of showing it could overcome defects in jurisdictional claim). Plaintiffs have made no such showing, nor could they. MTD at 16 n.8; Fed. R. Civ. P. 11(b); *see Boschetto*, 539 F.3d at 1020 (affirming denial of plaintiff's "request for discovery, which was based on little more than a hunch that it might yield jurisdictionally relevant facts").

First, Plaintiffs say, "[t]he Ninth Circuit has found purposeful direction in cases with far less forum-directed conduct." Opp. at 11–12 (citing *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258–59 (9th Cir. 2008) and *Soler v. Cnty. of San Diego*, 762 F. App'x 383, 385–86 (9th Cir. 2019)). But *Ibrahim* and *Soler* involved different circumstances than this case: the defendants there were line-level or local government employees (not federal "officials," Opp. at 11–12), accused of particular, direct actions toward the complaining party (not policymaking or issuing directives). *Ibrahim*, 538 F.3d at 1258–59; *Soler*, 762 F. App'x at 385–86. By contrast, the Defendants are fifteen Cabinet heads, Senate-confirmed appointees, and high-ranking executive officers, sued for alleged action in planning and implementing national immigration and prosecutorial policy or broadly "supervising" their chain-of-command. *Ibrahim* and *Soler* have nothing to do with personal jurisdiction in *this* scenario and cannot negate the wealth of legal authority Defendants cite. MTD at 17–19.

Second, Plaintiffs say, "Defendants' cases are inapplicable," because "they relate to either undifferentiated nationwide policies or officials acting in merely supervisory capacities." Opp. at 12 (citing *Munns*, *Perez, Yellowbear,* and *Oksner*[3] and ignoring the remainder of Defendants' cases). Taking the latter point first, Plaintiffs have sued some Defendants on exactly that ground – their alleged status as the ultimate supervisor of federal agents operating in Arizona. *See* Opp. at 10–11; MTD at 17 n.11 (identifying the FAC's allegations involving Defendants). The Defendants' cases (including *Perez* and *Yellowbear*) make clear this type of "broad supervisory authority" does not suffice as a basis for personal jurisdiction. *Yellowbear*, 612 F. App'x at 921; *Perez*, 2014 WL 4385473, at *8; *Claasen v. Brown*, No. Civ. A. 94-1018-GK, 1996 WL 79490, at *2 (D.D.C. Feb. 16, 1996); *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1484–85 (E.D. Wis. 1993); *see also Stone v. Derosa*, No. CV 07-0680-PHX-PGR (CRP), 2009 WL 798930, at *1 (D.

---

[3] *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1054, 1078 (E.D. Cal. 2011); *Perez v. United States*, No. 13CV1417-WQH-BGS, 2014 WL 4385473, at *8 (S.D. Cal. Sept. 3, 2014); *Yellowbear v. Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015); and *Oksner v. Blakey*, No. C 07-2273, 2007 WL 3238659, at *9 (N.D. Cal. Oct. 31, 2007).

Ariz. Mar. 25, 2009) (no personal jurisdiction over head of Federal Bureau of Prisons, even though "a BOP policy [was] a critical issue in [the] case"; "courts all over the country" have rejected idea of specific jurisdiction wherever agency activity allegedly caused tort).

Likewise, Plaintiffs' suggestion that *Munns* and *Oksner* do not apply because they involved "nationwide" policies, rather than "a geographically targeted effort" aimed at particular states, misses the mark. Opp. at 12–13. As Defendants' cases show, it is the nature of the high-level conduct alleged – not whether it seems to impact some states "more" than others (whatever that might mean)[4] – that drives the jurisdictional analysis. *See* MTD at 17–19. In *Perez*, for example, plaintiffs challenged a federal "Rocking Policy" governing agents "along the southern border" of the United States. 2014 WL 4385473, at *8. The court found plaintiffs failed to satisfy "the purposeful direction test" for officials who allegedly approved the policy, because their "supervisory responsibilities and alleged implementation" did not suffice – regardless of the policy's "targeted" focus toward "border" states, including California. *Id.* Likewise in other cases Defendants cited, including *Munns*, courts decided the jurisdictional question without examining whether a challenged policy "targeted" particular states or not. 822 F. Supp. 2d at 1078 (rejecting claim that personal jurisdiction arises in "forum where the effects of those policies are allegedly felt"); *Rank v. Hamm*, No. CIV A 204-0997, 2007 WL 894565, at **11–13 (S.D.W. Va. Mar. 21, 2007) (rejecting plaintiffs' *Calder* "effects test" argument and noting difficulty in ascertaining what states federal policy might implicate). Again, the contours of the alleged official conduct – not whether it appeared "geographically targeted" to the forum state, Opp. at 13 – determined the jurisdictional outcome. The recent decision in *K.O. v. Sessions*, a personal-capacity lawsuit similar to this one, is instructive. 436 F. Supp. 3d 442, 447–55 (D. Mass. 2020). There, the court followed the usual rule that high-level policy planning and oversight connects the acting official to the location of such activity,

---

[4] Here, for example, Plaintiffs in part challenge policymaking directed toward all federal prosecutors, not just those in "border" states. *See* MTD at 6 (link to April 6, 2018, Zero-Tolerance Memorandum, in turn citing memorandum to all federal prosecutors).

not to whatever area of the country it supposedly affects the most. *Id.* at 454 (dismissing for lack of personal jurisdiction and transferring to District of Columbia "where venue would be proper, and the defendants would be subject to personal jurisdiction"). In short, Plaintiffs cite no law supporting their "what-state-does-the-federal-policy-target?" argument for personal jurisdiction over high-ranking officials, because there is none.[5]

## B. Plaintiffs' New and Limited Travel-Related Allegations Do Not Establish Personal Jurisdiction Over Any Defendant.

In their second argument, Plaintiffs allege for the first time that "[m]ultiple Defendants, including Sessions and Nielsen, traveled to Arizona in connection with these matters" and thereby "directed his or her activities toward Arizona" for purposes of specific jurisdiction. Opp. at 11. According to Plaintiffs, this travel "was well covered in the press," as reflected by three YouTube videos cited in the Opposition. *Id.* at 11 & n.7. To begin with, however, the FAC alleges nothing at all about any Defendant visiting Arizona at any time. *See generally* FAC. It is axiomatic that Plaintiffs cannot augment their pleading through an opposition brief,[6] and the YouTube videos are not competent evidence of any

---

[5] Since Plaintiffs have not shown their policy/oversight allegations satisfy the "purposeful direction" prong of the specific jurisdiction test, Plaintiffs necessarily have not satisfied the test's second prong either. Defendants made a similar point in their motion, MTD at 19 n.14, and therefore did not fail to "meaningfully contest" the second prong, as Plaintiffs inaccurately state, Opp. at 9; *see Boschetto*, 539 F.3d at 1016 (if plaintiff "fails at the first step" of specific jurisdiction, "jurisdictional inquiry ends and the case must be dismissed"). Defendants address the third prong of the test *infra* p. 9–10 n.11.

[6] *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1237 & n.23 (C.D. Cal. 2013) (where plaintiff's jurisdictional-contacts allegation appears for "[t]he first time . . . in . . . [o]pposition" to a motion to dismiss, court "will not consider that allegation"), *citing Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir.1998); *Horne v. U.S. Dep't of Educ.*, No. CV-08-1141-PHX-MHM, 2009 WL 775432, at *5 (D. Ariz. Mar. 23, 2009) (plaintiffs "cannot . . . amend their Complaint by making new allegations in an opposition brief"); *see also Boschetto*, 539 F.3d at 1015 (when deciding personal jurisdiction without an evidentiary hearing, "this court only inquires into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction") (citation, internal quotation marks, and alterations omitted).

5

Defendant traveling anywhere.[7] For these reasons alone, the Court should not consider Plaintiffs' belated statements about three Defendants' alleged Arizona visits.

Furthermore, Plaintiffs' proposed new allegations do not remedy the personal jurisdiction problem anyway. Even assuming Defendants Sessions, Nielsen, and McAleenan made trips to Arizona as may be depicted in the videos, and even assuming such travel amounted to "purposeful direction" under the first prong of the specific jurisdiction test (which Defendants do not concede), Plaintiffs have alleged no facts suggesting this travel meets the second prong of the test. Plaintiffs have not asserted, in other words, that the three trips were the "but-for cause" of their claims, nor could they. Opp. at 11, 15; *see Terracom*, 49 F.3d at 561 ("The second prong of the specific jurisdiction test is met if 'but for' the contacts between the defendant and the forum state, the cause of action would not have arisen."). None of the claims in the lawsuit depends on Nielsen, Sessions, or McAleenan (or any other Defendant) visiting Arizona, because again, Plaintiffs challenge policymaking and oversight activity that occurred in the Washington, D.C., area where the fifteen Defendants were based. MTD at 17 (discussing Complaint's allegations involving the Defendants). Plaintiffs' claims would be the same with or without the referenced trips or other similar ones. *Id.*; Opp. at 11; *see*, *e.g., ScaleMP, Inc. v. TidalScale, Inc.*, Case No. 18-cv-04716-EDL, 2019 WL 7877939, at *11 n.7 (N.D. Cal. Mar. 6, 2019) (plaintiff failed to establish specific personal jurisdiction in California,

---

[7] Plaintiffs suggest that "[t]he Court may take judicial notice" of the YouTube videos as "public news reports." Opp. at 11 n.7. But judicial notice extends only to "a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201. Plaintiffs do not identify what particular fact or facts they seek to establish, let alone explain how the videos meet the criteria of Rule 201 (and indeed they do not, *see, e.g., Voip-Pal.Com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1110, 1134 n.6 (N.D. Cal. 2019) (no judicial notice of YouTube video because its "contents . . . are unverified and unsubstantiated, and are therefore subject to reasonable dispute"), *aff'd sub nom. Voip-Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020)). In addition, Plaintiffs cannot seek "jurisdictional discovery" to inquire about Defendants' alleged "travel[ ] to Arizona," Opp. at 11 n.7, because again, courts do not permit such discovery where, as here, there is no showing it would aid in establishing jurisdictionally relevant facts, *Terracom*, 49 F.3d at 562; *see Boschetto*, 539 F.3d at 1020.

despite defendant's travel there; those "contacts with the forum state are irrelevant," because plaintiff "has not alleged that [defendant] engaged in any tortious conduct during those contacts"). Since the three Defendants' alleged travel did not give rise to Plaintiffs' claims, such "contacts" cannot justify personal jurisdiction over those Defendants or any other. *See*, *e.g.*, *Eaton v. Davis*, No. Civ. 01-854-AS, 2002 WL 31441217, at *4 (D. Or. Feb. 28, 2002) (no personal jurisdiction where plaintiff's "claims would be the same" regardless of defendants' alleged interaction with Oregon, and plaintiff thus "failed to establish" no § 1983 claim "'but for' defendants' [contacts]").[8]

### C. Plaintiffs' Newly Alleged "Agency" and "Conspiracy" Theories Do Not Establish Personal Jurisdiction Over Any Defendant.

Plaintiffs next argue that "Defendants' agents and co-conspirators intended to and did cause effects in Arizona, and this Court may impute those contacts to Defendants in assessing purposeful direction." Opp. at 13. More specifically, Plaintiffs first say that "an agency relationship between out-of-state defendants and in-state agents can establish jurisdiction over those defendants where they exercised sufficient 'control' over their agents." *Id.* (citing five cases). According to Plaintiffs, "Defendants drafted directions and directly ordered CBP and ICE agents in Arizona to separate immigrant families," and so "the agents' actions in separating families may be attributed to out-of-state Defendants as the requisite minimum contacts." *Id.* at 14 (citing FAC ¶¶ 154–55, 167). Again, Plaintiffs made no such "agency" allegations and identified no "agency" theory of personal jurisdiction in the FAC. *See generally* FAC. The Court should not consider the new, unsupported theory now. *See supra* pp. 5–6.

---

[8] As discussed *supra* n.5, Plaintiffs' assertion that Defendants "do not meaningfully contest" the second prong of the specific jurisdiction test is wrong. Opp. at 9. Defendants did in the opening brief, *see* MTD at 19 n.14, and in any event, Plaintiffs never contended before filing their Opposition that any alleged travel produced any jurisdictional contacts. Thus, Defendants could not have "contest[ed]" the second prong as to those absent allegations until now. Opp. at 9. Furthermore, Plaintiffs bear the burden on the "but-for" question, and their abbreviated, non-specific effort to meet that burden fails. *See id.* at 15 (vaguely asserting that Defendants' conduct in implementing immigration policy connects them sufficiently to "Plaintiffs' in-state injuries" and citing two inapposite cases).

Even if the Court does so, the assertion that alleged forum contacts by some unidentified subordinates in Arizona can be imputed to the fifteen policymakers has no merit. Opp. at 13–14. The *K.O.* court roundly rejected just such an argument against eleven of the Defendants. 436 F. Supp. 3d at 451 n.5. In *K.O.*, Plaintiffs "[sought] to attribute the actions and contacts of unknown agents to their superiors," but the court found "[s]uch indirect contacts do not constitute 'purposeful availment'" by the high-ranking defendants, regardless of their ultimate authority over the subordinates. *Id.* (citing *Wormley v. United States*, 601 F. Supp. 2d 27, 34 (D.D.C. 2009), *Claasen*, 1996 WL 79490, at *2, and *Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003)). Furthermore, *K.O.* said, "[e]ven if the Court were to accept the 'contacts by implication' theory espoused by the Plaintiffs," it would not apply, "since Plaintiffs have not proffered any evidence which would link any given John Doe [employee] to a specific agency sufficient to 'implicate' any specific Defendant." 436 F. Supp. 3d at 451 n.5. "Instead, Plaintiffs assertions are based on she[e]r speculation and innuendo." *Id.*

So too here. Plaintiffs do not specify in the FAC or Opposition which "in-state agents" took what specific action allegedly attributable to which Defendant at what agency when. Opp. at 13–14, 9 n.6. And, Plaintiffs' vague contention that the "Defendants drafted directions and directly ordered" law enforcement officers to separate families, *id.* at 14, does no more than impermissibly point back to high-level officials' "broad supervisory authority" as grounds for bringing them into the forum, *Yellowbear*, 612 F. App'x at 921. Moreover, none of the cases Plaintiffs cite – nor any other to Defendants' knowledge – supports the idea that line-level federal employees carrying out day-to-day job duties have an "agency" relationship with their high-level leadership for purposes of jurisdictional contacts. Opp. at 13–14.[9] Plaintiffs' "'contacts by implication' theory" of personal jurisdiction fails. *K.O.*, 436 F. Supp. 3d at 451 n.5.

---

[9] The five cases Plaintiffs reference either involve no agency principles at all (*Biliack v. Paul Revere Life Ins. Co.*, 265 F. Supp. 3d 1003, 1008–1009 (D. Ariz. 2017)); discuss the absence of an agency relationship between a parent and subsidiary company (*Williams* v.

1   Likewise, Plaintiffs' unpled claim that the Court may "impute the contacts of *co-*

2   *conspirators* to out-of-state Defendants under a conspiracy theory of jurisdiction" has no

3   merit. Opp. at 14 (emphasis original); *see supra* pp. 5–6. To begin with, while Plaintiffs

4   state that "several courts have recently affirmed" such an approach, the Ninth Circuit has

5   not. Opp. at 14 (citing three out-of-Circuit cases). Instead, the Ninth Circuit has found "a

6   great deal of doubt surrounding the legitimacy" of such a theory and observed that the

7   Northern District of California and Southern District of California both rejected it. *Chirila*

8   *v. Conforte*, 47 F. App'x 838, 842 (9th Cir. 2002). So has this Court. *Stone*, 2009 WL

9   798930, at *3. Beyond that dispositive problem, Plaintiffs have not identified any

10   cognizable "conspiracy." *See* MTD at 57–59; *infra* pp. 28–29. This also forecloses

11   "conspiracy jurisdiction."[10] *Chirila*, 47 F. App'x at 843. At bottom, Plaintiffs have no

12   legally tenable ground for establishing that the Court may exercise personal jurisdiction

13   over any Defendant, and the case should be dismissed under Rule 12(b)(2).[11]

14   *Yamaha Motor Co.*, 851 F.3d 1015, 1023–25 (9th Cir. 2017)); identify an agency
15   relationship between a farming company and its farm labor recruiter with no similarity to
    the principal-agent scenario Plaintiffs propose here (*Ochoa v. J.B.Martin & Sons Farms,*
16   *Inc.*, 287 F.3d 1182, 1189–92 (9th Cir. 2002)); discuss specific facts and evidence showing
    an agency relationship between a defendant-law firm and one of its paralegals (*Myers* v.
17   *Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001)); or discuss agency under the
    New York long-arm statute as applied to federal employees with a much closer, much more
18   specific relationship than here in a decision pre-dating much of Defendants' case law (*Stadt*
    *v. Univ. of Rochester*, 921 F. Supp. 1023, 1025–26 (W.D.N.Y. 1996)). Opp. at 13–14.

19   [10] Plaintiffs' suggestion that the "Court can and should allow jurisdictional discovery
20   regarding" alleged forum contacts by "Defendants' agents and co-conspirators," including
    John/Jane Doe Defendants, is without merit. Opp. at 9 n.6 (citing two cases). As stated
21   *supra* nn.2 & 7, no such discovery is appropriate, and the two cases Plaintiffs cite on the
    point are not to the contrary or even pertinent. Opp. at 9 n.6. Both do no more than reject
22   personal jurisdiction motions *made by* "Doe" defendants (not their alleged principals or
    co-conspirators) in the unique context of copyright litigation against file-sharing users. *Id.*
23   (citing *Liberty Media Holdings, LLC v. Does 1-62*, No. 11-CV-575-MMA NLS, 2012 WL
    628309, at *3 (S.D. Cal. Feb. 24, 2012) and *London-Sire Records, Inc.* v. *Doe 1*, 542 F. Supp.
24   2d 153, 180–81 (D. Mass. 2008)).

25   [11] Since Plaintiffs have not met their burden on the first two prongs of the specific
    jurisdiction test, the Court need not reach the "reasonableness" issue. *See* MTD at 19 n.14;
26   *Boschetto*, 539 F.3d at 1016. To the extent the Court does consider it, Defendants have "a
    compelling case" precluding personal jurisdiction under the Ninth Circuit's seven-factor
27   test. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002). First, as discussed,
    Defendants did not "purposeful[ly] inject[]" themselves into Arizona's "affairs," but
28   instead implemented federal policy objectives affecting Arizona and other states. *Id.*; *see*

1

2

## II.    THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO CREATE A NEW CLASS OF *BIVENS* LITIGATION

### A. The Context In Which Plaintiffs' Allegations Arise Is New.

3

4

5

6

7

8

9

10

11

12

13

14

15

All of Plaintiffs' purported *Bivens* claims "involve a new context, *i.e.*, one that is meaningfully different." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020); *see* MTD at 20–22. "[E]ven a modest extension is still an extension," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017), and the Supreme Court's "understanding of a 'new context' is broad." *Hernandez*, 140 S. Ct. at 743. Plaintiffs assert that their claims fall within "core" *Bivens* territory because they involve the same amendments as *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980). Opp. at 17. But that fact adds nothing to the new context inquiry, and the Supreme Court has explicitly rejected such a superficial analysis. *See Hernandez*, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."). Instead, the Supreme Court has given a non-

16

17

18

19

20

21

22

23

24

25

26

27

28

---

*Rank*, 2007 WL 894565, at \*12–13 (finding in favor of high-level official on reasonableness inquiry). Second, the burden on Defendants of litigating in Arizona is significant and overlaps with the legal and policy problems of requiring high-level government officials to appear in myriad district courts based on the national scope of their job duties. *Dole*, 303 F.3d at 1114. Taking the third, fourth, fifth, and seventh factors together, although Arizona may have an interest in adjudicating the lawsuit, the District of Columbia does as well. *Id.* Defendants were based in the Washington, D.C., area during the challenged events, and multiple other lawsuits bringing similar family separation claims have proceeded there. *See, e.g.*, *Jacinto-Castanon de Nolasco v. U.S. ICE*, 319 F. Supp. 3d 491 (D.D.C. 2018); *K.O.* v. *U.S. ICE*, 468 F. Supp. 3d 350 (D.D.C. 2020). Turning to the sixth factor, *Dole*, 303 F.3d at 1114, Plaintiffs' argument that Defendants "cannot suggest an alternate forum where all Defendants, including John/Jane Doe Defendants acting in Arizona, would clearly be subject to jurisdiction" is misplaced, Opp. at 16. Again, the *K.O.* case proceeded in D.C. against eleven Defendants after transfer from Massachusetts for lack of personal jurisdiction, and that would be an appropriate venue for this case too. As for the unidentified, unnamed, unserved "John/Jane Doe Defendants," they are not parties to the lawsuit, and in any event, Plaintiffs' allegations against them do not resemble those against high-ranking policymakers. *See* MTD at 16 n.10. Thus, the personal jurisdiction analysis for those individuals may be quite different from the present one. In short, even if Plaintiffs had discharged their burden on the first two aspects of specific personal jurisdiction here, the Defendants present a "compelling case" that exercising such jurisdiction would not be reasonable. *Dole*, 303 F.3d at 1117.

1   exclusive list of differences that can render a context new – all of which are present here.

2   *Abbasi*, 137 S. Ct. at 1860, MTD at 20–22.

3       Even assuming (incorrectly) that the Fourth Amendment decisions cited by

4   Plaintiffs were relevant to the new context analysis, *Abbasi*, 137 S. Ct. at 1859 (only *Bivens*,

5   *Davis*, and *Carlson* are relevant),[12] none of those cases involve the number and degree of

6   differences this case presents, Opp. at 18–20. Plaintiffs' Fifth and Eighth Amendment cases

7   do not involve the same rights at issue here and none of the cases in which the Court has

8   recognized a *Bivens* remedy can be compared to Plaintiffs' claims against high-level

9   government officials for creating national immigration policy. And, although Plaintiffs

10  argue that the immigration and criminal contexts at issue here are not new, the only post-

11  *Abbasi* case cited in support of that proposition, *Lanuza v. Love*, 899 F.3d 1019 (9th Cir.

12  2018), says the exact opposite. *Id.* at 1028 (holding that it is "ineluctable" that a claim in

13  the immigration and prosecution context is "new").[13]

14      Underlying Plaintiffs' arguments is the notion that this context is not new because

15  they allege *unconstitutional* conduct. *See, e.g.*, Opp. at 20 (arguing that their allegations of

16  unconstitutional conduct fall outside of any "statutory or legal mandate," just as *Bivens*,

17  *Davis*, and *Carlson* did); *id.* at 21–22 (challenging unconstitutional conduct cannot be

18  "disruptive"). But every potential *Bivens* claim involves allegations of unconstitutional

19  conduct – that cannot be what makes a context "new." Plaintiffs' other arguments ask this

20  Court to ignore the kinds of meaningful differences listed in *Abbasi*, or interpret those

21  differences to render them meaningless. *See, e.g.*, *id.* at 21 (arguing that Defendants' ranks

22  do not matter because *Bivens* has been applied to "high-level officials" before); *id.* at 22

23  (arguing that creating a remedy here would be "particularly noninvasive" because Plaintiffs

24  successfully used an alternative process to gain relief). This case "easily" presents a new

25  context, *Abbasi*, 137 S. Ct. at 1865, and Plaintiffs' suggestions to the contrary lack merit.

26  _____

27  [12] *Accord Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2019 WL 5653444, at *3 (D. Ariz. Oct. 31, 2019) (noting prior circuit opinions are irrelevant to new context analysis).

28  [13] The other cases cited do not engage in new context or *Bivens* analyses. Opp. at 20.

1

**B. "Alternative, Existing Processes" Are Available.**

2      In their opening brief, Defendants demonstrated that Plaintiffs have other potential

3 avenues to address the alleged constitutional concerns raised, and these processes are

4 sufficient to preclude a new *Bivens* remedy. MTD at 22–25. Those alternatives include

5 pursuing official-capacity injunctive, APA, and/or habeas relief; suit under state tort law;

6 and/or a suit under the Federal Tort Claims Act ("FTCA"). *Id.*[14] In response, Plaintiffs

7 argue none of these avenues is "adequate" because they do not "compensate them for their

8 past injuries and hold individual governmental wrongdoers accountable" as a *Bivens* action

9 would. Opp. at 22 (citing *Minneci v. Pollard*, 565 U.S. 118, 130 (2012)). Plaintiffs'

10 argument misapprehends *Minneci* specifically and *Bivens* jurisprudence in general.

11      As an initial matter, Plaintiffs' use of the term "adequate alternative remedies," Opp.

12 at 23, and their proffered standard for measuring the sufficiency of an "alternative, existing

13 *process*" misstate the legal inquiry in several important respects. *Wilkie v. Robbins*, 551

14 U.S. 537, 550 (2007) (emphasis added). The correct inquiry focuses on the existence of a

15 *process* or "avenue" for relief, not the availability of a particular remedy to a particular

16 individual (or even class of individuals). *See* MTD at 24. Central to Plaintiffs' argument is

17 the notion that the processes available to them are insufficient because they do not "hold[]

18 to account federal officers" or provide damages for past harms. Opp. at 23. But it is black-

19 letter law, that alternative processes need not "punish" officers or offer monetary relief at

20 all.[15] Even in situations where a plaintiff has no possibility of relief, courts still refrain from

21 implying a remedy if other special factors are present. *United States v. Stanley*, 483 U.S.

22

---

23 [14] *See Unknown Parties v. Nielsen*, No. CV-15-00250-TUC-DCB, 2020 WL 813774, at
\*22 (D. Ariz. Feb. 19, 2020) (ordering CBP to provide certain detainees with certain
24 conditions and a medical assessment); Opp. at 41 (admitting that *Unknown Parties v. Nielsen* overlaps substantially with their claims).

25 [15] *See Abbasi*, 137 S. Ct. at 1865 ("alternative remedies available" could include "a writ of
26 habeas corpus," an "injunction," or "some other form of equitable relief"); *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) ("The absence of monetary damages in the
27 alternative remedial scheme is not ipso facto a basis for a *Bivens* claim."); *see also Schweiker v. Chilicky*, 487 U.S. 412, 428 (1988) ("agree[ing] that suffering months of delay
28 in receiving the income . . . cannot be fully remedied by the 'belated restoration of back benefits,'" but declining to extend *Bivens* remedy where Congress did not).

669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford . . . an 'adequate' federal remedy.").

Indeed, the Supreme Court does not require that available processes provide similar compensation, or backwards looking relief, particularly where those processes are created at the federal level. *See, e.g.*, *Bush v. Lucas*, 462 U.S. 367, 388 (1983) (declining to create *Bivens* action even where existing federal processes "do not provide complete relief"). Plaintiffs urge this Court to follow a standard they claim is set out in *Minneci*, 565 U.S. at 130. But *Minneci* does not state any standard for considering alternative *federal* avenues or processes. *Minneci* was considering an alternative *state-law tort regime* against a private actor (which, of course, could not provide injunctive or forward-looking relief against the government and would not implicate the separation-of-powers concerns animating *Abbasi*). And in *Minneci*, the Court held that state tort law's deterrence and compensation against employees of a private BOP contractor were sufficient (not required) to *deny* a *Bivens* remedy. 565 U.S. at 130. Its analysis is inapplicable to alternative federal avenues against the federal government. Indeed, Plaintiffs make much of the availability of these federal avenues to address government conduct elsewhere in their brief, Opp. at 22, 35–36, when urging that a judicially-created damages remedy would not be "intrusive" or that the law was clearly established, but ask this Court to ignore those avenues when considering whether to imply a backwards looking non-statutory damages remedy in the first instance.

*Lanuza* adds nothing to Plaintiffs' argument. 899 F.3d at 1032. There, the defendant allegedly "criminally obstructed" plaintiff's access to the relevant processes. *Id.* Here, Plaintiffs do not and cannot allege they were obstructed from accessing available processes. MTD at 22–25. In fact, federal court review was successful. FAC ¶ 77; *see* MTD at 11–12, 22–23. Courts have found that processes which provide injunctive relief are not only relevant, but "of central importance" to deciding whether to imply a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (explaining plaintiff was not "in search of a remedy as in *Bivens* and *Davis*" and refusing

13

to imply one in part because plaintiff could seek an injunction); *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) (noting habeas as a remedy in the immigration context).

Plaintiffs would also have this Court ignore the case law holding that APA review can foreclose *Bivens*. *See, e.g.*, *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009); *Miller v. U.S. Dep't of Agr. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998); *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011). Plaintiffs cite no cases to the contrary and attempt to distinguish *Western Radio* (which is binding) by arguing that they are seeking money damages, whereas those plaintiffs sought injunctive relief. But plaintiffs in *Western Radio* did seek money damages. 578 F.3d at 1122 ("At the outset, we note that *Wilkie* itself gave us a strong indication that the APA constitutes an 'alternative, existing process' for Western's damages claims based on agency actions and inactions."). And, as discussed above, it is black-letter law that plaintiffs need not receive money or "complete relief" through the APA or other processes. *Id.* at 1120; *see also Vance v. Rumsfeld*, 701 F.3d 193, 205 (7th Cir. 2012) ("[T]he normal means to handle defective policies and regulations is a suit under the [APA] or an equivalent statute, not an award of damages against the policy's author . . . even if that regulation imposes billions of dollars in unjustified costs before being set aside."). Like Plaintiffs here, the plaintiffs in those cases had an opportunity to end allegedly ongoing violations. There, as here, the ability to challenge alleged unconstitutional conduct (or policy) through official-capacity relief – whatever the avenue – "provided a faster and more direct route to relief than a suit for money damages." *Abbasi*, 137 S. Ct. at 1863. That is enough to preclude a *Bivens* remedy.[16]

---

[16] Plaintiffs argue that the FTCA and state law claims are not alternative processes. Opp. at 23–25. But Defendants never claimed the FTCA standing alone precludes a *Bivens* remedy. Rather, as the Supreme Court has noted, MTD at 24–25, the potential availability of state law or related FTCA remedies should be considered alongside the other factors counselling hesitation, as numerous courts have done. *See Turkmen v. Ashcroft*, 2018 WL 4026734, at **10–11 (E.D.N.Y. Aug. 13, 2018) (listing cases). And this argument does not conflict with the arguments of the United States urging dismissal of the FTCA claims, Opp. at 23, because the special factors inquiry focuses on whether an alternative process exists, not whether a particular plaintiff may prevail. MTD at 23–24.

**C.  Other Special Factors Counsel Hesitation.**

*1.  The "Conduct" Plaintiffs Challenge is the Creation of Policy.*

The premise running throughout Plaintiffs' arguments is that they are challenging Defendants' *conduct*, not government policy. Opp. at 27–29. Plaintiffs contend they cannot be challenging government policy because administration officials denied the existence of any "family separation" policy. *Id.*[17] But as Plaintiffs themselves say, at this point, the parties are bound by the allegations in the FAC, and the FAC alleges a "pattern, practice, or custom," FAC ¶¶ 290, 300, 309, 317, 326, of "widespread family separations." *Id.* ¶ 9. Plaintiffs cannot evade the repeated statements of the Supreme Court precluding *Bivens* remedies for constitutional challenges to government or agency-wide policy by substituting in the words "pattern, practice, or custom" for "policy."[18]

In any event, Plaintiffs' argument is based on an illusory distinction between Defendants' "conduct" and government "policy." Defendants were high-ranking policymakers. Plaintiffs do not allege that they were separated due to the acts of some lone officer failing to follow the rules. To the contrary, the "conduct" Plaintiffs challenge was the creation (purportedly by Defendants) of the rules themselves – national immigration and related prosecutorial policy (allegedly to deter immigration from particular countries). Numerous other facets of the FAC make it clear that Plaintiffs are suing over federal policy, regardless of what they now try to label it. *See, e.g.*, FAC ¶ 274 (proposing class of "thousands of children"); *id.* ¶ 147 (alleging plans to separate families "all along the southern border"); *id.* ¶¶ 27–38, 40–42 (suing Defendants for their roles as agency heads,

---

[17] The fact that officials disclaim the existence of *a particular* policy does not mean the government had no policies related to the alleged conduct. For example, the FAC alleges that the Department of Justice had a policy of prosecuting DHS referrals of § 1325(a) violations. FAC ¶¶ 160–64.

[18] Plaintiffs' suggestion that discovery may be needed to determine whether they challenge policy, Opp. at 28 n.15, is meritless. Defendants take as true Plaintiffs' non-conclusory factual allegations. No further factual elaboration is needed, or permissible, "[u]ntil th[e] threshold immunity question is resolved." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

rather than line-level officers); *id.* ¶¶ 9, 125, 142, 241 (alleging family separation aimed at deterring entire populations from regions and countries).[19]

Labels aside, the underlying claims implicate the exact concerns discussed by the Supreme Court in *Abbasi* and *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994), as precluding a non-statutory damages remedy. In *Meyer*, the Court declined to create a *Bivens* action against a federal agency because doing so would involve decisions about federal fiscal policy and end-run the government's sovereign immunity. 510 U.S. at 486. In *Abbasi*, the Court again declined to create a *Bivens* action against high-ranking government officials, noting "[e]ven if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy." 137 S. Ct. at 1860. Such an inquiry would require "that the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question" – an unacceptable result.[20] *Abbasi*, 137 S. Ct. at 1860–61. Plaintiffs also attempt to distinguish their case from *K.O.* v. *U.S. ICE*, 468 F. Supp. 3d 350 (D.D.C. 2020), *Peña Arita* v. *United States*, 470 F. Supp. 3d 663 (S.D. Tex. 2020), and *Mejia-Mejia v. U.S. ICE*, No. CV 18-1445 (PLF), 2019 WL 4707150 (D.D.C. Sept. 26, 2019), by claiming that they are not challenging "policy." But those decisions each rejected the same argument. *Id.* at *4; *K.O.*, 468 F. Supp. 3d at 365; *Pena Arita*, 470 F. Supp. 3d at 697. Plaintiffs offer no principled reason why their claims must not be rejected too. All of the concerns counseling hesitation

---

[19] Conversely, if Plaintiffs are not alleging that Defendants participated in the creation of some policy, then dismissal is required because they have failed to adequately allege that Defendants did anything. MTD at 55 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

[20] *Abbasi*'s national security considerations do not distinguish it. *See* Opp. at 28. As discussed below, Section III.C.3, this case involves national security. But, more fundamentally, the line of *Bivens* cases that lead to *Abbasi*'s "policy" discussion extends beyond the national security context. *See Meyer*, 510 U.S. at 473–74 (savings and loan officer suing banking agency); *Malesko*, 534 U.S. at 63 (prisoner suing private prison).

1  in creating a *Bivens* action against federal policymakers are present here, regardless of how

2  Plaintiffs recast their claims.[21]

3              2.  *Congressional Action in this Arena Counsels Hesitation.*

4              Plaintiffs argue that this Court should ignore Congress' extensive activity in the

5  immigration arena because Congress has not made an "explicit declaration" that it

6  "intended to bar a *Bivens* remedy." Opp. at 30. But no such explicit declaration is needed

7  to counsel hesitation (although it would certainly bar an implied remedy). It is enough that

8  congressional action has been "frequent and intense" and Congress has not created a

9  damages remedy. *Abbasi*, 137 S. Ct. at 1862 (quoting *Schweiker*, 487 U.S. at 413).

10            Plaintiffs' efforts to downplay Congress' actions do not hold water. Many statutes

11  have been enacted recently in immigration and border enforcement, including laws to

12  address the custody and care of minor children, *see* MTD at 2–6, 26–29. In fact, Congress

13  passed additional laws in response to the very separations Plaintiffs propose for class-based

14  relief, including laws to address the mental health needs of such children. MTD at 28–29.

15  Additional laws have been proposed, MTD at 29, and are probative here. *Meyer*, 510 U.S.

16  at 486 n.11 (citing proposed legislation). Congress' interest in custodial care of minor

17  children and immigration enforcement, including the particular decisions challenged here,

18  has been "frequent and intense." *Schweiker*, 487 U.S. at 425–26 (Congressional interest

19  "frequent and intense" where Congress enacted reform legislation on *two* occasions); *see*

20  *Tun-Cos*, 922 F.3d at 527 (discussing "Congress's legislative actions" in the immigration

21  area and declining to extend *Bivens*). Although Plaintiffs argue that only congressional

22  activity *after* the alleged events take place can counsel hesitation, precedent confirms the

23  opposite. *See, e.g.*, *Bush*, 462 U.S. at 381–90 (discussing long history of Congressional

24  action in the area before declining to imply a *Bivens* remedy); *Tun-Cos*, 922 F.3d at 526

25  (same). *Abbasi* does not support Plaintiffs' contentions and, in fact, also relied on the types

26  _____

27  [21] *Cf. Tun-Cos v. Perrotte*, 922 F.3d 514, 527 (4th Cir. 2019) (rejecting similar attempt to

28  recast allegations (by amendment) where purpose was "to avoid this very discussion").

of non-legislative congressional oversight that Plaintiffs urge this Court to ignore. *See* Opp. at 30–31; *Abbasi*, 137 S. Ct. at 1862 (Inspector General report evidenced Congress' interest).[22] And *Abbasi* also rejected the same reasoning Plaintiffs now rely on regarding Congressional silence. *Compare* 137 S. Ct. at 1862 ("This silence is notable because it is likely that high-level policies will attract the attention of Congress.") *with* Opp. at 31–32.

### 3. Plaintiffs' Claims Implicate National and Border Security.

Plaintiffs contend that national security and foreign policy concerns do not counsel hesitation here and that the cases relied upon by Defendants are "far afield" because they involve different concerns, such as "fighting terrorism or addressing foreign espionage." Opp. at 32–33. Plaintiffs' generalization ignores Defendants' on-point cases addressing the specific special factor present in this case. *Hernandez*, 140 S. Ct. at 746; *K.O.*, 468 F. Supp. 3d 350; *see also Tun-Cos*, 922 F.3d at 526. Each of those cases involved core immigration enforcement. In any event, the kinds of national security concerns highlighted by Plaintiffs cannot be so easily divorced from the immigration arena writ large. *See* MTD at 31 (quoting *Mirmehdi*, 689 F.3d at 982).

Plaintiffs' attempt to distinguish *Hernandez* likewise falls flat. Plaintiffs claim that *Hernandez* is distinguishable because the harm in that case occurred on foreign soil, whereas the harm here occurred in the Nation's interior. Opp. at 33. But Plaintiffs' reasoning muddles together the special factors identified by *Hernandez*. *Hernandez* recognized that the international nature of that case was itself one special factor counselling hesitation, but the Court also recognized border security considerations as a *separate* factor. *Compare Hernandez*, 140 S. Ct. at 745–47 (discussing national and border security implications of "conduct of agents at the border" (Section III.C)) *with id.* at 744–45 (discussing foreign policy implications of the "international incident" (Section III.B)) *and*

---

[22] As in *Abbasi*, "at Congress' behest" and on their own initiative, Inspectors General of multiple departments have compiled reports on the government's alleged family separation practices. *Abbasi*, 137 S. Ct. at 1862; *see, e.g.*, FAC ¶¶ 16, 196; Department of Justice Office of Inspector General, Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services, OIG-21-028 (January 2021).

1  *id.* at 747–49 (discussing Congressional action and inaction for "persons injured by . . .

2  Government officers . . . abroad" (Section III.D)). The point is not that all of these concerns

3  are not connected, but rather that the risk of judicial interference with government agents

4  at the border is an *independent* factor counselling hesitation before extending *Bivens*.

5      As explained in Defendants' principal brief, decisions respecting whether and how

6  to detain those who enter the United States go hand in hand with securing the border itself.

7  MTD at 30–31. As in *Hernandez*, much of the alleged government conduct here was taken

8  by CBP officers at or near the international border. *See* FAC ¶ 1 (stating that this "action

9  seeks damages" for conduct "in Arizona and at other places along the United States'

10  southern border by the U.S. government."). Indeed, the FAC is replete with alleged

11  government conduct along the southern border. *See, e.g.*, *id.* ¶¶ 8, 47, 56, 63, 125, 129,

12  130, 135, 141–145, 147, 151, 153–155, 162, 167, 200, 216, 227, 236. The fact that the

13  minor plaintiffs may have been ultimately housed in facilities elsewhere, Opp. at 33, does

14  not change the fact that the creation of the cause of action Plaintiffs seek would interfere

15  with the political branches primacy in securing the border. *See* MTD at 31–32.

16      *4.  Plaintiffs Challenge Prosecutorial Policy.*

17      Plaintiffs say they do not challenge prosecutorial policymaking. Opp. at 33. That

18  statement is contradicted by the FAC and, if true, would mean many (if not all) of the

19  Defendants have no connection to the alleged separations. In fact, the FAC alleges that

20  separations occurred because the government allegedly referred the adult Plaintiffs for

21  prosecution. FAC ¶¶ 162–64. Plaintiffs' claims thus implicate separation-of-powers

22  concerns related to the Executive's power to enforce the laws. *See* MTD at 35–36.

23      *5.  Expanding* Bivens *Here Would be Unworkable.*

24      Defendants have explained in detail why the proposed remedy here is unworkable.

25  MTD at 36–38. Plaintiffs respond by arguing that allowing a claim here would not open

26  the floodgates of litigation or cause undue financial burdens on the individual defendants,

27  and that the class vehicle would mitigate those concerns in any event. Opp. at 34. Plaintiffs

28  are incorrect and fail to distinguish Defendants' points and authorities on this issue.

Plaintiffs contend that the courts' experience with Section 1983 suits demonstrates that there will be no "deluge" of cases if the Court extends *Bivens* here. Opp. 34. But the Court need not have epistemic certainty that there will be such a deluge of litigation in order to exercise "caution" before extending *Bivens*. *Hernandez*, 140 S. Ct. at 742; *see also Ahmed v. Weyker*, No. 18-3461, 2020 WL 7637930, at *5 (8th Cir. Dec. 23, 2020) ("It may well be that the costs are worth it, but Congress is better equipped than we are to make the call."). And Plaintiffs' argument rests on a false comparison. There is no federal analog to Section 1983, *Abbasi*, 137 S. Ct. at 1854, and there is no analog to federal immigration enforcement in the Section 1983 context. As Defendants have demonstrated, there is every reason to believe that *Bivens* suits could proliferate in the immigration context. MTD at 37.

Plaintiffs argue that an individual-capacity action will not unduly burden federal officials because individual defendants may seek indemnification. But indemnification is discretionary, *see* 28 C.F.R. § 50.15(a)(8)(iii), and would be decided by an administration perhaps years from now after liability (hypothetically) is established. More fundamentally, Plaintiffs cannot use *Bivens* as an end-run around sovereign immunity. *See generally Meyer*, 510 U.S. at 484–86. Plaintiffs focus exclusively on potential monetary costs to individual defendants, but do not dispute that creating a *Bivens* remedy here would place additional "burdens to the judiciary" and government. *Mack v. Yost*, 968 F.3d 311, 324 (3d Cir. 2020) (noting practical concerns); *see* MTD at 35–36. Although Plaintiffs contend that a class action will alleviate the torrent of claims that (they implicitly concede) would result from extending *Bivens* here, the issue is not simply the number of suits, it is the impact of class-wide relief for nation-wide policymaking against individual actors. As Defendants have noted, MTD at 38, class actions are intrinsically ill-suited to *Bivens* actions, which must be brought against officials for their "own individual actions." *Iqbal*, 556 U.S. at 676.

And there are many other hazards of extending *Bivens* here which Plaintiffs do not dispel: chilling national policymaking, the broad and diverse scope of government action challenged, the massive number of claims, and the difficulty of determining policymakers' subjective motives. MTD 36–38; *see also Matthews v. United States*, No. CV 18-04096-

20

DLR (DMF) (D. Ariz. Apr. 9, 2020) (discussing workability concerns while denying extension of substantive due process claim). The Supreme Court has not created *Bivens* remedies in cases where multiple defendants, in arenas subject to different standards and mandates, are sued for a broad-reaching course of conduct. In fact, the only three Supreme Court cases ever allowing *Bivens* actions to proceed are notably uniform in their simplicity, with allegations of discrete constitutional violations by discrete individuals against a single plaintiff. *Bivens*, 403 U.S. at 389 (entry into and search of apartment and manacling); *Davis*, 442 U.S. at 230 (firing on the basis of sex); *Carlson*, 446 U.S. at 16 n.1 (failing to treat asthma). The action Plaintiffs propose could not be more ill-suited to a *Bivens* remedy.

## III. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS

### A. Plaintiffs Do Not Allege A Clearly Established Constitutional Violation.

Defendants are entitled to qualified immunity for all of Plaintiffs' claims. MTD at 41–59. Plaintiffs disagree, arguing it was "obvious" that Defendants' alleged conduct was unlawful and that "the case law has long been settled with respect to Plaintiffs' Fourth and Fifth Amendment claims." Opp. at 36. In so urging, Plaintiffs rely on disparate legal principles from a variety of contexts and ask the Court to hold (for the first time) that the law is clearly established. Such an effort cannot, by definition, show the law is clearly established. *See Walker v. Gomez*, 370 F.3d 969, 977–78 (9th Cir. 2004) ("[Plaintiff] has not brought to our attention . . . case law involving the particular circumstances presented by this case. . . . It is insufficient that the broad principle underlying a right is well-established."). Contrary to Plaintiffs' assertions, Opp. at 35 n.17, specificity is required for all of their claims, including equal protection. *Walker*, 370 F.3d at 978. Furthermore, district court and out-of-Circuit cases from dissimilar contexts cannot form the basis of clearly established law or a "consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); MTD at 45. But reliance on such cases infects *all* of Plaintiffs' qualified immunity arguments under any amendment. Opp. 36–52.

Nor does the dicta in *Hope v. Pelzer*, 536 U.S. 730 (2002), clearly establish the parameters of permissible or impermissible government activity in novel contexts such as immigration and prosecutorial discretion, where government interests are at their apex, and subsequent decisions make clear that particularity remains central to the immunity analysis. *See, e.g.*, *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (collecting recent Supreme Court cases).[23] Plaintiffs' reliance on the Court's *per curiam* decision in *Taylor v. Riojas*, 141 S. Ct. 52 (2020), is similarly misplaced. *Taylor* involved actions by prison officers who allegedly subjected an inmate to "shockingly unsanitary cells." *Id.* at 53. The law is thick with precedent demonstrating that such conduct by line level prison officials can be unconstitutional, even if there was not precedent to match the specific conditions involved. *Id.* at 54. And *Taylor* did not involve the sort of high-level planning and judgment at issue here, let alone the difficult public-policy balancing necessary in the area of immigration enforcement. *See generally* FAC ¶¶ 125–258.

As explained in Defendants' principal brief, MTD at 41–59, no precedent existed to put the Defendants on notice they could be personally liable for creating government policies to: (1) refer all 8 U.S.C. § 1325(a) offenders for prosecution, *see* FAC ¶ 160; (2) prosecute those offenders, *see id.* ¶¶ 162–64; (3) classify the children of those referred for prosecution as unaccompanied, *see id.* ¶¶ 58, 202, 229, 233; (4) follow the terms of the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), *see id.* ¶ 60; or (5) take all of those actions simultaneously. Regardless of the constitutional theory, Plaintiffs make the "classic" qualified immunity errors of either defining the rights at issue too generally or relying on caselaw post-dating the conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts—and the Ninth Circuit in particular . . . not to define clearly established law at a high level of generality."). Having failed to

---

[23] Plaintiffs do not respond to Defendants' arguments regarding personal participation. MTD 55–57. Plaintiffs thus do not dispute that Morgan and Albence are not alleged to have taken any action and must be dismissed, and that the remaining claims should be narrowed to actions taken while Defendants were in their official positions. *Iqbal*, 556 U.S. at 676.

identify a single pre-conduct case addressing the situation confronted by Defendants here under any constitutional theory, Plaintiffs fail to demonstrate the violation of *any* clearly established constitutional right, whether arising from the Fourth or Fifth Amendments.[24] Therefore, Defendants are entitled to qualified immunity on all constitutional claims.

And although the burden is on Plaintiffs to put forward case law showing that the law was clearly established, Plaintiffs also fail to distinguish the cases relied on by Defendants. MTD 41–55. In the equal protection context, Plaintiffs urge that this case is wholly dissimilar to *Dep't of Homeland Sec.* v. *Regents of the Univ. of California*, 140 S. Ct. 1891 (2020), despite Plaintiffs' reliance on the same disparate impact theory and the exact same statements at issue in *Regents*. *See* MTD at 51–52. The two statements Plaintiffs rely on to establish discriminatory animus, Opp. at 48, do not further their argument. The first is made by an unnamed, line-level officer in a context disconnected from the action of any named Defendant, FAC ¶ 79, and the second, attributed to Defendant Kelly, in no way shows animus or even mentions Central Americans, *id.* ¶ 253.[25] While Plaintiffs (in conclusory fashion) assert that Defendants "targeted" Central Americans, FAC ¶¶ 320–28, all of Plaintiffs' *factual* allegations speak only to the creation of generally-applicable policies. *See, e.g.*, *id.* ¶¶ 135–42, 157–66. The zero-tolerance prosecution policy, for

---

[24] *See, e.g.*, Opp. at 36–37 (citing cases from disparate contexts for overarching "right to family integrity"); *id.* at 37 (post-conduct cases); *id.* at 38 (inapplicable exigent circumstances cases); *id.* at 40 (cases for broad propositions regarding right to medical care); *id.* at 41–42 (general and post-conduct cases about punishing detainees); *id.* at 43 (general cases about parental rights); *id.* at 45–47 (cases for high-level equal protection rights); *id.* at 51 (Fifth, rather than Fourth, Amendment case).

[25] Even on its face, the cited statement plausibly can be read to voice legitimate concerns. *See Iqbal*, 556 U.S. at 682 (inferring an "obvious alternative explanation" rather than "purposeful, invidious discrimination"). In any event, Plaintiffs selectively edit the quote from Defendant Kelly. *Compare* FAC ¶ 253 *with* Transcript: White House Chief Of Staff John Kelly's Interview With NPR (May 11, 2018), *available at* https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr. Plaintiffs incorporate this interview by reference in their complaint, FAC ¶¶ 217, 253. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (allowing courts to consider "documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment"). In context, it is even clearer that Kelly is not speaking specifically about Central Americans and that the statement contains no animus toward the group he mentions (illegal entrants).

example, applied to people of any nationality. *Id.* ¶ 160. And ample justification existed for targeting immigration enforcement along the southern border. MTD at 52. Finally, *Regents* need not be "binding," Opp. at 48, in order for the decision to show that the law in this area was not "clearly established," as the four-Justice plurality and eight-Justice holding show. *See* MTD at 47 (quoting *Wilson*, 526 U.S. at 618). In any event, *Regent's* reasoning has been adopted by the Ninth Circuit, which certainly is "binding" on this Court and plainly supports dismissal of Plaintiffs' equal protection claim on immunity grounds. *See* MTD at 51 n.25.

### B. Plaintiffs Do Not Allege A Clearly Established Statutory Violation.

Plaintiffs contend that they have alleged a "conspiracy" and that Defendants are not otherwise entitled to qualified immunity. Opp. at 52–59. Plaintiffs are wrong. Plaintiffs' argument that they can overcome qualified immunity for their *statutory* claims by showing that Defendants violated their clearly established *constitutional* rights, Opp. at 56–57, is wholly without merit.[26] Federal employees are entitled to qualified immunity where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That means – as the Supreme Court and this Circuit have held with respect to the very statute at issue here (42 U.S.C. § 1985(3)) – if the law is unclear with respect to *either* the application of a statute *or* a relevant constitutional provision, qualified immunity bars suit. *See Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1059 (9th Cir. 2020) (citing *Abbasi,* 137 S. Ct. at 1866) ("*Abbasi* makes clear that intracorporate liability was not clearly established at the time of the events in this case and that the Agent Defendants are therefore entitled to qualified immunity from liability under § 1985(3)."). Contrary to Plaintiffs' interpretation, Opp. at 57–58, *Abbasi* held that the defendants there would be entitled to qualified immunity on the § 1985(3) claim even if the underlying constitutional

---

[26] Even if true, such a theory would be unavailing for the distinct reason that Plaintiffs fail to allege discriminatory animus or the violation of any clearly established equal protection right or liberty interest. *See* MTD at 41–44 (lack of clearly established right to be detained with family); *id.* at 48–51 (equal protection claims); *id.* at 57 (listing § 1985(3) elements).

allegations were otherwise well pleaded, because it was not clear whether the conspiracy element of § 1985(3) had been met. 137 S. Ct. at 1869. Similarly, in *Fazaga*, rather than decide if the FBI agents violated the First or Fifth amendments, 965 F.3d 1015, 1060, the Ninth Circuit asked whether "the Agent Defendants could reasonably have known that agreements entered into or agreed-upon policies devised with other employees of the FBI could subject them to conspiracy liability under § 1985(3)." *Id.* The court held they could not. *Id.* Although Plaintiffs characterize the reasoning of *Abbasi* and *Fazaga* as "def[ying] logic," Opp. at 57, these cases are binding and their principles sound.[27] Allowing Plaintiffs to bypass immunity where their allegations fail to satisfy a necessary statutory or constitutional element in a way that is clearly established would deprive officers of the "fair notice" that qualified immunity requires. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Plaintiffs' main contention is that Defendants can be said to have conspired together because they "are employees of a variety of different government agencies." Opp. at 54. Plaintiffs say that "[t]he Supreme Court has not extended the [intracorporate conspiracy] doctrine to civil rights claims" and assert (incorrectly) that courts "have speculated that, at most, the doctrine" might apply to actions taken within a single government agency. Opp. at 55; *but see K.O.*, 468 F. Supp. 3d at 370 (holding that the intracorporate-conspiracy doctrine might apply to communications between government departments).[28] But

---

[27] Unlike in *Keates* v. *Koile*, 883 F.3d 1228 (9th Cir. 2018), the question here is not whether Defendants were "aware of the precise theory of . . . liability," Opp. at 59, such as whether Plaintiffs' well-established rights are properly housed in one constitutional amendment or another. There is only one potential source of Plaintiffs' statutory claims: § 1985(3). Plaintiffs' reliance on *Reynaga Hernandez v. Skinner*, 969 F.3d 930 (9th Cir. 2020), Opp. 56–57, is similarly misplaced. *Reynaga* does note the uncertainty about which causation standard applied there, but the decision's qualified immunity analysis does not depend on the answer to that question. In fact, its qualified immunity analysis does not even mention or discuss the fact that the causation standard is unclear. Indeed, it would make no sense to engage in such an inquiry because the court ultimately held that "[u]nder either standard of causation" the defendant would be liable. *Reynaga*, 969 F.3d at 942. The same cannot be said here, because if the intracorporate conspiracy doctrine applies (and it either does or the law is unclear) Defendants cannot be liable under Section 1985(3). MTD at 57–59.

[28] Plaintiffs' attempt to distinguish *K.O.*, a nearly identical case, is meritless. Though

1   Plaintiffs carry the burden to show that their § 1985(3) rights were clearly established at

2   the time of Defendants' actions, *see Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938,

3   946 (9th Cir. 2017), not the reverse. And in light of *Abbasi*, Plaintiffs cannot meet that

4   burden. In other words, given *Abbasi* – which is largely on all fours here – it is Plaintiffs'

5   burden to cite controlling case law (or a "robust consensus" of persuasive authority), *D.C.

6   v. Wesby*, 138 S. Ct. 577, 591 (2018), that the intracorporate conspiracy doctrine is clearly

7   inapplicable in the context pled – specifically, that an alleged agreement between multiple,

8   high-level employees of the Executive Branch (including White House officials) can

9   constitute a conspiracy for § 1985(3) purposes.

10          To carry their burden, Plaintiffs cite two unpublished, out-of-circuit district court

11   opinions for the proposition that the intracorporate conspiracy doctrine does not apply "in

12   cases involving multiple federal agencies." Opp. at 58 (citing *Ali v. Raleigh Cnty.*, No.

13   5:17-cv-3386, 2018 WL 4101517 (S.D.W. Va. Aug. 28, 2018) and *Bailey v. Pataki*, No.

14   1:08-cv-8563, 2010 WL 4237071 (S.D.N.Y. Oct. 26, 2010)). But two out-of-circuit district

15   court decisions cannot clearly establish a proposition of this nature for qualified immunity

16   purposes. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Additionally, *neither* of

17   those decisions involved federal agencies or even suits against individual federal

18   employees and thus are not sufficiently context-specific. *Wesby*, 138 S. Ct. at 590 (quoting

19   *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)) ("The 'clearly established'

20   standard also requires that the legal principle clearly prohibit the officer's conduct in the

21   particular circumstances before him. . . . This requires a high 'degree of specificity.'"). *Ali*

22   post-dated the conduct here and involved multiple different governments (the *state* police,

23   *county* sheriff, and *city* police), not the single government at issue here. 2018 WL 4101517,

24   at *11. *Bailey* noted, moreover, that the law in this "area is far from settled" and declined

25

26   Plaintiffs now argue that "Defendants were not performing their ordinary course duties,"
     Opp. at 55 n.27, the FAC specifically alleges that at all times Defendants acted "within the
27   scope of their office or employment" FAC ¶ 26, exactly as in *K.O.*, 468 F. Supp. 3d at 369
     ("Another good reason to think the intracorporate-conspiracy doctrine might apply here is
28   that Plaintiffs recognize that every Defendant . . . acted within the scope of his or her
     employment."). While not binding, Opp. at 58, *K.O.* is directly on point.

to apply the intracorporate conspiracy doctrine to a claim involving multiple state agencies on summary judgment, while noting that the question may be "revisited at trial depending on how the conspiracy claims are presented to the jury." 2010 WL 4237071, at *5. Not only is Plaintiffs' case law legally insufficient to clearly establish a proposition for qualified immunity purposes, in the analogous context of alleged conspiracies among multiple state, city, or local government departments, the vast majority of courts have applied the intracorporate conspiracy doctrine to bar claims.[29]

---

[29] *See, e.g.*, *K.O.*, 468 F. Supp. 3d at 369 (listing cases); *Steele v. Rochester City Police Dep't*, No. 6:16-CV-06022-MAT, 2016 WL 1274710, at *4 (W.D.N.Y. Apr. 1, 2016) ("The conduct alleged here falls squarely within the bounds of the intracorporate conspiracy doctrine, because Plaintiff complains of harm caused by the employees of two City agencies, RPD and RAS, acting solely within the scope of their employment."); *Ezell v. Wells*, No. 2:15-CV-00083-J, 2015 WL 4191751, at *18 (N.D. Tex. July 10, 2015) (distinguishing "outlier" decision that declined to apply intracorporate conspiracy doctrine ("ICC") where multiple city departments were involved); *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 519 (S.D.N.Y.), *on reconsideration in part*, 133 F. Supp. 3d 563 (S.D.N.Y. 2015) (applying ICC to an agreement between the New York Fire Department and Police Department); *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1075 (D. Ariz. 2012), *aff'd sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013) (county sheriff and county attorney); *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131, 157 (E.D.N.Y. 2011), *amended*, No. 08 CV 2876 DRH AKT, 2011 WL 5156340 (E.D.N.Y. Oct. 28, 2011) ("Here, all of the individual defendants are employees of the same entity: the Town of Southampton. It matters not that they hail from different departments within the Town's governing structure; they are still covered by the doctrine and therefore any claims that they conspired amongst themselves necessarily fails."); *McEvoy v. Spencer*, 49 F. Supp. 2d 224, 226 (S.D.N.Y. 1999) (noting that it "is of no . . . moment" that the individual defendants "work for different departments of the City"); *Allen v. City of Chicago*, 828 F. Supp. 543, 564 (N.D. Ill. 1993) (applying ICC to mayor, a city commissioner, and members of the city council); *see also Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (city, city fire chief, and city manager); *Coker v. State of Alabama*, No. 516CV00891KOBTMP, 2016 WL 4492833, at *1 (N.D. Ala. July 1, 2016), *report and recommendation adopted sub nom.*, 2016 WL 4479921 (N.D. Ala. Aug. 25, 2016) (state, state Department of Corrections, state Board of Pardons and Paroles, and members of the Board); *Molina v. Brown Cnty.*, No. 6:13-CV-048-C, 2015 WL 11143472, at *4 (N.D. Tex. Mar. 17, 2015), *aff'd*, 616 F. App'x 163 (5th Cir. 2015) (county elections administrator, county judge, and county attorney); *Britt v. Jackson Cty., Miss.*, No. 1:11-CV-00074-HSO, 2012 WL 2460534, at *1 (S.D. Miss. June 27, 2012) (county board of supervisors, tax assessor, and tax assessor employee); *York v. Riley*, No. 2:09CV1163-MEF, 2010 WL 3034655, at *2 (M.D. Ala. July 15, 2010), *report and recommendation adopted*, No. 2:09CV1163-MEF, 2010 WL 3038321 (M.D. Ala. Aug. 3, 2010) (governor, director of state unemployment & claims, director of state department of revenue, and state attorney general); *Santulli v. Town of Brookhaven*, No. 08-CV-1355 (TCP), 2009 WL 10709085, at *1 (E.D.N.Y. Sept. 16, 2009) (town, fire marshals, code inspector, assistant town attorney); *Jackson v. Signh*, No. CIV. A. H-06-2920, 2007 WL 2818322, at *1 (S.D. Tex. Sept. 25, 2007) (city, city controller, city controller staff, and senior assistant city attorney).

27

Originally a principle of antitrust law, the intracorporate conspiracy doctrine has been applied to civil rights cases by a majority of circuit courts of appeals. *See Fazaga*, 965 F.3d at 1060 n.41 (discussing the split in circuits). As explained in *Abbasi*, the logic of the doctrine is simple:

> Conspiracy requires an agreement . . . between or among two or more separate persons. When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people.

137 S. Ct. at 1867 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). The doctrine applies to "coordinated activity" between corporate divisions, "autonomous units," or even wholly-owned subsidiaries. *Copperweld*, 467 U.S. at 771–73. The exact form of the corporation is irrelevant. *Id.* at 772. The hallmarks of the doctrine are common purpose and, more critically, "control." *Id.* at 771–72. As Defendants demonstrated, MTD at 58–59, alleged coordinated action between the White House, Cabinet officials, and their high-level subordinates in forming national policy simply cannot, consonant with constitutional structure, be labeled a "conspiracy." Indeed, "the very notion of an 'agreement' . . . between" the White House and Cabinet officials "lacks meaning." *Copperweld*, 467 U.S. at 771. Executive departments are not vested with independent constitutional authority or "persona" that could "agree" to joint action with the Executive: they are a "subdivision of the power of the Executive . . . for the more convenient exercise of that power." *United States v. Germaine*, 99 U.S. 508, 510–11 (1878). Even if there are "disagreements" between agents of the Executive, the Executive "may assert full control at any moment." *Copperweld*, 467 U.S. at 771–72; *see* MTD at 59.

Indeed, as explained in Defendants' principal brief, the authority of the Executive in the immigration enforcement arena has been painstakingly (if not perfectly) defined by Congress. MTD at 2–6 (discussing the Homeland Security Act, INA, and TVPRA). Congress has chosen to vest responsibility over immigration matters in multiple Executive Departments, including (as relevant here) the Departments of Justice, Homeland Security,

and Health and Human Services. The leadership and ultimate control of these departments rests in a single head, the President, who has the power to appoint and remove the leaders of those departments. *See* 28 U.S.C. § 503 (Justice); 6 U.S.C. § 112 (Homeland Security); 42 U.S.C. § 3501 (Health and Human Services). Coordination between these department heads and their subordinates in the creation of national policy, particularly when White House involvement is alleged, *see* FAC ¶¶ 29–30, 125, 127, 148, 154, 169–70, 241, must be understood as the action of a single entity, the Executive Branch, rather than a conspiracy between "two or more persons." 42 U.S.C. § 1985(3).

And, as discussed in *Abbasi*, "other sound reasons" also counsel against a holding that § 1985(3) clearly applies to "conversations and agreements between and among federal officials." 137 S. Ct. at 1868. These sound reasons include encouraging "open discussion among federal officers" and "[c]lose and frequent consultations to facilitate the adoption and implementation of policies," which are both "essential to the orderly conduct of governmental affairs." *Id.* True, *Abbasi* itself involved actions of a cabinet official (the Attorney General) and heads of sub-agencies (the FBI and former INS), but if anything, these "sound reasons" are even more important where, as here, the alleged agreement took place between various high-level Executive officials at the direction of the White House. *See* 137 S. Ct. at 1868 (noting the chilling effect on policymaking if discussions between government policymakers could be the basis for individual-capacity damages actions); *K.O.*, 468 F. Supp. 3d at 369 (noting the need for "the Attorney General to be able to have [frank and open] conversations with White House officials.").[30] For all of these reasons, Plaintiffs' § 1985(3) and § 1986 claims must be dismissed.

## IV.   PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY

Plaintiffs argue that none of the Defendants is entitled to absolute immunity because neither the initial separation nor subsequent refusal to reunite was intimately associated

---

[30] Indeed, one of the purposes of the Homeland Security Act of 2002, which delegated the relevant authority here between DHS and HHS, was to foster communication between "parts of government." H.R. Rep. No. 107-609, at 63 (2002).

with the judicial phase of the criminal process. Opp. at 59–60. But the FAC itself states that at least some of the separations were caused by the United States' prosecuting Plaintiffs or referring them for prosecution. FAC ¶¶ 162–64. The core activity protected by absolute prosecutorial immunity is the decision to initiate a prosecution. *See Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). To the extent Plaintiffs allege that former Attorney General Sessions, or any other Defendant, announced the prioritization of a class of criminal offenders, that decision is protected by absolute immunity. *See Dellums v. Powell*, 660 F.2d 802, 806 n.13 (D.C. Cir. 1981) (explaining that the Attorney General is entitled to absolute immunity for issuing general instructions to initiate prosecutions); FAC ¶ 160.

## CONCLUSION

Defendants respectfully request that the Court dismiss the FAC with prejudice.

Dated this 5th day of February, 2021.

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director
Torts Branch, Civil Division

MARY HAMPTON MASON
Senior Trial Counsel, Torts Branch

*/s/ Paul Quast*
PAUL QUAST

*Counsel for the Individual Defendants*

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by means of the District Clerk's CM/ECF electronic filing system on February 5, 2021.

*/s/ Paul Quast*
Paul Quast